

CUMMINGS · McCLOREY

DAVIS & ACHO , P.L.C.

ATTORNEYS AND COUNSELORS AT LAW

2851 CHARLEVOIX DRIVE, S.E., SUITE 327 • GRAND RAPIDS, MICHIGAN 49546 • PHONE: (616) 975-7470 • FACSIMILE: (616) 975-7471

Curt A. Benson
cbenson@cmda-law.com

August 31, 2018

J. Nicholas Bostic
Bostic & Associates
909 N. Washington Ave.
Lansing MI  48906

John G. Fedynsky
Assistant Attorney General
Michigan Dept. of Attorney General
525 W. Ottawa Street
P.O. Box 30736
Lansing, MI  48909

RE:   Antol v Adam Dent, et al.
      Case No. 1:17-cv-00613
      Our File No. 106813

Gentlemen:

Enclosed please find Defendants Dent, Straus, Bringedahl and Kutches' Motion for Summary Judgment and supporting brief.  Thank you.

Very truly yours,

CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.

Curt A. Benson

CAB:dbr
Enclosures

00668881-1

CLINTON TOWNSHIP, MI • GRAND RAPIDS, MI • LIVONIA, MI • TRAVERSE CITY, MI
KANSAS CITY, MO • RIVERSIDE, CA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

ANTOL, DEREK, individually and as
next friend for DSAII, a minor, DEVON
S. ANTOL and TRYSTON ANTOL,

     Plaintiffs,                 Case No. 1:17-cv-613

v.                                 HON. JANET T. NEFF

ADAM DENT, KATE STRAUS, CASEY
BRINGEDAHL, CASEY TRUCKS, and
PETE KUTCHES,

     Defendants.

---

J. Nicholas Bostic (P40653)
Attorney for Plaintiffs
909 N. Washington Ave.
Lansing MI  48906
517-706-0132
barristerbostic@att.net

John G. Fedynsky (P65232)
Adam Sadowski (P73864)
Patrick Stephen Myers (P81444)
Assistant Attorney General
Michigan Dept. of Attorney General
Attorney for Defendant Casey Trucks
525 W. Ottawa Street
P.O. Box 30736
Lansing, MI  48909
517-373-6434
FedynskyJ@michigan.gov
sadowskia@michigan.gov
myersp@michigan.gov

Allan C. Vander Laan (P33893)
Curt A. Benson (P38891)
Bradley C. Yanalunas (P80528)
Cummings, McClorey, Davis & Acho
Attorneys for Defendants Dent, Strauss,
Bringedahl and Kutches
2851 Charlevoix Dr., S.E. - Suite 327
Grand Rapids MI  49546
616-975-7470
avanderlaan@cmda-law.com
cbenson@cmda-law.com
byanalunas@cmda-law.com

---

**BRIEF IN SUPPORT OF DEFENDANTS DENT, STRAUS, BRINGEDAHL
AND KUTCHES' MOTION FOR SUMMARY JUDGMENT**

**\*\*\* ORAL ARGUMENT REQUESTED \*\*\***

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ............................................................................................iii

INTRODUCTION ......................................................................................................... 1

CONCLUSION ...........................................................................................................12

# INDEX OF AUTHORITIES

## CASES

*Hale v. Kart*
396 F.3d 721, 725 (6th Cir. 2005) ......................................................... 9

*Harlow v. Fitzgerald*
457 U.S. 800, 818 (1982) ................................................................. 12

*Livermore ex rel. Rohm v. Lubelan*
476 F.3d 397, 403 (6th Cir. 2007) ....................................................... 12

*Los Angeles County, California v. Rettele*
550 U.S. 609, 615 (2007) .................................................................. 9

*Messerschmidt v. Millender*
565 U.S. 535, 547 (2012) ................................................................. 10

*Michigan v. Summers*
452 U.S. 692, 704 (1981) ................................................................. 10

*Muehler v. Mena*
544 U.S. 93, 99 (2005) ................................................................... 10

*Mullenix v. Luna*
___ U.S. ___, 136 S. Ct. 305, 308 (2015) ............................................. 12

*Oswald v. Graves*
819 F. Supp. 680, 684 (Ed. Mich. 1993) ................................................. 6

*Pearson v. Callahan*
555 U.S. 223, 231 (2009) ................................................................. 12

*People v. Barlett*
231 Mich. App. 139, 156, 585 N.W.2d 341, 350 (1998) ................................... 3

*People v. Brown*
297 Mich. App. 670, 674-5, 825 N.W.2d 91, 93 (2012) ................................... 2

*People v. Champion*
452 Mich. 92, 115, 459 N.W.2d 849, 860 (1996) ........................................ 2

*People v. Hartwick*
498 Mich. 192, 241, 870 N.W.2d 37, 63 (2015) ......................................... 1

*People v. Kolanek*
491 Mich. 382, 394 (2012) ................................................................2

*Procunier v. Navarette*
434 U.S. 55, 566, 98 S. Ct. 855, 862 (1978) ............................................7

*Segura v. U.S.*
468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) ..........................8

*Snyder v. United States*
59 F. App'x 505, 51 (6th Cir. 2014) ......................................................7

*U.S. v. Allen*
211 F.3d 970 (6th Cir. 2000) ..............................................................9

*U.S. v. Duval*
742 F.3d 246, 252 (6th Cir. 2014) ........................................................3

*U.S. v. Ellis*
910 F. Supp. 2d 1008, 1017 (W.D. Mich. 2012) ....................................2

*Walsh v. Taylor*
263 Mich. App. 618, 628-9, 689 N.W.2d 506, 514 (2004) ......................2

## INTRODUCTION

Reduced to its essentials, the Plaintiffs complain as follows:  the building located at 885 East Apple Avenue is divided between two separate entities.  The first entity, occupying the northern part of the building is *Deuces Wild*, a commercial operation open to the public.  The southern part of the building is occupied by the marijuana operation and is closed to the public. The marijuana operation, the Plaintiffs allege, was perfectly legal under the Michigan Medical Marijuana Act.  Therefore, the theory goes, the police illegally obtained a search warrant for the "legal" business located in a facility separate and apart from *Deuces Wild*. From this questionable proposition, the Plaintiffs claim that the several searches and seizures were illegal (and unconstitutional.) All the negative consequences (to the Plaintiffs) which flowed therefrom was also illegal and unconstitutional.

But the theory rests upon two false declarations. The Plaintiffs falsely claim that their marijuana operation at 885 East Apple Avenue was "lawful." It was not lawful. They also falsely conclude that the three search warrants the Defendants executed were invalid. They were valid. Consequently none of the negative outcomes (to the Plaintiffs) which flowed from the warrants, including the Plaintiff's conviction for possession with the intent to distribute marijuana, constituted a federal or state cause of action.

### A.  *All three search warrants were valid*

As established in paragraphs 3 and 4 of the *Joint Statement of Material Facts for Defendant's Motion for Summary Judgment,* Detective Adam Dent made two undercover purchases of marijuana.  Both purchases were illegal under Michigan law because Mr. Dent was not a patient of either caregivers who sold him the marijuana. See ***People v. Hartwick***, 498 Mich. 192, 241, 870 N.W.2d 37, 63 (2015).

Detective Dent duly recorded the illegal marijuana sales in his affidavit for a search warrant. See **Paragraphs 2 and 3 of Dent's affidavit for search warrant attached as Exhibit 1.** Based in part of this accurate statement of facts, the District Judge authorized the warrant.

Probable cause exists "where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." **People v. Champion**, 452 Mich. 92, 115, 459 N.W.2d 849, 860 (1996). This assessment must be made in light of the "totality of the circumstances." **Walsh v. Taylor**, 263 Mich. App. 618, 628-9, 689 N.W.2d 506, 514 (2004).

The Michigan Medical Marijuana Act (MMMA) "does *not* create a general right for individuals to use and possess marijuana in Michigan. Possession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law." **People v. Kolanek**, 491 Mich. 382, 394 (2012). The MMMA only provides an affirmative defense against criminal liability for those individuals whose production and use of marijuana "is carried out in accordance with the provisions of the MMMA." **Id.**, at 394; **U.S. v. Ellis**, 910 F. Supp. 2d 1008, 1017 (W.D. Mich. 2012). "As an affirmative defense, the MMMA merely has the potential to excuse a defendant's criminal act; it does not negate any element of the crime." **Id**.

As a consequence, and contrary to Plaintiffs' assertions, a search warrant affidavit "need not provide specific facts pertaining to the MMMA, i.e., facts from which a magistrate could conclude that the possession, manufacture, use, creation, or delivery is specifically not legal under the MMMA." **People v. Brown**, 297 Mich. App. 670, 674-5, 825 N.W.2d 91, 93 (2012),

*U.S. v. Duval*, 742 F.3d 246, 252 (6th Cir. 2014).  The affidavit need only address the elements of an offense, not whether the target of investigation may have an MMMA defense.

Under M.C.L. 333.7405(1)(d), it is a criminal offense to "[k]nowingly keep or maintain a store, shop, warehouse, dwelling, building . . . or other structure or place . . . that is used for keeping or selling controlled substances in violation of [the public health code]."  This is a misdemeanor offense, M.C.L. 333.7406, but it is a criminal offense nonetheless.

As interpreted by the Michigan courts, criminal liability under M.C.L. 333.7405(1)(d) encompasses anyone having "general control" over premises, including a mere renter of bedroom space in a house. *People v. Barlett*, 231 Mich. App. 139, 156, 585 N.W.2d 341, 350 (1998) "We believe that . . . the payment of rent for the building where controlled substances were kept, sold, or used was indicative of control." *Id*.

In this case, Mr. Antol was an incorporator or officer of a corporation known as 885 East Apple, LLC. 885 East Apple was purchasing the subject building (located at 885 East Apple in Muskegon.) (*See* **Exhibit 1, Antol Dep. pp. 30 - 34**). 885 East Apple used the backroom as a marijuana dispensary.  (**Exhibit 1, Antol Dep. p. 36. lines 1-5**). There is no question that Mr. Antol occupied and controlled the marijuana dispensary. Whether Mr. Antol would have an affirmative defense by virtue of the MMMA is irrelevant for purposes of obtaining a search warrant and the execution of that warrant. **Bartlett**, 294 Mich. App. at 674-5, 825 N.W.2d at 93, **Duval**, 742 F.3d at 252.

The same analysis applies to the other charges brought against Plaintiff for illegal delivery and manufacturing of marijuana, M.C.L. 333.7401.  The elements of these offenses are unchanged by the MMMA for purposes of a search warrant affidavit and even prosecution.

Whether Mr. Antol would have an affirmative defense by virtue of the MMMA does not undermine the probable cause for either.

The fact that Mr. Antol claims that the 6th Circuit Tax Team had no permission to enter the locked marijuana dispensary is irrelevant: It is undisputed that two employees of *Deuces Wild* led Detective Dent into the dispensary and sold him marijuana in violation of Michigan's Criminal Code. See *Hartwick*, *supra*, *at 241*. The illegal contraband was plainly visible to Det. Dent as the two employees showed him the various marijuana products.

In fact, Mr. Antol's own testimony belies his fanciful claim that the marijuana dispensary was "legal." In his deposition, Mr. Antol testified under oath that he was *actually* guilty of illegally selling marijuana from the dispensary. Specifically, while reviewing Mr. Antol's extensive criminal record, Mr. Antol discussed his convictions arising out of the raid on *Deuces Wild* and his two homes:

> Q:   (by Mr. Benson) And so now we're looking at subpart D. Is this the crime which gives rise to this incident?
>
> A:   (by Mr. Antol) **It is.**
>
> Q:   Okay. So July 9th, Muskegon County Circuit Court, 20 -- excuse me, July 9th, 2014, Muskegon County Circuit Court, manufacture -- what's the PWID, marijuana, with possession with the intent to distribute, I assume?
>
> A:   **Yes.**
>
> Q:   Okay. Pled to manufacturing marijuana, 12 months in jail. And that is as a result of the warrants executed in the case that we're here today about, correct?
>
> A:   **Correct.**
>
> Q:   And you pled guilty to that?
>
> A:   **I did.**

Q:    I'm sorry?

**A:    I did.**

Q:    And you pled guilty because you were in fact guilty?

**A:    Yes.**

Q:    And subpart E, 2014, delivery of marijuana, pled guilty.  Is that the same -- does that arise out of this same incident?

**A:    It does.**

Q:    Okay.  And you pled guilty to delivery of marijuana, and you pled guilty because you were in fact guilty, correct?

**A:    Yes.**

All three search warrants were valid.

### *B. Count I must fail*

In Count I, the Plaintiffs accuse the Defendants of unlawfully seizing surveillance/security equipment and a DVR.  The Defendants provided the Plaintiffs with a notice of seizure and attempt to forfeit pursuant to M.C.R. 333.7523.  Even though the Plaintiffs posted a bond pursuant to that Act, and even though the Court ordered the return of the property, the Plaintiffs claim the Defendants destroyed the property.  The Plaintiffs claim the destruction was intentional even though the Defendants had actual notice that the Court had ordered the return of the DVR.  They allege a 4th Amendment violation.

The Plaintiffs' claim that the Defendants seized surveillance/security equipment and the DVR "unlawfully" is simply wrong.  As set forth above, the search warrant was valid.  The warrant clearly articulates "surveillance equipment, including but not limited to recording devices" as items the police are authorized to seize.   Thus, the Defendants' decision to seize the surveillance/security equipment and the DVR were expressly authorized by the District Judge.

The *destruction* of the DVR is another matter.  Defendant Straus indeed authorized the destruction of the DVR.[1]  The undisputed evidence establishes that Det. Sgt. Straus acted in good faith when she ordered the DVR destroyed, and as such is entitled to qualified immunity.

As set forth in the Joint Statement of Material Facts, in July and August of 2014, the Muskegon County Prosecutor's Office instituted three civil forfeiture actions in Muskegon County Circuit Court.  The seized surveillance/security equipment and the DVR were not listed as items to be forfeited. Senior Assistant Muskegon County Prosecuting Attorney Robert Matthew represented the County in those cases.  These three actions were concluded by way of a June 29, 2015 Consent Order.  *See* **Exhibit 2**.  According to the sworn testimony of Robert Matthew and Katie Straus, the following two points are undisputed:

1. Robert Matthew, not a party to this action, interpreted the Order, and still interprets the Order, as *not* providing for the return of the DVR; **Roberts Dep. P 13 I. 3 - 23**

2. Robert Matthew conveyed his interpretation of the Consent Order to Det. Straus, and Det. Straus, relying upon Robert Matthew's interpretation of the Order, ordered the DVR destroyed. **Roberts Dep. P 12 I. 11-17; Straus Dep. P 21 I. 12-17**

3. Kate Straus was *not* provided with a copy of the consent June 29, 2015, order. **Straus Dep. 21, I. 12-17; Roberts Dep. P. 25-I. 1-6.**

Qualified immunity allows law-enforcement personnel and prison officials to perform their discretionary duties in good faith and shields them from civil damages for the inadvertent infringements of constitutional rights. *See **Oswald v. Graves**,* 819 F. Supp. 680, 684 (Ed. Mich. 1993).

---

[1] It is undisputed that the recorded audio and images on the DVR were retrieved and made available to the Defendants *before* the DVR was destroyed.

The allegation against Det. Sgt. Straus, "at most, it might be tantamount to negligence, but negligence does not equate to a constitutional violation." *See Snyder v. United States*, 59F. App'x 505, 51 (6th Cir. 2014) (internal quotations and citations omitted).  A state official who acts in a merely negligent fashion lacks, by definition, the state of mind necessary to overcome a qualified immunity defense. *See Procunier v. Navarette*, 434 U.S. 55, 566, 98 S. Ct. 855, 862 (1978).

As Det. Sgt. Straus was acting on the instruction of the attorney handling the forfeiture case, her conduct cannot even reasonably be considered negligent.  In fact, it was perfectly proper under the circumstances.  But even if negligent, Det. Sgt. Straus is clearly entitled to qualified immunity.

### C. Count II will fail because police officers have the authority to secure a residence while waiting for a search warrant

In Count II, the Plaintiffs allege that Defendants Bringedahl, Trucks and Kutches unlawfully entered the Greencreek address *before* they obtained a search warrant (they eventually obtained one) and, thus, conducted an illegal search.  They claim the entry was, therefore, warrantless and there were no exigent circumstances justifying a warrantless entry. They claim a door was broken down, property was damaged and property illegally seized.  They allege a 4th Amendment violation.

Defendants Bringedahl, Trucks and Kutches were in front of the Green Creek address awaiting the arrival of a search warrant.  In waiting for the search warrant, the officers encountered a man coming from the residence and walking toward the barn.  Upon questioning the man, he said he was an electrician working for Mr. Antol.  He further stated he "did not know" whether anyone else was in the house.  Based on this information, Detective Bringedahl contacted Kate Straus, then a detective sergeant with the Muskegon Police Department, and

Det. Sgt Straus requested the officers to enter the home to secure the residence prior to the search warrant.[2] (**Bringedahl Dep. p. 13, l. 8-1-3**)

Given the fact an occupant of the house would have seen the WEMET officers in the yard, and that the man was so vague about whether there was someone in the house, the officers made the judgment to enter the home to secure it while they waited for the arrival of the search warrant. The search warrant arrived shortly after the home was secured.

A residence may be secured to preserve evidence while a warrant is sought. Such a warrantless seizure supported by probable cause interferes with the owner's possessory interest, but it is *reasonable if limited in time*. It still preserves the owner's privacy interest until there is judicial authorization to search. *See Segura v. U.S.*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

How long the officers were in the house before the arrival of the search warrant is unclear. But it is the Plaintiffs' burden to avoid qualified immunity, and they will not be able to present at evidence at trial that an unreasonable length of time passed while the officers secured the home.

**D. Count III is futile because, as set forth above, the warrant was valid.**

The allegations contained in Count III are similar to Count II. The Plaintiffs again claim that the entry into the Greencreek residence was unlawful. Plaintiffs added the allegation that Defendant's lied on the affidavits submitted to the District Court Judge who issued the warrant. Specifically, the Plaintiffs claim that the Defendants knew the marijuana operation located at 885 East Apple Avenue was separate and apart from *Deuces Wild* and constituted a separate business. The Plaintiffs extrapolate from there that the search of the marijuana operation was

---

[2] Officer Bringedahl testified that he did not enter the house before the search warrant arrived. Derek Antol, Jr. testified that he saw three officers in the home when he was awakened. While this may be a disputed fact, it is not "material." For purposes of this motion only, the Defendants will concede that three officers entered the home.

unconstitutional, and thus the search of the Greencreek address was also illegal. The Plaintiffs allege a 4th Amendment violation.

Plaintiff Antol's Count III basically alleges that the Defendants lied on their affidavit to the magistrate who issued the search warrant. Specifically, it asserts that Officer Dent failed to acknowledge the information contained in the affidavit was "unlawfully obtained." But the Plaintiffs' have no evidence that **A)** the evidence was unlawfully obtained; or **B)** that Det. Dent knew that the evidence was unlawfully obtained. There is simply no basis for liability under the facts alleged. "The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty." *Los Angeles County, California v. Rettele*, 550 U.S. 609, 615 (2007). "Affidavits do not have to be perfect, nor do they have to provide every specific piece of information to be upheld." *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005). "Nor is an affidavit required to present proof that would without question withstand rigorous cross-examination." *U.S. v. Allen*, 211 F.3d 970 (6th Cir. 2000). "[W]hile better investigative work is preferable to merely adequate investigation, it is not the constitutional measure of probable cause." *Allen*, 211 F.3d at 976. "At bottom, we return to the basics of the Fourth Amendment: is there 'probable cause' to believe that evidence of a crime will be found in the search?" *Id*. "Valid warrants will issue to search the innocent." *Rettele*, 555 U.S. at 615.

In other words, Count III springs from the false conclusion that the original search warrant pertaining to *Deuces Wild* and the marijuana operation was somehow illegal and invalid. As set forth above, the search, both before and after the warrant issued, was perfectly legal.

Moreover, the allegation of a false affidavit is directed to Officer Dent. It does not allege that Officers Bringedahl, Trucks, Kutches and Straus assisted or participated in preparing the affidavit. Absent manifest indicia that a warrant lacks a basis in probable cause, an officer

executing a warrant "cannot be expected to question the magistrate's probable cause determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).

### E. Count IV of the Complaint is specious

Count IV claims one of Mr. Antol's sons was arrested illegally when, as officers searched the house, the minor child was ordered him to sit up and slide down his bed at gunpoint. Alleging that the Defendants did not have a reasonable, articulable suspicion or probable cause to detain or arrest the minor Plaintiff, the arrest constituted false imprisonment.

Count IV of the Complaint is so specious as to border on frivolous. It alleges that Mr. Antol's son was falsely arrested while the officers were executing the search warrant at the home. It is well-established that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 704 (1981). In this context, handcuffing of persons at the searched premises is constitutionally reasonable. *Muehler v. Mena*, 544 U.S. 93, 99 (2005).

Therefore, Plaintiff Antol has no basis whatsoever to complain about his son being temporarily detained.

### F. Count V of the Complaint is unavailing

Count V alleges that Derek Antol recorded the "illegal" raid of his house with his son's cell phone, and then returned the cell phone to his son. The son was "released" to his biological mother. The police then allegedly seized the phone from the minor, an act the Plaintiffs claim was unlawful as there was no valid search warrant, nor any reason to believe that the minor was involved in a crime.

The Plaintiffs claim that Minor Antol's cellphone was illegally seized is baseless. A review of the search warrant shows that the judge authorized the seizure of, among other things, cellphones found on at *Deuces Wild*. The two other warrants authorized officers to seize cellphones at the Farr Road home and the Greencreek home. On the face of the Complaint, the Plaintiffs reveal that the cellphone in question was in the possession and control of Mr. Antol when he was with the officers on the Apple Avenue premises. Mr. Antol then gave the phone to his son who, at some point, left with his mother. The officer requested of Mr. Antol that the boy's mother return the boy so the officer could recover the cell phone.

Plaintiff Antol apparently believes that, in order to conceal property that is the subject of a search warrant, all one has to do is hand the property to a third party and announce, "Too late, someone else has the property now." One needs not engage in deep legal research to recognize the simple absurdity of this theory of liability. The cellphone was a properly listed as property subject to seizure. It was in the control of the Plaintiff on the subject premises. The police had the power to recover it when Mr. Antol's son carried it away from the scene.

### G.   Plaintiff Antol's pleaded facts do not state a claim for "false imprisonment" of his son.

Count VI is also a false-arrest claim on behalf of Antol's minor son. It is a state-law claim. Again, the theory stems from the contention that the original search warrants were unlawful and invalid. It also stems from the erroneous belief that the only time an officer may ever detain someone, even for only a few moments, is when the officer reasonably believes the detained person is guilty of a crime.

Count VI also fails. False imprisonment is the "unlawful restraint" of a person's liberty or freedom of movement. *Walsh*, 263 Mich. App. at 627, 689 N.W.2d at 513-4. "The restraint must

have occurred without probable cause to support it." *Walsh*, 263 Mich. App. at 627, 689 N.W.2d at 514.

As described at length above, "probable cause" existed in this case both for the search of Plaintiff's premises and for the temporary detainment of his son under Michigan law.

### H. The Defendants enjoy qualified immunity

"[G]overnment officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

In this context, a right is "clearly established" where existing case law precedents demonstrate the existence of the right to be "beyond dispute," such that "every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015). Qualified immunity covers "mistakes in judgment, whether the mistake is one of fact or one of law." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

### CONCLUSION

The searches and seizures were lawful. The warrants valid. The minimum detention of one of the Plaintiffs reasonable.

The Defendants respectfully request Summary Judgment.

Respectfully submitted,

CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.

/s/ Curt A. Benson
Allan C. Vander Laan (P33893)
Curt A. Benson (P38891)
Bradley C. Yanalunas (P80528)
Attorneys for Defendants Adam Dent, Kate
Strauss, Casey Bringedahl and Pete Kutches
Cummings, McClorey, Davis & Acho. P.L.C.
2851 Charlevoix Drive, SE, Ste. 327
Grand Rapids, MI 49546
616/975-7470

Dated: August 31, 2018

# EXHIBIT 1

### Page 29

1  cousin and his girlfriend, who were there. Kind of
2  helping them out with a place to stay.
3  Q.  Okay.
4  A.  And also security measure, if you will, for us,
5  because we did still have quite a bit of personal
6  belongings stored in the garage and in the basement
7  yet.
8  Q.  Who is your cousin?
9  A.  That was Mike Porter.
10 Q.  And his girlfriend?
11 A.  Heather Drabough (sp).
12 Q.  Were they paying rent?
13 A.  They were, yes.
14 Q.  How long had they lived there before this -- before
15    July 9th --
16 A.  Oh, gosh --
17 Q.  -- 2014?
18 A.  -- not long.  A matter of a couple months, maybe.
19 Q.  Okay.  And, to the best of your recollection, how long
20    had you lived at North Green Creek before this
21    incident?
22 A.  We were there approximately four years.
23 Q.  And it was you, Tryston, Devon, and Derek, Jr. at the
24    time of the raid?
25 A.  And Samantha.

### Page 30

1  Q.  And Samantha Conklin?
2  A.  Yep.
3  Q.  Was she a girlfriend?
4  A.  Fiancee, yes.
5  Q.  Fiancee?  Is she today?
6  A.  Yes.
7  Q.  Now, going back to July 9th, you have Deuces Wild
8     Smoke Shop at 885 East Apple Avenue.  How many
9     employees did you have there?
10 A.  I believe at the time we had four.
11 Q.  Okay.  Do you remember their names?
12 A.  Donald Supernaw, who's my brother, there was Fred
13    Fenning, Jr., Andrew Moser, and I forget Rob's last
14    name.  Rob something or other.  I forget his last
15    name.
16 Q.  And did you pay them an hourly rate?
17 A.  Yes, they were on payroll.
18 Q.  And they weren't on commission or anything?
19 A.  No.
20 Q.  Okay.  Now, I understand that -- well, first of all,
21    885 East Apple Avenue, is that a building you own?
22 A.  No.  That was another one I had a land contract, we
23    were purchasing that building.
24 Q.  Okay.  And I should rephrase that.
25       Were you purchasing the building on or

### Page 31

1     about July 9th, 2014?
2  A.  We were, yes, yeah.
3  Q.  Okay.  From whom were you purchasing it?
4  A.  Donald Shampine.
5  Q.  Champagne, like the wine?
6  A.  Shampine.
7  Q.  Do you think you could spell it?
8  A.  S-H-A-M-P-I-N-E.  And I believe that's Dasras,
9     Incorporated, D-A-S-R-A-S is his --
10 Q.  So you think maybe it was -- was it Dasras?
11 A.  Dasras.
12 Q.  Dasras?
13 A.  D-A-S-R-A-S.
14 Q.  And Dasras was the corporation that you think actually
15    owned the building?
16 A.  I believe so, yes.
17 Q.  And what were the terms?  In other words, what did you
18    pay for it, and what were you paying a month?
19 A.  It was a -- it was to be a five-year balloon -- or
20    five-year land contract.  I think the agreed purchase
21    price was 120,000, and our payments were 1,695 a
22    month.
23 Q.  Okay.  And what was that building before you bought
24    it, do you remember, was it a commercial --
25 A.  Before we -- before we moved in, it was -- there were

### Page 32

1     actually two entities in it, as we had.  There was
2     Alf Insurance, and there was a Cash Advance store.
3  Q.  Okay.
4  A.  Both in the same location.
5  Q.  Do you remember the square footage of that building?
6  A.  It was approximately 1,600 square foot.
7  Q.  1,600?
8  A.  Yeah.
9  Q.  Okay.  Is the building roughly a square shape, or is
10    it --
11 A.  Rectangular.
12 Q.  Rectangular?
13 A.  Yeah.  It was longer.
14 Q.  And is it divided -- I mean, obviously your allegation
15    is there were -- you know, there's a public place, a
16    nonpublic place, et cetera, et cetera?
17 A.  Correct.
18 Q.  So I'm asking, in the rectangular building, was there
19    divisions within the building?
20 A.  There was, yes.
21 Q.  Okay.  Can you describe the division?  Walls --
22 A.  Solid wall with a door.
23 Q.  Okay, solid wall with a door.  But just so I'm clear,
24    it was one building, correct?
25 A.  Correct.



DEREK ANTOL
May 10, 2018

## Page 33

1   Q.   And it was serviced with electricity, for example,
2        that served the entire building? There weren't two
3        separate meters, correct?
4   A.   Incorrect. There were two separate meters.
5   Q.   And what meter went to what?
6   A.   One meter was for the Deuces Wild, and the other was
7        for the 885 East Apple.
8   Q.   I'm sorry?
9   A.   The 885 East Apple.
10  Q.   Okay. Did it have the same address?
11  A.   Yes.
12  Q.   All right. So how -- roughly, what's the square
13       footage of Deuces Wild?
14  Q.   Where we're currently at, or at the time?
15  A.   At the time, I'm sorry. And, again, roughly? I'm not
16       going to hold you to it. I'm just trying to get an
17       idea.
18  A.   It was probably about -- I would say about 1,200
19       square feet was being leased to Deuces Wild.
20  Q.   Being leased by whom?
21  A.   885 East Apple.
22  Q.   Okay. What is that?
23  A.   That was an actual entity. It wasn't just the
24       address, it was the actual entity.
25  Q.   Okay. And what was it, a corporation?

## Page 34

1   A.   Yes.
2   Q.   And were you an incorporator or an officer?
3   A.   Yes.
4   Q.   Is that listed in your Interrogatory Answers?
5   A.   It was not, no.
6   Q.   Why not? So there's at least two other entities that
7        you were an officer, which are left off this
8        Interrogatory answer, correct?
9   A.   Yes.
10  Q.   Okay. Well, let's talk about Apple Avenue then. When
11       did you incorporate that?
12  A.   That was right around the same time, November of 2011,
13       when we moved in.
14  Q.   Why did you incorporate and not just buy it as
15       an individual?
16  A.   Excuse me?
17  Q.   Why did you incorporate and purchase it through a
18       corporation, as opposed to just you individually?
19  A.   The building was being purchased by myself as an
20       individual.
21  Q.   Okay. Then what is 885 East Apple, what was the
22       function of that?
23  A.   That was the alleged dispensary.
24  Q.   Okay. So you say alleged dispensary?
25  A.   That's what I said, yes.

## Page 35

1   Q.   What's the alleged part? Who's made this allegation?
2   A.   It would have been WEMET.
3   Q.   Okay. And what do you mean by dispensary?
4   A.   Provisioning center and dispensary, whatever you want
5        to call it.
6   Q.   I'm sorry?
7   A.   Provisioning center, medical marijuana dispensary,
8        whatever you want to call it.
9   Q.   Okay. Well, it's a term that you used. I'm asking
10       what do you mean by a dispensary? So it's where
11       marijuana is sold?
12  A.   Correct.
13  Q.   Okay. And marijuana -- and that was -- so 885 East --
14       excuse me, what was the name of the corporation again?
15  A.   885 East Apple.
16  Q.   Okay. And that was a corporation. And you say
17       "alleged" dispensary?
18  A.   It was an LLC.
19  Q.   Okay, LLC. Okay, and where was that dispensary
20       physically located?
21  A.   In the rear of the building.
22  Q.   Okay. Did you not consider that a marijuana
23       dispensary?
24  A.   We did. Isn't that what I just described it to you
25       as?

## Page 36

1   Q.   Well, you said alleged, and I'm -- and normally when
2        someone says that, they say I disagree with it, that
3        somebody else is calling it a dispensary. So it is a
4        dispensary, correct?
5   A.   It was a dispensary, yes.
6   Q.   Okay. And from that part of the building, you sold
7        marijuana -- or, rather, 885 East Apple --
8   A.   I didn't sell marijuana, no.
9   Q.   Let me finish the question.
10            885 East Apple, LLC sold marijuana,
11       correct?
12  A.   Correct.
13  Q.   Okay. Did you, as either an officer or an employee of
14       this LLC, ever sell marijuana?
15  A.   I did not.
16  Q.   Okay. So you never handed it to anyone, took any
17       money, correct?
18  A.   I did not.
19  Q.   Okay. Did Samantha Conklin?
20  A.   Yes.
21  Q.   Okay. Did anyone else besides Samantha?
22  A.   Yes.
23  Q.   Who?
24  A.   Rob Holm was his last name, H-O-L-M.
25  Q.   H-O-L-M?



# EXHIBIT 2

## Page 1

UNITED STATES OF AMERICA
IN THE WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

DEREK ANTOL, individually and as
Next Friend of DSA, a minor, DSAH,
a minor, and TRYSTON ANTOL,

    Plaintiffs,    Case No. 1:17-cv-613

-v-

            HON. JANET T. NEFF

ADAM DENT, KATE STRAUS, CASEY
BRINGEDAHL, CASEY TRUCKS, PETE
KUTCHES, and WESTERN MICHIGAN
ENFORCEMENT TEAM, a public body
organized under the laws of the
State of Michigan,

    Defendants.
                /

DEPOSITION OF CASEY BRINGEDAHL

Taken by the Plaintiffs on the 10th day of May, 2018,

at the offices of Cummings, McClorey, Davis & Acho, 2851

Charlevoix Drive, Suite 327, Grand Rapids, Michigan, at

3:57 p.m.

APPEARANCES:

For the Plaintiff:   MR. J. NICHOLAS BOSTIC (P40653)
           909 N. Washington Avenue
           Lansing, MI 48906
           (517) 706-0132
For the Defendant   MR. ADAM P. SADOWSKI (P73864)
Casey Trucks:     MR. PATRICK MYERS (P81444)
           525 W. Ottawa Street
           P.O. Box 30736
           Lansing, MI 48909
           (517) 373-6434

## Page 2

For the Defendants   MR. CURT A. BENSON (P38891)
Straus, Bringedahl &  MR. BRADLEY WANALUNAS (P  )
Kutches:          2851 Charlevoix Drive, Suite 327
          Grand Rapids, MI 49546
          (616) 975-7470

Recorded by:      Denise L. Jamba, CER 0786
          Certified Electronic Recorder

## Page 3

TABLE OF CONTENTS

                            PAGE

CASEY BRINGEDAHL:

   Direct Examination by Mr. Bostic      5

EXHIITS:              IDENTIFIED
  None.

## Page 4

1     Grand Rapids, Michigan
2     Thursday, May 10, 2018 - 3:57 p.m.
3         CASEY BRINGEDAHL
4     HAVING BEEN CALLED BY THE PLAINTIFFS AND SWORN:
5        MR. BOSTIC:  Please state your name for the
6   record.
7        THE WITNESS:  Casey Bringedahl.
8        MR. BOSTIC:  Mr. Bringedahl, my name is Nick
9   Bostic and I represent Derek Antol and others in Antol
10   versus Dent and others, Western District of Michigan File
11   1:17-cv-613.  Today is the time and date set for your
12   deposition, which will be used for all purposes as allowed
13   by the Michigan Rules -- I'm sorry, Federal Rules of Civil
14   Procedure and the Federal Court Rules.
15        Counsel, any objection as to notice?
16        MR. BENSON:  No.
17        MR. SADOWSKI:  No.
18        MR. BOSTIC:  Appearances for the record, please.
19        MR. BENSON:  Curt Benson here with Sergeant
20   Bringedahl.
21        MR. WANALUNAS:  Brad Wanalunas representing
22   Sergeant Bringedahl.
23        MR. SADOWSKI:  Adam Sadowski on behalf of
24   Defendant Trucks.
25        MR. MYERS:  Patrick Myers on behalf of Defendant

                         1  (Pages 1 to 4)

CASEY BRINGEDAHL
5/10/2018

## Page 13

1  a buy or something like that?  You -- you log almost every
2  movement, correct?
3  A  Yes.
4  Q  But when you go to do surveillance on a static location
5  just waiting for a warrant, do you typically do the same
6  type of surveillance notes?
7  A  Not generally.  In this case, any -- any movement that I
8  saw was documented in the report.  I didn't see the need
9  at that point to prepare any surveillance notes.
10  Q  But -- but you didn't document the time?
11  A  I don't know that.  It might be in my report if I can
12  reference that.
13  Q  Let's check and see.
14  A  Okay.  So according to my report, I began surveilling the
15  residence at approximately 13:50 hours.  At approximately
16  14:15 hours, I observed the subject walk out of the house.
17  Q  And then what did you do after you made that observation?
18  A  I contacted Detective Sergeant Straus and advised her that
19  we had someone that was in and out of the residence.
20  Q  So did you say you detected movement at 14:15?
21  A  Correct.
22  Q  And then after talking to her, what happened?
23  A  It was requested that I go make contact with that subject,
24  identify him, find out what he's doing at the residence.
25  Obviously, at that point I was familiar with Ms. Conklin

## Page 14

1  and Mr. Antol, knew who they were.  It wasn't either one
2  of them, so I requested that Trooper Trucks go and make
3  contact with the subject.
4  Q  When he came out of the pole barn, where did he go?
5  A  At -- at that point, we had just contacted him.  He
6  just -- he made -- by the time it took me to -- to, you
7  know, make the phone call and discuss what we were going
8  to do, he had -- he had kind of walked from the house to
9  the pole barn, you know, and to his car.  He was just kind
10  of -- you know, the guy ended up being an electrician.  He
11  was there probably getting tools out of his car, so on and
12  so forth.
13  Q  Were you able to see exactly what he was doing when he was
14  at his car?
15  A  I -- I couldn't, no.
16  Q  Was his car the car that you had mentioned earlier?
17  A  Yes.
18  Q  Okay.  From your observations of him before Trooper Trucks
19  arrives, did you have any indication that he's aware of
20  your presence?
21  A  No.
22  Q  He did not appear to be aware of your presence?
23  A  No.
24  Q  So does Trooper Trucks then pull up at your request?
25  A  Yes.

## Page 15

1  Q  In a marked unit?
2  A  Correct.
3  Q  Did this person that you're observing appear to be a minor
4  or an adult?
5  A  He was an adult.
6  Q  You could tell that from your surveillance position?
7  A  Yeah.
8  Q  Were you -- had you been informed that there was a minor
9  inside the home asleep?
10  A  I had not.
11  Q  Did you have any information given to you about who might
12  or might not be there?
13  A  I had none.
14  Q  So your instructions were to go watch the house pending a
15  warrant?
16  A  Correct.
17  Q  When Trooper Trucks pulled up, what did you observe?
18  A  I pulled up right behind him.  We made contact with the
19  subject, identified him as Michael Tozer.  I then took a
20  statement in regards to why he was -- he was at the home.
21  Q  What did he tell you?
22  A  He told me he was an electrician running a 220 line back
23  to the pole barn.
24  Q  Did you ask him about anyone else being in the home?
25  A  I did and he stated that he wasn't sure.

## Page 16

1  Q  Did he take you around and show you the door that he had
2  been using to get into the building or did you determine
3  whether he had been in the dwelling itself?
4  A  He admitted that he had been.  He had accessed through the
5  back door into the basement.
6  Q  Did he have access into the living portion?
7  A  I -- I don't know.
8  Q  After you told you that, what did you do?
9  A  I contacted Detective Sergeant Straus and advised her of
10  my findings.
11  Q  And then what happened?
12  A  She requested that officers enter the home to secure the
13  residence prior to the search warrant.
14  Q  Did Mr. Tozer indicate to you that he had spoken to
15  anybody inside the home?
16  A  He -- no.  I asked several times if he thought anybody was
17  inside.  He says, "I'm not sure."  He says, "I just went
18  into the basement."
19  Q  Where is the marked patrol car parked at this point?
20  A  In the driveway.
21  Q  So what did you do after Sergeant Straus made her request?
22  A  I stayed outside with Mr. Tozer while Detective Kutches
23  and Trooper Trucks went inside and secured the residence.
24  Q  Did you -- were you able to see them at all while they
25  were inside the residence?

4  (Pages 13 to 16)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

ANTOL, DEREK, individually and as
next friend for DSAII, a minor, DEVON
S. ANTOL. and TRYSTON ANTOL,

       Plaintiffs,                 Case No. 1:17-cv-613

v.                             HON. JANET T. NEFF

ADAM DENT, KATE STRAUS, CASEY
BRINGEDAHL, CASEY TRUCKS, and
PETE KUTCHES,

       Defendants.

_____

## CERTIFICATE OF SERVICE

       Curt A. Benson states he is counsel for Defendants Dent, Strauss, Bringedahl, and Kutches, in the above entitled cause of action, and on the 31st day of August 2018, he served Defendants Dent, Strauss, Bringedahl and Kutches' Motion for Summary Judgment and Brief in Support of Defendants Dent, Straus, Bringedahl and Kutches' Motion for Summary Judgment on behalf of above-stated Defendants, via first-class mail, postage prepaid to:

J. Nicholas Bostic                   John G. Fedynsky
909 N. Washington Ave.          Assistant Attorney General
Lansing MI  48906                Michigan Dept. of Attorney General
                                   525 W. Ottawa Street
                                   P.O. Box 30736
                                   Lansing, MI  48909

       The above information is true to the best of my knowledge, information and belief.

                       /s/ Curt A. Benson
                       Curt A. Benson (P38891)