UNITED STATES OF AMERICA

IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

| | |
|---|---|
| Derek Antol, individually and as next friend of DSAII, a minor, and Devon S. Antol, and Tryston Antol,<br>    Plaintiffs, | File No: 1:17-cv-613 |
| v. | |
| Adam Dent, Kate Straus, Casey Bringedahl, Casey Trucks, Pete Kutches, and Western Michigan Enforcement Team, a public body organized under the laws of the State of Michigan,<br>    Defendants, | Hon. Janet T. Neff<br>U.S. District Court Judge |

_____/

**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES**

Attachment 1 – deposition of Treasury Agent Greg Parolini

GREG PAROLINI
4/30/2015

## Page 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff,

v    Case No. 14-49626-CF

$1,160.00 IN U.S. CURRENCY,
et al,
  Defendant,
SAMANTHA CONKLIN,
  Claimant.
                    /

DEPOSITION OF TREASURY AGENT GREG PAROLINI
Taken by the Claimant on the 30th day of April, 2015, at the offices of Kevin Wistrom, 1 E. Apple, Muskegon, Michigan, at 1:34 p.m.

APPEARANCES:
For the Plaintiff:   MR. CHARLES F. JUSTIAN (P35428)
                     Senior Assistant Prosecutor
                     990 Terrace Street, 5th Floor
                     Muskegon, MI 49442
                     (231) 724-6435
For the Defendant:   MR. J. NICHOLAS BOSTIC (P40653)
                     909 N. Washington Ave.
                     Lansing, MI 48906
                     (517) 706-0132

Also Present:    Mr. Kevin J. Wistrom

RECORDED BY:     Denise L. Jamba, CER 0786
                 Certified Electronic Recorder

## Page 2

1      TABLE OF CONTENTS
2                               PAGE
3   GREG PAROLINI:
4     Direct Examination by Mr. Bostic        4
5
6
7
8   EXHIBITS:                       IDENTIFIED
9     DX-1 - Do Not Enter Sign         29
      DX-2 - Restricted Area Sign      30
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1  Muskegon, Michigan
2  Thursday, April 30, 2015 - 1:34 p.m.
3                GREG PAROLINI
4  HAVING BEEN CALLED BY THE DEFENDANT AND SWORN
5       MR. BOSTIC: Would you state your full name for
6  the record, please?
7       THE WITNESS: Sure. It's Greg, G-r-e-g, last,
8  Parolini, P-a-r-o-l-i-n-i.
9       MR. BOSTIC: Is it Gregory?
10      THE WITNESS: Well, legally it is, yes.
11      MR. BOSTIC: Okay. And your middle name?
12      THE WITNESS: Alan, A-l-a-n.
13      MR. BOSTIC: Sir, my name is Nick Bostic and I
14  represent Samantha Conklin in 14-49626-CF and Derek Antol in
15  14-49627, 14-49628, and 14-49638, all CF, which are
16  forfeiture actions in the 14th Circuit Court. Today is the
17  time and date for your deposition, to be used for all
18  purposes as allowed by the Michigan Rules of Evidence and
19  the Michigan Rules of Civil Procedure.
20      Have you ever testified in a deposition before?
21      THE WITNESS: Yes.
22      MR. BOSTIC: And have you had occasion to testify
23  in court?
24      THE WITNESS: Yes, I have.
25      MR. BOSTIC: Are you a certified law enforcement

## Page 4

1  officer?
2       THE WITNESS: Not anymore, no.
3       MR. BOSTIC: The same rules essentially as
4  testifying in court. She is taking a recorded version, but
5  she will eventually have to prepare a transcript, so she
6  needs audible answers instead of head shakes and things of
7  that nature.
8       THE WITNESS: Yes.
9       MR. BOSTIC: Because this is a discovery
10 deposition, sometimes my questions are not as structured as
11 they would be in court, which usually just leads to a bad
12 question. So if, for any reason, you don't understand the
13 question, please let me know 'cause I'm just -- I'm just
14 here to learn.
15      THE WITNESS: Okay.
16      MR. BOSTIC: But if you answer a question, I will
17 assume you understood it; fair enough?
18      THE WITNESS: Yes, indeed.
19             DIRECT EXAMINATION
20 BY MR. BOSTIC:
21 Q  Tell me about your formal education.
22 A  I have a Bachelor of Arts degree. That was after having an
23    Associate of Science degree in criminal justice first and
24    then a Bachelor of Arts degree after that.
25 Q  In criminal justice?

GREG PAROLINI
4/30/2015

### Page 5

1  A  Yes.
2  Q  Any post-graduate education?
3  A  No.
4  Q  And when did you get your Bachelor of Arts degree?
5  A  In 2001.
6  Q  Okay. When did you graduate high school?
7  A  1977.
8  Q  And what was your employment out of high school?
9  A  For the first three years, United States Army.
10 Q  Then what?
11 A  Then I was in college for two years or so and then I went to
12    work at the Michigan State University Department of Public
13    Safety.
14 Q  Where did you go to police academy?
15 A  Marquette, Michigan, Northern Michigan University.
16 Q  Were you sponsored or put yourself through?
17 A  I put myself through.
18 Q  Was that as part of your two-year curriculum?
19 A  After.
20 Q  Was it one of the regional academies?
21 A  Yes, regional -- regional police academy.
22 Q  And when did you finish that?
23 A  The academy?
24 Q  Yes.
25 A  It was 1983, from May until July.

### Page 6

1  Q  So at that point, you are eligible to be certified as a law
2     enforcement officer?
3  A  Yes.
4  Q  When was your first sworn position?
5  A  1983, in August with MSU campus police. I was there for
6     four years.
7  Q  Had you already pre-arranged with them for being hired?
8  A  No.
9  Q  Did you apply while you were in academy?
10 A  They -- the Director of Public Safety had actually contacted
11    the academy and asked for a name who may be interested in
12    coming to work for them and my name was given to them, so I
13    started -- I started the interview process.
14 Q  Okay. And so you leave MSU Public Safety approximately some
15    time in '87?
16 A  August of 1987, yes.
17 Q  And where did you go?
18 A  Kent County Sheriff's Department.
19 Q  And what were your duties there?
20 A  The first seven years was on patrol duty and the next 18 was
21    primarily within the Detective Bureau. I worked a variety
22    of assignments.
23 Q  Why did you leave MSU?
24 A  Just for a little bit broader law enforcement career. It
25    was pretty limited, a campus.

### Page 7

1  Q  And after 18 years in the Detective Bureau, did you retire?
2  A  Yes.
3  Q  And when -- so what year are we talking about now?
4  A  I retired effective January 1st of 2013.
5  Q  Where did you get your Bachelor's from?
6  A  Through Western Michigan University.
7  Q  After retiring in January, 2013, did you work in any other
8     law enforcement position?
9  A  No, I did not.
10 Q  During any time in your law enforcement career, were you
11    ever disciplined?
12 A  No.
13 Q  You had military service. Did you ever have a court martial
14    or an Article 15?
15 A  No, sir.
16 Q  Have you ever been diagnosed with mental illness?
17 A  No.
18 Q  Have you ever been arrested?
19 A  No.
20 Q  What is your current employment?
21 A  Michigan Department of Treasury.
22 Q  What capacity?
23 A  As a field agent for the Tobacco Enforcement Unit.
24 Q  How many agents are in the Tobacco Enforcement Unit?
25 A  Five.

### Page 8

1  Q  Does any of the funding of your unit depend upon your
2     enforcement efforts?
3  A  Yes.
4  Q  How?
5  A  Well, there -- there has to be an established enforcement
6     unit for the -- the funding that comes from the tobacco
7     manufacturers that gets distributed through the state.
8  Q  Explain that to me if you can.
9  A  Well, part -- part of what they call the master settlement
10    agreement between the states and the tobacco manufacturers
11    is that for certain amount of funds, and I forget exactly
12    how much it is that comes into the state each year, part of
13    the agreement that was made is that the states, and all the
14    states are involved in the master settlement agreement, have
15    to have an enforcement effort to ensure that the -- to
16    ensure that the best interest of the tobacco industry is
17    being looked out by the state. By that, I mean as far as
18    making sure that there isn't any fraudulent activity
19    occurring with tobacco products, that the tobacco products
20    that are in the state are actually received here legally
21    from a manufacturer -- a licensed manufacturer.
22 Q  Smuggling, counterfeit, those kinds of things?
23 A  Yeah, smuggling, counterfeiting, any type of -- of illicit,
24    I guess, tobacco products coming into -- into the country --
25    actually into the state here of Michigan.

GREG PAROLINI
4/30/2015

Page 9

1  Q  Okay. All right. So did some of the states opt out of that
2     master settlement?
3  A  I don't know.
4  Q  Okay. So we have a master settlement agreement from the
5     manufacturers that were part of it to the states. A portion
6     of that funding is contingent upon there being an
7     enforcement unit?
8  A  Yes.
9  Q  To protect the interest of the manufacturers?
10 A  Yes.
11 Q  And generally but primarily for smuggling and counterfeit
12    cigarettes?
13 A  Correct. Yes.
14 Q  Or -- or cigars or whatever?
15 A  Any type of tobacco products, correct. Yeah.
16 Q  Any -- is there any other way that your -- the funding for
17    your unit is contingent upon your enforcement efforts?
18 A  Not to my knowledge.
19 Q  I direct your attention to July 9 of 2014 and the location
20    of 885 East Apple Avenue. Do those two things have a
21    connection for you?
22 A  Yes.
23 Q  Prior to July 9, 2014, had you had any communication about
24    the business at that location with Detective Adam Dent?
25 A  No, sir.

Page 10

1  Q  What about with any member of the Western Michigan
2     Enforcement Team?
3  A  No, not at all.
4  Q  What about with Sergeant Schmitz from the MSP District Team?
5  A  Yes, I had.
6  Q  Speaking of the MSP District Team, --
7  A  Yeah.
8  Q  -- is -- is -- some of this contingent money from the master
9     settlement agreement, does that flow over into their team
10    funding, as well?
11 A  Yes.
12 Q  Okay. 'Cause he had mentioned something about -- about that
13    and I -- I wasn't clear on the source, so --
14 A  It's actually an initiative through the Treasury Department
15    and then the state police are there to basically assist us.
16    It's written, whatever, under the Tobacco Act that they're
17    in a position to do that.
18 Q  We may have to go back and ask him if -- to confirm that,
19    but I -- I'm suspicious that that's what he's referring to.
20    Do you recall receiving your notices of deposition in this
21    case? Did you get written notice of the --
22 A  No.
23 Q  -- depositions?
24 A  No.
25 Q  How did you know to be here today?

Page 11

1  A  I was contacted by Mr. Justian.
2  Q  Okay. The -- the attachment - there's an attachment, the
3     last page, required you to bring some things with you to the
4     deposition today.
5  A  Yes.
6  Q  Did you bring anything?
7  A  I was made aware of this.
8  Q  Okay.
9  A  I did not bring anything, no.
10 Q  Well, based upon your answer a moment ago, it sounds like
11    you've already answered Number 1 anyway, correct?
12 A  Correct.
13 Q  And then Number 2 is essentially the same question but a
14    different time frame. Are there any other communications -
15    e-mails, texts, as -- as indicated there, where you have
16    communicated directly with Detective Dent or any member of
17    WEMET concerning these forfeiture cases?
18 A  No, there isn't.
19 Q  Well, what about the investigation at 885 East Apple, in
20    general?
21 A  Not with WEMET, no, or with anybody from WEMET.
22 Q  Who have you communicated with about your investigation?
23 A  With Sergeant Schmitz from the MSP Tobacco Unit.
24 Q  And what information did you provide to him?
25 A  Well, it was basically -- beforehand it was basically

Page 12

1     setting up a date and time to go do the inspection and
2     afterwards it was communication as far as the property that
3     was seized and the value, etcetera. It was just pretty much
4     basic that we do on most inspections that we would have.
5  Q  Okay. Do you recall at some point after July 9th, 2014,
6     getting a letter from me?
7  A  Yes.
8  Q  Asking -- do you recall what the -- the content of the
9     letter was?
10 A  No, I don't.
11 Q  Do you recall me asking you as to whether or not you
12    intended to take any enforcement action based upon the
13    seizure?
14 A  I don't recall that.
15 Q  Do you recall whether or not you responded to my letter?
16 A  The -- whatever information that I had received from you or
17    your office, I was in contact with my supervisor to
18    determine whether -- what type of response there was going
19    to be and everything was forwarded to him so that he could
20    speak with the Attorney General's office or whomever he had
21    to -- to talk with to determine what kind of a response
22    was -- was to be made, and, so, therefore, I made no direct
23    contact or response to him.
24 Q  Okay. So you get my letter and you -- you discuss whether
25    you're going to respond with your supervisor?

3 (Pages 9 to 12)

GREG PAROLINI
4/30/2015

Page 13

1  A  No, I discussed what -- in which manner a response should be
2     and whether it should come from me or through someone else.
3  Q  And who did you have that discussion with?
4  A  His first name is Steve. The last name is spelled S-c-h-a-
5     u-b, Schaub.
6  Q  And what did he tell you he was going to do?
7  A  He was going to run it up his chain of command and make a
8     determination, someone was going to make a determination on
9     that.
10 Q  Did he tell you to not respond?
11 A  He told me to not respond until they could make some sort of
12    a determination on what the response was going to be.
13 Q  Did he ever get back with you after that?
14 A  I -- I don't recall. I don't know.
15 Q  But can you safely say that you never responded?
16 A  I never responded.
17 Q  Do you recall what the approximate value was of the tobacco
18    products that you seized on July 9, 2014?
19 A  I don't and I don't have my report with me. I believe it
20    should be in the report.
21 Q  I was unable to find your report, but I did find those. If
22    you would, take a look at those, please. Do you recognize
23    those three documents?
24 A  Yes. One is the -- the notice of seizure and inventory
25    statement of property received form that I completed, and

Page 14

1     the other two items -- the other two sheets are the seized
2     product inventory sheets listing the tobacco products that
3     were seized from the business.
4  Q  Do you agree that you did not seize any cigarettes?
5  A  Correct, we did not seize any cigarettes.
6  Q  What did you seize?
7  A  It was several types of Shisha, which is a Hookah tobacco,
8     and some cigar wraps.
9  Q  Would you spell that name you said for us?
10 A  Shisha?
11 Q  Yes.
12 A  S-h-i-s-h-a.
13 Q  Okay.
14 A  Shisha is just basically what -- we call it Hookah tobacco,
15    but it's actually called Shisha.
16 Q  Okay. How many inspections like this do you think you do on
17    average in a week?
18 A  Well, it varies but on average six -- six to eight.
19 Q  The types of things that you found here, is that common or
20    uncommon in your experience?
21 A  The cigar wraps are more common than the -- than the Hookah
22    tobacco is. I mean Hookah tobacco is -- not every business
23    sells it. It's pretty much of a specialized type of tobacco
24    product where the cigar wraps are at most grocery stores,
25    gas stations, etcetera.

Page 15

1  Q  And there is a way to have the cigar wraps properly stamped
2     and taxed and everything, right?
3  A  Well, they're not -- they're not stamped. They'd be
4     property tax if they came through a licensed distributor.
5  Q  When you -- how often is it that you find these wraps that
6     have -- have come in and been acquired like through an
7     Internet purchase or something where the -- the business
8     person didn't realize they -- they fell under the Tobacco
9     Tax Act?
10 A  Well, it's -- it's --
11    MR. JUSTIAN: Objection, unless he can tell you
12    that he knows that they were not aware of the Tobacco Tax
13    Act. I think that he wouldn't know one way or the other
14    whether or not they knew that they were in violation of the
15    law.
16 BY MR. BOSTIC:
17 Q  You can go ahead and answer if you can.
18 A  I'm sorry, repeat the question again.
19 Q  Is it -- is it fairly common that you run into these cigar
20    wraps at least where they've been ordered over the Internet
21    the proprietor didn't realize that they were -- they fell
22    under the definitions in the Tobacco Tax Act?
23 A  Well, compared to the number of establishments that are
24    doing it legally, it's not common.
25 Q  Okay.

Page 16

1  A  It's a much lower number. It's just based on -- on number
2     basically.
3  Q  But I mean of the ones where they don't have the proper
4     stamps and -- and documents, is that the kind of reason that
5     you're sometimes given?
6  A  That they weren't aware?
7  Q  That they -- they've ordered it over the Internet, for
8     example, or something and they didn't realize that it fell
9     within the definitions.
10 A  That is the most common response to that, yes.
11 Q  When you were there on July 9, 2014, were you able to -- was
12    Mr. Antol able to provide you with any documentations or
13    packing slips or anything about the source of the cigar
14    wraps or the Hookah tobacco?
15 A  He was not able to provide anything, any documentation.
16 Q  Did he tell you anything about how he acquired them?
17 A  No, he did not.
18 Q  Did you ask him?
19 A  Yes.
20 Q  Okay. What was his answer?
21 A  He refused to give me any information as far as the
22    acquisition of the tobacco. Actually, he refused to
23    identify himself, so I wasn't really sure who I was talking
24    with. I was under an assumption, but. . . .
25 Q  Was that over the phone?

4 (Pages 13 to 16)

GREG PAROLINI
4/30/2015

### Page 17

1. A  No, it was in person.
2. Q  Okay. That was after he arrived?
3. A  Yes. Yeah.
4. Q  Based upon what you've seen there on those documents, --
5. A  Um-hum.
6. Q  -- does that hopefully refresh your memory as to the
7.     approximate value that you came up with for the seized
8.     items?
9. A  Well, I mean I would just -- it's based on the wholesale
10.    value, not on -- on retail, so --
11. Q  That was going to be my next question.
12. A  Yeah. So I guess based -- based on the wholesale value - I
13.    was looking at the numbers of -- of packages that we have,
14.    you know, I would -- I would probably think in the $400
15.    range.
16. Q  Okay. As you sit here today, can you tell us did you submit
17.    this to any prosecuting agency for action?
18. A  I don't -- I don't follow that course. I'm not in a
19.    position to do that. That's what the state police would do.
20.    So I don't -- I don't have any -- any authority to -- to do
21.    the criminal route. I only look at this from a taxation
22.    standpoint.
23. Q  Okay. But the Tobacco Products Tax Act, when -- when
24.    someone is in possession of these things, is it -- do you
25.    agree that the remedies are broken down by the wholesale

### Page 18

1.     value -- the total wholesale value of what is seized?
2. A  Yes.
3. Q  And are -- what are the remedies then just on your side of
4.     things?
5. A  On my side, it's -- it's whatever tax should have been
6.     remitted had the proper -- had the tobacco gone through the
7.     normal course of distribution. That's what they would -- an
8.     assessment would be. They'd get the bill for that based on
9.     that, on -- on the wholesale value and the penalty.
10. Q  Okay. Yeah. That was going to be next question.
11. A  Okay.
12. Q  So you -- you calculate the tax?
13. A  Yes.
14. Q  And then I think the penalties are actually written in the
15.    statute, aren't they?
16. A  Yes, 500 -- 500 percent of the wholesale value.
17. Q  Okay. And then if you make a determination that you're
18.    going to make that assessment, how is it done? How do you
19.    go about notifying the person that you seize the property
20.    from, "Hey, you owe us this much money?"
21. A  The -- the collections division of the treasury unit has a
22.    system set up whereby this information would be basically
23.    uploaded to that and a letter is sent out with a bill, and
24.    then there's also appeal information on that, too, kind of
25.    how, if they disagree with it, that they can have -- go

### Page 19

1.     through the tax tribunal, etcetera.
2. Q  And do you load that information into the system?
3. A  I do not.
4. Q  How does it get loaded into the system for collections?
5. A  A tech assistant from the Tobacco Unit would do that, would
6.     enter into the system.
7. Q  Somebody that works in your unit?
8. A  Yes.
9. Q  Did that happen in this case?
10. A  I'm not sure. I don't know.
11. Q  Do you -- would you characterize it as unusual that Mr.
12.    Antol has not received a notice of assessment?
13. A  Yes, it would be unusual.
14. Q  Did you tell anyone to not load it in the system?
15. A  I did not, no. I did not tell anybody not to load it into
16.    the system.
17. Q  Did you specifically tell anybody to do it?
18. A  No, I didn't.
19. Q  Once you turn it in, what's -- I mean do you have to monitor
20.    it to make sure that it gets done or is it something that
21.    you just assume gets done?
22. A  No, my supervisor -- this packet, which would have this -- a
23.    copy of this -- these forms that you -- you've given to me,
24.    would -- and my report would be given to my supervisor, she
25.    would then assign it to one of the tech assistants to enter

### Page 20

1.     it. Now, I -- I don't know how there's -- if there's any
2.     followup after that to determine whether or not it was
3.     actually entered. That's all done over in Lansing. I don't
4.     work out of that office, so I -- I don't know.
5. Q  Now, earlier you mentioned you discussed this with a
6.     supervisor -- or the response to my letter anyway with a
7.     supervisor named Steve Schaub?
8. A  Yes.
9. Q  That's S-c-h-a-u-b?
10. A  Yes.
11. Q  But you just mentioned a female supervisor.
12. A  Correct.
13. Q  Who's that?
14. A  Alicia, A-l-i-c-i-a -- it's A-l-i-c-i-a is her first name,
15.    Alicia. Last name is Nordmann, N-o-r-d-m-a-n-n.
16. Q  And did she replace Mr. Schaub?
17. A  No. Alicia Nordmann is my immediate supervisor and Steve
18.    Schaub is Alicia Nordmann's supervisor.
19. Q  All right. So tell me about your communication with
20.    Sergeant Schmitz in deciding how and when you're going to
21.    end up at 885 East Apple.
22. A  Well, this -- this was -- this location, Deuces -- Deuces
23.    Wild, was on -- I create a list of -- of businesses to -- to
24.    go to to do inspections on kind of like geographically. I
25.    may go to Holland one day or Muskegon a day or two, so I've

5 (Pages 17 to 20)

Tri-County Court Reporters
248-608-9250

GREG PAROLINI
4/30/2015

Page 21

1 got kind of a large area in West Michigan to handle. I had
2 been in the Muskegon area several weeks or so before this
3 July 9th and had driven by this business, Deuces Wild Smoke
4 Shop, noticed it was on my list. When I looked at it, I saw
5 how -- the size of the building. It was quite -- quite a
6 large building, so it was one that I wasn't even going to
7 try to go in by myself. I didn't know what I was going to
8 find in there, if it was a lot of tobacco, a lot of -- in
9 storage. It would just take me forever to do an inventory
10 on it with the invoices, so that's -- that's when I usually
11 will enlist the help of the state police team. They have
12 four members here at the West Michigan team to -- to assist
13 me. So when I -- my research shows it could be a really
14 large amount of tobacco, basically that's when I'll enlist
15 their help.
16 Q So you just went by the -- the simple fact that the outside
17 dimensions of the building gave you concern over the --
18 the -- the challenge of the inventory task?
19 A Well, yeah, the fact that it's a smoke shop and with a large
20 building, I mean just -- I just -- you just never know. I
21 mean if it's -- if it's a little corner grocery store, I can
22 usually tell any -- I've been in enough of them that
23 whatever tobacco, it's right behind the counter and it
24 doesn't really take a whole lot. One or two people can do
25 it in a short time. But with a building that size and with

Page 22

1 it being a smoke shop, which is a specialty store, I'm not
2 going to -- I didn't think I was going to find groceries in
3 there and dog food and such, so with -- again putting that
4 together, I just figure I better just do it safe and make
5 sure I have enough people in there instead of having to go
6 in, being overwhelmed, and then having to come back. It
7 kind of defeats the purpose of a surprise inspection.
8 Q Do you work in plain clothes?
9 A Yes.
10 Q Did you ever consider just walking in, buy a T-shirt or
11 whatever and -- or just look around so you could get an idea
12 of the challenge?
13 A No, only because I mean if it's -- if there's a warehouse,
14 if there's a storage area, I really can't see what -- what's
15 in there and I -- I -- so no, I don't -- I don't even
16 consider doing that. I just go in at one time and do an
17 inspection.
18 Q So you coordinate with Sergeant Schmitz and mutually agree
19 on a time and date, correct?
20 A Yes.
21 Q And do you all meet there or do you meet somewhere else and
22 then drive over there?
23 A We -- we met there. Yeah, we met there 'cause we all pretty
24 much drove separately.
25 Q How were you dressed when you arrived?

Page 23

1 A Very similar to how I am now with just a pair of Dockers or
2 khakis and usually a button-down shirt.
3 Q Do you have any credentials or identification or a badge?
4 A I have an identification, a state -- my State of Michigan
5 I.D. card I usually wear on a lanyard around my neck.
6 Q Were you wearing it around your neck on this day?
7 A I don't recall.
8 Q How was Sergeant Schmitz dressed?
9 A Plain clothes. He was, yeah, not in uniform.
10 Q What about the two officers with him?
11 A All plain clothes.
12 Q Did you all walk in together?
13 A Yes.
14 Q Who walked in first?
15 A Don't recall.
16 Q Did the -- any of the three members of the state police have
17 their credentials out and visible?
18 A I don't recall.
19 Q Of the four of you, who identified -- who made contact with
20 any employee first?
21 A I believe I did.
22 Q Who did you have contact with?
23 A With a female, Samantha.
24 Q Where in the building?
25 A In the main retail area of the store by the counter.

Page 24

1 Q At this point, what kind of things are you observing?
2 A Just kind of looking around just to see what type of
3 products they have. I saw a lot of pipes and clothing, I
4 believe it was, and then usually the tobacco is kept behind
5 the actual counter area and -- I mean for security purposes,
6 and in this case, it was. I did see some -- some cigar
7 wraps -- some smaller boxes of cigar wraps behind the
8 counter.
9 Q What did you tell Ms. Conklin?
10 A Well, I have a business card that -- that I always provide
11 to the -- to the clerk or to the manager, whoever's at --
12 who's responsible for -- for the store to identify who I am.
13 And normally I would -- I would identify who the other
14 people I'm with from the state police, and they may have
15 done it at this time. I don't -- I don't really -- really
16 know how that would have happened. But just explain to
17 Samantha what this is about, what this entails, why we're
18 here and what kind of documentation that we need.
19 Q Did you then have an opportunity to look around in the
20 retail area?
21 A Yes.
22 Q Did she cooperate with that?
23 A She was -- she was a bit -- a bit antagonistic and
24 defensive, I think just from us being -- or at least from
25 me, I should say, I don't want to say about us but at least

GREG PAROLINI
4/30/2015

### Page 25

1   from me being in -- in the building. I mean what we could
2   see -- what we could see is what we were standing and
3   looking at, and -- and again I -- I immediately asked for
4   identification. I gave her my identification and I asked
5   for hers and she said it was in the back room in a -- in a
6   purse.
7   Q   When you say you gave her your identification, did you give
8       her the business card and your state I.D.?
9   A   I don't recall. I know the business card for sure that I
10      put on -- on the counter.
11  Q   In your current job, do you have a badge?
12  A   Yes.
13  Q   Did you have that with you?
14  A   I'm sure I did, yes.
15  Q   Is it on your lanyard that you wear around your neck?
16  A   No, it's in a wallet.
17  Q   Did you then go behind the counter and -- and look at the
18      cigar wraps that you saw?
19  A   Not immediately I didn't, no.
20  Q   How did that transpire?
21  A   Well, when I asked for identification and she said it was in
22      the back, a separate room in the back of the business, she
23      said she'd go back and get it, and I said, "Well, I'll come
24      with you." I don't want somebody just kind of wandering
25      off. I followed her back towards the back section to an

### Page 26

1   area where the -- kind of around a little partition and
2   that's when she stopped and said I couldn't go any further
3   than that. So I had left -- I had left the main counter
4   area at that point in time.
5   Q   Okay. And then what happened?
6   A   Then I -- she said I couldn't -- I couldn't come back there.
7       I told her, I said, "Well, the Tobacco Products Tax Act
8       allows me to look throughout the entire building for tobacco
9       products, including storage areas, closets." I said, "IF
10      this is back here, this is part of the building, I am
11      allowed to come back here." And at that point, one or two
12      of the state police troopers that were with me had kind of
13      wandered over that way and kind of heard the conversation of
14      Samantha not allowing me into this back area, the door was
15      closed, and that's when they -- one of them -- both of them
16      got involved with the conversation then, the troopers got
17      involved.
18  Q   And what part of the Tobacco Tax Act do you think allows you
19      to go into any part of the building?
20  A   The inspection section, I'm not really sure what number it
21      is, indicates that we can look at all locations within the
22      building, any kind of place where any tobacco products could
23      be stored.
24  Q   Is that --
25  A   It's very specific.

### Page 27

1   Q   Is that section not limited to wholesalers?
2   A   I don't believe it is, no.
3   Q   No?
4   A   No.
5   Q   Does a retailer have to have a license under the Tobacco Tax
6       Act?
7   A   No.
8   Q   Just the sales tax license, right?
9   A   Just the sales tax license.
10  Q   And is the -- is the authority to search not limited also to
11      licensees under the Tobacco Tax Act?
12  A   Just to licensees?
13  Q   Yes.
14  A   No, to anybody who has tobacco products, including
15      retailers.
16  Q   Any other basis that you think gave you the authority to go
17      into the back over her objection?
18  A   No. I only -- I only work under the -- the TPTA. That's
19      the only authorization I have.
20  Q   Any interpretations of that act or anything that you were
21      relying on?
22  A   No, just the act itself.
23  Q   What led you to think that there might be tobacco products
24      in that back area of the building?
25  A   Well, I -- I didn't know if there was. And actually my --

### Page 28

1   my -- my first impression was that -- was to get her
2   identification, and she was going to an unknown area and I
3   just wasn't going to allow that to happen.
4   Q   Why were you not going to allow her to go into an unknown
5       area?
6   A   To get her identification card? 'Cause I don't know what's
7       back there. I don't know -- for my own safety, I wasn't
8       going to let somebody just wander around to an area who was
9       already aggravated with us -- with me being there. I don't
10      know what -- what kind of response she was going to have.
11  Q   Well, you had three armed troopers with you, correct?
12  A   I did.
13  Q   Were you armed?
14  A   I was not.
15  Q   Tell me then about the conversation that went on between Ms.
16      Conklin and, like you said, perhaps two of the three
17      troopers.
18  A   Back by this -- the back area of the door?
19  Q   Yes.
20  A   Yeah, she wouldn't -- wouldn't allow -- and when the
21      troopers came up, they -- one or both of them had said the
22      same thing, that they're allowed to go back into this area
23      by virtue of the inspection, and she wasn't going to allow
24      them either, and at that point one of the troopers had taken
25      his handcuffs out from -- I don't know where he had them

7 (Pages 25 to 28)

GREG PAROLINI
4/30/2015

Page 29

1  stored and kind of lifted them up and showed Samantha the
2  handcuffs and said, "Well, you need to do what you're
3  supposed to do," or, "You need to allow us back there or
4  this is -- you could be under arrest," or -- or something of
5  that.
6  Q  So you heard one of these troopers threaten to arrest her if
7     she didn't comply?
8  A  Yes.
9  Q  And then what happened?
10 A  She -- Samantha then opened the door and -- opened the door
11    and started walking down this hallway into this area and we
12    followed behind her.
13 Q  Was the door locked?
14 A  I don't believe it was locked. I don't remember her pulling
15    out any kind of a key or anything.
16 Q  Okay.
17    (At 1:13 p.m., Defendant's Exhibit No. 1 marked by
18    court reporter)
19 BY MR. BOSTIC:
20 Q  I'm showing you what's been marked as Deposition Exhibit 1.
21    Do you recognize that?
22 A  No, I don't.
23 Q  You don't recall seeing that by that door behind that
24    partition?
25 A  I do not.

Page 30

1  (At 1:14 p.m., Defendant's Exhibit No. 2 marked by
2  court reporter)
3  BY MR. BOSTIC:
4  Q  I'm showing you what's been marked as Deposition Exhibit No.
5     2. Do you recognize that at all?
6  A  I do not.
7  Q  You don't recall seeing that one by the door either?
8  A  I don't.
9  Q  So you and two of the troopers go into the back with Ms.
10    Conklin, correct?
11 A  Correct.
12 Q  What do you see?
13 A  Well, there were several doors along the right-hand side
14    that were closed and then we -- there was maybe about a 10
15    or 15-foot walk down the -- this hallway to -- to the end
16    where there's kind of an open area and I could smell what
17    seemed like processed marijuana and I could see several jars
18    of some green leafy material which I believed to be
19    marijuana processed.
20 Q  Did Ms. Conklin eventually then get to her purse and give
21    you her identification?
22 A  Yes.
23 Q  And then what happened after that?
24 A  She produced her -- her driver's license or Michigan I.D.
25    card, I forget which, along with -- along with I believe a

Page 31

1  care giver card, maybe four or five of her patients' cards,
2  and set those on the table, and I took the -- the driver's
3  license, that's the only thing I was interested in, and I
4  left that area and went back into the -- to the retail area
5  of the store with just the driver's license. The other
6  cards and such were still on a desk or a table in that back
7  area.
8  Q  Did she and the troopers come out of that area with you or
9     did they stay back there out of your sight?
10 A  They stayed back there. Yeah, I was the only one that left
11    that -- that area at that point.
12 Q  And then you -- did you go then behind the counter and
13    finish what you were there to do?
14 A  Yes. Yeah, by the time I got back up to the main retail
15    area, one of the troopers was still out in that -- the main
16    retail area. I met up with him and he found some other, I
17    think it was, that Hookah tobacco in another section behind
18    the counter. And we didn't have any invoices for it, so we
19    just started to -- to inventory it in case we happened on
20    having to seize. We kind of got ahead of ourselves and
21    started inventorying it.
22 Q  What do you mean you got ahead of yourself?
23 A  Well, the -- the -- apparently Samantha was going to call
24    the owner, Derek. And at that point in time -- sometimes
25    when the owner gets there, they all of a sudden know where

Page 32

1  the invoices are or whatever, and we thought, well, if -- if
2  that happens, then we'll just tear these sheets up, these
3  inventory sheets, and we're good.
4  Q  Okay. And did you have any more communication on July 9th
5     with Ms. Conklin?
6  A  Outside of -- of --
7  Q  Well, when you left the area, she was still back there with
8     the troopers?
9  A  Um-hum. Yes.
10 Q  Did you have -- did you have any more direct communication
11    with her that day?
12 A  Yes, I did.
13 Q  And tell me about that.
14 A  Well, once -- once Derek had -- had arrived and we were able
15    to determine that there were no invoices, I think at some
16    point in time there was a phone conversation between one of
17    the troopers and Derek and it seems to me that Derek had
18    told me all the invoices or packing slips are shredded or --
19    or thrown away and that there -- there just won't be any.
20    So at that point in time, we felt pretty -- pretty good that
21    this -- there's no way to substantiate these tobacco
22    products, so we're going to have to seize it. So my next
23    contact with Samantha would have been with those forms you
24    previously showed me, the seizure forms, the inventory forms
25    and the -- the appeal forms. I -- I had -- I put those in

GREG PAROLINI
4/30/2015

### Page 33

1  her name 'cause she had identification. She was the only
2  employee that I knew that I had identification, so that's
3  why I dealt with her on that and supplied her with a copy
4  of -- of the -- the seizure form, as well as the inventory
5  sheets, the notice of seizure form and the two sheets
6  outlining the -- the inventory of the products that were
7  seized.
8  Q  Did you say that -- that you received word through one of
9     the troopers that Mr. Antol said he shreds the invoices or
10    the packing slips?
11 A  I'm quite sure that's what -- yeah.
12 Q  So that's how you got information about the status of the
13    products?
14 A  Initially, yes. But again that was -- that was a phone call
15    that I think it was Sergeant Schmitz had with Derek. And
16    somehow the information came out to us that, no, there are
17    none. I think he said, "I just spoke with Derek. He said
18    there's no invoices. They're destroyed or shredded or
19    something."
20 Q  And then was there a point in time where Mr. Antol showed up
21    while you were still there?
22 A  Yes.
23 Q  And did you have direct communication with Mr. Antol?
24 A  I did, yes.
25 Q  Tell me about that.

### Page 34

1  A  Well, he came in and I -- Samantha had said she was calling
2     Derek. When he came in, he kind of came in behind the
3     counter, this person, again, still not knowing who it was
4     but assuming it was Derek Antol, the owner or one of the
5     owners of the store, and again identified who I am, why --
6     why I was here, what I was doing, again asked him if he knew
7     where the invoices were, and I really got zero cooperation
8     from him about who he was, why he was there, any paperwork
9     and such, so I just continued on filling out the inventory
10    sheet.
11 Q  'Cause you had already been told via a third party that he
12    shreds them?
13 A  Correct.
14 Q  Had you ever met Derek Antol prior to July 9, 2014?
15 A  No.
16 Q  What about Samantha Conklin?
17 A  No, neither.
18 Q  Had you ever worked with Adam Dent from WEMET before?
19 A  No, I had not.
20 Q  I'm going to ask you to take a look at your inventory --
21 A  Um-hum.
22 Q  -- I mean, I'm sorry, your notice of seizure.
23 A  Yes.
24 Q  You have two addresses here for --
25 A  Yes.

### Page 35

1  Q  -- Samantha. Do you know how that happened?
2  A  One was on the driver's license and as I started copying it
3     down, she said, "Well, that's not the correct address. My
4     real address is I believe this top one here, 423 Farr Road."
5  Q  Okay.
6  A  But the Montgomery one would be the one that was on her --
7     oh, license number, so it'd be her driver's license then.
8  Q  If your agency -- well, not your agency, but if the
9     collections' folks in Treasury sent her a notice of
10    assessment to the Montgomery address and it came back, what
11    would happen?
12 A  Well, they would -- they would -- they would assess the
13    owner of the property. The assessment would go to the -- to
14    the owner of the property, not to who it was actually seized
15    from 'cause a lot of times it's just -- you know, we --
16    there could be just a clerk at like a gas station --
17 Q  Okay.
18 A  -- and the owner wouldn't be there, but we'd find out who
19    the actual owner of the business was who's responsible.
20    We're not going to hold, you know, the clerk responsible for
21    it.
22 Q  So you think the notice would have been sent to 885 East
23    Apple?
24 A  Yes.
25 Q  I mean the assessment.

### Page 36

1  A  I would assume. That's the only address that -- that we
2     have down for him unless the state police had a different
3     one, but they really wouldn't have been involved in that
4     assessment unless somebody from Treasury contacted the state
5     police. So then I don't know.
6  Q  Okay. So how did your involvement there on 885 East Apple
7     wrap up on July 9, 2014?
8  A  Well, once -- once the -- all the tobacco products were
9     inventoried, boxed, those forms were signed and given to
10    Samantha, it was I think shortly before that is when
11    Sergeant Schmitz said that WEMET was on their way or
12    whatever, they had been contacted, they were on their way or
13    one of them's coming or whatever. I really didn't pay a lot
14    of attention to that part. We got everything boxed up and I
15    pretty much just stayed there 'cause Derek was there and
16    Samantha was there. And then the -- I think the WEMET --
17    several members of the WEMET drug team arrived and I think
18    maybe one or two uniformed officers. I don't know if it was
19    from the state police or Muskegon Township or Sheriff, but a
20    couple uniformed officers came. There was conversation
21    between Derek and what he said was -- was an attorney over
22    the phone, and I couldn't obviously hear that. There was --
23    we were just -- I was basically just waiting there, just
24    standing there until we figured we were all going to leave.
25    And then I understand that there was a search warrant that

9 (Pages 33 to 36)

GREG PAROLINI
4/30/2015

Page 37

1  was going -- going to come into play here. And Derek said
2  to me -- looked at me and said, well, why am I -- why am I
3  still here, meaning me. He said, "Your job is done. You
4  don't need to be here anymore. This is now a police matter.
5  The tobacco's done, so you can leave." So I did. So I
6  left.
7  Q  You had your own ride, so you didn't need to stay with --
8  A  Correct.
9  Q  -- Schmitz or his fellows, right?
10 A  Correct.
11 Q  Okay.
12 A  And I -- I had all the tobacco. It was my inspection. They
13    were -- the state police were assisting me, so I had all the
14    tobacco, I had the paperwork, so, yeah, my job, my
15    responsibilities were done and I left.
16 Q  Did you see Mr. Wistrom arrive at any point?
17 A  I don't recall.
18 Q  Okay.
19 A  I don't know.
20 Q  How long do you think you were there?
21 A  Probably an hour, hour and a half, --
22 Q  Okay.
23 A  -- I would think.
24 Q  Were you aware of the -- the development, so to speak, where
25    Samantha and Derek demanded that everyone, all the law

Page 38

1  enforcement people leave the building?
2  A  I did hear that, yes.
3  Q  And then the law enforcement people said, "Okay, but we're
4     all going to step outside"?
5  A  Yes.
6  Q  And that's what happened?
7  A  Yes.
8  Q  Okay. Were you there when Detective Dent arrived?
9  A  I don't really know him. I don't know.
10 Q  Okay. And that would have concluded your involvement at 885
11    East Apple?
12 A  Yes. Once -- once we all left the building and the parking
13    lot, I pretty much said, "Nothing for me to do here," and I
14    left.
15 Q  And have you had any reason to have any telephone or written
16    communication with Mr. Antol since?
17 A  No.
18 Q  You're familiar with a commercial building that has a multi-
19    use? And when I say that, I'm talking about the trend that
20    we see lately where we'll have a gas station that has a
21    convenience store in it --
22 A  Yes.
23 Q  -- and a fast food joint under the same roof.
24 A  Yes, I'm familiar with that.
25 Q  How do you deal with that in terms of your authority to

Page 39

1  inspect an entire building when you -- when you have a
2  really obvious multi-use?
3  A  Well, quite often I've been in gas stations like that.
4  There's one -- one common storage area is what I -- what I
5  have found. We'll follow the manager back and say, "Is
6  there any other tobacco products stored in this building?"
7  and she'll lead us back to a storage area where we'll find
8  tobacco products, we'll find boxes of food products.
9  They're all in one basically a storeroom such, so that's --
10 that's where we'll go, to that -- to the storeroom. I don't
11 recall ever having been to, well, there's a separate
12 storeroom for the Subway, a separate storeroom for this.
13 The ones that I'm familiar with that I recall is that it's
14 been a central storage room.
15 Q  Let's say you have a McDonald's. Would you inspect the --
16    with a gas station and a convenience store that sells
17    tobacco. Would you inspect the cooking area, the manager's
18    office, the cooler, things of that nature on the McDonald's
19    side?
20 A  I'm trying to think. I don't think we've ever been -- I
21    don't know if I've ever been in a situation specifically
22    like that with a McDonald's. You know, I would really kind
23    of -- I would really rely on the manager who was there and,
24    you know, basically where -- where is the storage area --
25    areas here, and they would bring us to the storage areas.

Page 40

1  Q  Would you think that the ability to search under the Tobacco
2     Tax Products Act would allow you to go over and insist on
3     inspecting the manager's office on the fast food side?
4  A  Yes.
5  Q  Even if they're two obviously different businesses?
6  A  Well, it's -- it's in the same -- same structure and -- I
7     mean if it's -- if it's an open area. If it's two
8     separate -- two separate walls, specifically separate
9     businesses that I have separate names and separate addresses
10    and they're walled off, that would be individual
11    inspections. But, you know, in the -- I'm thinking of a
12    gas station/Subway that -- that's quite familiar. It's an
13    open area, so you just walk from one to another. It's --
14    it's that one business, one address on it.
15 Q  I mean sometimes they may have a cage that they drop down at
16    night through the archway or whatever, but --
17 A  Yeah, maybe --
18 Q  -- during business hours, it's going to be wide open?
19 A  It's going to be open and that's when we do it, during
20    normal business hours, yeah.
21     MR. BOSTIC: I don't have any other questions.
22     MR. JUSTIAN: No questions.
23     (At 2:28 p.m., deposition concluded)
24          * * *
25

10 (Pages 37 to 40)

Tri-County Court Reporters
248-608-9250

GREG PAROLINI
4/30/2015

```
                                    Page 41
 1
 2
 3
 4
 5
 6      I certify that this transcript, consisting of 41 pages, is a
 7   complete, true, and correct record of the testimony of Greg
 8   Parolini held in this case on April 30, 2015.
 9      I also certify that prior to taking this deposition, Greg
10   Parolini was duly sworn to tell the truth.
11
12   May 1, 2015
13              Denise L. Jamba, CER 0786
                Certified Electronic Recorder
14
15
16
17
18
19
20
21
22
23
24
25
```

11 (Page 41)

Tri-County Court Reporters
248-608-9250