**UNITED STATES OF AMERICA**

**IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION**

Derek Antol, individually and as next friend of          File No: 1:17-cv-613
DSAII, a minor, and Devon S. Antol, and Tryston Antol,
        Plaintiffs,

v.

Adam Dent, Kate Straus,                                  Hon. Janet T. Neff
Casey Bringedahl, Casey Trucks,                          U.S. District Court Judge
Pete Kutches, and Western Michigan
Enforcement Team, a public
body organized under the laws of the
State of Michigan,
        Defendants,
_____/

**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES**

Attachment 2 – Derek Antol affidavit

STATE OF MICHIGAN                    )
                                     ) ss:
COUNTY OF MUSKEGON                   )

<u>**AFFIDAVIT**</u>

    Derek S. Antol, being duly sworn, states:

  1.    Affiant is an adult and competent to testify to the assertions in the affidavit on personal

knowledge unless otherwise noted.

  2.    I never received any type of tax assessment from the Michigan Department of Treasury

as a result of the inspection of July 9, 2014.

  3.    Attachment A to this affidavit is an electric bill for 885 E. Apple Avenue for account

number 1000 6177 0663 for one of the two meters at the location.

  4.    Attachment B to this affidavit is an electric bill for 885 E. Apple Avenue for account

number 1000 6177 0739 for the other meter at the location.

  5.    Attachment C to this affidavit is the organization documents for the Greater Michigan

Compassion Club filed with the Michigan Secretary of State.

6.      Attachment D to this affidavit is the organization document for Deuces Wild Smoke Shop filed with the Michigan Secretary of State.

7.      Attachment E is a photograph of the signs by the door to the southern portion of the building.

8.      Attachment F is a copy of the IRS Form 1040 Schedule C for Deuces Wild I filed in for tax year 2013.

9.      Attachment G is a copy of the IRS Form 1040 Schedule C for Personal Care which was the activity of Greater Michigan Compassion Club with me as the service provider I filed for tax year 2013.

10.     Attachment H is a true and accurate still shot from the video surveillance of the tax team members first entering the building at 885 E. Apple Ave. on July 9, 2014 with Mr. Parolini being the first one through the door. The time stamp is accurate and shows them entering at 1:05:00 p.m.

11.     Attachment I is a true and accurate still shot from the video surveillance of the arrival of Defendants Dent and Straus with the search warrant. The time stamp is accurate and shows them entering at 4:37:24 p.m.


    Further your affiant sayeth not.

_____
Derek S. Antol

On the 5 day of October, 2018, Derek S. Antol appeared personally before me and
swore to the facts contained in the above affidavit.

_____
, Notary Public
Muskegon County, Michigan
My commission expires: Dec. 27, 2023

Carley A Schaner
Notary Public, State of Michigan
County of Muskegon
My Commission Expires December 27, 2023

**Consumers Energy** Count on Us

ATTACHMENT A

I  1000b1770bb3  000000246397  0000  205b  8  000000000000     H

**In case of a power outage,** you can choose from a variety of options to stay informed at work, at home or on the go. Report outages and get service restoration updates using our 24/7-customer service line or mobile-enhanced online outage map at www.ConsumersEnergy.com/outagemap.

**Sign up for our free eNewsletter and webinars** at www.ConsumersEnergy.com/business.

**In case of an emergency, call us immediately day or night at 1-800-477-5050.**

**DEREK S ANTOL**
**885 E APPLE AVE**
**MUSKEGON MI 49442-3737**

LANSING, MI 48937-0001

Account Number: **1000 6177 0663**

Due: **08/14/14** Enclosed:

Total: **$246.39**

Include Corrections/Comments on Back ☐

Fold, detach and mail top portion with payment. Make check payable to Consumers Energy.

## Detail of Current Charges

### Elec Gen Sec Rate GS Com
Rate: 1100

| Meter Number: 11762777 | POD: 0000000963810 |
|---|---|
| Meter Begin Read: 70028 | Meter End Read: 71474 |
| Read Type: actual | |

Total Metered Energy Use: 1446 kWh

**Electric Power Supply Charges**

| | | | |
|---|---|---|---|
| Energy | 1446 @ 0.099744 | · | $144.23 |
| PSCR | 1446 @ 0.004560 | | $6.59 |

**Electric Delivery Charges**

| | | |
|---|---|---|
| System Access | | $20.00 |
| Distribution | 1446 @ 0.037011 | $53.52 |
| Energy Efficiency | | $8.89 |
| LIEEF Residual U-17174 | | $0.01- |
| Securitization | 1446 @ 0.001385 | $2.00 |
| Securitization Tax | 1446 @ 0.000849 | $1.23 |
| Low-Income Assist Fund | | $0.99 |

**Total Electric** $237.44



| | | |
|---|---|---|
| Aug 2013 - Jul 2014 Usage | 18185 kWh | |
| July electric use | 1446 kWh | |
| Electric use per day | 47 kWh | |
| Electric cost per day | $7.66 | |

## Summary of Charges

**Account Number: 1000 6177 0663**

**Service:**
DEREK ANTOL
885 E APPLE AVE
MUSKEGON MI 49442-3737

| | |
|---|---|
| Last Month's Account Balance | $234.76 |
| Payment 07/01/14 - Thank You | $240.00- |
| **Balance Forward** | **$5.24-** |

Payments applied after Jul 23, 2014 are not included.

| | |
|---|---|
| Total Electric | $237.44 |
| Sales Tax | $14.19 |
| **Total Energy Charges** | **$251.63** |

| **Total Amount Due** | **$246.39** |
|---|---|

| | |
|---|---|
| Billing Period | 06/22/14 - 07/22/14 |
| Bill Month | July |
| Days Billed | 31 |
| Invoice | 201715114255 |

Your next scheduled meter read date is on or around 08/20/2014.

Your payment is due August 14, 2014. After the due date, the unpaid balance is subject to a 2% late payment charge.

### News You Can Use

**Renewable energy charge at $0.** The renewable energy plan monthly surcharge, which began September 2009, is currently $0. The amount varies each month, and this is the first time it has been $0.

**Questions about your bill?** Get an explanation of all charges and learn more about the sections of your bill at www.ConsumersEnergy.com/business.

**Sign up for our valuable eNewsletter:** Learn smart ways other businesses are saving every month. The eNewsletter covers energy saving tips, rebate incentive updates and much more. Visit www.ConsumersEnergy.com/mybusiness and choose "Evaluation Tools."

**FREE facility energy assessment online.** Spend a few minutes with our Online Facility Assessment Wizard and uncover a wealth of information that can lower your energy costs, increase efficiency and improve your bottom line. Visit www.ConsumersEnergy.com/mybusiness and choose

**Consumers Energy** *Count on Us*

ATTACHMENT B

I  100061770739  000000295170  0000  2056  7  000000000000  H

**In case of a power outage,** you can choose from a variety of options to stay informed at work, at home or on the go. Report outages and get service restoration updates using our 24/7 customer service line or mobile-enhanced online outage map at www.ConsumersEnergy.com/outagemap.

**Sign up for our free eNewsletter and webinars** at www.ConsumersEnergy.com/business.

**In case of an emergency, call us immediately day or night at 1-800-477-5050.**

ԱԲԱԲԱԲ...

**DEREK S ANTOL**
**885 E APPLE AVE**
**MUSKEGON MI 49442-3737**

LANSING, MI 48937-0001

Account Number: **1000 6177 0739**

Due: **08/14/14** Enclosed:

Total: **$295.17**

Include Corrections/Comments on Back ☐

Fold, detach and mail top portion with payment. Make check payable to Consumers Energy.

## Detail of Current Charges

### Elec Gen Sec Rate GS Com
Rate: 1100

**Meter Number: 8291825**
Meter Begin Read: 42502
Read Type: actual

POD: 000000963811
Meter End Read: 44305

Total Metered Energy Use: 1803 kWh

Electric Power Supply Charges

| | | |
|---|---|---|
| Energy | 1803 @ 0.099744 | $179.84 |
| PSCR | 1803 @ 0.004560 | $8.22 |

Electric Delivery Charges

| | | |
|---|---|---|
| System Access | | $20.00 |
| Distribution | 1803 @ 0.037011 | $66.73 |
| Energy Efficiency | | $1.63 |
| LIEEF Residual U-17174 | | $0.01- |
| Securitization | 1803 @ 0.001385 | $2.50 |
| Securitization Tax | 1803 @ 0.000849 | $1.53 |
| Low-Income Assist Fund | | $0.99 |

**Total Electric** **$281.43**



| | |
|---|---|
| Aug 2013 - Jul 2014 Usage | 8092 kWh |
| July electric use | 1803 kWh |
| Electric use per day | 58 kWh |
| Electric cost per day | $9.08 |

## Summary of Charges

**Account Number:** 1000 6177 0739

**Service:**
DEREK ANTOL
885 E APPLE AVE
MUSKEGON MI 49442-3737

| | |
|---|---|
| Last Month's Account Balance | $216.91 |
| Payment 07/01/14 - Thank You | $220.00- |
| **Balance Forward** | **$3.09-** |

Payments applied after Jul 23, 2014 are not included.

| | |
|---|---|
| Total Electric | $281.43 |
| Sales Tax | $16.83 |
| **Total Energy Charges** | **$298.26** |

| **Total Amount Due** | **$295.17** |
|---|---|

| | |
|---|---|
| Billing Period | 06/22/14 - 07/22/14 |
| Bill Month | July |
| Days Billed | 31 |
| Invoice | 201715114256 |

Your next scheduled meter read date is on or around 08/20/2014.

Your payment is due August 14, 2014. After the due date, the unpaid balance is subject to a 2% late payment charge.

### News You Can Use

**Renewable energy charge at $0.** The renewable energy plan monthly surcharge, which began September 2009, is currently $0. The amount varies each month, and this is the first time it has been $0.

**Questions about your bill?** Get an explanation of all charges and learn more about the sections of your bill at www.ConsumersEnergy.com/business.

**Sign up for our valuable eNewsletter:** Learn smart ways other businesses are saving every month. The eNewsletter covers energy saving tips, rebate incentive updates and much more. Visit www.ConsumersEnergy.com/mybusiness and choose "Evaluation Tools."

**FREE facility energy assessment online.** Spend a few minutes with our Online Facility Assessment Wizard and uncover a wealth of information that can lower your energy costs, increase efficiency and improve your bottom line. Visit www.ConsumersEnergy.com/mybusiness and choose

ATTACHMENT C

# Michigan Department of Energy, Labor & Economic Growth

## Filing Endorsement

This is to Certify that the ARTICLES OF INCORPORATION - NONPROFIT

for

GREATER MICHIGAN COMPASSION CLUB

ID NUMBER: 70913L

received by facsimile transmission on August 18, 2010 is hereby endorsed

Filed on August 18, 2010 by the Administrator.

The document is effective on the date filed, unless a
subsequent effective date within 90 days after
received date is stated in the document.



In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 18TH day
of August, 2010.

Director

Bureau of Commercial Services

Sent by Facsimile Transmission 10230

AUG-18-2010  14:02    FROM-THE UPS STORE 3469                2317555552             T-158   P.002    F-059

BCS/CD-502 (Rev. 05/10)

## MICHIGAN DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH
## BUREAU OF COMMERCIAL SERVICES

Date Received

This document is effective on the date filed, unless a
subsequent effective date within 90 days after received
date is stated in the document.

Name

Derek Stephen Antol

Address

1504 Montgomery

City                        State                        ZIP Code

Muskegon                    MI                           49441              EFFECTIVE DATE:

Document will be returned to the name and address you enter above.
If left blank, document will be returned to the registered office.

### ARTICLES OF INCORPORATION
### For use by Domestic Nonprofit Corporations
(Please read information and instructions on the last page)

Pursuant to the provisions of Act 162, Public Acts of 1982, the undersigned corporation executes the following Articles:

## ARTICLE I

The name of the corporation is:

Greater Michigan Compassion Club

## ARTICLE II

The purpose or purposes for which the corporation is organized are:

Engaging, at no profit, exclusively in charitable, educational, scientific and lobbying efforts of coordinating and facilitating
education and information concerning marijuana laws, and to provide educational instruction on proper cultivation.

## ARTICLE III

1. The corporation is organized upon a __Nonstock__ basis.

   (Stock or Nonstock)

2. If organized on a stock basis, the total number of shares which the corporation has authority to issue is

   _____ If the shares are, or are to be, divided into
   classes, the designation of each class, the number of shares in each class, and the relative rights, preferences and
   limitations of the shares of each class are as follows:

08/18/2010   2:47PM

AUG-18-2010 14:03 FROM-THE UPS STORE 3469 2317555552 T-158 P.003 F-059

## ARTICLE III (cont.)

3. a. If organized on a nonstock basis, the description and value of its real property assets are: (if none, insert "none")

None

b. The description and value of its personal property assets are: (if none, insert "none")

None

c. The corporation is to be financed under the following general plan:

Through the collection of dues, contributions, assessments, donations, etc.

d. The corporation is organized on a ___Directorship___ basis.
(Membership or Directorship)

## ARTICLE IV

1. The name of the resident agent at the registered office is:

Derek Antol

2. The address of its registered office in Michigan is:

1848 East Sherman Plaza Suite R     Muskegon     . Michigan   49441
(Street Address)                         (City)                              (ZIP Code)

3. The mailing address of the registered office in Michigan if different than above:

_____
(Street Address or PO Box)                   (City)          , Michigan _____
                                                                              (ZIP Code)

## ARTICLE V

The name(s) and address(es) of the incorporator(s) is (are) as follows:

| Name | Residence or Business Address |
|---|---|
| Derek Stephen Antol | 1848 East Sherman Plaza Suite R, Muskegon MI 49441 |
| Samantha Josaphine Conklin | 1504 Montgomery, Muskegon MI 40441 |

08/18/2010  2:47PM

AUG-18-2010  14:03    FROM-THE UPS STORE 3469              2317555552          T-159   P.004   F-059

Use space below for additional Articles or for continuation of previous Articles. Please identify any Article being
continued or added. Attach additional pages if needed.

I, (We) the incorporator(s) sign my (our)name(s) this _____ 11th _____ day of _____ August _____, 2010

08/18/2010  2:47PM

# Michigan Department of Licensing and Regulatory Affairs

## Filing Endorsement

This is to Certify that the ARTICLES OF ORGANIZATION (DOMESTIC L.L.C.)

for

DEUCES WILD SMOKE SHOP, LLC

ID NUMBER: D6557A

received by facsimile transmission on October 12, 2011 is hereby endorsed
Filed on October 13, 2011 by the Administrator.

The document is effective on the date filed, unless a
subsequent effective date within 90 days after
received date is stated in the document.



In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 13TH day
of October, 2011.

Director

Bureau of Commercial Services

Sent by Facsimile Transmission 11285

10/12/2011 3:42PM (GMT-04:00)

BCS/CD-700 (Rev. 04/11)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## BUREAU OF COMMERCIAL SERVICES

| Date Received | (FOR BUREAU USE ONLY) | |
|---|---|---|
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. | |

| Name | | |
|---|---|---|
| Derek S. Antol | | |
| **Address** | | |
| 885 E. Apple Avenue | | |
| **City** Muskegon | **State** MI | **ZIP Code** 49442 |

EFFECTIVE DATE:

Document will be returned to the name and address you enter above. If left blank, document will be returned to the registered office.

### ARTICLES OF ORGANIZATION
### For use by Domestic Limited Liability Companies
(Please read information and instructions on reverse side)

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

### ARTICLE I

The name of the limited liability company is: Deuces Wild Smoke Shop, LLC

### ARTICLE II

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

### ARTICLE III

The duration of the limited liability company if other than perpetual is: _____

### ARTICLE IV

1. The name of the resident agent at the registered office is: Derek S. Antol

2. The street address of the location of the registered office is:

   885 E. Apple Avenue, Muskegon _____ , Michigan ___ 49442
   (Street Address)                          (City)                                    (Zip Code)

3. The mailing address of the registered office if different than above:

   _____ , Michigan ___ _____
   (P.O. Box or Street Address)           (City)                                 (Zip Code)

### ARTICLE V (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

See Attached

Signed this ____ day of ____ October ____, 2011

By _____
(Signature(s) of Organizer(s))

Derek S. Antol
(Type or Print Name(s) of Organizer(s))

10/12/2011  3:42PM (GMT-04:00)

## MICHIGAN DEPARTMENT OF LABOR & ECONOMIC GROWTH
## BUREAU OF COMMERCIAL SERVICES

**ARTICLE V**

A member of the limited liability company shall not be personally liable to the limited liability company or its members for monetary damages for a breach of fiduciary duty as a member, except for liability.

(1)    For any breach of the member's duty of loyalty to the limited liability company or it's members;

(2)    For acts or omissions not in good faith or that involve intentional misconduct or knowing violation of law;

(3)    For any transaction from which the member derived an improper personal benefit; and

(4)    For any acts or omissions occurring before the date this Article is filed by the Department of Labor and Economic Growth.

If, after the adoption of this Article by the members of the limited liability company, the Michigan Limited Liability Company Act of Michigan is hereafter amended to further eliminate or limit the liability of a member, then a member of the limited liability company (in addition to the circumstances in which a member is not personally liable as set forth in the proceeding paragraph) shall not be liable to the limited liability company or its members to the fullest extent permitted by the Michigan Limited Liability Company Act of Michigan, as so amended. Any repeal or modification of this Article by the members of the limited liability company shall not adversely affect any right or protection of a member of the limited liability company existing at the time of such repeal or modification.

The limited liability company shall indemnify its present and past members, officers, employees and agents and such other persons a it shall have power to indemnify, together with their heirs and personal representatives, to the fullest extent permitted under and subject to the limitations of the Michigan Limited Liability Company Act of Michigan against all judgments, payments in settlement, fines and other costs and expenses (including attorney fees), incurred by such person in connection with the defense of any action, suit or proceeding which is brought or threatened against or involving such person because he or she was or is a member, officer, employee, agent or otherwise acting on behalf of the limited liability company or any affiliate.

Preparer's name:  Derek S. Antol
Business Telephone Number:  231-769-7461

Additional page of BCS/CD-700
Page 2 of 2

NO. 8852   P. 3      231 767 1314    OCT. 12. 2011  3:38PM

Vers 4.1 (02/14)

### DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
### CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU
### LIMITED LIABILITY COMPANY ANNUAL STATEMENT

## 2013

| Identification Number | Limited Liability Company Name |
|---|---|
| **D6557A** | **DEUCES WILD SMOKE SHOP, LLC** |

Resident agent name and mailing address of the registered office

**DEREK S ANTOL**

**MI**

The address of the registered office

**885 E APPLE AVE**

**MUSKEGON MI 49442**

### Electronic Signature

| Filed By | Title | Phone |
|---|---|---|
| **DEREK ANTOL** | **AUTHORIZED AGENT** | **231-557-1391** |

[X] I certify that this filing is submitted without fraudulent intent and that I am authorized by the business entity to make any changes reported herein.

### Payment Information

| Payment Amount | Payment Date/Time | Reference Nbr |
|---|---|---|
| $ 25 | 07/23/2014 11:26:35 | 71315 6802 D6557A 2013 |

Required by Section 207, Act 23, Public Acts of 1993

## INFORMATION & INSTRUCTIONS

### Annual Statement must be signed in accordance with MCL 450.4103.

**For Domestic Limited Liability Companies** - It may be signed by a member, if managed by members, by a manager if managed by managers, or by an authorized agent of the company.

**For Foreign Limited Liability Companies** -  Must be signed by a person with authority to do so under the laws of the jurisdiction of its organization.

Vers 5.0 (06/15)

## DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU
### LIMITED LIABILITY COMPANY ANNUAL STATEMENT

# 2014

| Identification Number | Limited Liability Company Name |
| --- | --- |
| **D6557A** | **DEUCES WILD SMOKE SHOP, LLC** |

Resident agent name and mailing address of the registered office

**DEREK S ANTOL**

**MI**

The address of the registered office

**885 E APPLE AVE**

**MUSKEGON MI 49442**

## Electronic Signature

| Filed By | Title | Phone |
| --- | --- | --- |
| **DEREK S ANTOL** | **AUTHORIZED AGENT** | **2315571391** |

[X] I certify that this filing is submitted without fraudulent intent and that I am authorized by the business entity to make any changes reported herein.

## Payment Information

| Payment Amount | Payment Date/Time | Reference Nbr |
| --- | --- | --- |
| $ 25 | 07/20/2015 16:03:22 | 71315 6802 D6557A 2014 |

Required by Section 207, Act 23, Public Acts of 1993

## INFORMATION & INSTRUCTIONS

**Annual Statement must be signed in accordance with MCL 450.4103.**

**For Domestic Limited Liability Companies** - It may be signed by a member, if managed by members, by a manager if managed by managers, or by an authorized agent of the company.

**For Foreign Limited Liability Companies** - Must be signed by a person with authority to do so under the laws of the jurisdiction of its organization.

Vers 5.0 (06/15)

DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU
LIMITED LIABILITY COMPANY ANNUAL STATEMENT

## 2015

| Identification Number | Limited Liability Company Name |
|---|---|
| **D6557A** | **DEUCES WILD SMOKE SHOP, LLC** |

Resident agent name and mailing address of the registered office

**DEREK S ANTOL**

**MI**

The address of the registered office

**3140 HEIGHTS RAVENNA RD**

**MUSKEGON MI 49444**

### Electronic Signature

| Filed By | Title | Phone |
|---|---|---|
| **DEREK S ANTOL** | **AUTHORIZED AGENT** | **2315571391** |

[X] I certify that this filing is submitted without fraudulent intent and that I am authorized by the business entity to make any changes reported herein.

### Payment Information

| Payment Amount | Payment Date/Time | Reference Nbr |
|---|---|---|
| $ 25 | 07/20/2015 16:06:26 | 71315 6802 D6557A 2015 |

Required by Section 207, Act 23, Public Acts of 1993

## INFORMATION & INSTRUCTIONS

### Annual Statement must be signed in accordance with MCL 450.4103.

**For Domestic Limited Liability Companies** - It may be signed by a member, if managed by members, by a manager if managed by managers, or by an authorized agent of the company.

**For Foreign Limited Liability Companies** - Must be signed by a person with authority to do so under the laws of the jurisdiction of its organization.

ATTACHMENT E

# RESTRICTED AREA

## DO NOT ENTER UNDER PENALTY OF LAW

THIS FACILITY IS OPERATED IN STRICT COMPLIANCE WITH THE MICHIGAN MEDICAL MARIJUANA AC
OPERATOR IS A ☐REGISTERED PRIMARY CAREGIVER ☐REGISTERED QUALIFYING PATIENT ☒BOT

## UNLAWFUL ENTRY INTO THIS FACILITY IS A CRIM

### NOTICE TO LAW ENFORCEMENT OFFICERS

- **This facility contains** no more than 12 marijuana *plants* for each qualifying patient serviced b the operator, plus 12 additional plants if the operator is also a registered qualifying patient.
- **The operator of this facility is registered** with the State of Michigan, and certifies that this facility strictly complies with the Michigan Medical Marijuana Act (MMMA).
- **Ask** the operator for credentials issued under the Registry ID Program.
- **You are directed to contact the COMPLIANCE DIVISION** of the DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS for verification of the operator's credentials. MCL 333.26426(h)(3)
- **Please present a valid warrant before you enter this facility.** You may enter only with a valid court order.
- **The ACT prohibits the operator to grant permission any other person to access this facility** (MCL 333.26423(3)(C); this prohibition against access includes government officials, without exception. No active opposition will be offered, and keys will be made available where appropriate, but such cooperation should not be interpreted as permission to access this facility.
- **Take notice that,** "Possession of, or application for, a registry identification card **shall not constitute probable cause or reasonable suspicion, nor shall it be used to support the search of the person or property** of the person possessing or applying for the registry identification card, or otherwise subject the person or property of the person to inspection by any local, county or state governmental agency". MCL 333.26426(G).
- **Take notice that,** a person who "has been issued and possesses a registry identification card **shall not be subject to arrest,** prosecution, or penalty in any manner" so long as that person is within the 12 plant/patient limitations established by the MMMA. Further, "Any incidental amount of seeds, stalks, and unusable roots shall also be allowed under state law and shall not be included in this amount." (MCL 333.26424(A) and (B).
- **Take notice that,** "any marihuana, marihuana paraphernalia, or licit property that is possessed, owned, or used in connection with the medical use of marihuana, as allowed under this act, or acts incidental to such use, **shall not be seized or forfeited.**" (MCL 333.26424(H).
- **Take notice that 42 USCA 1983** provides that a state or local government official who causes a person to be deprived of rights guaranteed by the U.S. Constitution (like the right against unlawful search and seizure), or federal law, is liable to that person for damages plus actual attorney fees. Further, **42 USCA 242** subjects officials to criminal penalties when applicable.
- **Please contact the following person *before* you enter into this facility:**

## ENTRY INTO THIS
# SECURE FACILITY
## IS STRICTLY PROHIBITED

© 2011 Gregory C. Schmid, Attorney at Law. PH (989) 799-4641. Forms available free of charge @
WWW.QUALIFYINGPATIENT.COM
All Rights reserved. However, permission for download, print, and redistribute for any purpose is hereby granted,
so long as author credits remain on the face of this document.
PRINTED BY SAFER MICHIGAN COALITION

# NOTICE

# RESTRICTED AREA

The person operating this facility is REGISTERED with the MICHIGAN DEPARTMENT OF HEALTH as a REGISTERED CAREGIVER. REGISTRY IDENTIFICATION CARD NUMBERs

_____,_____.

And is thereby authorized to be in possession of the materials on these premises pursuant to MCL 333.264221, et seq. I am / am not a Michigan Qualified Patient, Registry #

Pursuant to MCL 333.26426, §(h)(3), law enforcement personnel should contact the Michigan Department of Health, Compliance Manager, at 517-373-4992 or Program Coordinator, at 517-373-4992, to verify that the Registry Identification Card Number(s) above are valid. If you have further questions, please contact:- Derek Antol

_____.

Pursuant to MCL 333.26426, §(h), all licit property that is possessed, owned, or used in connection with this medical operation, storage, etc., or acts incidental to such use, shall not be seized or forfeited.

Any person who takes possession or otherwise damages the materials on these premises will be committing a felony. Any law enforcement personnel that secured a warrant, without disclosure of the foregoing information to the Court before proceeding with any search or seizure, will be subject to prosecution.

SAFER MICHIGAN COALITION ꟷꟷꟷ

ATTACHMENT F

| SCHEDULE C (Form 1040) | **Profit or Loss From Business** (Sole Proprietorship) | | OMB No. 1545-0074 **2013** |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | ► For information on Schedule C and its instructions, go to www.irs.gov/schedulec. ► Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065. | | Attachment Sequence No. **09** |

Name of proprietor
DEREK S ANTOL

Social security number (SSN)

**A** Principal business or profession, including product or service (see instructions)
RETAIL SALES

**B** Enter code from instructions
► 453990

**C** Business name. If no separate business name, leave blank.
DUCES WILD SMOKE SHOP

**D** Employer ID number (EIN), (see instr.)

**E** Business address (including suite or room no.) ► 885 E APPLE AVE
City, town or post office, state, and ZIP code   MUSKEGON MI   49442

**F** Accounting method:  (1) [X] Cash  (2) ☐ Accrual  (3) ☐ Other (specify) ►

**G** Did you "materially participate" in the operation of this business during 2013? If "No," see instructions for limit on losses  . [X] Yes ☐ No

**H** If you started or acquired this business during 2013, check here  . . . . . . . . . . . . . . . . . . . . . . ►

**I** Did you make any payments in 2013 that would require you to file Form(s) 1099? (see instructions)  . . . . . . . . . ☐ Yes ☐ No

**J** If "Yes," did you or will you file required Forms 1099?  . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

### Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked  . . . . . . . . . . . . . ► ☐ | 1 | 153,849 |
| 2 | Returns and allowances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0 |
| 3 | Subtract line 2 from line 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 153,849 |
| 4 | Cost of goods sold (from line 42)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 74,121 |
| 5 | Gross profit. Subtract line 4 from line 3  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 79,728 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions)  . . . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | 7 | 79,728 |

### Part II  Expenses
Enter expenses for business use of your home only on line 30.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8 | Advertising . . . . . . . . . | 8 | 1,200 | 18 | Office expense (see instructions) | 18 | | 314 |
| 9 | Car and truck expenses (see instructions) . . . . . . . . | 9 | | 19 | Pension and profit-sharing plans | 19 | | |
| | | | | 20 | Rent or lease (see instructions): | | | |
| 10 | Commissions and fees . . . . | 10 | | a | Vehicles, machinery, and equipment | 20a | | |
| 11 | Contract labor (see instructions) | 11 | | b | Other business property . . . . | 20b | | 19,000 |
| 12 | Depletion . . . . . . . . . . | 12 | | 21 | Repairs and maintenance . . . . | 21 | | 3,000 |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) . . | 13 | 2,707 | 22 | Supplies (not included in Part III) | 22 | | |
| | | | | 23 | Taxes and licenses . . . . . . . | 23 | | |
| | | | | 24 | Travel, meals, and entertainment: | | | |
| 14 | Employee benefit programs (other than on line 19) . . . . | 14 | | a | Travel . . . . . . . . . . . . | 24a | | |
| | | | | b | Deductible meals and entertainment (see instructions) | 24b | | |
| 15 | Insurance (other than health) . | 15 | | | | | | |
| 16 | Interest: | | | 25 | Utilities . . . . . . . . . . . | 25 | | 3,110 |
| a | Mortgage (paid to banks, etc.) . | 16a | | 26 | Wages (less employment credits) | 26 | | 54,923 |
| b | Other . . . . . . . . . . . . | 16b | | 27a | Other expenses (from line 48) . | 27a | | 4,561 |
| 17 | Legal and professional services | 17 | 500 | b | Reserved for future use . . . | 27b | | |
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27a  . . . . . . . . . ► | | | | | 28 | | 89,315 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7  . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 29 | | (9,587) |

| | | | |
|---|---|---|---|
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions). | | |
| | Simplified method filers only: enter the total square footage of: (a) your home: _____ and (b) the part of your home used for business: _____ . Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30  . . . . . . . . . . . . . | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on both Form 1040, line 12 (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see instructions). Estates and trusts, enter on Form 1041, line 3. | | |
| | • If a loss, you must go to line 32. | ► 31 | (9,587) |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on both Form 1040, line 12, (or Form 1040NR, line 13) and on Schedule SE, line 2. (If you checked the box on line 1, see the line 31 instructions). Estates and trusts, enter on Form 1041, line 3. | 32a [X] | All investment is at risk. |
| | • If you checked 32b, you must attach Form 6198. Your loss may be limited. | 32b ☐ | Some investment is not at risk. |

For Paperwork Reduction Act Notice, see the separate instructions.

Schedule C (Form 1040) 2013

EEA

Schedule C (Form 1040) 2013    RETAIL SALES 453990    Page **2**

| Name(s) | SSN |
|---|---|
| DEREK S ANTOL | |

| Part III | Cost of Goods Sold (see instructions) |

**33** Method(s) used to value closing inventory: **a** [X] Cost **b** [ ] Lower of cost or market **c** [ ] Other (attach explanation)

**34** Was there any change in determining quantities, costs, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [X] No

| | | | |
|---|---|---|---|
| **35** | Inventory at beginning of year. If different from last year's closing inventory, attach explanation . . . . | **35** | 15,000 |
| **36** | Purchases less cost of items withdrawn for personal use . . . . . . . . . . . . . . . . . . . . . . . . | **36** | 83,121 |
| **37** | Cost of labor. Do not include any amounts paid to yourself . . . . . . . . . . . . . . . . . . . . . . | **37** | |
| **38** | Materials and supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **38** | |
| **39** | Other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **39** | |
| **40** | Add lines 35 through 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **40** | 98,121 |
| **41** | Inventory at end of year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **41** | 24,000 |
| **42** | **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on line 4 . . . . . . . . | **42** | 74,121 |

| Part IV | Information on Your Vehicle. Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562. See the instructions for line 13 to find out if you must file Form 4562. |

**43** When did you place your vehicle in service for business purposes? (month, day, year) ▶

**44** Of the total number of miles you drove your vehicle during 2013, enter the number of miles you used your vehicle for:

**a** Business _____ **b** Commuting (see instructions) _____ **c** Other _____

**45** Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

**46** Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

**47 a** Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

**b** If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

| Part V | Other Expenses. List below business expenses not included on lines 8-26 or line 30. |

| | |
|---|---|
| SECURITY NOVOTNY | 360 |
| PAYROLL TAXES | 4,201 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| | | | |
|---|---|---|---|
| **48** | Total other expenses. Enter here and on line 27a . . . . . . . . . . . . . . . . . . . . . . . . | **48** | 4,561 |

EEA    Schedule C (Form 1040) 2013

ATTACHMENT G

| SCHEDULE C<br>(Form 1040) | **Profit or Loss From Business**<br>(Sole Proprietorship) | OMB No. 1545-0074<br>**2013** |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service (99) | ► For information on Schedule C and its instructions, go to www.irs.gov/schedulec.<br>► Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065. | Attachment<br>Sequence No. **09** |

| Name of proprietor | Social security number (SSN) |
|---|---|
| DEREK S ANTOL | |

| A | Principal business or profession, including product or service (see instructions) | **B** Enter code from instructions |
|---|---|---|
| | PERSONAL CARE | ► 812190 |

| C | Business name. If no separate business name, leave blank. | D Employer ID number (EIN), (see instr.) |
|---|---|---|
| | | |

**E** Business address (including suite or room no.) ► 423 FARR RD
City, town or post office, state, and ZIP code    MUSKEGON MI    49444

**F** Accounting method: (1) [X] Cash (2) ☐ Accrual (3) ☐ Other (specify) ►

**G** Did you "materially participate" in the operation of this business during 2013? If "No," see instructions for limit on losses   . [X] Yes ☐ No

**H** If you started or acquired this business during 2013, check here   . . . . . . . . . . . . . . . . . . . . ►

**I** Did you make any payments in 2013 that would require you to file Form(s) 1099? (see instructions)   . . . . . . . . . ☐ Yes [X] No

**J** If "Yes," did you or will you file required Forms 1099?   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

### Part I    Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked   . . . . . . . . . . . . . ► ☐ | 1 | 37,580 |
| 2 | Returns and allowances   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0 |
| 3 | Subtract line 2 from line 1   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 37,580 |
| 4 | Cost of goods sold (from line 42)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 3,978 |
| 5 | **Gross profit.** Subtract line 4 from line 3   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 33,602 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions)   . . . . . | 6 | |
| 7 | **Gross income.** Add lines 5 and 6   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | 7 | 33,602 |

### Part II    Expenses    Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising   . . . . . . . . . | 8 | | 18 | Office expense (see instructions) | 18 | |
| 9 | Car and truck expenses (see instructions)   . . . . . . . . . | 9 | | 19 | Pension and profit-sharing plans | 19 | |
| | | | | 20 | Rent or lease (see instructions): | | |
| 10 | Commissions and fees   . . . . | 10 | | **a** | Vehicles, machinery, and equipment   . | 20a | |
| 11 | Contract labor (see instructions) | 11 | | **b** | Other business property   . . . . | 20b | |
| 12 | Depletion   . . . . . . . . . . . | 12 | | 21 | Repairs and maintenance   . . . . | 21 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions)   . . | 13 | | 22 | Supplies (not included in Part III) | 22 | |
| | | | | 23 | Taxes and licenses   . . . . . . . | 23 | |
| | | | | 24 | Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19)   . . . . | 14 | | **a** | Travel   . . . . . . . . . . . . | 24a | |
| 15 | Insurance (other than health)   . | 15 | | **b** | Deductible meals and entertainment (see instructions) | 24b | |
| 16 | Interest: | | | 25 | Utilities   . . . . . . . . . . . . | 25 | 1,218 |
| | **a** Mortgage (paid to banks, etc.)   . | 16a | | 26 | Wages (less employment credits) | 26 | |
| | **b** Other   . . . . . . . . . . . . . | 16b | | 27 | **a** Other expenses (from line 48)   . | 27a | |
| 17 | Legal and professional services | 17 | | | **b** Reserved for future use   . . . | 27b | |

| | | | |
|---|---|---|---|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27a   . . . . . . . . . ► | 28 | 1,218 |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7   . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 32,384 |

**30** Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions).

Simplified method filers only: enter the total square footage of: (a) your home:    4,042
and (b) the part of your home used for business:    300    . Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30   . . . . . . . . . . . . . .

| | |
|---|---|
| 30 | 1,500 |

| | | | |
|---|---|---|---|
| 31 | Net profit or (loss). Subtract line 30 from line 29.<br>• If a profit, enter on both **Form 1040, line 12** (or **Form 1040NR, line 13**) and on **Schedule SE, line 2.**<br>(If you checked the box on line 1, see instructions). Estates and trusts, enter on **Form 1041, line 3.**<br>• If a loss, you **must** go to line 32. | 31 | 30,884 |

**32** If you have a loss, check the box that describes your investment in this activity (see instructions).
• If you checked 32a, enter the loss on both **Form 1040, line 12,** (or **Form 1040NR, line 13**) and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions). Estates and trusts, enter on **Form 1041, line 3.**
• If you checked 32b, you **must** attach Form 6198. Your loss may be limited.

| 32a | ☐ All investment is at risk. |
|---|---|
| 32b | ☐ Some investment is not at risk. |

For Paperwork Reduction Act Notice, see the separate instructions.    Schedule C (Form 1040) 2013
EEA

Schedule C (Form 1040) 2013   PERSONAL CARE 812190                                      Page **2**

Name(s)
DEREK'S ANTOL

| Part III | **Cost of Goods Sold** (see instructions) |

**33** Method(s) used to
value closing inventory:  **a** [X] Cost     **b** [ ] Lower of cost or market     **c** [ ] Other (attach explanation)

**34** Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If "Yes," attach explanation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  [ ] Yes   [X] No

| | | | |
|---|---|---|---|
| **35** | Inventory at beginning of year. If different from last year's closing inventory, attach explanation  . . . . | **35** | |
| **36** | Purchases less cost of items withdrawn for personal use  . . . . . . . . . . . . . . . . . . . . . . | **36** | |
| **37** | Cost of labor. Do not include any amounts paid to yourself  . . . . . . . . . . . . . . . . . . . . . | **37** | |
| **38** | Materials and supplies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **38** | 3,978 |
| **39** | Other costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **39** | |
| **40** | Add lines 35 through 39  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **40** | 3,978 |
| **41** | Inventory at end of year  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **41** | |
| **42** | **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on line 4  . . . . . . . . | **42** | 3,978 |

| Part IV | **Information on Your Vehicle.** Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file Form 4562. |

**43** When did you place your vehicle in service for business purposes? (month, day, year)   ▶

**44** Of the total number of miles you drove your vehicle during 2013, enter the number of miles you used your vehicle for:

**a** Business _____   **b** Commuting (see instructions) _____   **c** Other _____

**45** Was your vehicle available for personal use during off-duty hours?  . . . . . . . . . . . . . . . . . . . . . . [ ] Yes   [ ] No

**46** Do you (or your spouse) have another vehicle available for personal use?  . . . . . . . . . . . . . . . . . . [ ] Yes   [ ] No

**47 a** Do you have evidence to support your deduction?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes   [ ] No

**b** If "Yes," is the evidence written?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes   [ ] No

| Part V | **Other Expenses.** List below business expenses not included on lines 8-26 or line 30. |

**48** Total other expenses. Enter here and on line 27a  . . . . . . . . . . . . . . . . . . . . .  **48**







DEREK ANTOL
May 10, 2018

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF MICHIGAN
 3
 4    DEREK ANTOL, Individually and
 5    as next friend of DSA, a minor
 6    DSAII, a minor and TRYSTON ANTOL,
 7          Plaintiffs,
 8    vs.              Case No. 1:17-cv-613
 9                     Hon. Janet T. Neff
10    ADAM DENT, KATE STRAUSS,
11    CASEY BRINGEDAHL, CASEY
12    TRUCKS, PETE KUTCHES, and
13    WESTERN MICHIGAN ENFORCEMENT
14    TEAM, a public body organized
15    under the laws of the State of
16    Michigan,
17          Defendants.
18    _____
19
20        The Deposition of DEREK ANTOL,
21    Taken at 2851 Charlevoix Drive, SE, Suite 327,
22    Grand Rapids, Michigan,
23    Commencing at 10:43 a.m.,
24    Thursday, May 10, 2018,
25    Before Carol L. Gavigan, CSR-2494, RPR.
```

Page 2

```
 1    APPEARANCES:
 2
 3    J. NICHOLAS BOSTIC
 4    Bostic & Associates
 5    909 North Washington Avenue
 6    Lansing, Michigan 48906
 7    (517) 706-0132
 8    barristerbostic@att.net
 9        Appearing on behalf of Plaintiffs.
10
11    CURT A. BENSON
12    BRADLEY C. YANALUNAS
13    Cummings McClorey Davis & Acho
14    2851 Charlevoix Drive, SE
15    Suite 327
16    Grand Rapids, Michigan 49546
17    (616) 975-7470
18    cbenson@cmda-law.com
19    byanalunas@cmda-law.com
20        Appearing on behalf of Defendants Dent, Strauss,
21        Bringedahl, and co-counsel for Defendant Kutches.
22
23
24
25
```

Page 3

```
 1    ADAM P. SADOWSKI
 2    PATRICK MYERS
 3    Michigan Department of Attorney General
 4    525 West Ottawa Street
 5    Lansing, Michigan 48909
 6    (517) 373-6434
 7    SadowskiA@michigan.gov
 8    MyersP@michigan.gov
 9        Appearing on behalf of Defendant Casey Trucks.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              TABLE OF CONTENTS
 2
 3    WITNESS                                PAGE
 4    DEREK ANTOL
 5
 6    EXAMINATION
 7    BY MR. BENSON:                          5
 8    EXAMINATION
 9    BY MR. SADOWSKI:                       77
10    EXAMINATION
11    BY MR. BOSTIC:                         79
12
13
14              EXHIBITS
15
16    EXHIBIT                                PAGE
17    (Exhibits attached to transcript.)
18
19    DEPOSITION EXHIBIT 1                    73
20    DEPOSITION EXHIBIT 2                    76
21
22
23
24
25
```



DEREK ANTOL
May 10, 2018

Page 5

1   Grand Rapids, Michigan
2   Thursday, May 10, 2018
3   10:43 a.m.
4
5           DEREK ANTOL,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn to testify to the truth,
8   the whole truth and nothing but the truth, was
9   examined and testified as follows:
10          EXAMINATION
11  BY MR. BENSON:
12  Q.  Mr. Antol, my name is Curt Benson, and I represent
13      some of the officers that you filed this lawsuit
14      against.
15          Have you ever been deposed before?
16  A.  No.
17  Q.  Okay.  Well, I'm sure you talked to your lawyer about
18      it.  Let me give you just some basic -- or some basic
19      instructions.
20  A.  Sure.
21  Q.  If you, for some reason, don't understand a question
22      I'm asking, would you please ask me to either repeat
23      it or restate it so you understand exactly what it is
24      you're answering?
25  A.  Certainly.

Page 6

1   Q.  Okay.  If you want to take a break for any reason, you
2       need to use the restroom, you want to talk to your
3       legal counsel, just let us know, and we'll take a
4       break, all right?
5   A.  Sure.
6   Q.  And, obviously, you understand you're under oath.
7           And the other thing is the court reporter
8       has to record all of our conversation, and it's very
9       difficult if we talk over one another.
10  A.  Sure.
11  Q.  So listen until I'm done with the question, and then
12      give the answer.  And I will tell you right now I'm
13      the worst offender of that, because I'm constantly
14      interrupting the witness, it's just a bad habit.
15  A.  We'll manage.
16  Q.  Yeah.  I think that's probably the only thing I have
17      by way of instructions.
18          Do you have any questions of us before we
19      get underway?
20  A.  No, I do not.
21  Q.  All right.  Now, what I like to do, you know, one of
22      the most annoying things of litigation is answering
23      Interrogatories, which you have done?
24  A.  Sure.
25  Q.  And but it does save a lot of time at depositions.  So

Page 7

1       what I do is I tend to look at the Complaint, look at
2       the Answers to Interrogatories, and kind of use it as
3       an outline in moving forward, okay?
4   A.  Okay.
5   Q.  So I have a copy of your Interrogatories here, and so
6       let's -- I just want to get some background.  First of
7       all, do you recognize that document?  I've not had it
8       marked, because I figure it's part of the pleadings,
9       but are those your Answers to Interrogatories?
10  A.  They are, yes.
11  Q.  Okay.  And did you sign them under oath?
12  A.  Yes.
13  Q.  Okay.  And by oath I mean they're true and accurate,
14      to the best of your knowledge, correct?
15  A.  Correct.
16  Q.  Okay.  So I have a couple of questions.
17          First of all, I had asked in this whether
18      you have -- let's see here.  Looking at number 6, have
19      you ever been an officer, director, or incorporator or
20      claim an interest in a corporation or limited
21      liability company?  You listed Deuces Wild Smoke Shop,
22      LLC, correct?
23  A.  Correct.
24  Q.  And this is not a got you, it's a point of confusion.
25      Weren't you an officer of something called the

Page 8

1   Michigan Compassion Club?
2   A.  It was the Greater Michigan Compassion Club.
3   Q.  Okay.  Why is that not listed?  You were an officer,
4       correct?
5   A.  Yes --
6   Q.  Or an incorporator?
7   A.  We incorporated, and then we never went through the
8       process for the 501c3, it wasn't active for very long
9       at all, and it's just pretty much a dead entity.
10  Q.  It is today, but it was once a corporation with the
11      State of Michigan, correct?
12  A.  Correct.
13  Q.  Okay.
14  A.  For a matter of a few months, I believe.
15  Q.  Fair enough.
16          And what was your position with that
17      corporation -- and was it a corporation, or an LLC, do
18      you remember?
19  A.  It was -- the intention was to be a nonprofit.
20  Q.  Okay.
21  A.  And that's what I mean, we never -- it never went
22      anywhere.  We never went through the entire process of
23      gaining the 501 status.  We just filed the -- I
24      believe it was Articles of Incorporation that was
25      approved by the State.  We got a building for it.  And



DEREK ANTOL
May 10, 2018

## Page 9

1  then shortly after we tried to establish, you know,
2  what it was -- what we were setting out to do, we were
3  forced to move to another location, and then that's
4  when we just dropped what we were doing with that and
5  -- and went another route with the retail company,
6  with the Deuces Wild.
7  Q.  Okay. And so would it be accurate to amend number 6
8  to say -- what was the name of it, Greater --
9  A.  Greater Michigan Compassion Club.
10 Q.  Okay. So would we amend answer 6 and list the Greater
11 Michigan -- and I apologize, Michigan Compassion Club?
12 A.  I wouldn't object to that, no.
13 Q.  Okay. Which kind of leads to my next question, I had
14 asked about lawsuits involving the Greater Michigan
15 Compassion Club, and to be honest with you, I did not
16 understand your answer, so I'm going to ask you now to
17 explain it a little bit.
18       And I'm looking at question number 8, has
19 the Greater Michigan Compassion Club, or any other
20 entity in which you had an interest, ever been a party
21 to a civil action, whether State or Federal, and I
22 asked for some details.
23       Your answer is that Deuces Wild was also
24 named as a Defendant in the 2014 zoning tickets.
25       Could you elaborate -- I mean, I know

## Page 10

1  Greater -- I know that GMCC was sued for something.
2  What was that lawsuit all about?
3  A.  That was on the grounds of a public nuisance. We were
4  attempting to establish a nonprofit medical marijuana
5  dispensary.
6  Q.  Okay.
7  A.  We were very transparent with the Township as to what
8  our intentions were. In fact, we met with -- with
9  their counsel and the Board numerous times, you know,
10 with a wide open format on what we were trying to do,
11 and trying to gain not only interest, but approval of
12 the Township, which ultimately never happened.
13 Q.  Okay. But they -- did they file an action against the
14 Greater Michigan Compassion Club in Muskegon County
15 Circuit Court?
16 A.  I don't recall if it was actually against the entity,
17 or if it was just against myself and others who were
18 involved.
19 Q.  Okay. Is it listed in these -- anywhere in these
20 Answers to Interrogatories, that particular lawsuit?
21 A.  I don't believe so. It doesn't appear to.
22       MR. BOSTIC: You want me to help?
23       MR. BENSON: Oh, yeah, sure.
24       MR. BOSTIC: 7G.
25       MR. BENSON: Thank you.

## Page 11

1        MR. BOSTIC: Top of page 4.
2        MR. BENSON: I'm sorry --
3        MR. BOSTIC: Nuisance suit, yeah.
4        MR. BENSON: Oh, in other words --
5        MR. BOSTIC: That's this one, that's what
6  he's talking about.
7  BY MR. BENSON:
8  Q.  Okay. So the Township accused you of what,
9  maintaining a nuisance, for lack of a better term; is
10 that the right term?
11 A.  Public nuisance.
12 Q.  Okay.
13 A.  They filed on the grounds of a public nuisance.
14 Q.  And the case was dismissed because you decided to
15 close the Michigan Greater Compassion Club?
16 A.  Yeah. We just ceased all actions, and we seeked out
17 another location, which we found in a matter of days,
18 and moved approximately two-and-a-half miles west of
19 the -- what was the current location. And then we
20 opened up Deuces Wild Smoke Shop and went another
21 direction.
22 Q.  Got you.
23 A.  Completely different business venture.
24 Q.  So Greater Michigan Compassion Club is no more?
25 A.  Correct.

## Page 12

1  Q.  It is no more? But what does exist is Deuces Wild?
2  A.  Also correct.
3  Q.  And what is Deuces Wild?
4  A.  It is a general retail shop.
5  Q.  And what is the nature of the articles you sell?
6  A.  General retail, smoking accessories, flags, ashtrays,
7  candles, air freshener, health products, soaps,
8  posters, vapor supplies, E cigs, the vapor juice, all
9  of the accessories for the coils, and whatnot.
10 Q.  Do you sell tobacco products?
11 A.  We do not.
12 Q.  Have you ever sold tobacco products?
13 A.  Unknowingly, during the time of this investigation, we
14 had, I think, three different products that were
15 actually samples that were sent to us by one of my
16 distributors. They were cigar wraps, and we didn't
17 realize that they were actually made of tobacco. The
18 ones we carry now are not. They're all hemp wraps.
19 And the ones we had at the time apparently were
20 tobacco.
21       Ultimately, I -- you know, the Tobacco Tax
22 Enforcement Team that was in there, I instructed that
23 guy to please, you know, take anything that wasn't
24 supposed to be in there out, because we were
25 completely unaware, there was very, very fine print on



The Power of Commitment™

DEREK ANTOL
May 10, 2018

## Page 13

1 the rear side of the label that said that it contained
2 tobacco.
3 Q. So I'll ask you a little bit about that. So I think
4 in the Answers to Interrogatories was it 2011 Deuces
5 opened -- what year did it open? I may be wrong.
6 A. We filed the Articles in, I believe, October or
7 November of 2011. And we didn't actually gain the
8 business license, the local business license, and
9 actually open the business until February of 2012.
10 Q. Okay. And you'd mentioned a distributor had sent some
11 things to you that you did not realize contained
12 tobacco. First of all, who is the distributor?
13 A. I don't recall. You know, the nature of our business,
14 unfortunately we go through several distributors, some
15 of them don't last very long. Some of them just, you
16 know, stop carrying products that we were, you know,
17 purchasing and then reselling. So we -- we go through
18 probably at least a half a dozen different suppliers a
19 year.
20 Q. Okay.
21 A. I maintain probably close to a dozen suppliers, on
22 average, I'd say throughout, you know, the course of a
23 -- of a year. But, like I say, probably half a dozen
24 of those drop off, and another half a dozen get added
25 every year. It's just the nature of the business.

## Page 14

1 Q. So I'm going to ask you to elaborate a little bit. So
2 somebody unknown to you -- not unknown to you, but who
3 you cannot now currently remember, sent you some
4 tobacco products. Could you list --
5 A. I could narrow it down to a couple possible
6 distributors. It may have been Glow Industries,
7 G-L-O-O -- G-L-O-W. It may have been Sky Wholesale.
8 And it may have been Four Aces Wholesale. Those were
9 the three bigger ones that I was going through at the
10 time. And not all of my distributors sent samples
11 like those ones did. So I -- I could probably narrow
12 it down to those three, but I can't say for certain
13 which of those three -- especially because there was
14 -- there was I think three different products. There
15 was two different -- two different brands of the blunt
16 wraps that were found to be made with tobacco, and
17 then there was another product was -- what's referred
18 to as shisha, and that's the herbal molasses that goes
19 in a hookah.
20 Q. Okay.
21 A. And we had multiple varieties from different
22 manufacturers of shisha, and then these -- this one
23 particular sample, I think it was called Fantasia, if
24 I'm not mistaken.
25 Q. Okay.

## Page 15

1 A. None of the other ones were tobacco, but that one was.
2 Q. For the benefit of our court reporter, could you
3 venture a guess how to spell shisha?
4 A. S-H-E-E-S-H-A?
5 Q. Okay.
6 A. I believe.
7 Q. So there are two separate products we're talking
8 about. One is a blunt wrap. The other one is shisha?
9 Any other tobacco products that you --
10 A. I believe that was all that was found to be tobacco
11 product.
12 Q. So what is a blunt wrap? What do you do with a blunt
13 wrap?
14 A. People use them to role either tobacco or marijuana
15 into a smokable item.
16 Q. And that was basically like a tobacco leaf -- I mean,
17 it turns out to be, you didn't know this at the time?
18 A. Correct. The other ones that we carry are all hemp
19 based. And then these ones were tobacco.
20 Q. Got you. And those were actually in your shop and for
21 sale from when to when?
22 A. I don't believe we had them on the shelf for sale.
23 Q. Okay.
24 A. They were samples that were sent. The shisha was on
25 the shelf for sale.

## Page 16

1 Q. Okay.
2 A. That was a tower, I think it was a 12-pack of just
3 little, you know, cylinders that contain, you know,
4 maybe two or three ounces of the product.
5 Q. Okay.
6 A. Those were out for sale. The other ones we had just
7 gotten maybe a day or two before the incident went
8 down.
9 Q. Okay.
10 A. And those were not out for sale. Those were just on
11 the back wall on some shelving with some other
12 products, some other samples that had been sent.
13 Q. Now, you made a point of indicating that you had no
14 idea they were tobacco products. If you were selling
15 tobacco products would you have to be separately
16 licensed for that, do you understand?
17 A. Yes, yes.
18 Q. Okay. And you didn't have a license issued by the
19 State of Michigan to --
20 A. No, we do not.
21 Q. -- sell tobacco?
22 A. We do not. In fact, we have signage in our store that
23 specifically states that our products are not sold for
24 use with or intended for use with tobacco. As I say,
25 it was completely beyond my knowledge that it



DEREK ANTOL
May 10, 2018

## Page 17

1  contained tobacco.
2  Q. Okay.
3  A. Again, it was very fine small print on the rear side
4  of the packaging. And I wasn't familiar with the
5  product, again, either, they were samples that were
6  sent out --
7  Q. This is -- why would you have to have a sign saying
8  this is not intended to be used with tobacco? I mean,
9  for example, the blunt wrap, which you didn't know was
10  tobacco, is something you described that you might use
11  for tobacco?
12  A. It can be.
13  Q. Okay.
14  A. That was not our intention.
15  Q. Was it your intention then to be used with marijuana?
16  A. Correct.
17  Q. Okay. All right. In question number 9, I asked you
18  to describe your background -- your criminal
19  convictions, your offenses, and the like. So I'm
20  going to ask you a little bit about this.
21    Obviously, you don't have perfect
22  recollection of when this stuff happened, I appreciate
23  that. But sometime either 2001, 2002, it looks like
24  you were charged with manufacturing marijuana. Can
25  you tell me, number one, were you convicted of that?

## Page 18

1  And how? Were you convicted by plea? Or were you not
2  convicted? And I'm looking at subpart A.
3  A. I was convicted, I believe I took a plea on that.
4  Again, I -- 17, 18 years ago, I can't recall --
5  Q. Of course.
6  A. -- exactly what the agreement would have been. But I
7  do believe I took a plea for I think it was like a
8  two-year probationary period.
9  Q. Okay. Do you remember if you pled to a felony? And
10  we're looking at subpart A of your answer to number 9?
11  A. I can't say for certain. I want to say initially it
12  was dropped to a misdemeanor, and again, I can't say
13  for certain, but I believe I was -- I believe the
14  agreement was that they were going to drop it to a
15  misdemeanor, and then when the cocaine charge came
16  about, I was resentenced on the initial marijuana
17  violation.
18  Q. Okay. So correct me if I'm wrong, it sounds like you
19  pled guilty to either a felony or misdemeanor, you
20  don't remember?
21  A. Right.
22  Q. And you were placed on probation. And when you were
23  arrested for possession of cocaine, they revoked your
24  probation?
25  A. Correct.

## Page 19

1  Q. For -- okay.
2  A. And I was resentenced on the initial charge --
3  Q. Got you.
4  A. -- that I was put on probation for.
5  Q. So going back to that initial charge, did you plead
6  guilty because you were guilty?
7  A. Yes.
8  Q. And what was the circumstances of getting -- without
9  -- I don't need a whole lot of detail, but what were
10  the circumstances of getting caught with cocaine? How
11  did that come about?
12  A. I was pulled over -- I was actually going out fishing,
13  and as I was sitting in the parking lot on my phone,
14  an officer approached the vehicle and -- I remember
15  him wanting to search the vehicle, and at first I
16  declined consent to search. And then when he ran my
17  name, he found that I was on probation, and so they
18  searched the vehicle. And in the vehicle, there was
19  some CD cases in the center console, and they
20  contained little corner packs that contained cocaine
21  residue. And that's -- I mean, that's basically it.
22  Q. And so you were charged, and when it says 18 months,
23  that was because your probation was revoked with
24  respect to subpart A, correct?
25  A. Correct.

## Page 20

1  Q. Which, by the way, one might logically conclude then
2  that you pled to a felony in that subpart A, correct?
3  A. Correct.
4  Q. And did you also plead guilty to possession of
5  cocaine?
6  A. I did, yes.
7  Q. And you did because you were in fact guilty, correct?
8  A. Correct.
9  Q. All right, C, in February of 2014, District Court,
10  operating while intoxicated, just pulled over and
11  arrested? Nothing --
12  A. Yeah, it was just a routine traffic stop, I guess.
13  There was no accidents, or anything of that sort.
14  Q. Right. And then you pled guilty to that, I assume?
15  A. Correct.
16  Q. And you pled guilty because you were in fact guilty?
17  A. Also correct.
18  Q. And so now we're looking at subpart D. Is this the
19  crime which gives rise to this incident?
20  A. It is.
21  Q. Okay. So July 9th, Muskegon County Circuit Court, 20
22  -- excuse me, July 9th, 2014, Muskegon County Circuit
23  Court, manufacture -- what's the PWID, marijuana, with
24  possession with the intent to distribute, I assume?
25  A. Yes.



DEREK ANTOL
May 10, 2018

## Page 21

1  Q. Okay. Pled to manufacturing marijuana, 12 months in
2  jail. And that is as a result of the warrants
3  executed in the case that we're here today about,
4  correct?
5  A. Correct.
6  Q. And you pled guilty to that?
7  A. I did.
8  Q. I'm sorry?
9  A. I did.
10 Q. And you pled guilty because you were in fact guilty?
11 A. Yes.
12 Q. And subpart E, 2014, delivery of marijuana, pled
13 guilty. Is that the same -- does that arise out of
14 this same incident?
15 A. It does.
16 Q. Okay. And you pled guilty to delivery of marijuana,
17 and you pled guilty because you were in fact guilty,
18 correct?
19 A. Yes.
20 Q. Okay. All right, so let's talk about what happened on
21 July -- now, I have a copy -- I'm not -- let me talk
22 about this Complaint just for a second. You hire an
23 attorney to draft your Complaint, so I'm not going to
24 ask you to go through this Complaint and explain
25 anything to it, because that's why you have a lawyer.

## Page 22

1  A. True.
2  Q. I tend to use it as an outline, okay, so if you'd like
3  a copy of your own Complaint?
4  A. Sure.
5  Q. But, again, I understand it was drafted by your
6  lawyer, and he's the one asserting the various legal
7  theories, and the like, but it is helpful I think to
8  have it handy. Of course, I didn't keep one for
9  myself but --
10 MR. SADOWSKI: You can look over mine.
11 BY MR. BENSON:
12 Q. All right, July 9th, 2014, where were you at the --
13 because I understand when the Tobacco Tax Team arrived
14 you were not at Deuces Wild, right?
15 A. I was not at Deuces Wild.
16 Q. Do you remember roughly where you were?
17 A. I was over on the other side of town. I had my two
18 older sons with we, me were going to do some grocery
19 shopping.
20 Q. And I am referring, of course, to paragraph 13 of the
21 Complaint. Oh, never mind.
22 Are you married, by the way?
23 A. Divorced.
24 Q. Okay.
25 A. Engaged.

## Page 23

1  Q. And these two children were the product of your first
2  marriage -- your only marriage?
3  A. No.
4  Q. I'm sorry?
5  A. It was my only marriage. No, my children's mother and
6  I spent nine-and-a-half years together, we were never
7  married. All three of my sons were with her, and then
8  after we split, I married, and we had the marriage
9  annulled after I think it was about five months -- or,
10 actually, no, I take that back, we didn't have the
11 annulment. We ended up having to go through a divorce
12 because it was longer than six months.
13 Q. Okay. So -- and because your children are a part of
14 this, I have to ask you just a couple of questions
15 about that.
16 So you -- I didn't quite understand that
17 answer, and it's not really terribly important, but
18 you were married to whom at one -- you were married to
19 whom at what point?
20 A. I was married to Laura Adkins, is her name now.
21 Q. Okay.
22 A. It was Laura Humphries was her maiden name.
23 Q. Okay. And when did you marry Ms. Adkins or Humphries?
24 A. Oh, gosh, 2008? I believe.
25 Q. And how long were you married?

## Page 24

1  A. About seven months.
2  Q. And that ended in divorce, correct?
3  A. Correct.
4  Q. Okay. Now, is that the -- you were referring to
5  perhaps an annulment, and the like, but the bottom
6  line is it ended in divorce?
7  A. Yeah, yeah, we were going to try to get it annulled,
8  and then I guess there's a certain period that if you
9  go beyond that you have to actually go through a
10 divorce.
11 Q. And you had no children with Ms. Adkins?
12 A. No.
13 Q. Okay. And is that your only marriage?
14 A. Yes.
15 Q. Okay. And how many children do you have?
16 A. Three.
17 Q. And what is your oldest child's name?
18 A. Tryston.
19 Q. How do you spell Tryston? I know it's in these
20 pleadings.
21 A. T-R-Y-S-T-O-N.
22 Q. And how old is Tryston today?
23 A. He is 21.
24 Q. And who is next in line?
25 A. Devon, D-E-V-O-N.



US LEGAL SUPPORT
The Power of Commitment™

DEREK ANTOL
May 10, 2018

Page 25

```
1    Q. And how old is Devon today?
2    A. Devon is 18.
3    Q. And your youngest?
4    A.
5    Q. Okay.
6    A. He is 16.
7    Q. And do they have the same mother?
8    A. Yes.
9    Q. And who is that?
10   A. Erica Hume, H-U-M-E.
11   Q. And is -- Ms. Hume and you never married, obviously?
12   A. No.
13   Q. Are you together with her today?
14   A. No.
15   Q. Okay. Do you see her very often?
16   A. I can't say I've seen her in over a year. She has
17      very little to do with her children.
18   Q. I was going to ask you whether she was involved in her
19      children's lives?
20   A. Very, very little.
21   Q. Okay.
22   A. Not by my choice.
23   Q. I understand.
24         And Tryston -- and, by the way -- Tryston,
25      correct?
```

Page 26

```
1    A. Tryston.
2    Q. I'm sorry.
3          Of these three children today, do any of
4       them live with you today?
5    A. Yes. Devon and          the two youngest, live
6       with me.
7    Q. All right. And what's Tryston doing these days?
8    A. Tryston is living with a guy that was with his mother,
9       Samuel Shoen (sp). As far as I know, he's working
10      full time and working to get his own place.
11   Q. Okay. And Devon and          , are they in school,
12      or what are they doing?
13   A. Devon works full time for a landscaping company. And
14      my youngest son is currently enrolled in Reeths Puffer
15      High School in Muskegon.
16   Q. Now, referring back to paragraph 13 of the Complaint,
17      you were with all three of your boys, you were grocery
18      shopping that day?
19   A. No. My youngest son was at home. He had hockey
20      practice that morning.
21   Q. Okay.
22   A. And then he didn't want to go. He wanted to take a
23      nap and rest. So I left him at the house with my -- a
24      buddy of mine, Mike, that was there. And I took the
25      two older boys with me.
```

Page 27

```
1    Q. Now, I read, according to your Complaint, there are
2       two houses at issue here. Were you purchasing two
3       houses at the time of this incident?
4    A. At the time of the incident, yes, we had a land
5       contract for a property at 423 Farr Road in
6       Norton Shores. And we had an issue with the City of
7       Norton Shores over the number of dogs that we had, and
8       we were trying to get a kennel license, and we went
9       through the Zoning Board of Appeals, through the
10      application process, we were denied, and then we were
11      told we either had to get rid of our dogs or move.
12   Q. Okay.
13   A. So we entered into another land contract, where we
14      currently reside, at the 1769 North Green Creek
15      address, and put the home at the 423 address up for
16      sale, and continued to make payments on that for
17      approximately 14 months before we just couldn't handle
18      the payments on both and had to sign a quitclaim deed.
19   Q. So the house on Farr Road is in Norton Shores.
20      North Green Creek is what city?
21   A. North Muskegon.
22   Q. And at the time of this incident, which was -- began
23      on July 9th, 2014, where -- what did you consider your
24      home? Where did you return to at night and --
25   A. The 1769.
```

Page 28

```
1    Q. Okay. Farr Road?
2    A. No.
3    Q. No, I'm sorry, North Green Creek, okay.
4          So Farr Road, you were hoping to sell?
5    A. Yes.
6    Q. Because of the dog situation -- how many dogs did you
7       have?
8    A. We were trying to sell it so we could get our equity
9       back out of it.
10   Q. How many dogs did you have?
11   A. We had at the time five rottweilers.
12   Q. Was that a commercial enterprise, or were they just
13      pets?
14   A. No, we were -- our intention was to create a
15      rottweiler rescue, and, you know, they -- to
16      reiterate, we went through the early stages of the
17      process. We had to gain the City approval first for
18      the kennel license, and I didn't get anywhere, so we
19      were forced to either get rid of the dogs or move, so
20      we moved.
21   Q. So, again, going back to July 9th, 2014, what was the
22      state of Farr Road? Let me explain what I mean by
23      that. Was it -- although you were not living there,
24      was it habitable? Was it --
25   A. It was habitable. It was actually occupied by my
```



DEREK ANTOL
May 10, 2018

**Page 29**

1     cousin and his girlfriend, who were there. Kind of
2     helping them out with a place to stay.
3    Q. Okay.
4    A. And also security measure, if you will, for us,
5     because we did still have quite a bit of personal
6     belongings stored in the garage and in the basement
7     yet.
8    Q. Who is your cousin?
9    A. That was Mike Porter.
10   Q. And his girlfriend?
11   A. Heather Drabough (sp).
12   Q. Were they paying rent?
13   A. They were, yes.
14   Q. How long had they lived there before this -- before
15     July 9th --
16   A. Oh, gosh --
17   Q. -- 2014?
18   A. -- not long. A matter of a couple months, maybe.
19   Q. Okay. And, to the best of your recollection, how long
20     had you lived at North Green Creek before this
21     incident?
22   A. We were there approximately four years.
23   Q. And it was you, Tryston, Devon, and [    ] at the
24     time of the raid?
25   A. And Samantha.

**Page 30**

1    Q. And Samantha Conklin?
2    A. Yep.
3    Q. Was she a girlfriend?
4    A. Fiancee, yes.
5    Q. Fiancee? Is she today?
6    A. Yes.
7    Q. Now, going back to July 9th, you have Deuces Wild
8     Smoke Shop at 885 East Apple Avenue. How many
9     employees did you have there?
10   A. I believe at the time we had four.
11   Q. Okay. Do you remember their names?
12   A. Donald Supernaw, who's my brother, there was Fred
13     Fenning, Jr., Andrew Moser, and I forget Rob's last
14     name. Rob something or other. I forget his last
15     name.
16   Q. And did you pay them an hourly rate?
17   A. Yes, they were on payroll.
18   Q. And they weren't on commission or anything?
19   A. No.
20   Q. Okay. Now, I understand that -- well, first of all,
21     885 East Apple Avenue, is that a building you own?
22   A. No. That was another one I had a land contract, we
23     were purchasing that building.
24   Q. Okay. And I should rephrase that.
25     Were you purchasing the building on or

**Page 31**

1     about July 9th, 2014?
2    A. We were, yes, yeah.
3    Q. Okay. From whom were you purchasing it?
4    A. Donald Shampine.
5    Q. Champagne, like the wine?
6    A. Shampine.
7    Q. Do you think you could spell it?
8    A. S-H-A-M-P-I-N-E. And I believe that's Dasras,
9     Incorporated, D-A-S-R-A-S is his --
10   Q. So you think maybe it was -- was it Dasras?
11   A. Dasras.
12   Q. Dasras?
13   A. D-A-S-R-A-S.
14   Q. And Dasras was the corporation that you think actually
15     owned the building?
16   A. I believe so, yes.
17   Q. And what were the terms? In other words, what did you
18     pay for it, and what were you paying a month?
19   A. It was a -- it was to be a five-year balloon -- or
20     five-year land contract. I think the agreed purchase
21     price was 120,000, and our payments were 1,695 a
22     month.
23   Q. Okay. And what was that building before you bought
24     it, do you remember, was it a commercial --
25   A. Before we -- before we moved in, it was -- there were

**Page 32**

1     actually two entities in it, as we had. There was
2     Alf Insurance, and there was a Cash Advance store.
3    Q. Okay.
4    A. Both in the same location.
5    Q. Do you remember the square footage of that building?
6    A. It was approximately 1,600 square foot.
7    Q. 1,600?
8    A. Yeah.
9    Q. Okay. Is the building roughly a square shape, or is
10     it --
11   A. Rectangular.
12   Q. Rectangular?
13   A. Yeah. It was longer.
14   Q. And is it divided -- I mean, obviously your allegation
15     is there were -- you know, there's a public place, a
16     nonpublic place, et cetera, et cetera?
17   A. Correct.
18   Q. So I'm asking, in the rectangular building, was there
19     divisions within the building?
20   A. There was, yes.
21   Q. Okay. Can you describe the division? Walls --
22   A. Solid wall with a door.
23   Q. Okay, solid wall with a door. But just so I'm clear,
24     it was one building, correct?
25   A. Correct.



US LEGAL SUPPORT
The Power of Commitment™

DEREK ANTOL
May 10, 2018

Page 33

1  Q. And it was serviced with electricity, for example,
2     that served the entire building? There weren't two
3     separate meters, correct?
4  A. Incorrect. There were two separate meters.
5  Q. And what meter went to what?
6  A. One meter was for the Deuces Wild, and the other was
7     for the 885 East Apple.
8  Q. I'm sorry?
9  A. The 885 East Apple.
10 Q. Okay. Did it have the same address?
11 A. Yes.
12 Q. All right. So how -- roughly, what's the square
13    footage of Deuces Wild?
14 A. Where we're currently at, or at the time?
15 Q. At the time, I'm sorry. And, again, roughly? I'm not
16    going to hold you to it. I'm just trying to get an
17    idea.
18 A. It was probably about -- I would say about 1,200
19    square foot was being leased to Deuces Wild.
20 Q. Being leased by whom?
21 A. 885 East Apple.
22 Q. Okay. What is that?
23 A. That was an actual entity. It wasn't just the
24    address, it was the actual entity.
25 Q. Okay. And what was it, a corporation?

Page 35

1  Q. What's the alleged part? Who's made this allegation?
2  A. It would have been WEMET.
3  Q. Okay. And what do you mean by dispensary?
4  A. Provisioning center and dispensary, whatever you want
5     to call it.
6  Q. I'm sorry?
7  A. Provisioning center, medical marijuana dispensary,
8     whatever you want to call it.
9  Q. Okay. Well, it's a term that you used. I'm asking
10    what do you mean by a dispensary? So it's where
11    marijuana is sold?
12 A. Correct.
13 Q. Okay. And marijuana -- and that was -- so 885 East --
14    excuse me, what was the name of the corporation again?
15 A. 885 East Apple.
16 Q. Okay. And that was a corporation. And you say
17    "alleged" dispensary?
18 A. It was an LLC.
19 Q. Okay, LLC. Okay, and where was that dispensary
20    physically located?
21 A. In the rear of the building.
22 Q. Okay. Did you not consider that a marijuana
23    dispensary?
24 A. We did. Isn't that what I just described it to you
25    as?

Page 34

1  A. Yes.
2  Q. And were you an incorporator or an officer?
3  A. Yes.
4  Q. Is that listed in your Interrogatory Answers?
5  A. It was not, no.
6  Q. Why not? So there's at least two other entities that
7     you were an officer, which are left off this
8     Interrogatory answer, correct?
9  A. Yes.
10 Q. Okay. Well, let's talk about Apple Avenue then. When
11    did you incorporate that?
12 A. That was right around the same time, November of 2011,
13    when we moved in.
14 Q. Okay. Why did you incorporate and not just buy it as
15    an individual?
16 A. Excuse me?
17 Q. Why did you incorporate and purchase it through a
18    corporation, as opposed to just you individually?
19 A. The building was being purchased by myself as an
20    individual.
21 Q. Okay. Then what is 885 East Apple, what was the
22    function of that?
23 A. That was the alleged dispensary.
24 Q. Okay. So you say alleged dispensary?
25 A. That's what I said, yes.

Page 36

1  Q. Well, you said alleged, and I'm -- and normally when
2     someone says that, they say I disagree with it, that
3     somebody else is calling it a dispensary. So it is a
4     dispensary, correct?
5  A. It was a dispensary, yes.
6  Q. Okay. And from that part of the building, you sold
7     marijuana -- or, rather, 885 East Apple --
8  A. I didn't sell marijuana, no.
9  Q. Let me finish the question.
10    885 East Apple, LLC sold marijuana,
11    correct?
12 A. Correct.
13 Q. Okay. Did you, as either an officer or an employee of
14    this LLC, ever sell marijuana?
15 A. I did not.
16 Q. Okay. So you never handed it to anyone, took any
17    money, correct?
18 A. I did not.
19 Q. Okay. Did Samantha Conklin?
20 A. Yes.
21 Q. Okay. Did anyone else besides Samantha?
22 A. Yes.
23 Q. Who?
24 A. Rob Holm was his last name, H-O-L-M.
25 Q. H-O-L-M?



US LEGAL
SUPPORT
The Power of Commitment™

DEREK ANTOL
May 10, 2018

Page 37

1  A. Correct.
2  Q. And did you say Rob? I did not catch that.
3  A. Rob, yes, correct.
4  Q. Rob, all right. Anyone else?
5  A. There was a Raymond Meyers at one point.
6  Q. How do you spell Mr. Meyers' last name?
7  A. M-E-Y-E-R-S, I believe.
8  Q. Okay.
9  A. They were all licensed caregivers at the time, and
10    able to transfer medicine for compensation under the
11    definition of the medical use listed in 3E of the
12    Medical Marijuana Law at the time before other cases
13    had gone through the court process and, you know,
14    certain judgments were made.
15  Q. Okay.
16  A. But at the time our transfers were considered legal.
17  Q. By whom? You?
18  A. By the definition of the law. By the letter of the
19    law.
20  Q. Let me finish the question.
21  A. Sure.
22  Q. I understand the law exists, it's right there, we can
23    all read it. That was your interpretation at the time
24    these sales were made, you read the law and said these
25    are legal sales, correct?

Page 38

1  A. It wasn't just my interpretation, it was the letter of
2    the law. If you'd like me to explain I could do it
3    verbatim.
4  Q. I'd rather not. I'm asking you, you looked at it, you
5    read it, and in your opinion it was legal, correct?
6  A. Yes.
7  Q. Okay, thank you.
8    But you said subsequent judgments were
9    made. Made by whom? The Court of Appeals? Michigan
10    Court of Appeals?
11  A. Yes.
12  Q. Okay. And Michigan Court of Appeals evidently
13    interpreted that language differently from you; is
14    that correct?
15  A. Correct.
16  Q. Okay. So the Statute wasn't amended, it was the Court
17    of Appeals read the exact same language you read and
18    came to a different conclusion, correct?
19  A. It was a difference in interpretation.
20  Q. I understand. My question is, they read the exact
21    same language and came up with a different conclusion
22    than you did, correct?
23  A. Yes and no.
24  Q. Okay.
25  A. It was based on different -- different models, if you

Page 39

1    will, of the way people were running dispensaries.
2  Q. Okay. But the language hadn't been amended between
3    the time you made your judgment, and the time the
4    Court of Appeals issued its opinion, correct?
5  A. Correct.
6  Q. Okay. So let's go back then.
7    So Samantha Conklin was -- what would you
8    -- did you describe her as a caregiver under the
9    Statute?
10  A. Yes.
11  Q. Okay. And Rob Holm is a caregiver under the Statute?
12  A. Correct.
13  Q. And Raymond Meyers, was he selling or having anything
14    to do with 885 East Apple Avenue on July 9th, 2014?
15  A. I don't believe he was still with us at the time.
16  Q. Okay.
17  A. I could be wrong.
18  Q. All right. So back in the dispensary, around July
19    9th, 2014, on that day or around that day, what form
20    was the marijuana in in that dispensary? Were there
21    plants? Were they in jars? Were they -- what were
22    they like?
23  A. There was, I believe, one very small seedling. The
24    majority of it was in dry smokable form. And there
25    was also edible forms.

Page 40

1  Q. Okay. What's a seedling, by the way? I don't know.
2    What's a seedling?
3  A. A seed that was sprouted into a plant.
4  Q. Okay. So I take it a very small plant?
5  A. A very small plant.
6  Q. Okay. The rest was dried and in smokable form or
7    edible form?
8  A. Correct.
9  Q. Okay. If you had to give an estimate, roughly July
10    9th, what would be the combined weight of this
11    marijuana, if you know?
12  A. I would say probably somewhere around 12 to 14 ounces.
13  Q. Okay. And the dried form, was it -- how was it
14    stored? Was it stored in jars?
15  A. Jars.
16  Q. And the edible form, what form was that in?
17  A. It was packaged.
18  Q. Okay. And is it like a butter? Is it a brownie? Is
19    it -- what's it like?
20  A. It was hard candies, suckers.
21  Q. All right. Now, on July 9th, nonparties Schmitz,
22    Marshall, Vogt, Parolini, and Defendant Strauss
23    entered the public portion of the premises.
24    Do you know, who was Schmitz, Marshall,
25    Vogt, and Parolini? Who are they?



US LEGAL SUPPORT
The Power of Commitment™

Pages 37 to 40

DEREK ANTOL
May 10, 2018

## Page 41

1  A.  Parolini was the guy that was with the 6th District
2     Tobacco Task Enforcement. Schmitz was the sergeant,
3     supervisor of Trooper Vogt, and whoever the other one
4     is.
5  Q.  I'm sorry, Schmitz was a sergeant with whom, do you
6     know?
7  A.  Michigan State Police.
8  Q.  MSP, okay.
9        And then Marshall?
10 A.  Marshall was with WEMET.
11 Q.  Okay. And Vogt?
12 A.  Was a trooper with the Michigan State Police.
13 Q.  Okay. And who was at the shop at the time they
14    arrived?
15 A.  My brother, Donald Supernaw, and Samantha.
16 Q.  Donald -- what was his last name?
17 A.  Supernaw.
18 Q.  How do you spell that?
19 A.  S-U-P-E-R-N-A-W.
20 Q.  Okay. And did -- what -- if you -- because obviously
21    you were not there, but I assume somebody has told you
22    what their announced purpose was for showing up?
23 A.  Yes.
24 Q.  Okay. What was their purpose?
25 A.  The announced purpose at the time, I believe, was a

## Page 42

1     guise, just to gain entrance for WEMET, but it was
2     stated to us that it was just a routine inspection by
3     the Tobacco Task Enforcement Team.
4  Q.  Okay. You claim that that was a guise, correct?
5  A.  Correct.
6  Q.  Okay. What do you think their real purpose was there
7     for?
8  A.  To gain entry to the rear of the building, to the
9     dispensary.
10 Q.  Okay. Why did they want to do that?
11 A.  Seriously?
12 Q.  Yeah.
13 A.  Well, being that it was a four-year investigation,
14    that Detective Dent was relentless, I would say it was
15    to gain entry to the back to seize the marijuana and
16    prosecute us.
17 Q.  So Officer Dent conducted a four-year investigation
18    against Deuces Wild, correct? That's your testimony?
19 A.  Against me.
20 Q.  Against you personally?
21 A.  Deuces Wild didn't exist in the initial stage of the
22    investigation.
23 Q.  Okay. And on July 9th, you believe that this task
24    inspection was actually arranged by Officer Dent?
25 A.  I know it was.

## Page 43

1  Q.  Okay. How do you know that?
2  A.  I don't have proof. I just know.
3  Q.  Okay. And what, to your knowledge, was the nature of
4     Officer Dent's investigation? What did he do to
5     investigate you?
6  A.  We were a medical marijuana dispensary in the early
7     years of the law, while everything was still trying to
8     be figured out.
9  Q.  Right.
10 A.  Detective Dent arranged a raid at another location
11    where -- before we moved to the 885 address, and tried
12    to have us prosecuted, and was unsuccessful in doing
13    so. I don't know if he was reprimanded, or not. But
14    I know after a period of about three years, he picked
15    the investigation back up, because he found that we
16    were still doing business.
17 Q.  Okay. So what was that earlier place?
18 A.  That was -- it was on Apple. I don't even recall the
19    address.
20 Q.  Do you remember the name of the shop, or what it was?
21 A.  It was the Meyer -- it was a Meyer Cleaners before we
22    moved in.
23 Q.  Okay.
24 A.  I don't remember what the address was.
25 Q.  Okay. And what did you do at this Meyer's Cleaner?

## Page 44

1  A.  That was --
2  Q.  Was this a dispensary?
3  A.  That was where we were trying to form the Compassion
4     Club, the nonprofit.
5  Q.  And he -- you said he conducted a raid?
6  A.  Yes.
7  Q.  Okay. Do you remember roughly when that was?
8  A.  2010?
9  Q.  Okay.
10 A.  Or 2010, 2011?
11 Q.  Was that raid pursuant to warrant, a search warrant?
12 A.  Yes.
13 Q.  Okay. And did he seize any items?
14 A.  Yes.
15 Q.  Do you remember if anyone else was with him?
16 A.  There was an entire team, yes.
17 Q.  Okay. Were you placed under arrest at that time?
18 A.  Yes.
19 Q.  And what were you -- what were you charged with?
20 A.  I was actually never charged. I was detained -- I was
21    placed under arrest. We were taken down to the police
22    station for questioning, and after a matter of a
23    couple hours, we were released.
24 Q.  Okay. And you were never charged?
25 A.  We were never charged.



US LEGAL SUPPORT

The Power of Commitment™

DEREK ANTOL
May 10, 2018

**Page 45**

1  Q. Okay. Was all the product that was seized or any item
2  that was seized returned to you?
3  A. Everything that was seized was returned to us,
4  including the marijuana.
5  Q. Okay. No forfeiture action?
6  A. No.
7  Q. Okay. And Detective Dent picked up another
8  investigation? Is that what I understand you to say,
9  he began investigating again?
10  A. Apparently this was all the same investigation, it was
11  the same lead detective, same parties involved.
12  Q. Okay. And what --
13  A. Same underlying elements, I mean --
14  Q. What was the nature of the second investigation or
15  investigation into the Deuces --
16  A. Marijuana dispensary, same thing.
17  Q. What did he do?
18  A. What did he do? He organized a raid at my place of
19  business.
20  Q. You're talking about on July 9th?
21  A. He had officers come in and seize all of our property
22  in our homes and our business all before a warrant was
23  ever issued.
24  Q. Okay, and that was on July --
25  A. He threatened to damage my store. He had another

**Page 46**

1  officer hold my 12-year-old at gunpoint.
2  Q. I'm asking prior to --
3  A. I'm telling you --
4  Q. I'm asking prior to July 9th, did he go in and buy
5  marijuana from Samantha?
6  A. Yes, he did.
7  Q. Did he put you under surveillance -- okay, let's talk
8  about that.
9  What's your understanding of what he did
10  leading up to July 9th?
11  A. My understanding of what he did was he falsified
12  documents to gain himself entry, again, a difference
13  in interpretation of the law. The law states that
14  because it was taking so long for the State to process
15  cards, that if you had your documents that were signed
16  by the doctor, you were still protected under
17  Section 8's affirmative defense, even if you hadn't
18  registered with the State or your application had not
19  yet been processed.
20  So at that point in time, most dispensaries
21  were allowing people who had the paperwork for the --
22  with the doctor's signature, along with their green
23  slip from Lansing, showing that it had been received
24  and was being processed, that way we knew they had
25  registered with the State, that's the only way they

**Page 47**

1  were able to gain entry and purchase any medicine.
2  Q. Okay. And so Officer -- Detective Dent went into the
3  dispensary and purchased marijuana, correct?
4  A. With falsified documents, yes.
5  Q. I understand that. And who sold it to him?
6  A. Samantha.
7  Q. And so Samantha was a caregiver, correct?
8  A. Correct.
9  Q. And who were her patients at that time?
10  A. I'm not at liberty to say. That's protected by HIPAA.
11  Q. Okay. Was Detective Dent her patient?
12  A. He was not.
13  Q. Okay. So it was illegal for her to sell it to
14  Detective Dent, because he was not a patient, correct?
15  MR. BOSTIC: Object --
16  A. I disagree.
17  MR. BOSTIC: Object as to form and
18  foundation.
19  BY MR. BENSON:
20  Q. Okay. So, in your opinion, it was legal for her to
21  sell it to Detective Dent even though --
22  A. Yes.
23  Q. -- he was not a patient? You have to let me finish
24  the question. She can't write us down when we're both
25  talking at the same time.

**Page 48**

1  So it was in your opinion at the time it
2  was a legal sale, correct?
3  A. Yes, it was.
4  Q. Okay. How many sales -- how many times did he
5  purchase marijuana from Samantha Conklin --
6  A. I believe twice.
7  Q. Please let me finish the question. And I'm not
8  reprimanding you --
9  A. Sounded like it was finished to me. I apologize.
10  Q. Uh-huh.
11  How many times, to your knowledge, did
12  Detective Dent purchase marijuana from Samantha
13  Conklin?
14  A. So the question was finished? Twice.
15  Q. Thank you.
16  And in both of those occasions, in your
17  opinion, they were legal purchases?
18  A. Correct.
19  Q. Okay. Do you still believe they were legal?
20  A. I do. The law very clearly says that a caregiver may
21  be compensated for costs associated for assisting a
22  medical marijuana patient with the medical use of
23  measure. Medical use is described in Section 3E of
24  the Medical Marijuana Law to include delivery
25  transportation.



DEREK ANTOL
May 10, 2018

**Page 49**

1  Q. Okay. Has any Court disagreed with that
2  interpretation, or is that still the -- is that how
3  the Courts view it?
4  A. The law has been amended.
5  Q. Okay. And as it existed at that time, it was legal?
6  A. Per the letter of the law, yes --
7  Q. Okay, but not --
8  A. -- it said a caregiver was --
9  Q. My fault.
10  A. It said that a caregiver could only grow for its five
11  patients whom he or she was connected to through the
12  Department's registration process. It was very
13  specific in stating they could only grow for those
14  patients who they were connected to through the
15  Department's registration process. And a subsequent
16  subsection is where it says that a caregiver may be
17  compensated for costs associated for assisting a
18  qualified registered patient for the medical use of
19  marijuana. It did not specify they had to be
20  connected through the Department's registration
21  process, as previously stated in another section of
22  the law.
23  Q. When Samantha Conklin was charged, was she -- what was
24  she charged with?
25  A. She was charged with conspiracy to deliver less than

**Page 50**

1  -- less than 5 kilos, I think.
2  Q. And were those charges arising out of her sale of
3  marijuana to Detective Dent?
4  A. They were, yes.
5  Q. Did she plead guilty to those charges or to charges
6  arising from the sale of marijuana to Detective Dent?
7  A. She -- I believe she did a plea agreement for 7411 for
8  possession, I think. I don't know. He represented
9  her in that case.
10  Q. So she pled guilty, and you don't know whether she
11  pled guilty to charges arising out of selling
12  marijuana to Detective Dent?
13  A. I don't believe she was actually charged with that
14  incident. I believe what she was charged for was what
15  was seized with the intent to deliver, I believe.
16  Q. Okay. What were you charged with?
17  A. I was charged with conspiracy to manufacture more than
18  20, but less than 200 plants, and conspiracy to
19  deliver 5 to 45 kilos.
20  Q. In the dispensary, in the building that we're talking
21  about, do you believe that it was legal for you, under
22  State law, not Federal law, State law for you to
23  possess that marijuana?
24  A. Yes.
25  Q. Okay. And -- all right. Because the reason -- well,

**Page 51**

1  never mind, all right.
2  All right, so they, meaning the Tobacco
3  Enforcement Team, along with Michigan State Police,
4  along with Defendant Strauss' announced purpose was to
5  conduct an inspection of your shop looking for tobacco
6  products? That's your understanding, correct?
7  A. Yes.
8  Q. Did they conduct that inspection and investigation of
9  Deuces Wild, the smoke shop?
10  A. They did.
11  Q. And did they find tobacco products?
12  A. They did.
13  Q. Okay. And did they seize those products?
14  A. They did.
15  Q. Okay. What were the ramifications of that, meaning --
16  A. Nothing.
17  Q. -- you were not charged with a crime, you were not
18  asked to pay taxes on it, et cetera?
19  A. Correct.
20  Q. Okay. Now, according to your Complaint --
21  A. I wouldn't necessarily say they were seized. I
22  willingly gave up possession of them.
23  Q. Okay. When did you give possession of them, that same
24  day?
25  A. Before WEMET arrived, yes.

**Page 52**

1  Q. Okay. Before WEMET arrived on July 9th, you gave it
2  back to them?
3  A. Yes, to Mr. Parolini.
4  Q. Okay. So you were not there. Apparently, you then
5  went to the shop when they were there, I assume,
6  correct?
7  A. Correct. They were there I think for about 25
8  minutes, maybe 35 minutes before my arrival.
9  Q. Had they looked in the dispensary before you showed
10  up?
11  A. I believe so.
12  Q. Okay. So according to your allegation, the
13  dispensary, and I was a little confused about
14  something you said in your Complaint, because in one
15  -- one paragraph I read that it was locked, and then
16  another paragraph said they walked right in.
17  So I was going to ask you about the door
18  separating Deuces Smoke Shop and the dispensary. Was
19  that, at the time they showed up, locked?
20  A. Yes, it was.
21  Q. Okay. And it had signs on it, correct?
22  A. Correct.
23  Q. And what did the signs say? And I think your attorney
24  provided copies of the sign, but paraphrase?
25  A. The sign said that entry was not permitted without



US LEGAL SUPPORT

The Power of Commitment™

DEREK ANTOL
May 10, 2018

## Page 53

1   approval. And it included law enforcement. And there
2   was actually instructions for law enforcement.
3   Q.  How is it they walked in if it was locked?
4   A.  They cornered her in the rear of the building --
5   Q.  Samantha?
6   A.  Yes, took the keys, and walked in.
7   Q.  They took the keys off of Samantha?
8   A.  Correct.
9   Q.  Okay. And -- and when you arrived, you think they had
10  already done that, correct?
11  A.  Yes.
12  Q.  Okay.
13  A.  They had -- yes, they had already been in and out of
14  the back by the time I had gotten there.
15  Q.  Okay.
16  A.  I don't believe anybody was back there when I got
17  there. But, I mean, she had explained to me what was
18  going on, and WEMET was already on their way.
19  Q.  And so --
20  A.  Or may have even -- I think they already had a
21  detective there from WEMET by the time I arrived.
22  Q.  And to whom did you first start speaking to of these
23  various law enforcement personnel?
24  A.  I don't recall. I no longer have the video footage.
25  As soon as I entered the building, I was recording and

## Page 54

1   asking for names and badge numbers.
2   Q.  Okay. When you say you were recording, what were you
3   using?
4   A.  I was using a Motorola Droid.
5   Q.  A --
6   A.  Cell phone.
7   Q.  -- cell phone? And that's the regular -- your regular
8   cell phone you had with you at the time?
9   A.  At the time it was, yes.
10  Q.  You walked in and you videoed it, and what was the
11  nature of the conversation? To the best of your
12  recollection, what did you talk about?
13  A.  I was asking them to provide a warrant. And they
14  failed to do so. So I grabbed another phone and I
15  called my attorney and asked him to advise. He said
16  to keep recording and keep asking questions and keep
17  asking them to leave and come back with a warrant.
18  They failed to do so. They continued to search, they
19  continued to seize.
20  Q.  Did they search Deuces Smoke Shop --
21  A.  Both.
22  Q.  -- or while you were there -- let me finish.
23      While you were there, did they also go back
24  to the dispensary and search and seize product there?
25  A.  Yes.

## Page 55

1   Q.  And that was all captured on video?
2   A.  Yes.
3   Q.  On your phone, I should say?
4   A.  Correct.
5   Q.  And then what happened?
6   A.  Then my phone died. I took it out to my truck to put
7   it on the charger, grabbed my oldest son's Iphone, and
8   went back in and started recording more.
9   Q.  Okay. And just what happened after that?
10  A.  They just kept going through closets, going through
11  the safe. They were in fact already taking the seized
12  items and putting them into bins to be transferred out
13  to their transport vehicle.
14  Q.  Okay. And then what happened?
15  A.  And then my Muskegon attorney, Kevin Wistrom, showed
16  up, and we just let them conduct their investigation
17  and do whatever they were doing. And then they wanted
18  to ask me some questions. I was cooperative, for the
19  most part, until Detective Dent instructed me to turn
20  over the blue phone, my son's phone, which,
21  mind you, was not named in the warrant of things to be
22  seized.
23  Q.  Well, that was going to be my question. Did they
24  eventually --
25  A.  Well, it was part of my answer. Detective Dent --

## Page 56

1   Q.  Let me finish. Did they eventually produce a warrant
2   at that time?
3   A.  At that time, no, they did not.
4   Q.  Okay. So he took your son's phone without a warrant?
5   A.  Correct.
6   Q.  Okay. Because you said it wasn't described in the
7   warrant. But there is no warrant at this point,
8   correct?
9   A.  Later, the warrant was issued, two-and-a-half hours
10  later, and that phone was never listed in that
11  warrant.
12  Q.  I'm trying to walk through this chronologically. So
13  he took your son's phone?
14  A.  Chronologically, there was no warrant at the time this
15  occurred.
16  Q.  That's what I'm asking, okay.
17      And so what else did they take? They took
18  marijuana, I assume, correct?
19  A.  They took the marijuana, they took --
20  Q.  Did they take the DVR or the --
21  A.  All forms of marijuana. They took the glass jars that
22  contained the marijuana. They took my cell phone.
23  They took my son's cell phone after Dent threatened to
24  damage my store if I didn't produce that cell phone.
25  They took the DVR. They took some cameras. I believe



USLEGAL SUPPORT
The Power of Commitment™

DEREK ANTOL
May 10, 2018

## Page 57

1    they took Sammy's pistol. And they took some -- some
2    tax documents. I think that was the majority of it.
3    Q. And what did Detective Dent threaten to do to your
4    store if you didn't produce the cell phone?
5    A. Detective Dent's exact words were, "If you think I'm
6    being a prick now, son, wait and see what the fuck I'm
7    going to do to your store if you don't turn that phone
8    over."
9    Q. Any other things that he said to you that stand out?
10    A. No.
11    Q. Did they eventually vacate the premises on July 9th?
12    A. Eventually, we all were forced to vacate the premises,
13    and we were allowed to drive our vehicles to the 1769
14    address, where we were followed by all the officers,
15    where they continued searching and seizing at the 1769
16    North Green Creek address.
17    Q. Okay. So going back to Deuces Wild, you may have
18    already answered this, I apologize for asking the same
19    question twice, on July 9th, did they ever produce and
20    show you a warrant for Deuces Wild on that day?
21    A. At Deuces Wild, no.
22    Q. Okay.
23    A. I don't think I seen anything until we were at the
24    Green Creek location hours after the seizures occurred
25    at the 885 address.

## Page 58

1    Q. I understand.
2    So you drove out then to your home,
3    correct?
4    A. Uh-huh.
5    Q. Okay. And do you remember what time of day this was?
6    A. I think it was -- it was sometime after 5, 6, maybe?
7    Q. What's Deuces Wild at the time, what were the normal
8    business hours?
9    A. Normal business hours were 11 a.m. to 6 p.m.
10    Q. Okay. Did you close early that day? Was it closed
11    while the police were seizing things?
12    A. They weren't letting people come and go. They
13    wouldn't even let me and my children use the restroom.
14    Q. So when you were at Deuces Wild, you were there, and
15    were your children there?
16    A. My two older sons were there with me, yes.
17    Q. Okay. And then you drove back to your home? And you
18    say you were followed?
19    A. Yes.
20    Q. Okay. And what happened when you arrived at the home?
21    A. We were escorted into the home. We were told to sit
22    in the living room on the couch. We were asked some
23    questions while this was going on, there was other
24    officers rummaging through drawers, cupboards,
25    closets, and we were pretty much just forced to sit

## Page 59

1    there in the living room with our attorney.
2    Q. Okay. Did they have a warrant to search your home at
3    that time?
4    A. I don't believe the warrant had been produced yet, no.
5    Q. Okay. Did your attorney say anything to them about a
6    warrant when you were sitting at the home?
7    A. Oh, yeah.
8    Q. What did he say, do you remember?
9    A. He asked them to produce a warrant, and when they
10    didn't, I asked him what was up with that. And he
11    says, "Really, there's nothing we can do until we get
12    this into a courtroom. Stand by and let them do what
13    they're going to do."
14    Q. So during that, at North Green Creek, you were
15    present -- what's your attorney's name again? Mr. --
16    A. Kevin Wistrom.
17    Q. Winstrom?
18    A. Wistrom, W-I-S-T-R-O-M.
19    Q. Okay. And your two oldest boys?
20    A. Devon and Tryston.
21    Q. Okay. Anyone else? And besides the police, I mean?
22    A. That was at Deuces Wild, or at the Green Creek?
23    Q. No, no, no, I'm sorry, we're at Green Creek now.
24    A. My youngest son, [ ] was there.
25    Q. Okay.

## Page 60

1    A. Myself, my two older boys, my attorney, and Samantha.
2    Q. Okay. Did they seize any property at the North Green
3    Creek address?
4    A. Yes, they did.
5    Q. What did they seize?
6    A. They seized other cell phones. They seized another
7    weapon. And they seized all of our marijuana plants.
8    Q. Okay.
9    A. They seized cash. I think that was it.
10    Q. Okay. To your knowledge, when, if ever, did the
11    police produce a search warrant for the North Green
12    Creek address and show it to either you or your
13    lawyer?
14    A. I believe my attorney finally seen it right before the
15    officers left, and I don't even think I took a gander
16    at it until the following day.
17    Q. Okay. You mentioned that they seized marijuana
18    plants. Were you lawfully in possession of those
19    plants?
20    A. Yes, we were.
21    Q. Okay. Was that because they belonged to Samantha, and
22    she's a caregiver?
23    A. And myself as a patient.
24    Q. Was there anything in the house seized that you
25    consider illegal -- illegally in your possession?



DEREK ANTOL
May 10, 2018

Page 61

1  A. No.
2  Q. All right. Did they, at the same time, also search
3     another property that you owned?
4  A. 423 Farr.
5  Q. Okay. Were you at any time present on Farr when they
6     were present on Farr Road? I mean, in other words,
7     did you drive out there and talk to them or --
8  A. No, nope. We were detained at the 885 address, and
9     then later escorted to the 1769 address. We didn't go
10    see the 423 address until later that evening.
11 Q. Okay.
12 A. That's where the majority of the marijuana plants
13    were. I believe we only had six or seven plants that
14    had been moved to the Green Creek address. The
15    remainder were at the Farr Road.
16 Q. And did they seize the marijuana plants at the
17    Farr Road?
18 A. Yes, they did.
19 Q. Okay. In your opinion, were you legally in possession
20    of those marijuana plants?
21 A. Yes, we were.
22 Q. That's a "yes"?
23 A. Yes.
24 Q. Okay. And, again, is that because did they belong to
25    Ms. Conklin?

Page 62

1  A. Yes.
2  Q. And you're her patient?
3  A. No.
4  Q. Okay.
5  A. I'm my own -- I don't have a caregiver. She's a
6     patient, she has five people that she's a caregiver
7     for, and I'm a patient myself.
8  Q. Got you.
9        All right, there's an allegation that some
10    officer pointed a gun at your son. Can you tell me
11    where and when that happened?
12 A. It was upon arrival, they knew exactly where he was
13    per my description of the home. My son was the only
14    person in the home. My buddy, Mike, was out in the
15    pole barn. They knew where to find him. They knew he
16    was sleeping. And he was awoken by two armed
17    officers, both pointing their weapons at him. One
18    didn't have his weapon pointed at him very long. He
19    went to start searching the closet and under the bed
20    while a State detective remained out in the hallway,
21    and then he entered the bathroom and started going
22    through the cupboards in the bathroom.
23 Q. And that was at --
24 A. All of this time, one of the two officers still had my
25    son at gunpoint, escorted him into the hallway, and

Page 63

1     then started asking him questions about whose bedroom
2     belongs to who, what was upstairs, what was
3     downstairs. And then they finally forced him out into
4     the front yard, on the front side of the property,
5     didn't even let him put shoes on anything on, detained
6     him and took him outside while they searched the
7     remainder of the home.
8  Q. And that was the North Green Creek address?
9  A. That was the North Green Creek address.
10 Q. And that was obviously before you got there?
11 A. That was before I got there, and before a warrant was
12    issued.
13 Q. You describe that in detail. Is that detail what you
14    received from your son?
15 A. It is, yes. My son was questioned by my attorney
16    immediately after the police left the residence.
17 Q. Okay. And your son was sure that it was firearms that
18    were pointed at him, and not tasers?
19 A. Correct.
20 Q. Does he know the difference?
21 A. Yes, he does.
22 Q. How does he know the difference, to your knowledge?
23 A. He's 12.
24 Q. Okay.
25 A. Well, he was 12 at the time.

Page 64

1  Q. I understand.
2        And when you arrived, he was out in front
3     of the house, your son?
4  A. No. By the time I had arrived, he had been released
5     to the care of his mother, his biological mother.
6  Q. Got you.
7        Again, if you know how the biological
8     mother find out about this, did somebody call her?
9  A. I was allowed by Detective Dent to call her. He
10    released my two older children, who were with me at
11    the store.
12 Q. Right.
13 A. Released them to her care, and that's why the Iphone
14    was not in my possession, and I was unable to turn it
15    over when he made the threats to damage the store.
16 Q. Okay.
17 A. Because he had released my son, who was in possession
18    of that phone, to the care of his biological mother.
19 Q. Okay. So just so I'm clear, you had your son's phone,
20    you're videotaping, and then you hand the phone to
21    your son, and then he walks off with the phone,
22    correct?
23 A. Correct.
24 Q. Okay. At some point the police retrieved that phone,
25    correct?



US LEGAL SUPPORT
The Power of Commitment™

DEREK ANTOL
May 10, 2018

## Page 65

1  A. Yes.
2  Q. How did that come about?
3  A. He threatened to damage my store.
4  Q. Okay.
5  A. So I called -- I called the kid's mom and told her
6    what was going on and said, "This guy's up here
7    threatening to damage my store if you guys don't bring
8    that phone back up here."
9  Q. Okay.
10  A. So they brought the phone back up there.
11  Q. And that was at Deuces Wild?
12  A. Correct.
13  Q. And I know I asked you this before, but that phone
14    belonged to which of your three sons?
15  A. Tryston.
16  Q. Tryston? Got you.
17        All right. I had asked you in the
18    Interrogatories, the DVR, I understand, was destroyed,
19    and I asked you what the value was. Where did you get
20    this DVR?
21  A. Novotny Electronics.
22  Q. What was the first name?
23  A. Novotny.
24  Q. Do you know how to spell Novotny?
25  A. N-O-V-O-T-N-Y.

## Page 66

1  Q. And is that a local store?
2  A. Yes, it is.
3  Q. Do you remember what you paid?
4  A. It's a security company.
5  Q. Do you remember what you paid for it?
6  A. I would have to find the invoice for the exact amount.
7    I don't recall exactly what it was. And there was
8    installation fees. There was -- I don't remember.
9  Q. I was asking --
10  A. I think he had -- I think I believe I sent my attorney
11    the invoice as part of that a couple years ago.
12  Q. That's fine. The reason -- it's not a huge thing.
13    The reason I ask is in your Interrogatory Answers, you
14    actually made mention of the DVR installation fees,
15    et cetera, et cetera. I'm just trying to figure out
16    the value of the DVR without installation, without any
17    attendant costs. Do you remember what you paid just
18    for the unit?
19  A. Off the top of my head, no, I don't.
20  Q. Did you ever look at what it would cost to replace it,
21    just the DVR, not installation, or anything else, to
22    your recollection?
23  A. I don't recall exactly what model I had. The model
24    that we have now I believe is very similar, but, no, I
25    don't sell them for a living, so I don't know off the

## Page 67

1    top of my head what they would cost.
2  Q. Okay. Now, the DVR --
3  A. I just told -- excuse me.
4  Q. Sure.
5  A. I just told the guy that we were getting everything
6    from what happened, and that I needed a new DVR. So
7    he sent his crew to bring a new DVR and install it.
8  Q. Okay. The DVR obviously is designed to record what's
9    going on in the store, correct?
10  A. Correct.
11  Q. Now, the DVR was seized by the police, I understand,
12    but I also understand that there have been copies of
13    things that were on the DVR; is that correct?
14  A. Correct.
15  Q. Who's in possession of those copies, and in what form
16    are they?
17  A. I believe I have them. I'm not certain.
18  Q. Okay.
19  A. Per our discovery, we were supposed to have obtained
20    copies. My attorney advised me this morning he can't
21    come across those copies either. So I'm going to have
22    to go home and dig through and see what I've got and
23    see if those were even included with that -- items we
24    received from our discovery.
25  Q. Now that the criminal case is over, do those videos

## Page 68

1    have any intrinsic value to you?
2  A. They certainly do.
3  Q. Okay, why?
4  A. Well, because when this all went down, Detective Dent
5    threatened to turn this over to the Federal
6    authorities.
7  Q. Okay.
8  A. And, you know, especially with the -- with the plea
9    agreement and the agreement we had with all of our
10    stuff being returned, when I didn't get that, you
11    know, immediately, my first inclination is, well, what
12    about the rest of the deal? If this part of the deal
13    went south, and they destroyed my DVR, what else is
14    going to happen?
15  Q. Well, just so I --
16  A. So if they -- I wasn't finished.
17  Q. I understand.
18  A. If they were to turn this over to the Federal
19    authorities, I would very much need that factual video
20    footage of what happened, and it was all timestamped
21    for my own defense.
22  Q. But you have copies of everything on it, is what I'm
23    asking?
24  A. I'm not certain that I do.
25  Q. You have them in your possession and you can't find



The Power of Commitment™

Pages 65 to 68

DEREK ANTOL
May 10, 2018

Page 69

1　them, correct?
2　A. I have DVDs that were given to me. I don't know that
3　those DVDs include that footage. I don't recall ever
4　seeing that footage.
5　Q. Where are those DVDs now, is what I'm asking?
6　A. Those DVDs are at my residence. Everything that I was
7　given per our discovery is at that residence, and I
8　honestly do not recall seeing anything that was actual
9　footage that was recorded from the DVR. I remember
10　seeing footage from a traffic stop. I remember seeing
11　-- one I think just had a bunch of text documents on
12　it. Another one had some footage from the cell
13　phones. But I don't -- I don't believe I was ever
14　given anything, and I could be wrong, but I don't
15　remember seeing anything that was actual footage of
16　the store that was showing the officers going through
17　and searching and seizing, you know, doing what they
18　were doing during their investigation. I don't think
19　I ever received that.
20　Q. Okay, so -- okay. So you're not sure if you have or
21　you haven't, but you could go check, correct?
22　A. Right.
23　Q. Well, as long as you brought up the Federal thing, you
24　had mentioned in your Interrogatory Answers, as far as
25　your damages, your concerns, is the question of -- of

Page 70

1　Federal prosecution. So it is your understanding that
2　your possession of this marijuana violates Federal
3　law, correct?
4　A. Yes.
5　Q. And, as such, the Federal Government could, if the
6　Federal Government chose to, prosecute you, correct?
7　A. If they chose to, they absolutely could.
8　Q. And if they do, what would that have to do with my
9　clients, who are State officers?
10　　　MR. BOSTIC: Object to form and foundation.
11　BY MR. BENSON:
12　Q. If the Federal prosecutors would make an independent
13　decision to charge you, that would not be based on
14　anything that my clients did, correct? The decision
15　to prosecute?
16　A. I object to that, too.
17　　　MR. BOSTIC: You --
18　A. I don't agree.
19　BY MR. BENSON:
20　Q. Well, answer the question.
21　　　MR. BOSTIC: No, if you don't understand --
22　A. Maybe I didn't understand.
23　　　MR. BOSTIC: There you go.
24　BY MR. BENSON:
25　Q. Okay, thank you.

Page 71

1　　　MR. BOSTIC: The other part is my job.
2　BY MR. BENSON:
3　Q. Presumably, a United States attorney for the Western
4　District of Michigan might choose to prosecute you.
5　Is that your concern?
6　A. Yes.
7　Q. And whether that assistant -- excuse me -- whether
8　that US Attorney chooses to prosecute you or not is
9　based upon Federal law and his or her own decision
10　whether it's worth pursuing, correct?
11　A. Yes.
12　Q. Okay. Your answer to paragraph 15, does that
13　summarize your allegations of damages? Is there
14　anything that you have not included in your answer to
15　paragraph 15 and 16?
16　A. Aside from the fact of the mental distress of, you
17　know, watching my family still have to go through
18　this, be it nightmares, or just, you know, things --
19　my son not even wanting to go in a gas station with me
20　if there's a cop in there. He used to want to be a
21　police officer when he was a little boy. No, nothing
22　else.
23　Q. Okay. Who is Michael Tozer? I'm sorry, he's listed
24　as a witness, and I think everybody else, I recognize.
25　I don't recognize Michael Tozer.

Page 72

1　A. I don't either.
2　Q. Okay, fair enough.
3　　　MR. BENSON: All right, why don't we take a
4　break here.
5　　　(Off the record at 11:58 a.m.)
6　　　(Back on the record at 12:06 p.m.)
7　　　MR. BENSON: Back on the record.
8　BY MR. BENSON:
9　Q. Mr. Antol, did you ever read the Affidavit that
10　Detective Dent submitted in order to get the search
11　warrant?
12　A. I did.
13　Q. Okay. Do you disagree factually with anything he
14　said? You may disagree with the interpretation, but
15　did he say anything that was not true?
16　A. I don't have the Affidavit in front of me. I don't
17　recall what it said.
18　Q. Okay. So your answer is you don't know?
19　A. My answer is I don't recall what the Affidavit
20　included.
21　Q. You don't remember reading it and thinking that this
22　was inaccurate?
23　A. Oh, yeah, I do. I just don't remember to what extent.
24　Q. Do you remember -- what can you best recollect --
25　excuse me, what can you best recollect that was untrue



US LEGAL SUPPORT

The Power of Commitment™

DEREK ANTOL
May 10, 2018

Page 73

1   in his Affidavit?
2   A. I would have to see the Affidavit. I -- it's been so
3   long, honestly, I don't recall.
4        MR. BOSTIC: I've got a copy of it. Here.
5   A. First thing I disagree with is the color of the
6   building, but that's obviously irrelevant.
7        Well, right here in black and white,
8   Detective Dent showed Conklin a previously prepared
9   fictitious application for a medical marijuana card.
10  If we did that, we'd be going to Federal jail.
11       I think I'd actually like a moment in
12  private with my counsel.
13  Q. Sure.
14       (Off the record at 12:12 p.m.)
15       (Back on the record at 12:13 p.m.)
16  Q. All right. Are you prepared -- I can ask another
17  question and --
18  A. Yeah, if you could repeat that question?
19       MR. BENSON: Do you mind if I mark this?
20  Because it's your copy, that's why I'm asking. I can
21  make a copy for you.
22       MR. BOSTIC: Yeah, that's fine.
23       MARKED FOR IDENTIFICATION
24       DEPOSITION EXHIBIT 1
25       12:13 p.m.

Page 74

1   BY MR. BENSON:
2   Q. All right, I'll hand you what's been marked as 1, that
3   is the Affidavit of Adam Dent. You've had the
4   opportunity to review that, correct?
5   A. Correct.
6   Q. Just now, correct?
7   A. Correct.
8        MR. BENSON: Okay. Could you read the
9        question back to the witness?
10       (The requested portion of the record was
11       read by the reporter at 12:14 p.m.)
12  A. Okay, the statements made on the first page of the
13  Affidavit, I don't object to anything on there. What
14  I had issues with was the references to the other
15  things, for instance, the McQueen and the Hartwick
16  case, you know, his affirmations that our business
17  model was running the same as these other two
18  individuals, when they in fact did not apply at all to
19  our model. I mean, I guess that would be the only
20  thing that I'd disagree with.
21  BY MR. BENSON:
22  Q. Okay. And just for point of clarification, you're on
23  page 2?
24  A. Correct.
25  Q. Okay. Could you just kind of point generally where

Page 75

1   we're talking about?
2   A. Yep, pretty much all of this.
3   Q. Okay, thank you. Let me quick look this over.
4        Oh, I see, okay. I got you, okay.
5        You make reference to, it looks like
6   paragraph 8, which is a reference to a Michigan Court
7   of Appeals case People V Hartwick. And I assume you
8   don't disagree with his interpretation of the case,
9   you just disagree with that your business model was
10  similar to People V Hartwick?
11  A. Correct.
12  Q. Okay. Is that also true with the -- excuse me,
13  another case he cites, which is State V McQueen? Do
14  you disagree that State V McQueen is applicable to
15  your case?
16  A. Correct.
17  Q. Okay. And I think you said that was it?
18  A. Yes.
19  Q. Okay. All right.
20  A. Thank you.
21  Q. Sure. Do you know what Detective Dent said to
22  Ms. Conklin in buying the marijuana? He just showed
23  fictitious papers indicating that he either had a card
24  or had applied for a card?
25  A. Correct.

Page 76

1   Q. Did he give any additional information other than to
2   show her the card -- or, excuse me, show her the
3   paperwork, to your knowledge?
4   A. Not to my knowledge.
5   Q. Okay. Your attorney was kind enough to provide us
6   with a report of inspection from the State of Michigan
7   Department of Treasury detailing the inspection that
8   occurred on July 9th of 2014. Much of what they
9   described occurred when you were not present. The
10  last paragraph just above the phrase seizure of
11  tobacco products has a paragraph in there that I
12  wonder if you would take a moment to read that
13  paragraph? I'm sorry, it's the one just above -- it's
14  that one right there, yeah, the last paragraph just
15  before seizure of tobacco products?
16  A. Okay, and your question is?
17  Q. Does that accurately describe your encounter with the
18  author of this report?
19  A. Yes. In compact form, yes.
20       MARKED FOR IDENTIFICATION
21       DEPOSITION EXHIBIT 2
22       12:19 p.m.
23  Q. Normally, you do this first, but I'll hand you what's
24  been marked as Exhibit Number 2, and that is the
25  report of inspection. And I had asked you a



US LEGAL SUPPORT

The Power of Commitment™

DEREK ANTOL
May 10, 2018

## Page 77

1  question about that last paragraph.
2       Is Exhibit 2 what you were referring to?
3  A. Yes.
4       MR. BENSON: Okay, I've got nothing
5  further, thank you.
6            EXAMINATION
7  BY MR. SADOWSKI:
8  Q. Mr. Antol, I'm Adam Sadowski, as you know, I represent
9  Defendant Trucks.
10      I've seen your discovery responses, and you
11  would agree that you personally, on behalf of just
12  yourself, are not making any claims against Defendant
13  Trucks, correct?
14  A. Correct. I don't believe I had any encounter with
15  Trucks.
16  Q. Okay.
17  A. To my knowledge. He may have been at the store, but
18  there was probably close to, I don't know, eight or --
19  eight to 12 officers at the store. I couldn't tell
20  who was an officer, who wasn't. Some were in uniform,
21  some were -- you know, they had like open carrying, I
22  guess. There was quite a few people out in the
23  parking lot, some customers, some neighbors. But I
24  honestly don't think I ever encountered Trucks.
25  Q. Okay. So it's your three sons that have claims

## Page 78

1  against Trucks, or is it just Devon and [     ] is it?
2  A. Yeah, I think it would be just Devon and [     ]
3  Q. Okay.
4  A. Or maybe Tryston did, too, because Trucks was at the
5  home.
6  Q. Okay. What did Devon tell you that Defendant Trucks
7  did, or was he able to provide you with that level of
8  detail?
9  A. To me, he hasn't, no. I mean, they -- it's hard to
10  say, because, I mean, we're -- I can't even put a face
11  to the name. I mean, I -- and I wasn't there at the
12  house. To me, it would be different if you were
13  asking the kids and you had a picture of him, and then
14  they'd be able to specify, you know, okay, yeah, I
15  remember this guy, you know, whatever. But as far as
16  me, I wasn't at the home, and Devon and Tryston
17  weren't at the moment either. So as far as I know,
18  with Trucks, it would have only been [     ] to my
19  knowledge. But, I mean, there may be other things
20  ensuing per the -- you know, the -- our alleged
21  illegal search and seizure, you know, things that were
22  -- his room and his due process being violated, that's
23  -- I don't -- I don't believe I'm part of that.
24  Q. Okay. Other than Defendant Trucks being involved in
25  the search of the North Green Creek residence, is

## Page 79

1  there any other claims, to your knowledge, on behalf
2  of any of your kids against Defendant Trucks?
3  A. Here again, to reiterate, we're not sure which one of
4  the officers he is. A picture to my son would help
5  clarify that. He may or may not have been one of the
6  two officers holding a gun at my son. I can't say. I
7  wasn't there. That would be a question for my son.
8       MR. SADOWSKI: Okay. Well, then I have no
9  further questions, thank you.
10            EXAMINATION
11  BY MR. BOSTIC:
12  Q. I just want to clear up a couple things while we're
13  all here together.
14      Look at Exhibit 2.
15      MR. BENSON: That's the inspection right
16  there.
17  A. Me or him?
18  BY MR. BOSTIC:
19  Q. You. The last few pages.
20  A. Yeah, this was the sample of the --
21  Q. Right?
22  A. -- shisha.
23  Q. But what I wanted to clarify for the record was that
24  we have a report, which is seven pages, the first
25  seven pages. The last few pages appear to be printed

## Page 80

1  off the internet. Do you know -- I wanted to clarify
2  whether this is something that you or I printed off?
3  A. I didn't.
4  Q. Or whether it was part of Parolini's report, if you
5  remember?
6  A. I didn't print this off.
7  Q. Okay.
8  A. This isn't anything I did.
9  Q. All right. When we had a break, did we -- you and I
10  have an opportunity to discuss who Michael Tozer might
11  be?
12  A. Yes.
13  Q. What do you think?
14  A. I believe he was my electrician.
15      MR. BENSON: Oh, thank you. I know the
16  reference then, thanks.
17  A. Okay.
18  BY MR. BOSTIC:
19  Q. And the -- looking at your Interrogatory Answers,
20  under number 9, I want to see if you want to correct
21  your answer about whether E was from the same incident
22  in July as -- as D? Do you understand that D was the
23  July 9, 2014 search warrant on all three locations,
24  correct?
25  A. Okay.



**US LEGAL SUPPORT**

The Power of Commitment™

DEREK ANTOL
May 10, 2018

---

Page 81

1   Q.  And then later in that same year, did you have a
2       separate case?
3   A.  Yes.
4   Q.  Okay.  So E was not — they were resolved together,
5       correct?
6   A.  Correct.
7   Q.  But they didn't occur together?
8   A.  But it was dropped, but they didn't occur together.
9                MR. BOSTIC:  Okay, that's all I have.
10               MR. BENSON:  I don't have anything further.
11               MR. SADOWSKI:  I don't either.
12               (The deposition was concluded at 12:25 p.m.
13       Signature of the witness was not requested by
14       counsel for the respective parties hereto.)
15
16
17
18
19
20
21
22
23
24
25

---

Page 82

1                   CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                    ) SS
4   COUNTY OF KENT   )
5
6            I, CAROL L. GAVIGAN, certify that this
7   deposition was taken before me on the date
8   hereinbefore set forth; that the foregoing questions
9   and answers were recorded by me stenographically and
10  reduced to computer transcription; that this is a
11  true, full and correct transcript of my stenographic
12  notes so taken; and that I am not related to, nor of
13  counsel to, either party nor interested in the event
14  of this cause.
15
16
17
18
19
20
21
22           CAROL L. GAVIGAN, CSR-2494, RPR
23           Notary Public,
24           Kent County, Michigan.
25           My Commission expires: April 10, 2021



US LEGAL SUPPORT

The Power of Commitment™

Pages 81 to 82