# UNITED STATES OF AMERICA

## IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

Derek Antol, individually and as next friend of   File No: 1:17-cv-613
DSAII, a minor, and Devon S. Antol, and Tryston Antol,
  Plaintiffs,

v.

Adam Dent, Kate Straus,         Hon. Janet T. Neff
Casey Bringedahl, Casey Trucks,      U.S. District Court Judge
Pete Kutches, and Western Michigan
Enforcement Team, a public
body organized under the laws of the
State of Michigan,
  Defendants,
_____/

## PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES

Attachment 4 – depositions of Defendant Dent

ADAM DENT
3/30/2015

Page 1

STATE OF MICHIGAN
IN THE 14TH CIRCUIT COURT FOR MUSKEGON COUNTY

People of the State of Michigan,
             CASE NO: 14-49626-CF
    Plaintiff,

v

$1160.00 in U.S. Currency, et al,

    Defendant,

Samantha Conklin,

    Claimant.
_____/

The Deposition of Adam Dent,
taken before me, Cassandra M. Rodriguez, CER 8186, on
March 30, 2015, at 1 East Apple Avenue, Muskegon, Michigan
49442, commencing at or about 2:43 p.m.

APPEARANCES:

BY: CHARLES F. JUSTIAN, ESQUIRE
SENIOR ASSISTANT PROSECUTOR
990 Terrace Street, Fifth Floor
Muskegon, Michigan 49442
231-724-6435
Appearing on behalf of the Plaintiff.

BY: J. NICHOLAS BOSTIC, ESQUIRE
BOSTIC & ASSOCIATES
909 North Washington Avenue
Lansing, Michigan 48906
517-706-0132
Appearing on behalf of the Claimant.

ALSO PRESENT: Kevin Wistrom

Page 2

1              INDEX
2  WITNESS        EXAMINED BY      PAGE
3  Adam Dent      Mr. Bostic         4
4
5              * * * *
6
7        INDEX OF EXHIBITS
8  EXHIBIT      DESCRIPTION     PAGE
9  Exhibit Number 1    Warrant        12
10  Exhibit Number 2    Photograph     50
11  Exhibit Number 3    Photograph     51
12  Exhibit Number 4    Photograph     56

Page 3

1            March 30, 2015
2            Muskegon, Michigan
3            2:43 p.m.
4
5
6            ** ** ** ** **
7            ADAM DENT,
8  was thereupon called as a witness herein and, after having
9  been first duly sworn to tell the truth, the whole truth and
10  nothing but the truth, was examined and testified as follows:
11          ** ** ** ** **
12         MR. BOSTIC: Would you state your full name for
13  the record, please?
14         THE WITNESS: Adam Dent, D-e-n-t.
15         MR. BOSTIC: Mr. Dent, my name is Nick Bostic.
16  I am the attorney for the Claimants. Today is the date and
17  time set for your deposition in the 14th Circuit Court, number
18  14-49626, which is a forfeiture action for $1,160.00 with
19  Samantha Conklin as the Claimant; 14-49627, which is a
20  forfeiture action for $21,021.00 with Mr. Antol as a Claimant;
21  14-49628, which is a forfeiture action for $124.00 with
22  Mr. Antol as a Claimant; and 14-49638, which is a forfeiture
23  action for $1,935.00 with Mr. Antol as a Claimant. You have
24  testified in court before, correct?
25         THE WITNESS: Yes, sir.

Page 4

1         MR. BOSTIC: Have you ever testified in a
2  deposition before?
3         THE WITNESS: No, sir.
4         MR. BOSTIC: For purposes of testifying in a
5  deposition, it's similar to court. She has to have verbal
6  answers to the questions so that she can make a transcript for
7  us, but because it's a discovery deposition sometimes my
8  questions are not as structured as they might be in court.
9         THE WITNESS: Okay.
10        MR. BOSTIC: Because we're here to learn and
11  that sometimes leads to bad questions, so if I ask a question
12  that you don't understand either because of that, I've relaxed
13  the standards, or because my voice is not working well, please
14  let me know. We'll rephrase it. We'll work through it. But
15  if you answer the question I will assume you understood it.
16  Fair enough?
17        THE WITNESS: I understand.
18        ** ** ** ** **
19        EXAMINATION
20  BY MR. BOSTIC:
21  Q  Tell me about your formal education.
22  A  I graduated high school, went to college, I have a two-year
23  education in college, and through that I was trained to be a
24  police officer and since then I've had hundreds of hours of
25  in-service training through various schools put on throughout

1 (Pages 1 to 4)

ADAM DENT
3/30/2015

**Page 5**

1  the state of Michigan.
2  Q  When did you graduate from high school?
3  A  1999 and I graduated college in 2001.
4  Q  With an associate's degree?
5  A  Correct.
6  Q  In what field?
7  A  Law enforcement.
8  Q  And where did you attend police academy?
9  A  Grand Rapids Community College.
10  Q  Were you sponsored or did you go through it on your own?
11  A  Myself.
12  Q  So once you became certifiable as a police officer when was
13  your first law enforcement job?
14  A  April 2002.
15  Q  Did you go through the academy as part of your studies for
16  your associate's degree?
17  A  Yes.
18  Q  Okay. And in April of 2002 who hired you?
19  A  The City of Greenville.
20  Q  As a patrol officer?
21  A  Actually, it was as a seasonal bike patrol officer.
22  Q  Was that a permanent position?
23  A  No. It was seasonal, so April to -- it was supposed to be
24  April through October.
25  Q  Was it full-time?

**Page 6**

1  A  Correct, yeah.
2  Q  It had full law enforcement powers, correct?
3  A  Yes.
4  Q  Okay. And then what happened in October 2002?
5  A  In June or July of that year I got hired by the Village of
6  Nashville and I worked part-time there while still working at
7  Greenville as a patrol officer. And then right around October
8  I was hired at the Village of Bellevue, Michigan, full-time as
9  a patrolman.
10  Q  Bellevue, is that at the southern end of Eaton County?
11  A  Yes, sir, yeah.
12  Q  Okay. How long did you work there?
13  A  Up until March of 2003, which was when I was hired on here at
14  the City of Muskegon.
15  Q  So you finished out your seasonal employment?
16  A  Correct.
17  Q  And then in the meantime you did a little part-time work for
18  Nashville?
19  A  Correct. And I continued my part-time work working for
20  Nashville while I worked at Bellevue up until I accepted
21  Muskegon.
22  Q  Where is Nashville?
23  A  It's the southeast corner of Barry County. Nashville and
24  Bellevue are like 15 minutes away from each other.
25  Q  At the City of Greenville were you ever disciplined for your

**Page 7**

1  conduct as a police officer?
2  A  None.
3  Q  At the Village of Nashville were you ever disciplined for your
4  conduct as a police officer?
5  A  No.
6  Q  What about at the Village of Bellevue?
7  A  No.
8  Q  And have you been continuously employed as a police officer
9  with the City of Muskegon since March of 2003?
10  A  Yes.
11  Q  Have you ever been disciplined by the City of Muskegon for
12  your duties as a police officer?
13  A  No.
14  Q  Have you ever been arrested?
15  A  No.
16  Q  Have you ever received treatment for any psychological or
17  mental disorder?
18  A  No.
19  Q  Have you ever been in the military?
20  A  No.
21  Q  Since working for the City of Muskegon have you held any other
22  part-time or full-time work?
23  A  No.
24  Q  Initially, I want to take you back to 2011. Do you recall
25  having Officer Bringedahl make a traffic stop on Mr. Antol?

**Page 8**

1  A  Yes.
2  Q  Do you recall what -- when was that? Do I have the year
3  right?
4  A  Well, I'm -- I believe. I believe you do.
5  Q  Okay. Do you remember the month?
6  A  Summer, I think, maybe.
7  Q  Did you ask him to make that stop because of some sort of a
8  tip that you had concerning Mr. Antol?
9  A  I asked him to make that stop because another detective on the
10  team requested a unit make the stop. I'm the city detective
11  that was on the team at the time and we were in the City of
12  Muskegon, so I was making contact with our city officer to
13  make the stop. So that's why I contacted Detective
14  Bringedahl, or Officer Bringedahl, at the time. That was
15  Detective Ottinger that was requesting it. Detective Ottinger
16  had the information.
17  Q  Okay. Do you recall that there was actually some mention in
18  that tip of Mr. Antol being involved in heroin?
19  A  I could not truthfully answer that.
20  Q  Had you ever heard that before at the time? Does that even
21  sound familiar to you?
22  A  I don't -- I don't think I honestly ever read the tip because
23  the tip wasn't mine because, in general, a city narcotics
24  detective works generally all cases involved in the City of
25  Muskegon or any cases that are brought -- like if my general

2 (Pages 5 to 8)

Tri-County Court Reporters
248-608-9250

ADAM DENT
3/30/2015

Page 9

1    investigation brings me outside of my city, then I investigate
2    it. But otherwise, at that time, Mr. Antol's business was
3    outside of the city. At no point did I start an investigation
4    outside of the city. That was the detective who was from the
5    Muskegon County Sheriff's Department who started that
6    investigation. I did interview Mr. Antol that -- during that
7    investigation.
8    Q   Do you recall who ended up doing the report?
9    A   I know I did the report. I'm not sure who all did reports on
10   that day.
11   Q   Why would you have done the report?
12   A   Because I did the interviews.
13   Q   Were you present when an inspection was done of Mr. Antol's
14   business at the time, again, back in 2011?
15   A   On Apple, the Michigan Compassion Club?
16   Q   Yes.
17   A   Yes. I think we -- I'm speaking from a long ago memory. I
18   haven't even read the report, so --
19         MR. JUSTIAN:   Only testify as to what you
20   recall.
21         THE WITNESS:   Yeah. So I -- I believe so,
22   yeah. I believe it was myself and Sergeant Waltz went there
23   with Mr. Antol under his consent.
24   Q   (Continuing by Mr. Bostic)   Actually, it appears that
25   Detective Bringedahl did the primary report.

Page 10

1          MR. JUSTIAN:   Are we talking about the stop now
2    or are we talking about the --
3          MR. BOSTIC:   2011.
4          MR. JUSTIAN:   -- business?
5    Q   (Continuing by Mr. Bostic)   On that -- April 25, 2011,
6    according to Officer Bringedahl's report, do you recall
7    whether you had any direct contact with Mr. Antol?
8    A   Yes, I'm sure I did. At the police department I interviewed
9    him.
10   Q   So if the report says that Officer Bringedahl was asked by you
11   to make the traffic stop the reason was because you were the
12   liaison with the uniform for where the stop would occur?
13   A   That was correct.
14   Q   It was not -- you were not working your own tip?
15   A   It was not my investigation, no.
16   Q   Okay. Do you recall any of the details of your interaction
17   with Mr. Antol?
18   A   Not without reading the report I could not --
19   Q   Yeah. "I don't recall" is a perfectly legitimate answer.
20   A   Yeah. No, I don't. I don't recall.
21   Q   Okay. Do you recall any of your contact with Samantha Conklin
22   from 2011?
23   A   I recall that she was in the vehicle and she was interviewed.
24   I don't recall her statement at the time.
25   Q   Did you interview her?

Page 11

1    A   Yes.
2    Q   Where?
3    A   At the Muskegon Police Department. Both of them were
4    interviewed at the Muskegon Police Department.
5    Q   Why were they taken to the Muskegon Police Department?
6    A   At that time, their marijuana was commingled and, obviously,
7    this was very new under the Medical Marijuana Law. We
8    contacted the prosecutor's office. All their marijuana was
9    commingled and we were conducting an investigation into whose
10   marijuana it was, if it was all Samantha's or if it was all
11   Derek's or if it was all just theirs jointly together at that
12   point.
13   Q   Exactly where inside the police department did you interview
14   Ms. Conklin?
15   A   I would assume in the interview room.
16   Q   Was she chained to a piece of furniture at the time?
17   A   No. Well, I would tell you that if while she was awaiting
18   being interviewed there is a place at the Muskegon Police
19   Department that there's a chain to the wall that she would
20   have had one handcuff to while she was awaiting the interview,
21   so that -- as to not be able to escape if that's where she
22   was, but I'm not 100 percent sure on that.
23   Q   Did you chain her to the wall?
24   A   No. I wasn't the person who stopped her. I didn't transport
25   her. I did not place her down there.

Page 12

1    Q   During 2011 did you undertake any other investigative
2    activities concerning Mr. Antol?
3    A   I believe in that report, no, just with what was in that
4    report. I think maybe he -- but I can't be 100 percent sure.
5    I think he might have brought us to his grow where he was
6    living at the time, as well. It might have been Montgomery or
7    somewhere on --
8    Q   So in addition to the club, compassion club, you went
9    somewhere else and checked some plants or something?
10   A   Yeah, I believe so.
11   Q   During 2011 did you do any other investigation concerning
12   Ms. Conklin?
13   A   No.
14   Q   Was there a time when you became aware that the compassion
15   club stopped doing whatever it was doing and he took up
16   business on East Apple?
17   A   Yes.
18   Q   Do you recall when you became aware of that?
19   A   Shortly before we made the buy into the business in -- what
20   was it, 2012? If you don't mind, could I quick glance at my
21   date?
22   Q   I'm going to cure that for you with an exhibit.
23   A   That would have been 2013 then.
24         (At or about 3:02 p.m., Exhibit Number 1 was
25   marked for identification.)

3   (Pages 9 to 12)

ADAM DENT
3/30/2015

## Page 13

1  Q  (Continuing by Mr. Bostic): All right. I'm showing you a
2      two-page document that's been marked as Deposition Exhibit 1.
3      Do you recognize that document?
4  A  Yes, I do.
5  Q  What do you recognize it to be?
6  A  The search warrant I obtained on July 9th, 2014 for 885 East
7      Apple, more commonly known as Deuces Wild smoke shop or
8      dispensary.
9  Q  All right. Under the third bold entry, see paragraph 2. It
10     says, "On June 4, 2013."
11  A  Yes, sir.
12  Q  Is that the buy that you were making reference to?
13  A  Yes, sir.
14  Q  And who made that undercover buy?
15  A  I did, sir.
16  Q  How were you dressed when you did that?
17  A  I would say typical, like I am today. I couldn't tell you
18      exactly what I was wearing, but I was wearing plain clothes.
19  Q  Did you have any adornments on your clothing indicating
20      culture, you know, for marijuana or anti-police or anything of
21      that nature, any symbols? Did you use any of that kind of
22      stuff?
23  A  No.
24  Q  Did you normally do that when you worked in an undercover
25      capacity?

## Page 14

1  A  No. It might have been hoodie, baseball hat. Like that's
2      very typical but, you know, maybe a t-shirt.
3  Q  Okay. Now, the paragraph in this affidavit indicates that you
4      had a previously prepared fictitious application for a
5      Michigan Medical Marijuana card. Do you see that?
6  A  Yes, sir.
7  Q  So did you take one of the forms from the Department of
8      Licensing and Regulatory Affairs and fill it out?
9  A  Correct.
10  Q  And when you got assigned to the State Police drug team from
11     the City of Muskegon were you provided with a fake
12     identification?
13  A  Yes.
14  Q  And does it have a different name, driver's license number,
15     date of birth? I mean, it's truly a fictitious persona, but
16     it's on a legitimate driver's license, correct?
17  A  That is correct.
18  Q  And besides that driver's license did you have any other
19     officially issued cards or information?
20  A  No. The paperwork and a cancelled check, like a fictitious
21     cancelled check that we prepared.
22  Q  Under that fake name just so you had some other --
23  A  Correct.
24  Q  Okay. So you have the driver's license and a fictitious
25     cancelled check. Anything else?

## Page 15

1  A  Just the medical marijuana paper, no.
2  Q  Okay. So you take -- when you -- you fill out the fake
3      medical marijuana application. You take a legitimate form off
4      the internet, I suppose, and you fill it out, correct?
5  A  Yes.
6  Q  With your fake name or your real name?
7  A  Fake, fictitious.
8  Q  Okay. And then do you send it in to the Department of
9      Licensing and Regulatory Affairs?
10  A  No, sir.
11  Q  So when you went on June 4th and dealt with this fellow here
12     did you have a medical marijuana card, the hard plastic card?
13          MR. JUSTIAN: I'm going to object because I
14     didn't know that you established who he dealt with.
15          MR. BOSTIC: Okay.
16          MR. JUSTIAN: You're saying a fellow now. I
17     don't know if he dealt with a fellow or Conklin or who.
18  Q  (Continuing by Mr. Bostic): All right. When you went in on
19     June 4th did you have the hard plastic medical marijuana card?
20  A  No, sir.
21  Q  Okay. So you went in with the paperwork and the fake
22      cancelled check as your evidence of being valid?
23  A  I went in with it, correct, yes, sir.
24  Q  Okay. And you were assuming that they would rely then on the
25     fact that under the law if you have proof of payment you're

## Page 16

1      good, I don't know, 20 days later or whatever it says?
2  A  Correct, for myself to possess it, yes.
3  Q  On your fake paperwork were you allowed to possess plants?
4  A  I don't recall.
5  Q  Okay.
6  A  I don't believe I put a caregiver down or anything like that,
7      so I don't recall.
8  Q  Do you still have that paperwork somewhere?
9  A  Yes. It's been supplied to the prosecutor's office.
10  Q  Okay. It's probably in the criminal case --
11  A  Correct.
12  Q  -- we got it through discovery?
13  A  Yes, sir.
14  Q  Okay. I'm trying to segregate things for purposes of the
15     deposition and it's kind of hard. What disease did you --
16     what debilitating medical condition did you claim?
17  A  Crohn's.
18  Q  Anything else?
19  A  No, sir.
20  Q  Did you familiarize yourself with the symptoms of Crohn's
21     disease?
22  A  Not really, no.
23  Q  Do you actually suffer from Crohn's disease?
24  A  No, sir.
25  Q  Do you know anybody that does?

4 (Pages 13 to 16)

ADAM DENT
3/30/2015

---

**Page 17**

1  A  No, sir.

2  Q  But you did know that it was a listed condition?

3  A  Correct.

4  Q  So when you arrive on June 14, 2013 who do you first interact

5      with at Deuces Wild?

6  A  Samantha.

7  Q  Okay. Inside the building or outside?

8  A  Inside.

9  Q  Tell me about that conversation.

10  A  I just went up to her and showed her my paperwork and my card

11      and basically asked how I could, you know, get some marijuana.

12  Q  Well, you said you showed her your paperwork and your card?

13  A  And my driver's license.

14  Q  Okay. Your ID?

15  A  Sorry.

16  Q  Okay. And what did she say in response?

17  A  She looked over my paperwork and said I'm all set and showed

18      me to the back room.

19  Q  Now, the back room, you're referring to the southern portion

20      of the building?

21  A  Correct.

22  Q  And there's a doorway that leads into that southern portion,

23      correct?

24  A  Correct.

25  Q  And do you agree that there's some sort of a fake wall or half

---

**Page 18**

1      wall or something there that if you're in the main part of the

2      store it prevents you from being able to see that door?

3  A  Yes.

4  Q  And so that's -- you went around that wall and did you -- did

5      she escort you back there?

6  A  Yeah. She led me back there.

7  Q  Was it locked?

8  A  No.

9  Q  So she didn't unlock it, but she did take you back there?

10  A  Yes.

11  Q  Did she go with you?

12  A  A portion of the way and then introduced me to that Nick guy

13      that was back there who was dispensing the marijuana.

14  Q  Okay. So describe for me when you go through that door are

15      you in a hallway?

16  A  Yes.

17  Q  And then what happens?

18  A  It opens -- there's like a doorway to the right, maybe a few

19      doors to the right, and then opens up to the left where

20      there's the counter, where there's some marijuana in smaller

21      jars, and then there's, you know, a back shelving area where

22      there's more marijuana and, you know, there was -- underneath

23      the glass counter, I believe, is where the marijuana was that

24      you would pull it out, you know, to let you smell. And then

25      there was a cash register, digital scales.

---

**Page 19**

1  Q  Were there any labels or price lists, things of that nature?

2  A  Yes.

3  Q  Tell me about your conversation with this Nick fellow.

4  A  Nick spoke to me for a little while. He did ask me what my

5      ailment was. I told him it was Crohn's and then he didn't --

6      then he just asked me what I liked and went and started going

7      through different strains and different smells and different

8      types of marijuana that he -- that they had for sale at that

9      point.

10  Q  Did he look at your paperwork again?

11  A  No, not at all.

12  Q  Had she given it back to you?

13  A  Yes, yes.

14  Q  Did you make a selection?

15  A  Yes, yes.

16  Q  Do you recall how much either in quantity or how much --

17  A  It was something around four grams.

18  Q  Okay. About how much did you pay?

19  A  Like $40.00, $45.00.

20  Q  And then was that pretty much the extent of your interaction

21      with Nick?

22  A  Yes.

23  Q  As you left did you have any conversation with Ms. Conklin?

24  A  I don't believe so.

25  Q  Did you even see her as you were leaving?

---

**Page 20**

1  A  I think she was just sitting out front in the front room.

2  Q  In June of 2014 do you recall seeing any signs by the door

3      that goes into the southern portion of the building?

4  A  Not that I remember.

5  Q  Okay.

6  A  Not that I specifically remember, no. I remember in the back

7      room there was some sign about Derek and Samantha, no deals,

8      you know, payment right away or something to that effect, but

9      that's the only specific sign that I remember.

10  Q  Did you have any type of recording device on you at the time?

11  A  You're talking about 2014 when we're doing the search warrant

12      or are you going --

13  Q  No. All of these questions have been talking about June 4th

14      of 2013.

15  A  You just said '14 just a second ago.

16  Q  Okay.

17          MR. JUSTIAN: So would you correct your answer

18      then --

19          THE WITNESS: Okay.

20          MR. JUSTIAN: -- regarding what signage you may

21      have seen?

22          THE WITNESS: Okay. That sign I was just

23      referring to is the search warrant in 2014.

24  Q  (Continuing by Mr. Bostic): Okay.

25  A  I don't recall any signs at all of 2013.

---

5 (Pages 17 to 20)

ADAM DENT
3/30/2015

Page 21

1    Q   Either by the door or in the back?
2    A   That is correct.
3    Q   Did you ever submit a warrant request for anyone concerning
4        the June 4, 2013 transaction?
5    A   No. It was an ongoing investigation.
6    Q   Well, I know it was an ongoing investigation, but did you
7        ever -- up to this day have you ever submitted a warrant
8        request?
9    A   Yes.
10   Q   For that buy?
11   A   Oh, yeah, absolutely.
12   Q   What happened to it?
13   A   It's currently going through court. They issued one count
14       of --
15   Q   I see what you're saying. In your mind, the dates of the
16       current conspiracy charge include this?
17   A   That is correct.
18   Q   I got you. Okay.
19   A   Instead of charging Samantha with multiple counts they did one
20       conspiracy count at this time.
21   Q   Okay. And then, I don't know, is Nick co-Defendant? This
22       particular guy, is he even --
23   A   I don't believe they decided to charge Nick at that point.
24   Q   Okay. Now, on June 18th, paragraph 3, did you have any
25       contact with Ms. Conklin on June 18th, 2013?

Page 22

1    A   Yes.
2    Q   Tell me about that.
3    A   On June 18th, I went in. Nick was working the front area.
4        Nick remembered me. I didn't have to show him any of my
5        paperwork or anything. He allowed me to go to the back. He
6        didn't lead me to the back. The door was as I recall -- I
7        believe it was shut. No, maybe it was open. Either way, I
8        was able to go into the back area and then I had to wait
9        because there was a Hispanic gentleman that was being tended
10       to or sold to by Samantha at that time, so I stood by and
11       waited for that sale to finish and then, yeah, a male
12       exchanged $10.00 -- purchased $10.00 of marijuana and then I
13       purchased an additional $30.00 of marijuana from Samantha.
14   Q   So the roles were reversed this time?
15   A   That is correct.
16   Q   Between Nick and Samantha?
17   A   That is correct.
18   Q   Okay.
19   A   I think --
20   Q   But because Nick was out front and he remembered you, you
21       didn't have to show your paperwork again?
22   A   I didn't have to show him my paperwork. He just said, "Hey, I
23       remember you. Slide on back."
24   Q   All right. You can't remember if the door was open or closed,
25       but can you safely say that it was not locked?

Page 23

1    A   It was not locked.
2    Q   Okay.
3    A   That is correct.
4    Q   Now, I'm going to go back to --
5    A   I didn't have to knock. She didn't have to come answer it.
6        Nothing like that, so I know I just was allowed to go back.
7    Q   I'm going to go back to June 4 a minute and clarify something.
8        You testified earlier I think that she opened
9        the door, got started with you going down the hallway, and
10       then where did she go?
11   A   She left and went back up front. She either led me around
12       that partition and said, "Go down that door -- so if the
13       partition's here and the door -- walkway is towards you,
14       right, if it's -- the table is the partition, she either
15       walked me around and said, "Go down that door," or opened the
16       door and said, "Go down." I don't remember if the door was
17       open or closed.
18   Q   Okay. But --
19   A   I don't think she had the key to open it or anything to that
20       effect.
21   Q   Was it your understanding that she essentially had to go back
22       out and work the front of the store?
23   A   Yeah. Like she went back out to the front and watched the
24       front of the store, yes.
25   Q   Okay. So she was not present --

Page 24

1    A   During the sale.
2    Q   -- during the sale?
3    A   No.
4    Q   I'm correct?
5    A   Correct.
6    Q   Okay. On June 4 --
7    A   She just basically approved my paperwork that day.
8    Q   On June 4, 2013, were you wearing a device to record what
9        happened?
10   A   Yes. On the June 4th date, yes.
11   Q   And what about on June 18th?
12   A   June 18th, no, I did not bring it.
13   Q   Why?
14   A   On June 4th -- I'll tell you why June 4th we were. On June
15       4th I went in every dispensary in the City of Muskegon and
16       tried to make purchase attempts and Deuces Wild was the only
17       one that made a sale, so we held the recorder for every
18       attempt. So after that sale we preserve that video and on
19       June 18th it's not -- it's very -- it's not typical for us to
20       use the recorder unless it's like a homicide investigation or
21       something like that, so it's very, very seldom that we use it.
22   Q   Okay.
23   A   So on June 18th that's why I didn't use it. It's not -- we're
24       always microphoned up anyways, so it's very -- so the team
25       knows what's going on, so they -- they knew what was going on

ADAM DENT
3/30/2015

## Page 25

1 during the time when I was in there anyways. They could hear
2 the transaction from outside.
3 Q Well, you're talking about your body transmitter. That's a
4 safety device, correct?
5 A Correct. But they can hear what's going on. They know what's
6 going on while I'm in there for safety purposes and to
7 actually know what's going on.
8 Q Now, during 2013 was there an attempt by you to purchase
9 again?
10 A No. I made no more attempts.
11 Q Did anybody on the WEMET team in 2013 again attempt to
12 purchase at Deuces Wild?
13 A Yes.
14 Q Who?
15 A Detective Bahorski, who is now a sergeant.
16 Q Spell that one for us.
17 A B-a-h-o-r-s-k-i.
18 Q All right. And do you recall when that happened?
19 A I would say months later, sometime late August or so. He made
20 two attempts and I could tell you -- well, I guess I'll wait
21 for the question.
22 Q I'm just going to have you review that and ask you to look at
23 that journal entry on August 28th, 2013. What is that telling
24 you?
25 A Reviewed, let's get back and try a second detective. And

## Page 26

1 then, again, October 2nd, let's attempt to get back.
2 Q And that's the lieutenant --
3 A Fias.
4 Q -- who's monitoring the progress of the cases?
5 A That is correct.
6 Q This is page 1 of supp 3 of your report. See that first
7 paragraph under "summary"?
8 A Yes, sir.
9 Q That's where you're talking about Detective Bahorski made an
10 effort?
11 A Yeah.
12 Q One or two?
13 A Two. Well, I said at least two because I could recall two.
14 Q Okay. Who authored that report?
15 A I did.
16 Q At the time you made that entry what were you referring to
17 confirm those two attempts?
18 A I'm sorry. What?
19 Q How did you know that those occurred? I mean, because you're
20 doing your report in July of 2014. How did you know there
21 were two more attempts?
22 A Because I was present during those two attempts.
23 Q Are those documented anywhere?
24 A No. And I don't know why. I couldn't tell you why they were
25 never documented. Detective Bahorski never wrote them in the

## Page 27

1 journal. I never did, so I guess -- and neither did the
2 lieutenant, so I don't know why they were never notated.
3 Q So in a perfect world somebody would have at least made a
4 journal entry?
5 A Yeah. In a perfect world, absolutely.
6 Q Okay. So does that paragraph help you remember when his two
7 attempts occurred?
8 A Unfortunately, no.
9 Q Okay. So it could have been anytime between -- apparently,
10 between August of 2013 and July of 2014?
11 A Detective Bahorski at this time had been promoted to a
12 sergeant for probably six months, so he had been off the team
13 since almost January. So that's why I'm telling you it was
14 probably late summer when he was in there.
15 Q But you can pretty safely say that at the latest it was late
16 2013 or --
17 A Correct.
18 Q -- prior to his promotion?
19 A Yes. Absolutely, yeah. He didn't -- I know -- I don't think
20 he made any attempts. He was on our team for like a month or
21 two as a sergeant, but after that then he went back to the
22 road.
23 Q Do you have any specific recollection of listening to the
24 transmitter or debriefing him or him telling you about why he
25 was unable to make a buy?

## Page 28

1 A Yes. Specifically why, it was stated in the report that both
2 times that there were employees inside and that neither --
3 because he -- well, let me start from the beginning.
4 Detective Bahorski did the same thing I did. He had a
5 fictitious Michigan driver's license and he prepared
6 fictitious medical marijuana paperwork. Okay. So he went
7 into the Deuces Wild store with the same premise, so as to not
8 taint the case, as to not try to fool them with a hard card,
9 and when he went in the store he went to the employees that
10 were working at the time and both times was told Derek or
11 Samantha are not there and they're the ones that have to
12 approve paperwork and because they were not there to approve
13 the paperwork he could not make any purchases.
14 Q So we don't even know whether anybody was in the back room at
15 the time?
16 A That is correct, yeah.
17 Q He never got past the --
18 A He never got past into the back room.
19 Q All right. Now, so you're telling me that in June of 2014, on
20 a particular day, June 4, you chose decides to try to make a
21 buy from every place in the City of Muskegon that you thought
22 was a dispensary?
23 A That's correct.
24 Q Had there been anything that led up to that in terms of a
25 specific directive from --

7 (Pages 25 to 28)

ADAM DENT
3/30/2015

Page 29

1  A  Yes.
2  Q  Okay. Tell me about that.
3  A  Our chief from the city said, "I want you to -- apparently,
4     these dispensaries are selling illegally. I want you to see
5     if they are and if they are, I want you to take proactive
6     action on them." So, therefore, we made attempts.
7  Q  Now, is Detective Bringedahl on the team by June of 2013?
8  A  No, sir.
9  Q  So you're the -- you're the City of Muskegon representative?
10  A  Myself and Detective Bahorski, correct. So at that point --
11  Q  So your police chief --
12  A  Directs --
13  Q  Asks you as -- with WEMET's resources to do this?
14  A  Absolutely.
15  Q  Do you know what prompted the chief to want to do it at this
16     particular time?
17  A  No.
18  Q  When he gave you those instructions did he single out Deuces
19     Wild?
20  A  No, no. Absolutely, no.
21  Q  It literally was every place that we think is a dispensary?
22  A  Correct. We tried every -- we tried Diane's up on Ottawa. We
23     tried -- we tried the ones on the border of the city, as well.
24     There was -- they're closed down now, but the People's Center
25     that's on Lincoln that's just outside of the city; Big Blue

Page 30

1     Hydroponics we got tips on at that time, that's on Ottawa, as
2     well; and then we tried Deuces Wild and there was one more at
3     that time that was on like Henry just north of Sherman, but
4     that never made it. Kevin knows what I'm talking about.
5  Q  Yeah. I do, too. If you know, had tips come in or what made
6     the chief think that Deuces Wild was selling either in the
7     front part or the back part of the store?
8  A  No. I don't think it was Deuces Wild. I think it was we have
9     dispensaries that are operating in the gray area of the law.
10     This is my assumption. I was not specifically told this. I
11     was told just to --
12            MR. JUSTIAN: Only answer what you know.
13            THE WITNESS: Okay.
14            MR. BOSTIC: Yeah.
15            MR. JUSTIAN: If you don't know, say you don't
16     know.
17            THE WITNESS: Then I guess I couldn't tell you.
18  Q  (Continuing by Mr. Bostic): Right. That's fine.
19  A  I don't know.
20  Q  That's fine.
21  A  I could tell you it was not a specific directive towards
22     Deuces Wild.
23  Q  I know, but --
24  A  That's why we went towards six places.
25  Q  I understand that.

Page 31

1  A  Yeah.
2  Q  But my question is these businesses made the list. My
3     question is did the chief tell you why Deuces Wild was on that
4     list?
5  A  No. The chief doesn't tell me. The chief will go through my
6     sergeant or the lieutenant that's on the team. The chief
7     would not tell me.
8  Q  So this directive you didn't get directly from the chief?
9  A  No.
10            MR. JUSTIAN: I might have misunderstood, but I
11     thought he had said the chief didn't say Deuces Wild?
12            THE WITNESS: That is correct. The chief did
13     not -- the chief said -- my understanding is the chief gave a
14     directive to attempt to, you know, see if these dispensaries
15     are operating correctly under the law or not or if they are
16     actual dispensaries, each -- every dispensary in the city.
17  Q  (Continuing by Mr. Bostic): Right. Did you have that
18     conversation with the chief?
19  A  No.
20  Q  Who did you have that conversation with?
21  A  My sergeant at the time. Or, actually, I think it was just
22     the lieutenant. I don't even think there was a sergeant on
23     the team at the time.
24  Q  Lieutenant Fias?
25  A  Yes, I believe so.

Page 32

1  Q  All right. So the chief gets ahold of the leader of WEMET?
2  A  Correct.
3  Q  And makes the request?
4  A  Correct.
5  Q  All right.
6  A  And because I'm a city detective it's my job.
7  Q  All right. Now, so the chief essentially leaves it up to
8     Lieutenant Fias to decide who makes the list?
9  A  No. Lieutenant Fias made the decision we are trying every
10     dispensary in the city.
11  Q  All right. And did Lieutenant Fias tell you how or why Deuces
12     Wild ended up on the list?
13  A  Because I think we -- no. I would say no.
14  Q  Okay. Well, as of June of 2013 had you specifically, just
15     you, received any tips concerning Deuces Wild or the southern
16     portion of Deuces Wild?
17  A  It was well-known that Deuces Wild was operating as a
18     dispensary.
19  Q  Okay. Let's talk about well-known. What were the sources?
20            MR. JUSTIAN: I'm going to object to any
21     sources, any confidential sources, he is not going to name.
22  Q  (Continuing by Mr. Bostic): I don't mean naming CIs. I mean,
23     you know, citizen complaints, anonymous tips, traffic stops
24     with intelligence. I mean, just where is this coming from?
25  A  The fact that Derek and Sam had the shop open before that was

8  (Pages 29 to 32)

ADAM DENT
3/30/2015

**Page 33**

1     a compassion club. The assumption was, you know, pretty good
2     that they were still operating a compassion club or
3     dispensary. There had been traffic stops, I believe, of
4     people who had said they had received their, you know,
5     marijuana from Deuces Wild and I believe anonymous tips that
6     came over through Silent Observer.
7   Q  Okay. So an officer might make a traffic stop for running a
8     red light down on Apple and during that stop he finds a baggie
9     of marijuana and he says to the driver, "Where did you just
10    get this from?" Or, "Where do you get your -- and that would
11    be a source?
12  A  Correct.
13   Q  Okay. Now, as far as you know, was -- and, again, focusing on
14     June 2013, did WEMET maintain an intelligence file on Derek
15     Antol?
16  A  No.
17   Q  What about on Samantha Conklin?
18  A  No.
19   Q  What about on the business?
20  A  No
21   Q  As far as you know, did the City of Muskegon Police Department
22     maintain an intelligence file on any of those three?
23  A  Not that I'm aware of.
24   Q  Okay. In addition to this directive that came through
25     channels to you are you aware of any type of operational plan

**Page 34**

1     to target Antol or Deuces Wild?
2  A  There is none.
3   Q  Are you aware of any general plan that sets up standard
4     operating procedures for the City of Muskegon Police
5     Department to utilize fire marshal, building department, code
6     compliance, WEMET, et cetera, to focus on these dispensaries?
7  A  Not that I'm aware of. You know, orders roll down to me.
8   Q  Right.
9  A  And I follow them. So I have no idea what the fire marshal,
10    code compliance, or any of those people are doing or who
11    controls them all, I guess.
12   Q  So if there is such a plan it's above your pay grade?
13  A  Way above my pay grade.
14   Q  Okay.
15  A  And it would be hard for me to believe that there's multiple
16    other dispensaries that are operating still.
17   Q  Now, moving forward to July 9, 2014, other than Detective
18     Bahorski's two attempts were you personally involved in any
19     other investigative activity concerning Deuces Wild?
20  A  Yes.
21   Q  What was that?
22  A  On the 8th we, myself and Detective Bringedahl, conducted
23     surveillance on Derek and Samantha, Deuces Wild, and their new
24     residence and their old residence.
25   Q  Farr Road and Green Creek?

**Page 35**

1  A  That is correct.
2   Q  Did you do surveillance notes?
3  A  I don't recall and if I did they were typed and added to the
4     report.
5   Q  And that was most likely disclosed through the other --
6  A  Criminal case.
7   Q  -- criminal case? So it was just you and Detective
8     Bringedahl?
9  A  That is correct.
10   Q  All right. And you said the 8th. Did you mean July 8th?
11  A  July 8th, 2014.
12   Q  And so between Bahorski's two attempts and July 8th, 2014 is
13     it your testimony that there was no other investigative
14     activity for either the business, Ms. Conklin, or Mr. Antol?
15        MR. JUSTIAN: As far as he is aware?
16   Q  (Continuing by Mr. Bostic): As far as you participated in.
17  A  Yeah. There might have been some surveillance now and again
18     on the business, but nothing that was -- nothing to note.
19   Q  Okay.
20  A  Just to make sure they were still operating or -- but that
21     would be it.
22   Q  As far as you know, whether you -- even if you weren't
23     personally involved did any other WEMET members conduct any
24     investigative activity?
25  A  No.

**Page 36**

1   Q  All right. What prompted you to do the surveillance on July
2     8, 2014?
3  A  As you saw in those reports, those numerous journal notes,
4     saying that the report was reviewed and every month the
5     report's stuck on my desk and I needed to clear the case up.
6     We had a consultation with the prosecutor's office the week
7     before and I was just going to shear up some addresses and if
8     I had enough information, possibly seek to obtain a record
9     search warrant based on my prior buys and new surveillance or
10    updated surveillance.
11   Q  Well, you have in front of you there Exhibit 1 for your
12     deposition, which talks about -- well, that's your affidavit
13     that you explained to the magistrate why you thought you had
14     probable cause, correct?
15  A  Yes, sir.
16   Q  Is there any particular reason that you left out the two
17     failed buys by Detective Bahorski?
18  A  I believe it slipped my mind at that point. That's the only
19     thing I can -- the reason I could explain it.
20   Q  And what did your surveillance disclose on July 8, 2014?
21  A  That the business was still operating. We saw Derek and
22     Samantha both living or in and out of the address on North
23     Green Creek and that the Farr Road address had somebody else
24     inside and out of it and, I mean, basically, that. We watched
25     them for I think it was an hour or two hours, but they had

9 (Pages 33 to 36)

ADAM DENT
3/30/2015

Page 37

1   both ended up leaving. Once we made sure that they were
2   still -- they were living on North Green Creek and we had a
3   newer address for them.
4   Q   Did either of them during the surveillance go to 885 East
5       Apple?
6   A   I don't recall.
7   Q   On July 9th, 2014 what was the method of you first learning
8       that anything had happened at Deuces Wild involving law
9       enforcement?
10  A   Detective Marshall received a phone call from Detective
11      Sergeant Karl Schmitz.
12  Q   Were you present? Could you hear Detective Marshall's end of
13      the conversation?
14  A   Yeah. Yes, I mean, I was in the room.
15  Q   Okay. Do you remember any of the details?
16  A   Just that he -- what he was telling -- I guess I can't recall
17      exactly what he was saying, but he was -- I remember him
18      specifically telling me that Tobacco Tax is at 885 East Apple
19      and that they're inside and that they found a bunch of -- or
20      that they could see a bunch of marijuana inside.
21  Q   Prior to July 9, 2014 had you ever met Greg Parollini from the
22      Department of Treasury?
23  A   Never.
24  Q   Prior to July 9, 2014 had you ever met Karl Schmitz?
25  A   Once.

Page 38

1   Q   Tell me about that.
2   A   We assisted the Tobacco Tax Team on a search warrant in the
3       South Heights like Fifth or Sixth Street, like 3300 block for
4       a DVD fraud counterfeit case.
5   Q   Okay.
6   A   That was, you know, a long, long time ago. Or, I mean, it was
7       months before this case, but a long time ago from now.
8   Q   Did you have any other -- did you have any really direct
9       interaction with Mr. Schmitz during that?
10  A   No, no. I worked with Trooper Vogt on his team from that to
11      get them the items they needed from the case back and forth.
12      That's all I really had to do.
13  Q   So once Detective Marshall gets this information how do you
14      divide up the duties of what needs to happen next?
15  A   Well, I sent Detective Marshall to the store and then I let
16      the sergeant, who was Sergeant Strauss, and Lieutenant Fias
17      decide what they were going to do with the duties, but I
18      suggested that someone needed to go to North Green Creek and
19      that someone needed to go to Farr Road. And then I said, "I
20      will be going to the prosecutor's office to get a search
21      warrant," because I knew that we were going to be getting a
22      search warrant based on the records search warrant or I was
23      going to seek to obtain a search warrant based on the records
24      search warrant anyways. Unfortunately, Tobacco Tax had
25      already sped up that process. So I was obviously the one that

Page 39

1   knew all the details for the case anyways, so that was my
2   choice to go get the search warrants anyways.
3   Q   When you say you knew all the details, primarily, you had done
4       surveillance the previous day and you had made the buys the
5       previous year. That's what you're referring to?
6   A   That is correct.
7   Q   At any point in time were you -- was it on your mind in 2014
8       what had happened back in 2011?
9   A   No, not at all.
10  Q   And, ultimately, what happened in 2011? After you interviewed
11      both of them and you inspected the business and inspected the
12      home, what happened?
13  A   The prior county prosecutor decided not to charge them.
14  Q   Who is the prior county prosecutor?
15  A   Tony Tague.
16  Q   Okay. And did you return -- but you had not only inspected
17      the house and the business, you actually seized stuff from
18      those locations, right?
19  A   We didn't seize anything from the house.
20  Q   Okay. What did you seize from the compassion club?
21  A   Nothing.
22  Q   You don't recall having to give back the property?
23  A   The only thing we seized from my recollection is the stuff
24      that was in the vehicle.
25  Q   Okay. Do you recall having to give that back?

Page 40

1       MR. JUSTIAN: The marijuana?
2       MR. BOSTIC: Anything.
3       THE WITNESS: I don't remember if we gave it
4   back or -- I couldn't tell you if we gave it back or not.
5   Q   (Continuing by Mr. Bostic): During that 2011 stop do you
6       recall you or Officer Bringedahl checking with the prosecutor
7       about searching the vehicle?
8   A   Yes.
9   Q   Do you recall that a prosecutor requested that you search the
10      vehicle?
11  A   That's a little -- that was a little incorrect.
12  Q   Well, it's not your report, so I'm not --
13  A   That's not my report.
14  Q   I'm not holding you to it, but --
15  A   Correct. Officer Bringedahl -- I would state this. Officer
16      Bringedahl didn't think that he had enough to search the
17      vehicle. I called the prosecutor's office. The prosecutor's
18      office said, yes, you do have enough to search the vehicle and
19      then I told Officer Bringedahl, "You absolutely have enough to
20      search the vehicle and you can," and basically told him the
21      prosecutor's office, you know, will back you up.
22      MR. WISTROM: Can we just do something off the
23      record just for one second?
24      (At or about 3:46 p.m., off the record.
25      Whereupon Mr. Wistrom left the deposition. At

10   (Pages 37 to 40)

ADAM DENT
3/30/2015

Page 41

1         or about 3:46 p.m., back on the record.)
2   Q  (Continuing by Mr. Bostic): Okay. Now, again, referring back
3      to Exhibit 1, we're going to move back up into July 2014.
4      You're at the prosecutor's office preparing this affidavit,
5      correct?
6   A  Correct.
7   Q  Do you have any direct telephone contact with Sergeant
8      Schmitz?
9   A  No.  I'm talking to Marshall.
10   Q  That's it?
11   A  Correct.
12   Q  Did Detective Marshall during the conversation while you were
13      preparing this search warrant affidavit ever tell you that the
14      tax team officers entered the southern portion of the building
15      without a warrant?
16   A  No.
17   Q  Did he ever tell you that they entered after they threatened
18      to arrest Samantha?
19   A  No.
20   Q  Since then have you ever talked to Detective Marshall and had
21      Detective Marshall tell you that he was aware of either of
22      those two pieces of information?
23   A  No.  Well, that they were in that back smoke shop area?
24   Q  Well, not necessarily that they were in the back.  I mean, I
25      think -- I think you probably knew that.

Page 42

1   A  Yeah.  Because it was pretty apparent that they were back
2      there.
3   Q  Right.
4   A  But, yeah.  No, no, not that they were not allowed back there
5      or -- no, I don't --
6   Q  Or no court order?
7   A  Correct.
8   Q  Those are the two pieces of information I want to know if
9      Detective Marshall has ever acknowledged to you that he was
10      aware of.
11   A  No.
12   Q  Because you don't have any personal information of his
13      telephone contact.  Well, by now, he's at the scene, right?
14   A  Correct.
15   Q  When he's talking to you on the phone and you're typing or
16      you're telling the prosecutor --
17   A  This is what he's saying.
18   Q  He's at 885?
19   A  Correct, yeah.  Our drive is about the same.
20   Q  Okay.
21   A  I mean, it's a half mile down the road.
22   Q  Now, the next paragraph, paragraph 5, says that now you are
23      making contact with Kate Strauss?
24   A  Correct.
25   Q  And you're still at the prosecutor's office.  She's still at

Page 43

1      the scene.  Does she tell you that they entered the southern
2      portion of the building without a warrant?
3   A  No.
4   Q  Does she tell you that they entered the southern portion of
5      the building after they threatened to arrest Samantha Conklin?
6   A  No.
7   Q  Now, I'm going to show you what we've had marked as Deposition
8      Exhibits 1 and 2 in Mr. Schmitz's deposition.  Did Detective
9      Marshall or Detective Sergeant Strauss during their phone
10      conversations with you while you're preparing the warrant
11      describe either of those notices to you?
12   A  No.
13   Q  When you got out to the scene did you see either of those
14      notices at 885?
15   A  I don't recall seeing them.
16   Q  Okay.
17   A  If I would have seen them I would have taken a photo, but I
18      took a lot of photographs that day, as you could have saw with
19      a criminal investigation.
20   Q  All right.  Now, moving onto the back page of Exhibit 1 you
21      have in paragraph 8 talked about a couple of -- well, in
22      paragraph 8 you're talking about Hartwick, People versus
23      Hartwick, that's H-a-r-t-w-i-c-k.  But are you aware of a case
24      that came out in January or February of 2013 that essentially
25      said that a caregiver was not violating the act or would

Page 44

1      receive protections of the act if they sold to a person with a
2      card?
3   A  No, I'm not aware of it.
4   Q  Okay.  And then in the next paragraph you mentioned People
5      versus McQueen, which was decided before June of 2013.  I know
6      that.  Yeah, before June of 2013; where the Supreme Court
7      said, no, you can't?
8   A  Correct.
9   Q  And that's what you relied on in part to justify putting the
10      two June 13, 2013 buys in there, right?
11   A  Yes, sir.
12   Q  Okay.  Were you aware that the earlier case in the Court of
13      Appeals that occurred in January or February of 2013 wasn't
14      reversed by the Supreme Court until after June of 2013?
15   A  No, I was not aware of it.
16   Q  Okay.  Now, when you did the search warrant affidavits for
17      Green Creek and Farr Road did you change anything except the
18      descriptions of the places to be searched?
19   A  I don't believe so.
20   Q  Well, maybe paragraph 11.
21   A  Yeah, correct.
22   Q  Okay.  And I think you earlier indicated that even though you
23      didn't know yet what was inside of Green Creek or Farr Road
24      you were also essentially doing a record search warrant?
25   A  Correct.

11  (Pages 41 to 44)

ADAM DENT
3/30/2015

Page 45

1   Q  I mean, that was -- that's part of your justification for the
2      residences, right?
3   A  Correct. Prior to the Tobacco Tax being there. If they
4      wouldn't have been there July 9th, my sole plan for that day
5      was going to be to obtain the records warrant.
6   Q  Now, paragraph 12, you talk about your training and experience
7      and I'm assuming that -- well, let's -- rather than me assume
8      it, let's get some facts out on the record here. You've been
9      to basic narcotics school by the State Police?
10  A  Yes, sir.
11  Q  Have you been to advanced narcotics school by the State
12     Police?
13  A  No, sir.
14  Q  Have you been to any DEA schools?
15  A  No. Indoor marijuana grow school.
16  Q  Pardon me?
17  A  Indoor marijuana grow school, which is a DEA school. So I
18     guess, yes.
19  Q  You've been to raid school?
20  A  Yes, sir.
21  Q  When did you first start on your assignment at WEMET?
22  A  December of 2010.
23  Q  In any of those trainings that you've been to did they talk
24     about the impact of the Michigan Medical Marijuana Act on how
25     records are kept?

Page 46

1   A  I don't recall.
2   Q  Do you agree that as a general proposition the training that
3      you get for controlled substance investigations takes as a
4      given that drug dealers will keep records or proceeds or
5      product at a place over which they have control, their
6      residence, a storage building, some place where they control
7      it? As a general proposition that is something that's common
8      in drug investigations?
9   A  I would say most of the time, but I've seen it that, you know,
10     sometimes they'll pay, you know, their next-door neighbor to
11     store drugs at.
12  Q  Right. But you put this general proposition of the fact that
13     they keep things at places over which they have control in
14     your affidavits to justify going into these places to get
15     records, correct?
16  A  Because it's common, yeah.
17  Q  Okay. And that's -- I mean, that's essentially what paragraph
18     12 is doing?
19  A  Correct.
20  Q  You're taking your own experience, your own investigations and
21     investigations where you help others, and your training,
22     you're boiling it all down into a couple of general
23     propositions?
24  A  Correct.
25  Q  Okay. Do you agree that when a person runs this as a medical

Page 47

1      marijuana business that you do not have a track record of data
2      to support the idea that records, product, and proceeds are
3      going to be kept at their dwelling?
4              MR. JUSTIAN:  I'm going to object because
5      you're trying to distinguish between whether or not these
6      people are drug dealers or they're something else. I mean, if
7      this officer actually truly distinguishes the two, I'm sure he
8      could probably try to answer that question. I think that
9      you're going to have to confirm first whether or not he
10     actually distinguishes the two.
11  Q  (Continuing by Mr. Bostic):  In a deposition he objects, it's
12     preserved, and you answer the question.
13  A  I think there's no difference. I think people commonly,
14     whether you run an irrigation business, they're going to keep
15     money at their house.
16  Q  Okay.
17  A  They're going to keep it in their bank sometimes, too, but if
18     you're running a business that is typically illegal drugs
19     they're going to more often than not keep it at their house.
20  Q  What is it about the operation here that you initially spoke
21     of earlier as being in the gray area?
22  A  Because of the case law. The case law doesn't allow for --
23     well, I should say that the State has not approved for
24     dispensaries yet. Therefore, people have attempted to operate
25     what I say is in the gray area and find loopholes or not

Page 48

1      necessarily loopholes, but just patient-to-patient transfers
2      and, you know . . .
3   Q  Do you agree also that since 2009 or maybe 2010 when we
4      started getting the first appellate opinions coming out that
5      there have been changes in developments in the way the Court
6      of Appeals and the Supreme Court have interpreted the act?
7   A  Well, yeah. Numerous, yeah. So we're all learning on the
8      fly.
9   Q  Now, I just noticed something and I want to go back and
10     correct it. Earlier I had asked you questions about your
11     medical marijuana paperwork and I kept saying -- asking you
12     about whether or not you had submitted it to the Department of
13     Licensing and Regulatory Affairs and it just dawned on me that
14     it -- the stuff went to the Department of Community Health.
15  A  Right.
16  Q  Not LARA. Does that change any of the answers that you gave?
17  A  No.
18  Q  Okay. So you knew then that I didn't know what I was talking
19     about. Are you aware from conversations with the other
20     officers on WEMET that the officers entered the dwelling on
21     Green Creek prior to the search warrants arriving?
22  A  Yes, I knew they did.
23  Q  Who told you that they did?
24  A  I think Detective Bringedahl did.
25  Q  Did they tell you why?

12  (Pages 45 to 48)

Tri-County  Court Reporters
248-608-9250

ADAM DENT
3/30/2015

Page 49

1    A   I don't recall why. Oh, yes.
2    Q   What did he say?
3    A   Someone arrived and was leaving, so I think he -- they stopped
4        the car and to preserve evidence, make sure -- they found -- I
5        believe they found out someone else was inside and then
6        they -- that the people had already known everything was going
7        on and they -- I believe they located marijuana in the car,
8        too. So, at that point, I didn't make the decision. I don't
9        even think he made the decision. I think command officers
10       made the decision to secure the house.
11   Q   Do you recall --
12   A   I think we were like a half hour away. I think I was -- the
13       search warrant was typed and I think I was walking to the
14       judge or something. It was very close to being finished.
15   Q   Do you recall that at Farr Road they claimed that the
16       marijuana room was not locked?
17   A   Who claimed, sir?
18   Q   The officers that executed the search warrant.
19   A   Yes.
20   Q   That they were claiming it was not in an enclosed, locked
21       facility?
22   A   Yes. I -- yes.
23   Q   Okay. Did you go to Farr Road on July 9th, 2014?
24   A   No.
25   Q   Did you go to Green Creek?

Page 50

1    A   Yes.
2    Q   Did you ever see any of the photographs from Farr Road?
3    A   Yes.
4    Q   Did you see the drywall that they busted through?
5    A   Yes. I think so, yes.
6    Q   Did you see the doors that were damaged to get in the drying
7        room?
8    A   I've seen numerous pictures, some that were posted by -- the
9        pictures I remember is that there was a -- they couldn't find
10       it and there was like a bookshelf or something that you just
11       had to move and as soon as you moved it that door was unlocked
12       is the way it was explained to me.
13   Q   You didn't personally see that though?
14   A   That is correct.
15   Q   Okay.
16   A   That's what I was told. I was told that it was unlocked and
17       all you had to do was move the bookshelf and I believe they
18       broke that drywall, but I'm not 100 percent sure. Are those
19       pictures we provided you?
20   Q   I don't think so.
21   A   Because I don't believe all that damage was there before.
22           (At or about 4:04 p.m., Exhibit Number 2 was
23           marked for identification.)
24   Q   (Continuing by Mr. Bostic): I'm showing you what's been
25       marked as Exhibit 2. So you think that this photograph is not

Page 51

1        one taken by the police, correct?
2    A   Well, I'm not 100 percent sure.
3    Q   Okay.
4    A   That's why I asked you if this is one that we provided you or
5        not.
6    Q   Okay.
7    A   But I believe this bookshelf just covered up this doorway and
8        that once they -- I think they went -- from my recollection
9        that I was told they had to go through the drywall because
10       they couldn't figure out how to get in, but they could see the
11       light emitting from the floor and then once they went in they
12       figured out where the door was and moved the bookshelf and
13       they came in.
14           (At or about 4:05 p.m., Exhibit Number 3 was
15           marked for identification.)
16   Q   (Continuing by Mr. Bostic): I'm showing you what's been
17       marked as Deposition Exhibit 3. So rather than move the
18       bookshelf did they tell you that you just moved something that
19       was in front of that hole and it gave you access to the lock
20       for this door?
21   A   I don't remember.
22   Q   You don't remember that much?
23   A   No.
24   Q   Okay. But you weren't -- you did not go to Farr Road,
25       correct?

Page 52

1    A   That is correct.
2    Q   So you don't have -- you're basing this entirely on what you
3        remember somebody else --
4    A   Being told.
5    Q   -- maybe told you or maybe a photograph that you saw?
6    A   That were taken by us.
7    Q   Or maybe a photograph that Derek posted? Were you saying
8        earlier that there were some photographs posted on the
9        internet?
10   A   I thought at some point someone showed me something like this.
11   Q   And those would have been photographs not taken by the police,
12       correct?
13   A   Yeah.
14   Q   Okay.
15   A   I think I have a -- or at some point. Never mind. Well, I
16       think -- I think -- I think someone showed me the pictures
17       that Derek showed -- posted on Facebook.
18   Q   Okay.
19   A   On his Facebook, but I don't remember who.
20   Q   Well, that's fine. And you don't remember specifically what
21       the photos were, either?
22   A   No. I remember the damage or something.
23   Q   Okay.
24   A   And I do remember Detective Ginka who was there saying,
25       "That's not the damage we made."

13 (Pages 49 to 52)

Tri-County   Court Reporters
248-608-9250

ADAM DENT
3/30/2015

## Page 53

1    Q   Okay.
2    A   I specifically remember him saying that.
3    Q   But you do recall --
4    A   But I wasn't there.
5    Q   Right. But you do recall at least one of the officers saying
6        they had to break through some drywall because there was a
7        light source they couldn't figure out?
8    A   Yes. I believe so, yeah.
9    Q   After you get the search warrants do you notify someone by
10       phone or radio that the judge has signed them?
11   A   Detective Sergeant Strauss or Fias I notified right away that
12       they were signed and I'm on my way.
13   Q   Is it your understanding that once you notify them that the
14       judge has signed them then they can start searching or do they
15       wait until the search warrant paper arrives?
16   A   They waited.
17   Q   Okay.
18   A   They waited.
19   Q   As far as you know?
20   A   Well, no. I know that. They waited -- they waited on Apple
21       for me and then somebody met me to retrieve -- Farr Road, they
22       waited. They waited on Apple and then somebody met me. I'm
23       sorry. Green Creek they waited. Somebody met me at Deuces
24       Wild for the Farr Road and then they executed it and then
25       Deuces Wild, you'll see in the surveillance video that I'm

## Page 54

1        there, that Detective Sergeant Strauss, they start walking in
2        right at the end of the video and then I walk in and I have
3        the signed search warrant at that point.
4    Q   Okay. Is everybody still congregated in the parking lot when
5        you pull up?
6    A   Yeah. I didn't give you that -- the parking lot surveillance
7        video is horrific. You can't -- it like looks down, so
8        there's no purpose for it. But, yes, they're all outside.
9        The assumption is that they're still outside because they all
10       leave.
11   Q   No. I'm talking about when you actually pulled up?
12   A   Oh, yes.
13   Q   Everybody was still physically out in the parking lot?
14   A   Oh, yes. Yes, sir.
15   Q   Okay. Do you have any contact at 885 East Apple with Derek
16       Antol on July 9th, 2014?
17   A   Yeah. I'm sure I talked to him. I'm sure I did.
18   Q   Did you see him walking, him or Samantha, walking around with
19       cell phones taking video?
20   A   I don't remember. If -- I don't remember.
21   Q   Do you recall a point in time where Derek's son, I think his
22       name is Tristan, that the son's mother showed up?
23   A   That was not when I was there.
24   Q   Okay.
25   A   Or unless it comes back. I guess I'll let you finish the

## Page 55

1        question.
2    Q   Did you have an occasion to discuss with Mr. Antol having him
3        instruct Tristan to come back to the scene to get Tristan's
4        cell phone?
5    A   That was with Mr. Wistrom, yes, I believe, or one of us did.
6        I don't -- one of us -- one of us had that conversation.
7    Q   You say "one of us." What do you mean?
8    A   Either myself or Detective Marshall had that conversation.
9    Q   Were you present when the conversation occurred if it
10       wasn't --
11   A   I believe so. No, I believe so. I just knew that I was told
12       there was a cell phone that was there that was now gone and I
13       think I asked Derek where it was and he said, "It's my son's
14       phone. It's gone." I said, "All the cell phones that were
15       here -- apparently, it was allowed to leave. It shouldn't
16       have been allowed to leave when this place was secured." I
17       spoke with Mr. Wistrom about it and Mr. Wistrom said, "Derek,
18       have him bring it back."
19   Q   Did Mr. Antol protest?
20   A   Not from my recollection.
21   Q   Do you recall ever saying something to Mr. Antol to the effect
22       of if you don't have that phone returned back here that you
23       were going to see to it that his business was harmed?
24   A   In front of his attorney it wouldn't be very smart to say,
25       sir.

## Page 56

1    Q   Well, I didn't -- I'm saying at any time. At any time?
2    A   No, sir.
3    Q   Okay. And I don't mean like physically damage like, you know,
4        breaking windows, but anything like that?
5    A   Absolutely not. That entire conversation happened in front of
6        Mr. Wistrom. I believe at that point we still thought it was
7        Mr. Antol's phone.
8                (At or about 4:14 p.m., Exhibit Number 4 was
9                marked for identification.)
10   Q   (Continuing by Mr. Bostic): What do you recall seeing at
11       Green Creek when you were in there?
12   A   Specifically or --
13   Q   Yes.
14   A   -- generally?
15   Q   In terms of marijuana.
16   A   Well, we seized a lot of stuff. I mean, there was a lot of
17       plants that were seized that were outside. I know there was a
18       lot of marijuana that was seized. I believe some leaves and
19       stuff that was in the freezer. There was some usable stuff
20       like the leaves that are in the freezer. I believe there were
21       leaves in the freezer. Usually leaves, they turn into BHO.
22       If you know how to make BHO they, you know -- or if you're
23       familiar with it you use butane and turn it all into butane
24       hash oil, but there was -- there was a lot of stuff that was
25       seized from North Green Creek, but Detective Bringedahl

14  (Pages 53 to 56)

ADAM DENT
3/30/2015

Page 57

1  assisted me and seized all that stuff.
2  Q  Yeah.  Who did the property entries?
3  A  Detective Bringedahl did.  I got the search warrants, I did
4  all the evidence on Apple, Detective Ginka did all the
5  evidence on Farr Road, and then Detective Bringedahl did all
6  the evidence on North Green Creek and then Detective Marshall
7  did all the interviews.
8  Q  Okay.  Supp 2 is the journal.  Supp 3 is acquisition of the
9  search warrants.
10  A  And all the evidence.
11  Q  Search of the business, photographs, forfeiture seizures,
12  property entry.  All right.  Supp 4 is Detective Marshall
13  documenting interviews, not Detective Strauss.
14  A  No, no, no.  Yeah, it's Detective Marshall.
15  Q  Supp 5 is a summary of some of the video review.  Supp 6 is
16  text messages from the phones.  Do you know which supp would
17  be Bringedahl's?
18  A  It would have been pulled under a whole separate report.
19  North Green Creek is a whole separate report.  Yeah, it's not
20  even in here.  I only have all the . . .
21  Q  So you pulled a separate number for North Green Creek?
22  A  Correct.
23  Q  And Farr?
24  A  Correct.  I did not, both those detectives did.
25  Q  And you don't have anything to tell us what those incident

Page 58

1  numbers would be?
2  A  No.  I could possibly send a text message or something and
3  find out for you, but those forfeiture forms --
4  Q  Yeah.  It's blank.
5  A  Okay.
6  Q  Describe for me the -- what you see when you walk in the
7  business at 885 from the outside assuming you're going in the
8  public entrance.
9  A  So the front door off of Apple there's -- I can't remember if
10  there's clothing or something.  There's like racks or stuff in
11  the middle, then there's stuff on shelves around the outside
12  and there's a glass countertop that has smoking implements in
13  it and, you know, other paraphernalia or other items for sale,
14  but nothing illegal as far as I was concerned.
15  Q  Apparently, except for some cigar wraps and, apparently,
16  hookah tobacco or whatever it was that he wasn't supposed to
17  sell without --
18  A  A tobacco license.
19  Q  Right.  Tax stamps, whatever.  You would agree that everything
20  in the retail portion of the store was lawful?
21  A  Oh, yeah.  Well, no.  We seized some stuff in the safe area,
22  some marijuana in the safe area.
23  Q  Well, and, again, I talked to Detective Schmitz about this.
24  Do you agree that this building used to be a bank or a credit
25  union or something?

Page 59

1  A  Yeah.  It was a bank.
2  Q  Okay.  And the vault, was it your impression that members of
3  the public like retail customers would have been allowed to
4  walk back into the vault?
5  A  No.
6  Q  Okay.  So I'm talking about the retail area, the racks, the
7  counter, the display shelves, those kinds of things.  There
8  was an abundance of inventory there to purchase, correct?
9  A  Yes.
10  Q  Would you say that the value of the inventory probably
11  exceeded $20,000.00?
12  A  Probably.  $10,000.00 to $20,000.00, something like that.
13  Q  And there was a cash register out there on that glass counter
14  in the main part of the store, correct, the northern portion
15  of the store?
16  A  Yes.
17  Q  And then the -- in July of 2014 did you recall the signs that
18  were Exhibits 1 and 2 from Mr. Schmitz's deposition being near
19  the door to go into the southern portion of the building?
20  A  I don't remember.
21  Q  You don't recall?
22  A  No.
23  Q  Okay.  There was $21,000.00 seized at one point.  Where was
24  that money?
25  A  At the store?

Page 60

1  Q  Yes.  Well, I don't know that it was at the store.  I mean,
2  that's one of the captions of our forfeiture cases, so I
3  wanted to find out where exactly that money was.
4  A  I believe the $21,000.00 was at the residence on North Green
5  Creek.
6  Q  Okay.
7  A  Because at the store there was $1,284.00 seized.
8  Q  And where was that money?
9  A  There was $124.00 in the smoke shop register, $485.00 in the
10  dispensary register, $135.00 in a jar back there, and there
11  was $540.00 in the safe room in a jar with a bunch of edibles.
12  Q  Okay.
13  A  So throughout the building.
14  Q  But just the only one of those that was out in the main retail
15  portion of the store was the $124.00 from the cash register?
16  A  Yeah, yes.
17  Q  Okay.
18  A  It looks like change.
19  Q  Now, the fourth of our cases here is a forfeiture with Derek
20  as a claimant for $1,935.00.  I believe -- correct me if I'm
21  wrong, but I believe that money was from his arrest.  It was
22  on his person when he was arrested.  Did you participate in
23  that at all?
24  A  No.  I wasn't there and I did not see that.
25  Q  Do you have --

15  (Pages 57 to 60)

Tri-County   Court Reporters
248-608-9250

ADAM DENT
3/30/2015

### Page 61

1  A  That forfeiture report?

2  Q  Do you have the complete incident report there with you for

3  this case?

4  A  For 1-11. I don't have everything and I don't -- there's no

5  forfeiture in here for that portion I don't think.

6  Q  It was about a week and a half later I think he was arrested.

7  A  Yeah. I don't have that report.

8  Q  What's the highest number of supp you have?

9  A  Eleven.

10  Q  Okay. Well, mine stopped at six, but I may have the rest on

11  the disc that you guys provided me. I don't know for sure.

12  Were you made aware from Mr. Wistrom that Mr. Antol was

13  willing to turn himself in and self-surrender if a warrant was

14  issued?

15  A  Mr. Wistrom, my understanding was, just to contact him and he

16  would arrange Derek to turn himself in.

17  Q  Do you know why that didn't happen?

18  A  I do not. I was just curious why that report wasn't there. I

19  don't know what -- where the report is under.

20  Q  Yeah. I'm curious about that, as well. Could it be under one

21  of the other two incident numbers?

22  A  It probably is.

23  Q  And you don't know the circumstances of why someone went out

24  and arrested him on the street when he was willing to self-

25  surrender?

### Page 62

1  A  Just as far as I know, he got -- we obtained the warrant and

2  someone saw him driving and traffic stopped him or had him

3  traffic stopped.

4  Q  Okay. And then why did they go to the house then and arrest

5  Ms. Conklin?

6  A  That same day?

7  Q  Yeah.

8  A  I don't know if they -- he said she's there or --

9        MR. JUSTIAN: If you know. Answer if you know.

10        THE WITNESS: I don't know. Yeah, I don't

11  know.

12  Q  (Continuing by Mr. Bostic): Do you know --

13  A  I don't recall the details.

14  Q  Do you know why we were not given an opportunity to self-

15  surrender her?

16  A  No.

17  Q  I'm showing you what's been marked as Deposition Exhibit 4.

18  Do you recognize the vehicle in that picture?

19  A  It's a Muskegon Police Department patrol vehicle.

20  Q  Do you recognize the parking lot that it's in?

21  A  Not really.

22  Q  If I told you that it was across the street from Deuces Wild

23  would you have any reason to disagree with that?

24  A  No.

25  Q  Did you have any conversations with the chief or any of the

### Page 63

1  uniformed officers after the lawsuit was filed in federal

2  court to have marked vehicles parked near Deuces Wild?

3  A  No.

4  Q  Did you hear any conversations to that extent by anybody?

5  A  No.

6  Q  I want to go over some details in your incident report if you

7  want to just refer to yours for convenience. On page 1 of the

8  original incident report under "information" it said, "WEMET

9  received information that Deuces Wild is still selling

10  marijuana to medical marijuana cardholders." Who did you

11  receive that information from?

12  A  I believe it was the generalized information we were getting

13  from tips that were coming into our office. I couldn't tell

14  you exactly who.

15  Q  Look at page 1 of supp 3.

16  A  Okay.

17  Q  Under "summary."

18  A  Okay.

19  Q  There's our other two complaint numbers, right?

20  A  Yes. 143 of 14 and 144 of 14.

21  Q  In the third paragraph under "summary" it says 1.8 pounds of

22  marijuana, leaves, and clippings were seized from the

23  business?

24  A  Correct.

25  Q  Where was that located?

### Page 64

1  A  In the refrigerator in the marijuana sale room, the south

2  room.

3  Q  Was it scrap? Was it left over from trimming plants?

4  A  Yeah. I would just say it's like BHO trim is what I would

5  call it.

6  Q  Well, it's -- do you agree that it's not considered usable

7  marijuana under the current interpretations that we have

8  that's incidental leaves, stems, and stalks?

9  A  I would have to read the current interpretation.

10  Q  Well, I'm not -- I misspoke. I'm not talking about the

11  interpretation. Part of the statute specifically allows

12  cardholders to have some incidental leaves, stems, and stalks,

13  correct?

14  A  Correct.

15  Q  And so is that what we're talking about here for that 1.8

16  pounds?

17        MR. JUSTIAN: If you know.

18        THE WITNESS: I would say it's -- it's

19  marijuana. It's usable.

20  Q  (Continuing by Mr. Bostic): Why?

21  A  Because they're going to use it for -- they're keeping it for

22  a reason. They're using it for -- to either turn it into BHO

23  or they're going to use it into edibles, period.

24  Q  Okay. Well, let's take your assumptions about what they're

25  going to do with it out of the picture for a moment.

16 (Pages 61 to 64)

ADAM DENT
3/30/2015

**Page 65**

1  A  Well, no. It's the truth.
2  Q  No. I know you're piecing that together from the whole
3  investigation. I understand that, but let's assume that you
4  haven't gone to Green Creek yet. You haven't seen the butane.
5  Okay? You have that?
6  A  Correct.
7  Q  And you've been plenty of places where people who are not
8  making BHO have trimmed their buds, they've cut their plants,
9  they've trimmed their bud, and they've got leftover stuff,
10  correct?
11  A  Yes, sir.
12  Q  Okay. Do you agree that leftover stuff, the leaves, the
13  stems, and the stalks, are what the statute says they're
14  allowed to possess incidentally?
15        MR. JUSTIAN: He's not going to comment on what
16  the law is.
17  Q  (Continuing by Mr. Bostic): Incidentally?
18  A  No, sir.
19  Q  Okay. Go ahead.
20  A  My statement is this is usable marijuana.
21  Q  No, I know. I understand. But I was asking you a
22  hypothetical about other places where you go --
23  A  Other places -- I've been to many places that they have five
24  pounds of trimmings, right, and it's in their garbage can.
25  Q  Right.

**Page 66**

1  A  And I don't charge anybody for that.
2  Q  Right.
3  A  But I'll find five pounds in their freezer because they're
4  getting ready to release it into something because they're
5  preserving it, period.
6  Q  By virtue of it being in the freezer?
7  A  Absolutely.
8  Q  Instead of in the garbage?
9  A  It's not garbage then.
10  Q  Okay.
11  A  They're saving it for something because I've done four years
12  of investigations otherwise it turns, you know you what I mean,
13  brown when it's in the garbage can.
14  Q  Right. Except for the cell phone that has -- that still has
15  the screen lock on it --
16  A  Yes, sir.
17  Q  -- is there any continuing need from your perspective for
18  WEMET to continue holding the electronics, the computer and
19  the cell phones, the laptops?
20        MR. JUSTIAN: It's not his call.
21  Q  (Continuing by Mr. Bostic): No, no, no. I don't mean the
22  ultimate decision to release it. I mean as a detective on the
23  case do you foresee any additional need for what you need to
24  do in those items?
25  A  No. I mean, we went through the cell phones and all that.

**Page 67**

1  Q  I mean, you've --
2  A  I would say my personal opinion is that the cell phone that's
3  locked would not be -- I would probably never give it back,
4  me, personally.
5  Q  You would never give it back?
6  A  If we forfeited it. I can't recall if we forfeited that
7  phone.
8  Q  And I'm not talking about the ultimate decision on the
9  forfeiture or --
10  A  Right.
11  Q  -- anything. I'm just talking about if --
12  A  Otherwise the computer, like the store computer and all that
13  store stuff, yeah, I don't -- it's already been --
14  Q  Downloaded? Right.
15  A  Yeah. Like --
16  Q  I mean, my point is if we go -- if I go to the judge and say,
17  "Hey, can -- you know, they dumped all this stuff. They have
18  a forensic image of all of the storage capacity on every one
19  of these things. Can we have them back?" I just -- I don't
20  want to waste everybody's time and have you show up in court
21  and say, "Oh, well, we still need to do X, Y, Z."
22        MR. JUSTIAN: I assume you mean you're going to
23  stipulate to its admission?
24  Q  (Continuing by Mr. Bostic): He doesn't get to ask questions
25  today.

**Page 68**

1        MR. JUSTIAN: Well, don't show up to the judge
2  unless you're going to because we have to have the original
3  stuff to introduce it as evidence.
4  Q  (Continuing by Mr. Bostic): One of the first things a judge
5  is likely going to want to know is whether there's still any
6  law enforcement need.
7  A  Yeah.
8  Q  Investigative need. That's all I was asking.
9  A  No, I --
10  Q  Yeah. Okay. Have you done any -- in terms of the forfeiture
11  cases have you done any investigation in terms of acquiring
12  Mr. Antol or Ms. Conklin's tax returns, business records, or
13  anything to establish, you know, their -- the source of their
14  incomes?
15  A  In the report it verifies how much money the smoke shop -- not
16  the smoke shop, sorry, the marijuana shop makes based on the
17  register receipts a day.
18  Q  I don't mean on what's seized and documented. I mean separate
19  from that like acquired their tax returns, done a FIN-CEN
20  check on them, any of that kind of stuff?
21  A  No, sir.
22  Q  Okay. So if you were called as a witness to testify at the
23  forfeiture trial we can anticipate that your testimony is
24  going to be limited to what's documented in these reports?
25  A  That's correct.

17 (Pages 65 to 68)

Tri-County  Court Reporters
248-608-9250

ADAM DENT
3/30/2015

**Page 69**

1  Q  Okay. Do you know if any other detectives with WEMET have
2     done any of these external things?
3  A  I would not -- I don't -- I do not know.
4  Q  Okay. If they had do you think you would know it?
5  A  I don't know if our evidence -- our forfeiture guy down in
6     Ottawa does any of those. Sometimes he might, but I'm not 100
7     percent sure. Usually, he documents the stuff.
8  Q  Who is your forfeiture guy in Ottawa?
9  A  Bill Evans. He does all our evidence.
10 Q  Okay. Is he a police officer?
11 A  He's a civilian, but he's a retired lieutenant.
12 Q  And he works for the team in doing -- handling that
13    administrative side?
14 A  That is correct, sir.
15 Q  Okay. Have you ever known him to do a FIN-CEN request?
16 A  No, not that I can recall.
17 Q  Have you ever done one?
18 A  I've never had the need.
19 Q  All right. I think I've only been provided with one lab
20    report, apparently, from the very first purchase you made in
21    2013.
22 A  Okay.
23 Q  Has the other stuff been sent to the lab?
24 A  I don't know exactly what all got sent. I would have to go
25    through the whole report again, but multiple items got sent

**Page 70**

1     from each case.
2  Q  Have you seen additional lap reports come back yet?
3  A  They should be back. There was a gigantic stockpile or
4     buildup at the lab when they were doing a remodel, so I will
5     check and any additional lab reports I'll email to
6     Mr. Roberts, so he can email them to you.
7  Q  Right. Okay.
8  A  Because it surprises me that there's only one.
9  Q  Well, this was given to me in 2014.
10       MR. BOSTIC: I don't have any other questions.
11       MR. JUSTIAN: No questions.
12       (At or about 4:43 p.m., the deposition
13       concluded.)

**Page 71**

1  STATE OF MICHIGAN  )
2                     ) ss:
3  COUNTY OF KENT     )
4
5
6     I hereby certify that the foregoing attached pages
7  are a full and complete transcript of the proceedings held
8  on the date and at the place hereinbefore set forth. I
9  reported electronically the proceedings held in the matter
10 hereinbefore set forth, and the testimony so reported was
11 subsequently transcribed under my direction and supervision,
12 and the foregoing is a full, true and accurate transcript of
13 my original electronic recording.
14
15
16    Cassandra M. Rodriguez, CER-8186
17
18
19
20
21
22 Notary Public
23 Kent County, Michigan
24 My Commission Expires:
25 May 6, 2017

18 (Pages 69 to 71)

STATE OF MICHIGAN, COUNTY OF MUSKEGON} SS      **AFFIDAVIT FOR SEARCH WARRANT**

July 9, 2014, AFFIANT DETECTIVE ADAM DENT APPEARS BEFORE THE UNDERSIGNED MAGISTRATE AUTHORIZED TO ISSUE WARRANTS IN CRIMINAL CASES AND MAKES THIS AFFIDAVIT IN SUPPORT OF THE ISSUANCE OF A SEARCH WARRANT TO SEARCH THE FOLLOWING DESCRIBED PLACE(S) AND/OR PERSON(S):

885 East Apple Avenue, "Deuces Wild Smoke Shop," City of Muskegon, County of Muskegon, State of Michigan; including any outbuildings and/or vehicles located on the premises. 885 East Apple Avenue is more fully described as a tan in color single story commercial building; 885 East Apple Avenue is the second building west of Eastgate Street. on the south side of Apple Avenue; The numbers "885" are affixed to the side of the building; a sign which states "Deuces Wild Smoke Shop" is located in front of the building along East Apple Avenue.

## AND TO THERE SEIZE, SECURE, TABULATE AND MAKE RETURN ACCORDING TO LAW THE FOLLOWING PROPERTY AND THINGS:

Illegal drugs including Marijuana; digital scales; money; records of monetary deposits and transfers; computers and their contents; computer tower and its contents; computer storage devices and their contents; computer tablets and their contents; surveillance equipment, including but not limited to recording devices, storage devices, any recordings of drug transactions; financial records; drug records, including but not limited to Patient Cards, Caregiver Cards, records of Patient sign-in sheets, Patient Caregiver Application forms, waiver forms, Patient information forms, any and all patient records; guns; weapons; ammunition; drug packaging materials; drug distribution materials; cell phones and their contents; drug paraphernalia; proof of residency; photographs.

## DETECTIVE ADAM DENT BEING FIRST DULY SWORN, SAYS THAT HE HAS PROBABLE CAUSE TO BELIEVE THAT THE ABOVE-LISTED THINGS TO BE SEIZED ARE NOW LOCATED UPON THE ABOVE DESCRIBED PREMISE(S)S/PERSON(S), BASED UPON THE FOLLOWING FACTS:

1. Affiant is an officer with 12 years' experience, employed by the Muskegon Police Department. Affiant has investigated illegal drug trafficking including Marijuana for 3 years. As a result, Affiant knows Marijuana to be a green leafy substance with a distinct pungent smell.

2. On June 4, 2013, Affiant went to the "Deuces Wild Smoke Shop" located at 885 East Apple Avenue, City of Muskegon, County of Muskegon, State of Michigan. Upon arrival, Affiant met with an individual later identified as Samantha Conklin who was working inside the store; Affiant showed Conklin a previously prepared fictitious application for a Michigan Medical Marijuana Card under the Michigan Medical Marijuana Act, MCL 333.26424,and a fictitious cancelled check showing payment to the state of Michigan; Conklin told Affiant that he had been "approved;" Conklin then lead Affiant to a rear area inside the business where Affiant observed 20-30 glass jars containing a green leafy substance Affiant suspected was marijuana; Affiant observed signs associated with each jar indicating a marijuana strain type and name; while in the rear of the business, Affiant made contact with a second employee only known to Affiant as "Nick;" Affiant gave Nick $45 in US currency in exchange for a quantity of marijuana; Nick asked Affiant what Affiant's ailment was to which Affiant responded Crohn's Disease; Nick did not ask Affiant how much marijuana was required to treat Affiant's condition nor how often Affiant must ingest marijuana to effectively treat Affiant's condition; Affiant observed that Nick obtained the suspected marijuana from one of the glass jars; Affiant performed a Nark II field test on the substance and observed a positive result for the presence of the controlled substance marijuana.

3. On June 18, 2013, Affiant again went into the "Deuces Wild Smoke Shop" and made contact with "Nick" inside the business; Nick indicated that he remembered Affiant and allowed Affiant to proceed to the rear of the business without producing any paperwork or identification; Once in the rear of the business, Affiant observes a transaction between Conklin and another male in which Conklin exchanges a quantity of green leafy substance consistent with marijuana with the male in exchange for $10 in US currency; Affiant then makes contact with Conklin and exchanges $30 in US currency for a quantity of green leafy substance Affiant suspected to be marijuana; Conklin never asked Affiant about his medical condition; Affiant performed a Nark II field test on the substance and observed a positive result for the presence of the controlled substance marijuana.

4. On July 9, 2014, Affiant spoke to Detective Phillip Marshall, West Michigan Enforcement Team, and learned the following: On July 9, 2014 Det. Marshall was contacted by Det/Sgt Karl Schmitz, 6th District Tobacco Tax Team, who told Detective Marshall that on July 9, 2014, Det/Sgt Schmitz performed an administrative tobacco inspection at the "Deuces Wild Smoke Shop;" Det/Sgt Schmitz indicated that during the inspection Det/Sgt Schmitz went into the rear of the business and observed several jars of suspected marijuana; Det. Marshall also responded to the "Deuces Wild Smoke Shop;" Det. Marshall also observed approximately 20 glass jars containing a green plant like substance consistent with marijuana; Det. Marshall further observed a price list attached to the wall inside the business as well as a digital scale on or near a counter inside the business; Det. Marshall made contact with Nicholas Slater who told Det. Marshall that Slater volunteers to work at the shop in exchange for quantities of marijuana; Det. Marshall observed computers and surveillance equipment inside the business.

5. Affiant made contact with Det/Sgt Kate Straus, West Michigan Enforcement Team, who told Affiant the following: Det/Sgt Straus also responded to the "Deuces Wild Smoke Shop;" Det/Sgt Straus made contact with an individual


EXHIBIT (?2
Dent - 1
3-30-15

identified as Derek Antol, DOB 3/9/1978; Antol told Det/Sgt Straus that he is the owner of "Deuces Wild Smoke Shop;" Antol told Det/Sgt Straus that Antol owns two residences in Muskegon County; Antol told Det/Sgt Straus that he owns 423 East Farr Road, Norton Shores, Muskegon County, State of Michigan, and 1769 North Green Creek Road, Laketon Township, Muskegon County, State of Michigan.

6. Affiant used the LEIN law enforcement information database to determine that Derek Antol, DOB 3/9/1978, was convicted of Deliver/Manufacture Marijuana on 10/1/2002 in Muskegon County, Possession of Less than 25 Grams of a Controlled Substance on 2/14/2006 in Muskegon County, and Deliver/Manufacture Less than 50 Grams of a Controlled Substance on 5/4/2006 in Muskegon County.

7. Affiant knows through prior contacts and investigation of Derek Antol is not a "Caregiver" pursuant to the Michigan Medical Marijuana Act. Affiant further knows, through training and experience, that convicted felons cannot be qualified as "Caregivers" under the Medical Marijuana Act.

8. Affiant has read the recent case of *People v Hartwick*, 303 Mich App 247; 842 NW2d 545 (2013), which sets forth the general laws regarding the Michigan Medical Marijuana Act (MMMA) as follows: The MMMA originated as a citizen's initiative petition and was approved by the people of Michigan in November 2008.... Its expressed purpose is to allow a "limited class of individuals the medical use of marijuana...." The statute "does *not* create a general right for individuals to use and possess marijuana in Michigan." ... Nonmedical-related possession, manufacture, and delivery of the drug (and medical-related possession, manufacture, and delivery not in compliance with the MMMA) "remain punishable offenses under Michigan law." ... The MMMA is best viewed as an "exception to the Public Health Code's prohibition on the use of controlled substances [that permits] the medical use of marijuana when carried out in accordance with the MMMA's provisions." ... The statute's protections are "limited to individuals suffering from serious or debilitating medical conditions or symptoms, to the extent that the individuals' marijuana use 'is carried out in accordance with the provisions of [the MMMA].'" The requirements of § 8 of the MMMA "are intended for a patient or caregiver that is intimately aware of exactly how much marijuana is required to treat a patient's condition, which he learns from a doctor with whom the patient has an ongoing relationship." *Hartwick*, 303 Mich App at 268.

9. Affiant has read *State v McQueen*, 493 Mich 135; 828 NW2d 644 (2013). That case establishes that Section 4 immunity under the MMMA "does not extend to a registered primary caregiver who transfers marijuana for any purpose other than to alleviate the condition or symptoms of a specific patient *with whom the caregiver is connected through the* [*Michigan Department of Community Health's*] *registration process.*" *Id.*, 156 (emphasis in original).

10. Neither "Deuces Wild Smoke Shop," nor its employees, inquired how much marijuana is required to treat Affiant's conditions. Affiant presented no evidence regarding how much marijuana he required to treat his pain or medical condition and how often it should be treated.

11. Affiant has personally observed 885 East Apple Avenue, "Deuces Wild Smoke Shop," City of Muskegon, County of Muskegon, State of Michigan, and has observed it to be consistent with the above provided description.

12. Based upon drug investigation training and experience, Affiant has observed that additional marijuana, digital scales, guns, weapons, ammunition, money, records of monetary deposits and transfers, financial records, computers, computer tablets, surveillance equipment, drug records, drug packaging materials, drug distribution materials, cell phones, pagers and drug paraphernalia are often found in areas where persons are selling or storing illegal drugs including additional marijuana. Affiant has also come to know, based upon training and experience, that individuals involved in the sale or storage of illegal controlled substances will commonly hide controlled substances and/or the proceeds from the sale of controlled substances in their residences, outbuildings located on the premises, and vehicles owned or controlled by them and located on the premises.

13. Affiant intends to seek criminal warrants as a result of this investigation. Further Affiant sayeth not.

_____
**Detective Adam Dent**

SUBSCRIBED AND SWORN TO BEFORE ME AND ISSUED UNDER MY HAND ON July 9, 2014.

_____
**Rachael R. McEnhill**
**Prosecuting Attorney**

**60TH DISTRICT COURT JUDGE**

STATE OF MICHIGAN, COUNTY OF MUSKEGON} SS

<u>AFFIDAVIT FOR SEARCH WARRANT</u>

**July 9, 2014, AFFIANT DETECTIVE ADAM DENT APPEARS BEFORE THE UNDERSIGNED MAGISTRATE AUTHORIZED TO ISSUE WARRANTS IN CRIMINAL CASES AND MAKES THIS AFFIDAVIT IN SUPPORT OF THE ISSUANCE OF A SEARCH WARRANT TO SEARCH THE FOLLOWING DESCRIBED PLACE(S) AND/OR PERSON(S):**

1769 North Green Creek Road, Laketon Township, Muskegon County, State of Michigan, including any outbuildings and/or vehicles located on the premises. 1769 North Green Creek Road is more fully described as follows: 1769 North Green Creek Road is a two story single family residential dwelling; 1769 North Green Creek Road is tan in color with tan trim; 1769 North Green Creek Road has a two stall attached garage; 1769 North Green Creek Road is the sixth residence north of Giles Road on the west side of Green Creek Road; a mailbox with the numbers "1769" affixed is located directly across North Green Creek Road from the residence of 1769 North Green Creek Road.

**AND TO THERE SEIZE, SECURE, TABULATE AND MAKE RETURN ACCORDING TO LAW THE FOLLOWING PROPERTY AND THINGS:**

Illegal drugs including Marijuana; digital scales; money; records of monetary deposits and transfers; computers and their contents; computer tower and its contents; computer storage devices and their contents; computer tablets and their contents; surveillance equipment, including but not limited to recording devices, storage devices, any recordings of drug transactions; financial records; drug records, including but not limited to Patient Cards, Caregiver Cards, records of Patient sign-in sheets, Patient Caregiver Application forms, waiver forms, Patient information forms, any and all patient records; guns; weapons; ammunition; drug packaging materials; drug distribution materials; cell phones and their contents; drug paraphernalia; proof of residency; photographs.

**DETECTIVE ADAM DENT BEING FIRST DULY SWORN, SAYS THAT HE HAS PROBABLE CAUSE TO BELIEVE THAT THE ABOVE-LISTED THINGS TO BE SEIZED ARE NOW LOCATED UPON THE ABOVE DESCRIBED PREMISE(S)S/PERSON(S), BASED UPON THE FOLLOWING FACTS:**

1. Affiant is an officer with 12 years' experience, employed by the Muskegon Police Department. Affiant has investigated illegal drug trafficking including Marijuana for 3 years. As a result, Affiant knows Marijuana to be a green leafy substance with a distinct pungent smell.

2. On June 4, 2013, Affiant went to the "Deuces Wild Smoke Shop" located at 885 East Apple Avenue, City of Muskegon, County of Muskegon, State of Michigan. Upon arrival, Affiant met with an individual later identified as Samantha Conklin who was working inside the store; Affiant showed Conklin a previously prepared fictitious application for a Michigan Medical Marijuana Card under the Michigan Medical Marijuana Act, MCL 333.26424,and a fictitious cancelled check showing payment to the state of Michigan; Conklin told Affiant that he had been "approved;" Conklin then lead Affiant to a rear area inside the business where Affiant observed 20-30 glass jars containing a green leafy substance Affiant suspected was marijuana; Affiant observed signs associated with each jar indicating a marijuana strain type and name; while in the rear of the business, Affiant made contact with a second employee only known to Affiant as "Nick;" Affiant gave Nick $45 in US currency in exchange for a quantity of marijuana; Nick asked Affiant what Affiant's ailment was to which Affiant responded Crohn's Disease; Nick did not ask Affiant how much marijuana was required to treat Affiant's condition nor how often Affiant must ingest marijuana to effectively treat Affiant's condition; Affiant observed that Nick obtained the suspected marijuana from one of the glass jars; Affiant performed a Nark II field test on the substance and observed a positive result for the presence of the controlled substance marijuana.

3. On June 18, 2013, Affiant again went into the "Deuces Wild Smoke Shop" and made contact with "Nick" inside the business; Nick indicated that he remembered Affiant and allowed Affiant to proceed to the rear of the business without producing any paperwork or identification; Once in the rear of the business, Affiant observes a transaction between Conklin and another male in which Conklin exchanges a quantity of green leafy substance consistent with marijuana with the male in exchange for $10 in US currency; Affiant then makes contact with Conklin and exchanges $30 in US currency for a quantity of green leafy substance Affiant suspected to be marijuana; Conklin never asked Affiant about his medical condition; Affiant performed a Nark II field test on the substance and observed a positive result for the presence of the controlled substance marijuana.

4. On July 9, 2014, Affiant spoke to Detective Phillip Marshall, West Michigan Enforcement Team, and learned the following: On July 9, 2014 Det. Marshall was contacted by Det/Sgt Karl Schmitz, 6th District Tobacco Tax Team, who told Detective Marshall that on July 9, 2014 Det/Sgt Schmitz performed an administrative tobacco inspection at the "Deuces Wild Smoke Shop;" Det/Sgt Schmitz indicated that during the inspection Det/Sgt Schmitz went into the rear of the business and observed several jars of suspected marijuana; Det. Marshall also responded to the "Deuces Wild Smoke Shop;" Det. Marshall also observed approximately 20 glass jars containing a green plant like substance consistent with marijuana; Det. Marshall further observed a price list attached to the wall inside the business as well as a digital scale on or near a counter inside the business; Det. Marshall made contact with Nicholas Slater who told Det. Marshall that Slater volunteers to work at the shop in exchange for quantities of marijuana; Det. Marshall observed computers and surveillance equipment inside the business.

5. Affiant made contact with Det/Sgt Kate Straus, West Michigan Enforcement Team, who told Affiant the following:

Det/Sgt Straus also responded to the "Deuces Wild Smoke Shop;" Det/Sgt Straus made contact with an individual identified as Derek Antol, DOB 3/9/1978; Antol told Det/Sgt Straus that he is the owner of "Deuces Wild Smoke Shop;" Antol told Det/Sgt Straus that Antol owns two residences in Muskegon County; Antol told Det/Sgt Straus that he owns 423 East Farr Road, Norton Shores, Muskegon County, State of Michigan, and 1769 North Green Creek Road, Laketon Township, Muskegon County, State of Michigan.

6.    Affiant used the LEIN law enforcement information database to determine that Derek Antol, DOB 3/9/1978, was convicted of Deliver/Manufacture Marijuana on 10/1/2002 in Muskegon County, Possession of Less than 25 Grams of a Controlled Substance on 2/14/2006 in Muskegon County, and Deliver/Manufacture Less than 50 Grams of a Controlled Substance on 5/4/2006 in Muskegon County.

7.    Affiant knows through prior contacts and investigation that Derek Antol is not a "Caregiver" pursuant to the Michigan Medical Marijuana Act. Affiant further knows, through training and experience, that convicted felons cannot be qualified as "Caregivers" under the Medical Marijuana Act.

8.    Affiant has read the recent case of *People v Hartwick*, 303 Mich App 247; 842 NW2d 545 (2013), which sets forth the general laws regarding the Michigan Medical Marijuana Act (MMMA) as follows:  The MMMA originated as a citizen's initiative petition and was approved by the people of Michigan in November 2008…. Its expressed purpose is to allow a "limited class of individuals the medical use of marijuana…." The statute "does *not* create a general right for individuals to use and possess marijuana in Michigan." … Nonmedical-related possession, manufacture, and delivery of the drug (and medical-related possession, manufacture, and delivery not in compliance with the MMMA) "remain punishable offenses under Michigan law." … The MMMA is best viewed as an "exception to the Public Health Code's prohibition on the use of controlled substances [that permits] the medical use of marijuana when carried out in accordance with the MMMA's provisions." … The statute's protections are "limited to individuals suffering from serious or debilitating medical conditions or symptoms, to the extent that the individuals' marijuana use 'is carried out in accordance with the provisions of [the MMMA].'" The requirements of § 8 of the MMMA "are intended for a patient or caregiver that is intimately aware of exactly how much marijuana is required to treat a patient's condition, which he learns from a doctor with whom the patient has an ongoing relationship." *Hartwick*, 303 Mich App at 268.

9.    Affiant has read *State v McQueen*, 493 Mich 135; 828 NW2d 644 (2013).  That case establishes that Section 4 immunity under the MMMA "does not extend to a registered primary caregiver who transfers marijuana for any purpose other than to alleviate the condition or symptoms of a registered patient *with whom the caregiver is connected through the [Michigan Department of Community Health's] registration process.*" *Id.*, 156 (emphasis in original).

10.    Neither "Deuces Wild Smoke Shop," nor its employees, inquired how much marijuana is required to treat Affiant's conditions. Affiant presented no evidence regarding how much marijuana he required to treat his pain or medical condition and how often it should be treated.

11.    Affiant has personally observed 1769 North Green Creek Road, Laketon Township, Muskegon County, State of Michigan, and has observed it to be consistent with the above provided description.

12.    Based upon drug investigation training and experience, Affiant has observed that additional marijuana, digital scales, guns, weapons, ammunition, money, records of monetary deposits and transfers, financial records, computers, computer tablets, surveillance equipment, drug records, drug packaging materials, drug distribution materials, cell phones, pagers and drug paraphernalia are often found in areas where persons are selling or storing illegal drugs including additional marijuana. Affiant has also come to know, based upon training and experience, that individuals involved in the sale or storage of illegal controlled substances will commonly hide controlled substances and/or the proceeds from the sale of controlled substances in their residences, outbuildings located on the premises, and vehicles owned or controlled by them and located on the premises.

13. Affiant intends to seek criminal warrants as a result of this investigation.  Further Affiant sayeth not.

Detective Adam Dent

SUBSCRIBED AND SWORN TO BEFORE ME AND ISSUED UNDER MY HAND ON July 9, 2014.

Rachael R. McEnhill
Prosecuting Attorney

60TH DISTRICT COURT JUDGE

ADAM DENT
5/10/2018

## Page 1

UNITED STATES OF AMERICA
IN THE WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

DEREK ANTOL, individually and as
Next Friend of DSA; a minor, DSAII,
a minor, and TRYSTON ANTOL,

     Plaintiffs,     Case No. 1:17-cv-613

-v-

     HON. JANET T. NEFF
ADAM DENT, KATE STRAUS, CASEY
BRINGEDAHL, CASEY TRUCKS, PETE
KUTCHES, and WESTERN MICHIGAN
ENFORCEMENT TEAM, a public body
organized under the laws of the
State of Michigan,

     Defendants.
_____/

DEPOSITION OF ADAM DENT

Taken by the Plaintiffs on the 10th day of May, 2018,

at the offices of Cummings, McClorey, Davis & Acho, 2851

Charlevoix Drive, Suite 327, Grand Rapids, Michigan, at

1:34 p.m.

APPEARANCES:

For the Plaintiffs:     MR. J. NICHOLAS BOSTIC (P40653)
     909 N. Washington Avenue
     Lansing, MI 48906
     (517) 706-0132
For the Defendant     MR. ADAM P. SADOWSKI (P73864)
Casey Trucks:     MR. PATRICK MYERS (P81444)
     525 W. Ottawa Street
     P.O. Box 30736
     Lansing, MI 48909
     (517) 373-6434

## Page 2

For the Defendants     MR. CURT A. BENSON (P38891)
Straus, Bringedahl, &     MR. BRADLEY WANALUNAS (P  )
Kutches:     2851 Charlevoix Drive, Suite 327
     Grand Rapids, MI 49546
     (616) 975-7470

Recorded by:     Denise L. Jamba, CER 0786
     Certified Electronic Recorder

## Page 3

### TABLE OF CONTENTS

#### PAGE

ADAM DENT:

Direct Examination by Mr. Bostic     5

EXHIITS:     IDENTIFIED

None.

## Page 4

```
1      Grand Rapids, Michigan
2      Thursday, May 10, 2018 - 1:34 p.m.
3                    ADAM DENT
4      HAVING BEEN CALLED BY THE PLAINTIFFS AND SWORN:
5          MR. BOSTIC: State your name for the record,
6      please.
7          THE WITNESS: Adam Dent, D-e-n-t.
8          MR. BOSTIC: Mr. Dent, my name is Nick Bostic.
9      I represent the plaintiffs in this matter. It's the
10     Western District of Michigan, Antol and others versus Dent
11     and others, 1:17-cv-613. Today is the time and date set
12     for your deposition.
13         Counsel, is there any objection to notice?
14         MR. BENSON: None.
15         MR. SADOWSKI: Oh, I'm sorry. I'm reading e-
16     mail. Adam Sadowski on behalf of Defendant Trucks.
17         MR. BOSTIC: Any objection to notice?
18         MR. SADOWSKI: No.
19         MR. BOSTIC: Okay.
20         Counsel, identify yourself for --
21         MR. BENSON: Curt Benson here representing
22     Detective Dent.
23         MR. WANALUNAS: Brad Wanalunas here representing
24     Detective Dent.
25         MR. MYERS: Patrick Myers on behalf of the
```

1 (Pages 1 to 4)

Electronically signed by Denise Jamba (201-416-679-6803)     9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

**Page 5**

1 Attorney General's office.
2      DIRECT EXAMINATION
3 BY MR. BOSTIC:
4 Q Mr. Dent, do you recall being deposed I think in 2015
5    concerning an incident on July 9, 2014 in the context of a
6    civil forfeiture case?
7 A I do recall.
8 Q Have you ever reviewed a transcript of your deposition
9    from that case?
10 A I did.
11 Q When did you review that?
12 A Within the last few days.
13 Q Is there anything that you noticed in any of your answers
14    in that deposition that you wish to correct?
15 A No, sir.
16 Q On July 9, 2014, where were you employed?
17 A The City of Muskegon Police Department.
18 Q Do you know a person named Derek Antol?
19 A I do.
20 Q When was the first time you had in-person contact with Mr.
21    Antol?
22 A Forgive me on the date, but it was some time, I believe,
23    in 2011 during a traffic stop.
24 Q How long -- let's see, so on July 9th of '14, you were on
25    the Western Michigan Enforcement Team?

**Page 6**

1 A That's correct.
2 Q We'll call that WEMET, okay?
3 A Yes, sir.
4 Q How long had you been on WEMET?
5 A I began December, 2010, so in 2014, three and a half, four
6    years.
7 Q When we deposed Mr. Dent (sic) this morning, he said
8    something about a raid having been conducted on a building
9    on Apple but not at 885. It was the Greater Michigan
10    Compassion Club. Does that ring a bell?
11 A Just to clarify, you mean -- that wasn't me this morning.
12    You said Mr. Dent.
13 Q Mr. Antol. Sorry.
14 A Okay. Do I recall that?
15 Q Yes.
16 A It was not a raid, though, that I was a part of.
17 Q Was it just part of a aftermath of a traffic stop?
18 A Yes, sir.
19 Q Okay. So your recollection is that the -- the traffic
20    stop in the spring of 2011 was your first in-person
21    contact with him?
22 A That is correct. That's from my recollection. I have not
23    reviewed any police reports in several years.
24 Q Okay. Do you know a person named Casey Bringedahl?
25 A I do, sir.

**Page 7**

1 Q How do you know him?
2 A I was employed with him at the City of Muskegon for
3    several years.
4 Q So if his report indicates that he assisted WEMET with a
5    traffic stop on April 25, 2011, would that be the traffic
6    stop that you're thinking about?
7 A Yes, sir.
8 Q Were you involved at all in some interactions between
9    members of the Muskegon Police Department and Ms. Conklin
10    in March of 2011 concerning her permit to purchase a
11    pistol?
12 A I do not believe so.
13 Q Were you aware that there had been an issue about her
14    purchase permit because of sharing a household with Derek?
15 A I have to say I don't recall.
16 Q Okay. You weren't in the Muskegon police building all
17    that often while you were on WEMET, is that --
18 A No. We were in a secured off-sight location that was not
19    known to many and we very rarely -- usually like one day a
20    week for maybe an hour I'd stop by the police department
21    to pick up paperwork.
22 Q I didn't see any indication that you were -- your name
23    came up in those reports. I was just wondering if you, at
24    any point, had been made aware of them.
25 A I do not believe so, --

**Page 8**

1 Q Okay.
2 A -- but I couldn't specifically recall anything.
3 Q Why did you ask Officer Bringedahl to stop Mr. Antol?
4 A From my recollection and I believe my prior deposition
5    testimony, Detective Ottinger had information about
6    potential narcotics and the traffic stop was requested
7    through him -- or by him to me. Since I was the City of
8    Muskegon Police detective at that point in time, I had
9    communication -- direct communication with my department,
10    so I requested Bringedahl, who I believe was the closest
11    available officer.
12 Q And he was in uniform, he being Mr. Bringedahl, was in
13    uniform at the time?
14 A That is correct.
15 Q Subsequently he was also on WEMET?
16 A Yeah. A few years later he was.
17 Q Okay. So Detective -- how did you say that?
18 A Ottinger.
19 Q How do you spell that?
20 A O-t-t-i-n-g-e-r.
21 Q All right. So was he just another detective assigned to
22    WEMET at the time?
23 A That's correct. He was a Muskegon County Sheriff's deputy
24    assigned to WEMET.
25 Q Okay. But you had radio capability direct to the Muskegon

2 (Pages 5 to 8)

Electronically signed by Denise Jamba (201-416-679-6803) 9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

## Page 9

1    patrol?

2    A   That's correct.

3    Q   And that's why you were in the loop?

4    A   Correct. So Detective Ottinger requested a stop over the

5        WEMET frequency, and then I went to our Muskegon P.D.

6        frequency and relayed what we needed.

7    Q   Did you have informant information regarding that stop?

8    A   I had none.

9    Q   You were just the radio medium guy?

10   A   That's correct, relay.

11   Q   Okay. What did Detective Ottinger tell you -- well, did

12       he tell you the nature of the information that he had?

13   A   I don't recall.

14   Q   So you didn't add anything to it like, "An informant says

15       he's holding this drug or that drug," or anything?

16   A   No, sir. Whatever information I would have had at the

17       time either I put in a report or potentially have

18       Detective Ottinger. I don't recall if he -- Jeff did a

19       report or not. I would say WEMET at the time had four or

20       five agencies on it and we had eight detectives, so I

21       apologize, it varied at the time in my five years out

22       there, and, you know, frequently if I was out in the

23       county, I would ask, you know, either the MSPD detective

24       or the county detective to request a traffic stop for me.

25   Q   Did you arrive at the scene of the traffic stop?

## Page 10

1    A   I did. I was in direct observation of it at some point.

2    Q   Did you have personal interaction with Mr. Antol or

3        Samantha Conklin at the traffic stop?

4    A   I did, I believe.

5    Q   And at some point did you ask Mr. Antol if you could

6        search his business location?

7    A   From my recollection, yes, but that was back at the

8        Muskegon Police Department.

9    Q   Was -- where was that location?

10   A   The Muskegon Police Department or --

11   Q   No, no. No, the business location.

12   A   That -- that was the one on -- I believe it was the

13       Muskegon Compassion Club. It was out in the township --

14       Muskegon Township somewhere on Apple.

15   Q   Other than -- other than 885?

16   A   Yeah. Oh, yeah, correct.

17   Q   How about 2116 East Apple?

18   A   That sounds about right. I -- I can't say specifically

19       unless I see the report, but, however, it's probably --

20       1900 block's the highway and it was a little past that.

21   Q   So why did you want to look in -- at the business?

22   A   Honestly, I don't recall. I just remember myself and

23       Detective Sergeant Waltz, I believe, was interviewing with

24       me and we asked consent to search the business and it was

25       obtained. I believe there was a written consent obtained.

## Page 11

1    Q   How do you spell Waltz?

2    A   W-a-l-t-z.

3    Q   Steve?

4    A   Yep.

5    Q   Okay. Was there a policy in place that you became aware

6        of, and again back in 2011, about the drug teams wanting

7        to inspect dispensaries?

8    A   I -- I would ask you to clarify.

9    Q   I've had several cases where drug teams have approached

10       people and claimed they have a right to inspect under the

11       Medical Marijuana Act. Now, whether that's true or not --

12       so as a background, that's what I'm --

13   A   Uh-huh.

14   Q   Were you aware of any kind of memo or directions or policy

15       that came either from WEMET, the WEMET board, the state

16       police, the AG's office of that nature?

17   A   I would say no. I would say at that time and even now,

18       unless someone's licensed, there's always been a gray area

19       on dispensaries, and at the time anyone's selling, there

20       were several different appellate court decisions that I

21       was aware of, but most of it was still gray area if it was

22       even legal to dispense out of a -- in an establishment,

23       we'll call it, a dispensary. So -- but there was no

24       direction from anybody necessarily over what we were

25       allowed to say. Any time I wanted to check anyone's

## Page 12

1        property, I either asked for consent or obtained a search

2        warrant, period.

3    Q   But was there any direction, pressure, requests, emphasis

4        from within law enforcement to suggest that law

5        enforcement had a right to inspect? And again we're back

6        in 2011.

7    A   I'm going to say not that I'm aware of, no. There were

8        very few -- I think that Compassion Club was the first one

9        that popped up in Muskegon County that I'm aware of or

10       recall, and I don't remember there being any pressure to

11       inspect it. I didn't inspect it until after the traffic

12       stop when we found marijuana in the vehicle, and then I

13       asked consent to inspect or search the business.

14   Q   But if you find traffic -- if you find marijuana on a

15       traffic stop, what's the connection to go look at the

16       business?

17   A   Well, one, I would say the information I had at the time I

18       believe connected Derek to the ownership or something, the

19       information I was given, and I ask consent for everything.

20       If it's a grandma on a traffic stop and I feel like there

21       might be something in a vehicle, I'll ask Grandma for

22       consent to search. I just was a really proactive officer.

23   Q   Did you ever have any kind of direction or emphasis from

24       the City of Muskegon Police Department to be aggressive

25       toward these medical marijuana facilities?

Tri-County Court Reporters
248-608-9250

Electronically signed by Denise Jamba (201-416-679-6803)                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 13

1  A  No. There was a time in 2014 or '13 where we were asked
2     to try to make attempts to purchase at these facilities to
3     see if they're actually selling and we did that, but that
4     was it.
5  Q  Wasn't that also about the time Muskegon was trying to get
6     its ordinance written?
7  A  I would say maybe. I don't know how to answer that 'cause
8     obviously I'm not involved in making the ordinances, so I
9     wouldn't -- wouldn't know the specifics.
10 Q  So then again in April of 2011, did you also then ask to
11    inspect his residence?
12 A  I or Detective Sergeant Waltz did, yes.
13 Q  And was that given?
14 A  Yes.
15 Q  Now, where was Ms. Conklin during all of this?
16 A  So I don't recall who we interviewed first. I haven't
17    read the police report, like I said. But we interviewed
18    Derek and Samantha separately, standard procedure, and so
19    Samantha was at the police department either under direct
20    observation or from a sergeant or lieutenant or Office
21    Bringedahl at the time --
22 Q  She --
23 A  -- likely in the basement.
24 Q  She did not go to either the Compassion Club or the
25    dwelling, correct?

Page 14

1  A  No, but I recall we -- we spoke to her with Derek and let
2     her know where we were going.
3  Q  But my point is you left the building with Derek and went
4     to both locations?
5  A  That's correct.
6  Q  And isn't it true that while you were doing that, she was
7     chained to a desk?
8  A  That's incorrect.
9  Q  Where was she?
10 A  If she was chained, I don't know if she was, she would
11    have had one handcuff on, and there was a spot at the
12    Muskegon Police Department -- there's two spots to secure
13    prisoners, and to prevent escape and to make it more
14    comfortable for someone not to wear handcuffs behind their
15    back or two handcuffs in front of them the whole time,
16    there's a chain that comes out of the wall that's secured
17    and they can one handcuff to it.
18 Q  Is that where she was?
19 A  At some point, she likely was, but I was not with her the
20    whole time, I was with Derek.
21 Q  Did you put her there?
22 A  Absolutely not.
23 Q  Who did?
24 A  I do not know.
25 Q  And then you seized things from the dwelling and the

Page 15

1     Compassion Club in April of 2011, correct?
2  A  I don't recall that.
3  Q  Do you recall having to return all of the marijuana, the
4     firearm, and all of the things that were seized to Mr.
5     Antol and Ms. Conklin?
6  A  One, I likely wouldn't have been the one to return it, but
7     I don't recall.
8  Q  Do you recall the prosecutor's office declining to bring
9     any charges?
10 A  I do recall that.
11 Q  Did you protest the return of their property to them?
12 A  No. I could care less.
13 Q  And both of the -- in April of 2011, the Compassion Club
14    and the house were searched pursuant to a consent,
15    correct?
16 A  One hundred percent.
17 Q  Did you also get a separate consent for the seizure?
18 A  One, I don't recall seizing anything, but, two, if I would
19    have saw anything illegal, then I either would have seized
20    it under plain-view doctrine or because I had probable
21    cause to believe it was contraband.
22 Q  After I ask you all the questions about it, then I
23    remembered I do have a report. Looking at the first five
24    pages, that's obviously through the Freedom of Information
25    Act --

Page 16

1  A  Um-hum.
2  Q  -- because it has redactions, but look at the second --
3     look at Supp 1. I think it's the third or fourth page.
4     They forgot to redact who the investigating officer was on
5     one page. Look down at the bottom of Supp 1. Do you see
6     your name?
7  A  Yeah.
8  Q  Okay. And so --
9  A  I think this was my report.
10 Q  -- which Supp is that?
11 A  Supp 1.
12 Q  Okay. The original, who do you think authored the
13    original incident report?
14 A  I would say Detective Ottinger probably did --
15 Q  Okay.
16 A  -- 'cause that's all his tip information in there.
17 Q  What's our incident number, 11-11?
18 A  Yeah, 111-11.
19 Q  111-11. Okay. So you think the original was Ottinger?
20 A  Likely.
21 Q  Okay. Now, look at whatever you need to in there, but see
22    if you can refresh your memory about whether or not
23    anything was seized.
24 A  Well, I know there was stuff seized from the vehicle.
25     MR. BENSON: Take as much time as you need.

4  (Pages 13 to 16)

Tri-County Court Reporters
248-608-9250

Electronically signed by Denise Jamba (201-416-679-6803)          9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 17

1    Just go ahead and review it.
2        THE WITNESS:  In this supplement, it doesn't
3    appear that I seized anything.  Now, Detective Ottinger
4    might have seized more 'cause there's not a property
5    section in mine of any property and that would have
6    automatically went in there.
7    BY MR. BOSTIC:
8    Q   So in Supp 1, the list of things is from the truck?
9    A   Where are you talking?  I'm sorry.  Interview --
10   Q   Where's that list?  Right there.
11   A   These are his statements, this list, --
12   Q   Okay.
13   A   -- so I questioned him.  He said there's no other useable
14   marijuana at the -- so when I type it, I don't do exact
15   word for word, right?  I take a synopsis of what he said
16   because I believe this was being videoed and that went
17   through it.  But these are -- he had $4,576 on him, you
18   know, $1881 from his back pocket, $2695 from his front, so
19   there's money, this, that and the other.  So in Detective
20   Ottinger's report, yes, there are some items seized.
21   Q   From the business --
22   A   I don't know.
23   Q   -- or the residence?
24   A   Quick glancing at it, it looks like it's from the vehicle
25   from the traffic stop.  There's 21 mason jars which

Page 18

1    appears to be over 11 ounces of marijuana.
2    Q   That was in the duffel bag in the truck, though, right?
3    A   Yeah, black duffel bag, black jars, plastic bag of
4    marijuana, total weight, 440 grams, .4 to be exact.
5    Q   All right.  I may have misunderstood Derek's testimony.
6    He may have only been talking about the -- the truck.
7    So -- but I just wanted to see if you guys were on the
8    same page.  You see what the discrepancy was seven years
9    ago.  We're not really terribly worried about that one.
10   A   After reviewing that, yes, I obtained consent for both
11   residences.  Derek went with me unhandcuffed.
12   Q   But your recollection is that the police didn't seize
13   anything from the dwelling or the business?
14   A   Not from my recollection, not according to my report.
15   Q   Okay.
16   A   At least I did not.
17   Q   Between April of 2011 and June of 2013, did you have any
18   additional contact with Mr. Antol?
19   A   I don't believe so.
20   Q   What about Ms. Conklin?
21   A   I don't believe so.
22   Q   Did you have a chance to review your report from June 4th
23   of 2013?
24   A   No, I did not.
25   Q   When was the last time you think you saw that report?

Page 19

1    A   It's been a few years.
2    Q   What do you recall prompted your investigation again in
3    the middle of 2013?
4    A   I don't recall what prompted it specifically, but we -- I
5    remember I did a undercover buy from the --
6    Q   Well, that's also going to be about the time you seem to
7    recall that the city was asking WEMET to try to make buys
8    from these facilities.
9    A   There was a point when the city requested -- specifically
10   what I was told is the chief requested it, and stuff rolls
11   downhill, so as the detective on the team, I was requested
12   to make a buy and attempt at all the Compassion Clubs or
13   dispensaries in the city, whichever you'd like to call
14   them, and several attempts were made, and from my
15   recollection, his was the only shop that sold.
16   Q   Have you ever been on any other drug teams other than
17   WEMET?
18   A   Oh, no, sir.
19   Q   Did WEMET have a practice of having the officer assigned
20   from a jurisdiction also do undercover work in that
21   jurisdiction?
22   A   Typically?
23   Q   How many counties -- in 2013, how many -- how many
24   different agencies sent personnel -- law enforcement
25   personnel to WEMET?

Page 20

1    A   That's -- that's a hard question to answer because we
2    cover several counties and our team alone was under WEMET
3    and just covered Muskegon County.  However, we went
4    outside of Muskegon County frequently and we would work
5    with the other WEMET teams, so four or five counties WEMET
6    covers.
7    Q   Okay.  So we've been referring to WEMET as a team, but
8    what you're saying is WEMET is multiple teams?
9    A   That's correct.  There's like WEMET North, WEMET South.
10   You know, I guess the team above us was not called WEMET,
11   it was called something else in Ludington.  But WEMET, us,
12   and then there's WEMET Ottawa, which is south, and there's
13   WEMET Allegan for sure, so there's three counties, maybe
14   four that we covered frequently.  But I was just on the
15   Muskegon specific team, which is where I worked out of, I
16   guess I should say and clarify.
17   Q   But, for example, if the Holland team -- Ottawa team needs
18   an undercover officer, do you understand what I'm saying
19   when I -- when I say it would be a best practice to not
20   use the Holland or the Ottawa County officers to do the
21   U.C. work because they might be recognized?
22   A   I would say in five years, I was recognized one time doing
23   undercover work, so I would say it's uncommon to be
24   recognized in undercover work.  But I would say nothing's
25   normal in narcotic investigations.  If Holland needed an

5   (Pages 17 to 20)

Electronically signed by Denise Jamba (201-416-679-6803)                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 21

1    extra person because their team felt uncomfortable, they
2    would call us. We would frequently ask the Holland or the
3    Ottawa team to come up if we wanted to do, you know,
4    street buys, which would frequently burn your face up
5    quicker than other operations. So I don't have a great
6    answer for it besides it depends.
7    Q    But you -- did you ever -- when you went through basic and
8         advanced narcotics training, did they not tell you that
9         that was the better practice?
10   A    I don't specifically recall that portion.
11   Q    So why were you chosen to be the one to go in and make the
12        buys?
13   A    You know, I don't recall. I just know that myself. Tim
14        Bahorski was an officer and a sergeant on the team. There
15        was always three, sometimes four city detectives and/or
16        sergeants on the team, and it was randomized, you know.
17        It never really mattered. I don't remember why it was
18        myself that day. It could have been, you know, my
19        sergeant said, "You're going." But I did a lot of
20        undercover work.
21   Q    In the city?
22   A    All over, yeah.
23   Q    So we have a couple of buys at 885 in June of 2013,
24        correct?
25   A    Yeah. I believe I made two buys.

Page 22

1    Q    Do you think anybody else made any other buys?
2    A    I recall Detective Bahorski, it could have been Sergeant
3         Bahorski at the time tried twice, made two attempts and
4         was turned away because we didn't do the plastic cards, we
5         did fictitious paperwork and --
6    Q    And those -- those --
7    A    -- Sam or Derek were not there.
8    Q    Those attempts were later in the year 2013, correct?
9    A    Yeah, I believe so. The investigation was started, there
10        was a couple buys, and then I don't remember why they just
11        kind of went on pause. I don't remember if it was we were
12        busy with other -- other things or what. I don't recall
13        specifically.
14   Q    So describe to me these fake documents that you created to
15        go in there.
16   A    Well, they weren't fake. They would -- I would say like
17        the names and stuff were fictitious, so they were LARA
18        forms specifically for marijuana caregiver and/or
19        physician attestations, and they were filled out with our
20        undercover license information to the T. And, you know,
21        the physician attestation was obviously forged. We didn't
22        go find a physician to sign it. And we did a fake
23        cancelled check, as well.
24   Q    Okay. So you fill out the application form --
25   A    Um-hum.

Page 23

1    Q    -- in your undercover name, --
2    A    Correct.
3    Q    -- which is an assigned name, correct?
4    A    We pick it --
5    Q    Well, --
6    A    -- or I pick it.
7    Q    -- assigned wasn't the right word. My point is the state
8         police -- it's -- it's an authorized name, you don't make
9         a new one up for each investigation?
10   A    No, it's -- it's 100 percent my fictitious identification.
11   Q    Right, 'cause you have an official fake driver's license?
12   A    That is correct, yeah, 100 percent. Well, I don't any
13        longer.
14   Q    They still make you turn that in, huh?
15             MR. BENSON: I had one of those when I was 17.
16             THE WITNESS: Oh, this one's real.
17             MR. SADOWSKI: Issued from the state?
18             THE WITNESS: This one's real.
19             MR. SADOWSKI: You had some connections.
20   BY MR. BOSTIC:
21   Q    So what ailments do you select?
22   A    I believe mine said, and I'm going based on the
23        deposition, I think it was Crohn's -- Crohn's disease.
24   Q    What did you do with those fake documents when you were
25        done with this investigation?

Page 24

1    A    I recall just from the prior deposition that they were all
2         turned over or copies were placed somewhere, like copies
3         were given, turned over in the discovery, and I believe
4         they were placed in evidence, but I'm not for sure.
5    Q    When you do that, would that be the kind of thing that you
6         would keep in the file as a external document?
7    A    It -- it -- it could have been or it could have been
8         placed in evidence, so I'm not 100 percent sure.
9    Q    So your recollection is that that was turned over to us in
10        the forfeiture discovery?
11   A    In my prior testimony, it was turned over in the criminal
12        case. I turned over everything, so the evidence, notes,
13        everything.
14   Q    Oh, in the criminal. Okay. Any other ailments that you
15        can think of that you selected?
16   A    Not that I recall.
17   Q    Now, the doctor certification, was the doctor's name real?
18   A    I don't recall.
19   Q    Okay.
20   A    I don't -- I don't believe so.
21   Q    Somebody just signed a doctor's name?
22   A    Yeah. It was one of the other detectives in the office so
23        the handwriting didn't look the same.
24   Q    All right. And then you had a cancelled check, fake
25        check?

6   (Pages 21 to 24)

Tri-County Court Reporters
248-608-9250

ADAM DENT
5/10/2018

Page 25

1  A  That's correct.
2  Q  And then the point of those is to have the dates be before
3     that 20-day or 60-day waiting period or whatever it was?
4  A  I think it was after. I think it was like if you don't
5     hear after -- or within 20 days, then you're automatically
6     approved at that time. So then that paperwork -- which
7     was normal. I mean if I stopped -- since we're talking
8     about Antol, if I stopped Derek Antol and he had that
9     paperwork and he had 2 and 1/2 ounces of marijuana on him
10    at the time and he was out of that 20-day window, it would
11    be gold, right? It's like he was approved. So we were
12    using those. Instead of going through the process of
13    getting a fake, you know, medical marijuana card, we were
14    just using this to see if people were issuing or
15    dispensing.
16 Q  But -- but in this case, you did date them so that you
17    were beyond that window?
18 A  That is true.
19 Q  And did you have a return receipt card like from the post
20    office?
21 A  I don't believe so.
22 Q  So you just -- the application, the certification, and the
23    check?
24 A  And the -- the fake cancelled check, yes.
25 Q  Oh, well, --

Page 26

1  A  So it was showing like it was cashed.
2  Q  Okay.
3  A  I believe that's what it was.
4  Q  All right, now, moving forward to July of 2014, you get a
5     call from the Tobacco Tax Team fellows, correct?
6  A  I did not.
7  Q  But that's what prompted you to respond out there,
8     correct?
9  A  That's what started the team to respond, yes, sir.
10 Q  And you got assigned to go get a search warrant?
11 A  That is correct. That was my plan for the day.
12 Q  Did you go to the scene first?
13 A  I did not.
14 Q  So you went straight to a typewriter or --
15 A  Yeah, a computer, prosecutor's office.
16 Q  Okay. And so the information in your affidavit, a lot of
17    it is -- is being relayed to you?
18 A  A lot of it was. So the day before, I did pre-
19    surveillance because of that investigation that we just
20    spoke of, and we were going to do -- get -- attempt to
21    obtain or seek a search warrant for records.
22 Q  So on July 8th, you, without prompting from the tax team,
23    did pre-surveillance?
24 A  Yeah. For my investigation, we did pre-surveillance. As
25    stated before in prior depositions, there's a journal

Page 27

1     entry in there where every month it's basically telling me
2     to do something with it. I have a certain number of cases
3     I have to prioritize at the time, and this case sat there
4     and then at some point, I needed to do something with it
5     because every 30 days I'm having a lieutenant stick it on
6     my desk telling me to do something with it. So my plan to
7     do something with it was did pre-surveillance, spoke to
8     the prosecutor's office, and was going to seek a record
9     search warrant the following day. However, the Tobacco
10    Tax Team arrived.
11 Q  So your last journal entry is June 5th, correct?
12 A  Yes, sir.
13 Q  When did you prepare Page 1 of Supp 3?
14       MR. BENSON:  Is that -- I'm sorry to interrupt.
15    Just for the record, is that what he has -- is that what
16    you just handed him?
17       MR. BOSTIC:  Yes.
18       MR. BENSON:  Okay. Thank you.
19       THE WITNESS:  So I prepared that, it says right
20    here, July 9th of 2014. And you can see the journal
21    entries of December of 2013, January, February, March,
22    April, May, June of 2014 telling me pends further
23    investigations.
24 BY MR. BOSTIC:
25 Q  Well, and that's usually when you get a note dropped on

Page 28

1     your desk right after a supervisor reviews it to do
2     something, right?
3  A  Approximately every 30 days, yes, the file's stuck on my
4     desk, all my open files to basically tell me what to do or
5     what I need to do with it, and at that time, it was
6     Detective Sergeant Straus that's sticking them on my desk.
7  Q  So why is the July 8th entry not in chronological order
8     with the other two July 9th entries?
9  A  You mean in my summary?
10 Q  Yes.
11 A  'Cause that's -- that's just how I typed it. I have no
12    idea.
13 Q  So on July 8th after you do the surveillance, do you not
14    do any kind of a notation or a report indicating that you
15    did the pre-surveillance?
16 A  No. That was not required from the investigations. So I
17    did pre-surveillance, I did surveillance notes, which I
18    believe you were given for the criminal case, and those
19    surveillance -- those surveillance notes were eventually
20    typed and then the next day the Tobacco Tax Team, as I
21    state, arrived over there and we executed search warrants.
22 Q  All right.
23 A  So, no, I would not have, just because I did surveillance,
24    came back and typed a report.
25 Q  But you would have done surveillance notes?

7  (Pages 25 to 28)

Electronically signed by Denise Jamba (201-416-679-6803)                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 29

1    A   At least taken surveillance notes, yes. So I believe I
2        had the description of both residences because I was
3        there. Detective Bringedahl assisted me in that.
4    Q   By now -- by this date, he's on the team?
5    A   That's correct.
6    Q   Do you recall having a conversation with Mr. Antol about
7        getting Tryston Antol's telephone?
8    A   I'd ask for you to be more specific because I recall cell
9        phones being seized at some point, yes.
10   Q   When do you think you first arrived at 885 East Apple on
11       July 9th?
12   A   I -- I could not tell you the time. It was in the
13       afternoon.
14   Q   But you are typing search warrants at the prosecutor's
15       office at first? I mean you don't go out to East Apple
16       with the team; is that correct?
17   A   That is correct. So the team separated because I knew
18       there was at least two residences plus the business now
19       that the Tobacco Tax Team was at, so we separated. We
20       sent two -- or a couple to Farr, a couple to Green Creek,
21       and we sent however many went to the business, as well,
22       so.... They set up pre-surveillance on the, you know,
23       residences and then I had conversations with detectives at
24       each scene in order to relay and write the search warrant.
25   Q   So did you also do pre-surveillance on the 8th of Green

Page 30

1        Creek and Farr Road?
2    A   I believe that's what my notes say, that we did pre-
3        surveillance on those two locations.
4    Q   So you did all three locations?
5    A   Two or three, yeah, for sure. I got to be honest. I
6        haven't read the search warrants in a while and I know
7        that I probably would have put them in the search warrant,
8        as well, when we saw the -- the surveillance information
9        was probably pertinent, as well.
10   Q   Well, in the affidavit for the search warrant, you said
11       that the information about the other two dwellings came
12       from Detective Straus's interview. Why would you have put
13       that in there if you already knew it from the previous
14       day?
15   A   I don't recall.
16   Q   When you first arrived -- well, which of the three
17       locations did you first go to on July 9th?
18   A   I believe it was Apple and I believe a detective or
19       somebody met me at Apple and I gave them the other search
20       warrants for Farr and Green Creek, but I'm not 100 percent
21       sure that that's how it choreographed.
22   Q   But you -- you think you brought all three search warrants
23       with you to East Apple first?
24   A   Or I met somebody on the way. They're like a mile apart,
25       max. From the prosecutor's office and the courthouse to

Page 31

1        East Apple is a mile, max, so it's very possible that I
2        met somebody on the way and handed off a search warrant to
3        one location. You know, someone else might have just had
4        to leave Apple and go to the other location with the other
5        search warrant, but I don't recall.
6    Q   But you went to Apple first?
7    A   'Cause it's the closest spot to where I was.
8    Q   And you -- did you have the search warrant for East Apple
9        with you?
10   A   Absolutely.
11   Q   At what time did you arrive?
12   A   I do not recall.
13   Q   When you left the court building or about the time you got
14       the magistrate's signature on the affidavits, did you tell
15       anybody that you had the warrants in hand?
16   A   Per my prior deposition testimony, I contacted my command
17       staff and notified them that I had the warrants signed.
18   Q   So even before you physically arrive at East Apple, you've
19       put the word out?
20   A   Yes.
21   Q   And you were the affiant on all three search warrants,
22       correct?
23   A   From my recollection.
24   Q   So let's -- let's fast forward to the summer of 2015.
25       When did you leave WEMET?

Page 32

1    A   November -- or, no, I think it was December. Yeah, it was
2        December, 2015, and I retired early in January, 2016 and
3        took my job now.
4    Q   How much employment time did you have with the City of
5        Muskegon?
6    A   Just shy of 13.
7    Q   During your time with the City of Muskegon Police
8        Department, were you ever disciplined?
9    A   Never.
10   Q   In 2014 and -- well, let's leave it to 2015, what do you
11       recall being the procedures for handling of property
12       within WEMET? Once it's been processed by the seizing
13       detective, --
14   A   Um-hum.
15   Q   -- labeled, and turned over to the property personnel, who
16       handles it and who has access to it?
17   A   So if I took in property, depending if I -- I maintain the
18       property, I'd lock it in a specific safe locker, okay,
19       depending on what type of property I had until I could
20       process it fully, so if I needed it for any -- if I
21       needed, you know, to test it or whatever, so it could take
22       a day or so. But it's maintained by me. Then once I seal
23       it either in a bag or a box, I seal it and initial it and
24       then I let the boss know, "Hey, it needs to go down from
25       Muskegon to Fillmore," which is where the Ottawa team is

8 (Pages 29 to 32)

Electronically signed by Denise Jamba (201-416-679-6803)                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 33

1  held, and that's the main property room. A sergeant,
2  somebody besides me would run it down there 'cause they
3  have to scan it in, right? They do the "I'm taking all
4  this property and it's going down," and then it all gets
5  scanned in. Make sense?
6  Q  Well, sort of, but my old school knowledge interfered with
7  my assumptions. I forgot about WEMET -- I forgot about
8  WEMET having other secret locations than Fillmore. I
9  forgot about that part. So there's no permanent storage,
10 and I don't want you to tell me where or anything, but
11 there's no permanent storage at the WEMET office that you
12 worked out of, correct?
13 A  No. It would go into evidence and it would stay it's in
14 temporary locker 1, 2, 3, 4, or 20.
15 Q  But once you bag it and seal it, now it's ready for
16 transport?
17 A  Correct. And then I would -- I'd let a boss know. There
18 was like a process where you'd stick a magnet on the
19 locker that was ready to go out.
20 Q  But a different locker than you controlled?
21 A  I don't recall.
22 Q  Okay.
23 A  I can just tell you that I bagged it, I logged it, let the
24 boss know -- one of the bosses know I could go down. Any
25 of the bosses, I believe, could make the run down there

Page 34

1  because then they would take over the chain of evidence,
2  bring it down, drop it off to Bill Evans. If Bill's not
3  there, they would put it in a locker that Bill could then
4  receive it the next day and chain of evidence it.
5  Q  Okay. So there we go. So now that answers my question
6  because on a day-to-day basis, it's not even physically in
7  the same building as you, correct?
8  A  Oh, no. Once -- at least once a week, unless we got a ton
9  of seizures that needed -- that we didn't have room in our
10 Muskegon property room, at least once a week they'd run
11 down all the property.
12 Q  So if you needed to get a piece of property, say, to go to
13 a prelim or a suppression hearing or something of that
14 nature, how do you go about getting it?
15 A  Then I would contact the property room manager, Bill
16 Evans.
17 Q  Would you have to go down there and physically sign it
18 out?
19 A  I would either -- it'd depend. I'd e-mail him or ask him
20 to bring it. Rarely did I have to get property out. Like
21 if it was a big case, then I'd -- then I'd go down there,
22 get a box of property, the specific items the prosecutor's
23 office wanted, and I would check it out to me, bring it up
24 to Muskegon and it would be assigned to me and I'd do a in
25 and out of the locker, --

Page 35

1  Q  Okay.
2  A  -- that sort of thing. Or, I mean, I've had Bill just
3  meet me if any one piece of property. He would come up
4  for a prelim, so he could just control custody of it.
5  Q  If you knew far enough in advance, could whoever makes the
6  property run pick it up and bring it back up?
7  A  Absolutely.
8  Q  Okay. What is your understanding of your obligations to
9  maintain property that is seized pursuant to a search
10 warrant when you're the affiant?
11 A  All I know is that once I put it in property, I would
12 assume that the property officer maintains it
13 appropriately.
14 Q  All right. Now, it's -- it's subject to legal debate and
15 interpretation, and I'm sure I'm probably going to get an
16 objection as to form and foundation, but are you aware
17 that there's a statute that makes you as the affiant
18 responsible for the safekeeping of that property?
19 A  I'm not aware --
20 Q  Okay.
21 A  -- specifically, no. I would say I maintained that         .
22 property until it went and got transferred out of my
23 possession appropriately through legal means.
24 Q  So in 2015, were you made aware of the settlements reached
25 between Mr. Antol and the prosecutor's office?

Page 36

1  A  The forfeiture settlement or the criminal settlement?
2  Q  Both.
3  A  I -- I recall I think he did like just shy of a year in
4  jail or something like that. I mean I don't recall the
5  specifics. I don't even care.
6  Q  All right. Well, let's just focus on the forfeitures
7  because --
8  A  Okay.
9  Q  Were you aware that there were four separate forfeiture
10 cases filed by the prosecutor's office?
11 A  No. I didn't deal with forfeiture besides taking it.
12 Q  Did anybody at any time make you aware that the forfeiture
13 settlement agreement required all property seized from Mr.
14 Antol that did not contain THC to be returned to him?
15 A  No, --
16 Q  Were you --
17 A  -- not that I recall.
18 Q  Were you aware that there was a written settlement
19 agreement for the forfeitures?
20 A  Not to my knowledge. None of that stuff goes to me. It
21 goes -- it's above my pay grade, goes through a lieutenant
22 or sergeant on the team.
23 Q  So when there's a resolution of a forfeiture case and
24 property is to be returned, you have nothing to do with
25 it, correct?

9  (Pages 33 to 36)

Electronically signed by Denise Jamba (201-416-679-6803)                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

**Page 37**

1 A  That's not true. If -- if a property agreement's been
2   reached, they, you know, contact Bill Evans or they might
3   contact Fias, and there are times, so we'll say in a car,
4   if we seize a car and Bill Evans says, "Hey, this
5   agreement's been made. Here's the receipt. You need to
6   have the person sign it. Go deliver the car back to 1, 2,
7   3, 4, 5 Main Street," then I would do that.
8 Q  Were you involved at all in returning some of the property
9   to Mr. Antol in this case?
10 A  I -- I don't recall. I doubt it. I would have assumed
11   that he probably had to go to Fillmore and retrieve it.
12   So a lot of times if -- because it's held at Fillmore, you
13   know, if -- if we had a car for over a month, it'd be
14   brought to Fillmore. If we had, you know, any other
15   property that wasn't large, we'd ship it down right away,
16   right, and so rarely did we have to go get the stuff and
17   bring it back. Bill would just handle it down there.
18   Someone would show up, they'd deal with their forfeiture
19   agreement and sign the property in and out appropriately,
20   and I didn't have anything to do with it. But there were
21   times when I would return stuff because, you know,
22   Muskegon was maintaining the vehicle because we had a
23   bigger garage and, you know, I could drive the car back
24   and I would get faxed or e-mailed over an agreement I
25   would have to print out and keep two copies of or I'd keep

**Page 38**

1   a copy and give a copy to the claimant.
2 Q  Were you aware that not all of the property seized from
3   East Apple was listed in the forfeiture complaint?
4 A  No.
5 Q  Do you have any idea why the DVR was not listed in the
6   forfeiture complaint?
7 A  I do not know.
8 Q  Were you aware at all that some of the property was
9   returned after the settlement but other parts of it were
10   held?
11 A  I would say I don't have direct knowledge of any of that
12   like what was returned and what was not, no.
13 Q  Were you aware of any kind of a policy within WEMET about
14   not returning recordings that had undercover officers on
15   them?
16 A  No, not that I believe so. I wasn't aware of any direct
17   policy, no.
18 Q  Did you ever discuss -- well, let me ask it a different
19   way. In late 2015 and early 2016 -- well, you were gone
20   in January, so up until the time you left, were you aware
21   that I was raising a stink about the missing property
22   through Lieutenant Fias?
23 A  I don't really recall, sir.
24 Q  Did you ever have a discussion with him about Antol's
25   property that you recall?

**Page 39**

1 A  Two days ago, I spoke to him and he said that -- something
2   about the DVD had been -- some DVD had been destroyed or
3   something like that because of this lawsuit and that there
4   was some settlement. I think it was 1750 bucks that
5   WEMET's attorney came up with to replace the DVD.
6 Q  Well, it's the DVR that we're talking about.
7 A  DVR.
8 Q  Right. But you recall seizing that from Apple Avenue,
9   correct?
10 A  I seized tons of property from there, --
11 Q  Okay.
12 A  -- so I don't recall that specifically.
13 Q  Well, right. And I got --
14 A  I'm sure -- I'm sure I did.
15 Q  -- I got sidetracked over Tryston's phone, too. We were
16   talking about that and I finally dropped it. But at the
17   end of the day, as you guys were getting ready to leave to
18   go over to Green Creek, do you recall discussing with Mr.
19   Antol having Tryston return so you could get a cell phone
20   from him?
21 A  There was some point when I was there that a detective or
22   a sergeant indicated that there was a phone that Derek had
23   handed off to somebody, and he had his attorney present on
24   scene, Mr. Wistrom, and I explained to him that he
25   needed to return the cell phone as it was -- should have

**Page 40**

1   been secured in the first place as the whole location was
2   secured, and, two, if they did not return it, then
3   potentially there's some obstruction issues there because
4   the search warrant clearly said all electronics, and Mr.
5   Wistrom directed Mr. Antol to bring it back there. I -- I
6   went through his attorney to figure out if we could get
7   that back or not.
8 Q  Was Derek -- I know you can't tell us what he did or
9   didn't hear, but was he within earshot of that
10   conversation?
11 A  I believe he was standing right next to Kevin and I was
12   talking directly to Kevin.
13 Q  So did you tell them that if they didn't bring it back,
14   you would damage the business?
15 A  No, sir, not at all.
16 Q  If the phone was handed off to Tryston and he left prior
17   to the search warrant being obtained, then what would be
18   the authority for demanding the return of the phone?
19 A  I asked for it under the authority of the search warrant
20   through the attorney. And my assumption was because it
21   should have been secured in the first place, it shouldn't
22   have left. Now, at that time, his attorney didn't object;
23   his attorney had him bring the phone back.
24 Q  So Mr. Wistrom didn't think about what I just mentioned,
25   the fact that the timing may not have covered the phone?

10  (Pages 37 to 40)

Electronically signed by Denise Jamba (201-416-679-6803)
9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 41

1    What you're saying is that was --
2    A   I'm saying --
3    Q   -- that was never brought up to you at the time?
4    A   Correct, he did not bring it up. I do not know what he
5        was thinking. But all I know is I asked for it. He
6        gladly provided it -- or had Derek gladly provide it.
7    Q   And do you know in terms of timing had the phone already
8        left the premises before you had the search warrant?
9    A   Oh, I have no idea.
10   Q   Okay. So your -- your thought process is that when the
11       officers arrived, the whole scene should have been secured
12       and it shouldn't have left because a warrant was pending?
13   A   Correct.
14   Q   Okay. Did you have any conversations with Kate Straus
15       about the return of Mr. Antol's property?
16   A   She may have been the one that said, "Hey, that phone
17       left. We need it back here."
18   Q   Oh, I'm sorry, I skipped -- I skipped scenarios on you.
19       In 2015, when the forfeitures were settled, did you have a
20       conversation with Kate Straus about returning the
21       property?
22   A   The only thing I recall, and I believe it's in the prior
23       deposition, is that there was one phone we could not get
24       into, and I believe that was contentious on whether or not
25       we should return something that potentially had evidence

Page 42

1        on and the passcode would not be provided. I think that's
2        what happened. And I think eventually you guys provided
3        it and we got into it, downloaded it, and gave it back.
4        But I can remember some disagreement about a specific item
5        that we could not get into. So we didn't know if there
6        was a murder that was on the phone, right, so we weren't
7        going to give it back until we -- you know, possibly the
8        technology updated in six months, you could, you know,
9        download it. Make sense?
10   Q   Do you recall seeing the footage on the DVR?
11   A   Did I watch it; --
12   Q   Yes.
13   A   -- is that what you're saying? Okay. I do remember I
14       think I went through several days -- myself and Detective
15       Ginka went through several days of the DVR together. It
16       was a lot of video that we went through for the
17       prosecutor's office request, I think. I don't remember --
18   Q   Well, one of the things you watched was the two undercover
19       buys from June of 2013, correct?
20   A   I don't recall.
21   Q   Okay. But do you recall also putting -- one of you
22       putting sort of a summary of movements? It's in one of
23       the reports.
24   A   Yeah, I think Detective Ginka did that for me.
25   Q   Okay. Do you recall being asked to make a copy of any of

Page 43

1        the data that was on the DVR?
2    A   I don't recall.
3    Q   All right. Do you make a copy -- an electronic copy of
4        the text message download off of Mr. Antol's phone?
5    A   I don't know if we -- I don't remember if we made a copy
6        of it.
7    Q   Do you remember focusing on a few of the text messages
8        that you thought were related to the marijuana business?
9    A   Likely.
10   Q   So I've asked you about conversations with Lieutenant Fias
11       and Sergeant Straus. Do you recall having any
12       conversations with anybody else in 2015 about the return
13       of the property?
14   A   I mean not specifically.
15   Q   All right. As we sit here today, based on anything you've
16       learned from any source except your attorney, do you have
17       any clue why the DVR was withheld?
18   A   No. I can tell you that we've had property in the past
19       incidentally be -- you know, when you hold -- I think
20       there's a couple thousand pieces of property that are held
21       down there that aren't clicked on correctly, you know. I
22       think in the past, we've had one, you know, something slip
23       through that was improperly or destroyed before the
24       prosecutor's office wanted it destroyed, you know. But I
25       think that thing happens anywhere.

Page 44

1    Q   Well, have you had a property -- are you aware of any
2        other time where a piece of property was destroyed after a
3        court ordered it returned?
4    A   Oh, no, I don't . . . .
5    Q   Were you aware that Lieutenant Fias, at one point, claimed
6        that there was a policy that any device that recorded an
7        undercover officer had to be destroyed?
8    A   He's the boss and he's in charge of that stuff, so he --
9        he would know if there was something in place
10       specifically.
11   Q   But has he ever said anything like that to you?
12   A   I don't recall. I would just go back to the fact that
13       he's in charge of all the teams and so if -- if it was a
14       directive or a policy or a unwritten policy, then he would
15       know more than I. And as I said before, the bosses are
16       the ones in charge of how property works and he would have
17       to approve -- it's my assumption he'd have to approve
18       something getting returned or Bill would have to run it by
19       him.
20   Q   They wouldn't have to approve it if a court's ordered it,
21       would they?
22   A   I don't know. Like I said before, that's way above my pay
23       grade. I don't deal with evidence besides taking it in
24       and giving it to somebody else.
25   Q   On July 19th, did you go to North Green Creek?

11  (Pages 41 to 44)

Electronically signed by Denise Jamba (201-416-679-6803)                                    9fea78df-7465-42cf-bcde-a508b5ccd342

ADAM DENT
5/10/2018

Page 45

1   A  Nineteenth?
2   Q  July 9, 2014. Sorry.
3   A  I believe so, yes.
4   Q  Did you go to Farr Road?
5   A  I don't believe so.
6   Q  Did you discuss at all with Mr. Bringedahl his activities
7      at Green Creek?
8   A  Just -- I think just that he secured it because there was
9      some movement of traffic stop and maybe some narcotics or
10     marijuana specifically was located in the vehicle. But
11     that was afterwards.
12  Q  But this is a vehicle that arrived while the police were
13     there, correct?
14  A  I don't know. I wasn't there.
15  Q  I know, but I'm just -- I'm looking for what he told you.
16  A  I don't recall specifics of what he said three, four years
17     ago.
18  Q  Did you have any conversations with Kate Straus about her
19     behavior at Green Creek?
20  A  She was the boss, so I would never question my boss's
21     behavior
22  Q  Not question, but did she say anything to you about what
23     she did while she was at Green Creek?
24  A  I don't -- I thought she went from Green Creek -- or from
25     Apple with me to Green Creek 'cause we were at Apple a

Page 46

1      long time and Green Creek was held, searched maybe a
2      little bit, but held for a long time.
3   Q  All right. Have you had any conversations with Casey
4      Trucks about what happened at Green Creek prior to your
5      arrival?
6   A  No, not that I recall.
7   Q  Was Mr. Trucks at East Apple while you were there?
8   A  I don't recall.
9   Q  Okay.
10  A  I don't recall who I gave the search warrant to at North
11     Green Creek. I remember Trucks and Bringedahl and maybe
12     one other person were up on Green Creek, so I could have
13     given him the search warrant, but I don't remember --
14  Q  Okay.
15  A  -- specifically. I'd have to look at the reports even if
16     I put it in there.
17        MR. BOSTIC: That's all I have.
18        MR. SADOWSKI: I don't have any questions.
19        MR. BENSON: I don't have any questions.
20        (At 2:39 p.m., deposition concluded)
21
22
23
24
25

Page 47

CERTIFICATION

I certify that this transcript, consisting of
pages, is a complete, true, and correct record of the
testimony of Adam Dent taken in this case on May 10, 2018.
I also certify that prior to taking this deposition,
Adam Dent was duly sworn to tell the truth.
I also certify that I am not a relative of, employee
of, or an attorney for a party; nor am I financially
interested in the action.
Dated: May 11, 2018

        Denise L. Jamba, CER 0786
        Notary Public, State of Michigan
        Kent County
        My commission expires: October 13, 2019

47

12 (Pages 45 to 47)

Tri-County Court Reporters
248-608-9250

Electronically signed by Denise Jamba (201-416-679-6803)     9fea78df-7465-42cf-bcde-a508b5ccd342