## UNITED STATES OF AMERICA

## IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

Derek Antol, individually and as next friend of　　　　　File No: 1:17-cv-613
DSAII, a minor, and Devon S. Antol, and Tryston Antol,
　　　Plaintiffs,

v.

Adam Dent, Kate Straus,　　　　　　　　　　　　　　Hon. Janet T. Neff
Casey Bringedahl, Casey Trucks,　　　　　　　　　　U.S. District Court Judge
Pete Kutches, and Western Michigan
Enforcement Team, a public
body organized under the laws of the
State of Michigan,
　　　Defendants,
_____/

### PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES

Attachment 6 – deposition of Defendant Bringedahl

CASEY BRINGEDAHL
4/30/2015

## Page 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff,

v    Case No. 14-49626-CF

$1,160.00 IN U.S. CURRENCY, et al,
    Defendant,
SAMANTHA CONKLIN,
    Claimant.
    /

DEPOSITION OF DETECTIVE CASEY BRINGEDAHL
Taken by the Claimant on the 30th day of April, 2015, at the offices of Kevin Wistrom, 1 E. Apple, Muskegon, Michigan, at 2:32 p.m.

APPEARANCES:
For the Plaintiff:  MR. CHARLES F. JUSTIAN (P35428)
    Senior Assistant Prosecutor
    990 Terrace Street, 5th Floor
    Muskegon, MI 49442
    (231) 724-6435
For the Defendant:  MR. J. NICHOLAS BOSTIC (P40653)
    909 N. Washington Ave.
    Lansing, MI 48906
    (517) 706-0132

Also Present:  Mr. Kevin J. Wistrom

RECORDED BY:  Denise L. Jamba, CER 0786
    Certified Electronic Recorder

## Page 2

1    TABLE OF CONTENTS
2    PAGE
3  DETECTIVE CASEY BRINGEDAHL:
4    Direct Examination by Mr. Bostic    4
5
6
7
8  EXHIBITS:    IDENTIFIED
9    None.

## Page 3

1  Muskegon, Michigan
2  Thursday, April 30, 2015 - 2:32 p.m.
3  DETECTIVE CASEY BRINGEDAHL
4  HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:
5  MR. BOSTIC: Would you state your name for the
6  record, please?
7  THE WITNESS: Casey Bringedahl, B-r-i-n-g-e-d-a-h-
8  l.
9  MR. BOSTIC: Sir, today is the time and date set
10  for your deposition in 14-49626, 14-49627, 14-49628, and 14-
11  49638-CF, which are forfeiture actions pending in the 14th
12  Circuit Court with Samantha Conklin as the claimant in 626
13  and Mr. Antol as the claimant in the other three. My name
14  is Nick Bostic and I am the attorney for the claimants.
15  This is the time and date set for your deposition in these
16  matters, and your deposition will be used for all purposes
17  as allowed by the Michigan Rules of Evidence and the
18  Michigan Rules of Civil Procedure.
19  You are a police officer, correct?
20  THE WITNESS: Correct.
21  MR. BOSTIC: You have testified in court before,
22  right?
23  THE WITNESS: Yes, I have.
24  MR. BOSTIC: Our secretary -- our -- our court
25  reporter here is recording the proceedings and we -- just

## Page 4

1  like in court, we have to have verbal answers so that she
2  can eventually prepare a transcript for us, so --
3  THE WITNESS: Understood.
4  MR. BOSTIC: -- head shakes, uh-huhs and uh-uhs
5  don't transcribe.
6  Because this is a discovery dep, sometimes I do
7  not structure my questions like I would if I was in court
8  and it can lead to a confusing question or you just don't
9  know what it is I'm getting at, so if that happens, don't
10  hesitate to ask me to clarify or rephrase, but if you
11  answer, I will assume you understood; fair enough?
12  THE WITNESS: Understood.
13  DIRECT EXAMINATION
14  BY MR. BOSTIC:
15  Q  Tell me about your formal education.
16  A  I am a 2002 graduate of Reeths Puffer High School. I
17  attended directly thereafter two years at Muskegon Community
18  College and then transferred to Ferris State University,
19  where I did three years there. I graduated with a
20  Bachelor's degree in criminal justice.
21  Q  When did you get your Bachelor's?
22  A  2007.
23  Q  Did you get an Associate's from Muskegon or just transfer
24  credits?
25  A  I don't know, to be honest with you. I can't remember if I

1 (Pages 1 to 4)

CASEY BRINGEDAHL
4/30/2015

### Page 5

1. got it from -- I would imagine I got it from Ferris, but I'm
2. not positive on it.
3. Q  Okay. And you got a Bachelor's --
4. A  Through Ferris.
5. Q  And any other post-graduate after your Bachelor's degree?
6. A  No.
7. Q  Did you attend police academy?
8. A  Yes, I did.
9. Q  Where?
10. A  Through Ferris State University.
11. Q  As part of your curriculum?
12. A  Correct.
13. Q  So did you sponsor yourself?
14. A  We didn't have to be sponsored.
15. Q  That's not the way to ask it. You didn't have a sponsoring
16. department, you just went through the program?
17. A  Correct.
18. Q  And after you finished that, how did you become a certified
19. police officer?
20. A  I applied in the City of Muskegon Police Department and I
21. believe it was in May of 2007 accepted a position within the
22. department.
23. Q  And are you still employed with the City of Muskegon Police
24. Department?
25. A  Yes.

### Page 6

1. Q  Have you been continuously employed with them since May of
2. 2007?
3. A  Yes.
4. Q  Have you ever worked at any other law enforcement entity?
5. A  I had a summertime job during college with the Muskegon
6. Sheriff's Department as a marine patrol deputy.
7. Q  Was that a sworn position?
8. A  It was.
9. Q  What years did you do that?
10. A  I can't tell you for sure. I'd have to pull up my resume'.
11. Q  Well, I'm just wondering when did you finish your police
12. academy?
13. A  It would have been at the end of '07. My entire last year
14. at Ferris State University was the police academy.
15. Q  Okay. But during college, how were you a sworn officer
16. during college if you hadn't finished academy yet?
17. A  As far as for the marine patrol position?
18. Q  Yes.
19. A  I took an oath in front of the sheriff. However, we didn't
20. carry a firearm, so I'm not sure whether that constitutes
21. what you're looking for as far as a sworn position.
22. Q  All right. So you didn't have arrest powers?
23. A  Correct.
24. Q  Okay. So literally it was a sworn position because you
25. swore an oath?

### Page 7

1. A  Right.
2. Q  Okay. But it was not a state-certified law enforcement
3. officer position?
4. A  Not -- we had the ability to write tickets. If we -- we
5. could detain people and bring them to a deputy, who would
6. then, you know, perform the investigation.
7. Q  Okay. Any other entities that you've performed law
8. enforcement services for?
9. A  No.
10. Q  During your time as a police officer, have you ever been
11. disciplined?
12. A  I have never received days off. To my knowledge, I only
13. have one disciplinary letter in my file.
14. Q  And when was that?
15. A  I'm not sure exactly. It was either '07 or '08.
16. Q  And this is -- this was like a written reprimand?
17. A  Correct.
18. Q  Did it involve anything along the lines of a false statement
19. or a false report or anything like that?
20. A  No. I can tell you what it's about if you want to know.
21. Q  Go ahead.
22. A  I said "ass" to a guy on a traffic stop. He got mad and
23. came in and made a complaint. I wasn't calling him an ass,
24. I said it out of context, and so he came in and filed a
25. complaint. They had called it a founded complaint.

### Page 8

1.   MR. JUSTIAN: Wait a minute. This is a complaint
2. by a citizen that's in your file or were you actually
3. reprimanded by the department?
4.   THE WITNESS: It was a written letter that goes in
5. my file that states a citizen came in, we reviewed it, found
6. that Officer Bringedahl said "ass" on a traffic stop, dealt
7. with by speaking with Officer Bringedahl, and that was the
8. end of it.
9. BY MR. BOSTIC:
10. Q  So it's written documentation of a counseling? This is
11. essentially not discipline?
12. A  Correct. I've never received days off, nothing like that,
13. in that nature.
14. Q  Does your collective bargaining agreement specify what's
15. defined as discipline?
16. A  I'm sure it does, but I'm not aware of the exact wording.
17. Q  You, fortunately, never had to look it up?
18. A  Correct.
19. Q  All right.
20. A  I'll worry about that when the time comes, if the time
21. comes.
22. Q  All right. Now, you are named in another lawsuit in federal
23. court not involving Ms. Conklin or Mr. Antol but another
24. one, correct?
25. A  Yes.

2 (Pages 5 to 8)

CASEY BRINGEDAHL
4/30/2015

Page 9

1  Q  And what was the nature of that allegation?
2  A  Are you referring to the William Griffin --
3  Q  Yes.
4  A  -- incident? Two officers were in a fight in the 1900 block
5     of Manz with William Griffin. It was a prolonged fight.
6     William Griffin was taken into custody by a couple officers
7     on scene. I showed up on scene, offered the officers water.
8     I had no direct contact with Mr. Griffin at all. He was
9     brought back to our police department because he refused to
10    identify himself. Once there, he collapsed and died. I'm
11    not exactly -- I -- I think I just kind of got wrapped up
12    into that 'cause I was on scene, but, like I said, I never
13    spoke with Mr. Griffin, I never touched him, I never had
14    contact with him. It was purely I think because I was
15    there.
16 Q  Okay. As far as you know, was Detective Dent involved in
17    that incident at all with Mr. Griffin?
18 A  I don't recall Detective Dent being there.
19 Q  Okay. What was your initial job with the City of Muskegon
20    as far as law enforcement?
21 A  I was a road patrol officer.
22 Q  I want to take you back to an incident in 2011. Do you
23    recall in 2011 making a traffic stop on Mr. Antol and Ms.
24    Conklin was a passenger?
25 A  Yes.

Page 10

1  Q  And why did you make that traffic stop?
2  A  I was notified by Detective Dent that he was conducting an
3     investigation. He advised me he would like the vehicle
4     stopped and advised me that there would -- he had
5     information that there was a black duffel bag in the back
6     seat containing heroin and marijuana.
7  Q  Did he ever -- how did he give you that information that
8     day?
9  A  I think he called me on the phone.
10 Q  On a cell phone?
11 A  Yes.
12 Q  Any particular reason he wouldn't use the radio?
13 A  The WEMET cars don't share city car to car. It's an MSP
14    radio, which doesn't talk directly to our -- our radios
15    unless you go directly through dispatch.
16 Q  Did he ever tell you what his source was for that
17    information?
18 A  No. And to this day, I still don't know.
19 Q  So he's on WEMET at the time, correct?
20 A  Yes.
21 Q  You're in uniform?
22 A  Correct.
23 Q  And he needs a marked car to make a stop?
24 A  Correct.
25 Q  In addition to his tip, did you also observe any traffic

Page 11

1     violations?
2  A  I did.
3  Q  And that involved the tinted windows?
4  A  Correct.
5  Q  Any other traffic violations that you recall?
6  A  I don't recall any specifically.
7  Q  When was the last time that you reviewed that incident
8     report?
9  A  Two nights ago.
10 Q  After you've stopped the vehicle, did you remain in contact
11    for any length of time with Mr. Antol?
12 A  I guess I don't understand the question.
13 Q  Are you aware that Detective Dent took Mr. Antol to a couple
14    of other locations to -- to look over the medical marijuana
15    operations?
16 A  I was not aware of that. You're saying after the traffic
17    stop that happened?
18 Q  Yes.
19 A  No, I'm not aware of that.
20 Q  You didn't have anything to do with that?
21 A  No.
22 Q  Okay. How long do you think you were engaged with Mr. Antol
23    and Ms. Conklin as a result of you making that stop?
24 A  A rough guess would be 20 minutes.
25 Q  Okay. So did you transport Ms. Conklin to the police

Page 12

1     station?
2  A  No.
3  Q  Do you remember who did?
4  A  The only other officer I recall being on scene is Officer
5     Zonnebelt. I know he was dealing with her. I don't recall
6     if he took her back to the police department or not.
7  Q  So did you stay and help them do anything or did you just go
8     back on road patrol?
9  A  After, you know, the vehicle was searched, I turned
10    everything over to Officer Dent and I went about my
11    business.
12 Q  Okay. At what point did you get assigned to WEMET?
13 A  January 7th of 2013. Don't ask me how I remember that.
14 Q  Prior to that date, did you have any assignment other than
15    road patrol?
16 A  I was community officer for the Angell neighborhood. After
17    that I was -- worked the neighborhood response team and I
18    was pulled from the neighborhood response team into WEMET.
19 Q  What is a neighborhood response team?
20 A  It's an aggressive unit that targets street violence, gang
21    members, street-level narcotics. You're patrolling the
22    rougher neighborhoods and you don't take calls. Your --
23    your job is proactive enforcement.
24 Q  And how did you get selected for that?
25 A  You'd have to ask my superiors.

3 (Pages 9 to 12)

Tri-County Court Reporters
248-608-9250

CASEY BRINGEDAHL
4/30/2015

### Page 13

1  Q  Were you asked? Do they announce it and you put in a letter
2     of interest or --
3  A  No.
4  Q  -- do you show up for roll call one day?
5  A  Pretty much when our previous chief, Tony Kleibecker, was
6     leaving, that was one of his last things he wanted to do,
7     was kind of put together this team, and he just kind of
8     handpicked guys and said, "These are the guys I want to do
9     it."
10 Q  As a result of that assignment, did you have any specialized
11    training?
12 A  In relation to?
13 Q  Doing the neighborhood response work.
14 A  No. I had generalized police training in driving and I'd
15    have to go back through and see exactly but nothing that was
16    specialized. I think I went to a street survival class but
17    nothing that would --
18 Q  But that's something you might have gone to if you'd stayed
19    on road patrol, right?
20 A  Right.
21 Q  Okay. Was that neighborhood response team program grant
22    funded?
23 A  I don't believe so.
24 Q  Okay, once you go on to WEMET in January, 2013, what
25    specialized training for that assignment did you have?

### Page 14

1  A  Let me see, I had raid entry, basic narcotics, surveillance,
2     indoor grow, I think I went to a Desert Snow interdiction
3     course, and that's all that I can recall right now.
4  Q  Are all those MSP programs?
5  A  Yes, minus the indoor grow, I think, which is put on the
6     DEA, and the Desert Snow is a private company that comes in
7     and does it, but it was put on through MSP.
8  Q  Is that -- interdiction, is that like highway interdiction,
9     profiling?
10 A  Not profiling, highway interdiction.
11 Q  No, no, I don't mean -- I don't mean --I don't mean
12    profiling for -- for justification of the activity, but --
13 A  It's -- it's, more or less, about -- it's a program to use
14    on a traffic stop to discover discrepancies in a driver's
15    story -- a driver or passenger's story which might lead to
16    the interdiction of -- of narcotics, and half of it was
17    vehicle searches and compartments in vehicles and so on and
18    so forth.
19 Q  Okay. So it's not focused on justification for making the
20    stop, it's focused on developing the stop?
21 A  Right. Correct.
22 Q  Okay. Have you ever served in the military?
23 A  No.
24 Q  Have you ever been diagnosed with mental illness?
25 A  No.

### Page 15

1  Q  Have you ever been arrested?
2  A  No.
3  Q  I actually had an officer say yes to that once.
4  A  Hey, some of the best cops weren't always, you know, on the
5     up and up.
6  Q  I almost missed it. Bringing you forward now to -- well,
7     not yet. Other than the 2011 contact that you had with Mr.
8     Antol and Ms. Conklin, between then and July 9, 2014, are
9     you aware of any other contact that you had with either of
10    them?
11 A  Was July 9 the day of the search warrant on Green Creek?
12 Q  Yes.
13 A  Okay. I believe Muskegon Police Department took an alarm
14    that occurred at the store. I can't remember if somebody
15    actually got in or not. They called us, WEMET. Our team
16    jumped in the van, drove to the store. I met with Mr.
17    Antol, requested consent to search, was denied. I asked who
18    his attorneys were. He told me. I cleared and that was the
19    end of it.
20 Q  That was at 885 East Apple, the alarm?
21 A  The stop down there. Yeah, Joker's Wild.
22 Q  You mean Deuces?
23 A  Deuces Wild, Joker's Wild, close enough.
24 Q  Other than that alarm call, anything else that you're aware
25    of, any other contact with either of them?

### Page 16

1  A  No.
2  Q  Now, we have a report from Detective Dent and in June of
3     2013, there were a couple of undercover buys at 885 East
4     Apple Avenue documented in the search warrant affidavit.
5     Did you have anything to do with either of those?
6  A  I might have been on part of the surveillance team, but I
7     was never in the store, never in the parking lot.
8  Q  At some point between June of 2013 and December of 2013, a
9     WEMET member at least once, if not twice, went in and tried
10    to buy marijuana at 885 East Apple and was turned away.
11    Were you aware of that?
12 A  Yes.
13 Q  Were you involved in that at all?
14 A  I never went in the store. I was probably part of the
15    surveillance team if I was there at all.
16 Q  Is your recollection that there was one attempt or two?
17 A  I don't recall specifically. I -- I do recall someone
18    trying to go in there and buy and was turned away, but I
19    can't remember the date. I can't -- I don't even recall for
20    sure who it was.
21 Q  Okay. Do you recall there being any conversation as to why
22    they were unable to buy?
23 A  I don't recall.
24 Q  Now, prior to July 9, 2014, did you ever have a discussion
25    or hear Detective Dent talk about his desire to pursue this

CASEY BRINGEDAHL
4/30/2015

Page 17

1  investigation as to Mr. Antol?
2  A  No.
3  Q  Did it ever come up at team meetings or planning sessions or
4     anything like that that Deuces Wild or Mr. Antol was on
5     somebody's radar screen?
6  A  Not that I can recall. I mean to clarify, I know the case
7     was talked about, but it was low priority, you know. It
8     wasn't something that -- I guess I see what you're after
9     here, and it was never like you're thinking as far as being
10    high on somebody's radar to do, so I'll leave it at that and
11    I can't answer that any more clearly, I guess.
12 Q  Did you have cases of your own that you were -- where you
13    had developed informants or developed targets and you were
14    the lead officer on cases while you were at WEMET?
15 A  Yes.
16 Q  And this one happened to be one of Mr. Dents', correct?
17 A  Correct.
18 Q  So he does his, you do yours, and sometimes you have to work
19    as a team?
20 A  If he needs help, we help.
21 Q  Right. On July 9, 2014, what was your first awareness that
22    something was going on involving 885 East Apple or Mr.
23    Antol?
24 A  I don't recall specifically. I know I was notified by
25    Detective Dent that he was applying for a search warrant for

Page 18

1  the residence on Green Creek, but I don't recall
2  specifically how that went.
3  Q  All right. And what was the first awareness that you had
4     that you were going to be involved in executing something or
5     doing something involving this investigation that day?
6  A  All I can tell you is I was asked by Detective Dent on that
7     day to go conduct search warrant -- or, excuse me, conduct
8     surveillance on the residence that afternoon.
9  Q  Which residence?
10 A  Green Creek, Derek's home on Green Creek. I think it's 1469
11    maybe. Am I close?
12    MR. WISTROM: Don't know the house number.
13 BY MR. BOSTIC:
14 Q  And what did you do when you got there?
15 A  I parked in a position where I could see the residence and
16    was trying to keep abreast of what was going on and
17    Detective Dents' status with the search warrant.
18 Q  Do you know about what time you got there to start
19    surveillance?
20 A  I don't recall specifically.
21 Q  Do you recall whether or not you did a surveillance log?
22 A  I would have.
23 Q  Was anybody with you?
24 A  I believe Detective Kutches was with me, not directly with
25    me. He was in his own vehicle.

Page 19

1  Q  Can you spell his name?
2  A  K-u-t-c-h-e-s.
3  Q  And as far as you know, he tried to take up a position to be
4     able to see but not be seen?
5  A  Correct. Also, Trooper Trucks was in the area.
6  Q  Spell that for us.
7  A  T-r-u-c-k-s.
8  Q  Is this a WEMET member?
9  A  No, he's a MSP trooper.
10 Q  So he would have been in a marked unit?
11 A  Correct.
12 Q  And he was just lurking about in case a uniform was needed?
13 A  If you want to call it that.
14 Q  Okay. What would you call it?
15 A  In a stationary position waiting for my radio call.
16 Q  For what purpose?
17 A  If we had any issues at the house we needed a marked unit
18    for.
19 Q  So what happened next? I mean you're running surveillance.
20    How long do you think you did surveillance?
21 A  I don't recall.
22 Q  What happened next?
23 A  The next thing I recall is I observed a male subject leave
24    the back of the residence and walk into a pole barn which
25    was near a pond. At that point I notified Trooper Trucks.

Page 20

1  I also contacted Detective Sergeant Straus and advised her
2  that there was a subject on the property, received
3  permission from Detective Sergeant Straus to go and make
4  contact with the subject, at which time myself, Trooper
5  Trucks, and Detective Kutches made contact with him.
6  Q  Where?
7  A  Out in the driveway of the residence.
8  Q  Who was it?
9  A  It was -- I don't recall the guy's name. It was an
10    electrician that said he was doing work for Derek.
11 Q  Okay. What happened next?
12 A  Spoke with him briefly. He advised me he was running a 220
13    line out to the barn. I asked him what he was running a 220
14    line for. He says, "I don't know." I asked him if there --
15    if he saw any marijuana plants in the barn. He said there
16    was a couple small ones in there. I asked him how he was
17    getting in and out of the house. He told me that the
18    basement door was left unlocked so he could have access in
19    and out of the house. He told me he was a medical marijuana
20    card holder, consented to a search of his person, a search
21    of his vehicle, which revealed no marijuana. He was ran
22    through LEIN and I contacted Detective Sergeant Straus, told
23    her what we had, basically that there was, you know, the
24    subject story on the property. The subject agreed to leave
25    the residence. And Detective Sergeant Straus advised me

5 (Pages 17 to 20)

CASEY BRINGEDAHL
4/30/2015

Page 21

1 that we needed to enter the house to prevent the destruction
2 of any evidence.
3 Q Okay. Explain to me again what this fellow said about --
4 you asked him how he was getting in and out of the house?
5 A Correct.
6 Q And what was his answer?
7 A The basement door was left unlocked.
8 Q Well, is this a basement door that's -- that goes out to
9 grade or is it inside the dwelling?
10 A It was a basement -- he was entering, I guess he said,
11 through the back door. I guess I never asked specifically
12 which door. I believe it to be on -- it goes out to grade,
13 as I recall, but I'm not positive on it.
14 Q So back door and basement door, we're talking about the same
15 door?
16 A It would be on the -- the west side of the residence.
17 Q Okay. From where you were standing, could you see this door
18 that he was referring to?
19 A I could see the entire back of the house, yes.
20 Q So you knew which door he was talking about when he said it?
21 A I believe I did at the time, but I can't recall the door
22 now. I can't remember if it was a door up on the porch or a
23 door that goes out to grade to the basement. I know it was
24 the door on the west side of the house.
25 Q And -- but at that point in time, you were -- you at least

Page 22

1 thought you knew which door he was talking about?
2 A Correct.
3 Q You may have been talking about two different doors, but you
4 thought you knew which door he meant?
5 A Yes.
6 Q And was that the one that faced the barn -- the pole barn?
7 A Yes.
8 Q Were you able to see that door from your position while you
9 were talking with him?
10 A I would have been able to, yes.
11 Q Was it open or closed?
12 A I don't recall.
13 Q Did you have any reason to doubt what this man had told you
14 in terms of his -- why he was there?
15 A No. I mean he had basic electrician tools. He wasn't
16 driving a vehicle which was consistent with an electrician,
17 but he said -- I think it was more of he was over there as a
18 favor.
19 Q Did he have a tool bag with him? You said you saw some
20 tools?
21 A Yes.
22 Q Okay. Is his name documented in your report?
23 A It is.
24 Q Now, from your vantage point there talking with him in the
25 driveway, what else are you seeing at that point?

Page 23

1 A Just the back of the house and I could see a couple dogs up
2 in the window, I could hear them barking.
3 Q Where was this man's vehicle?
4 A It was immediately south parked in the driveway --
5 immediately south of the house parked in the driveway, so it
6 was basically straight south.
7 Q And who searched this gentleman?
8 A I believe I searched his person and Detective Kutches
9 searched the car.
10 Q Was the grass -- was there grass between the west side of
11 the house and the pole barn?
12 A So if the house is here, the pole barn's here, there was
13 some grass kind of around the front and then there was like
14 a horse pasture that kind of come up almost right to the
15 deck and that was all pretty trampled by horses. I don't
16 recall if there was any grass growing in there. As I
17 recall, it was pretty trampled by the horses and probably
18 eaten.
19 Q Was there grass beyond the pole barn like you would
20 associate with a yard?
21 A No. It was pretty much all horse pasture right up to a
22 pond.
23 Q Okay. And what I'm getting at there is this notion that we
24 use as curtilage.
25 A Okay.

Page 24

1 Q You know, like if you have a storage shed and it's in your
2 yard, it's usually considered to be within the curtilage.
3 A Correct.
4 Q Pole barns, you know, who knows. So when you're looking at
5 this, do you -- do you consider -- would you think that that
6 pole barn is -- is within the area of what you would
7 consider the back yard?
8 A Yes. It was woods on either side and the pole barn was
9 within the clearing for the yard.
10 Q So he shows you his medical marijuana card?
11 A Yes.
12 Q And he's a patient?
13 A Correct.
14 Q Is he a care giver?
15 A I don't recall.
16 Q Do you recall if he had a care giver or he could possess
17 plants?
18 A I don't recall.
19 Q Okay. Was he cooperative?
20 A Very.
21 Q When you're there in the driveway talking to him, you see
22 two dogs in the windows barking. What else do you see?
23 What else is going on with this house?
24 A Nothing, in particular.
25 Q Did you -- what did you relay to Sergeant Straus about the

6 (Pages 21 to 24)

CASEY BRINGEDAHL
4/30/2015

Page 25

1  status there once you cut this guy loose?
2  A  He was still on scene when I made the call to Detective
3     Sergeant Straus. She gave me permission to cut him loose.
4     I then told her that the subject stated he was there to do
5     electrical work, he was running a 220 line to the barn, he
6     gained access through the door on the west side of the
7     house, which had been left unlocked so he could go in and
8     out of there, and at that point we were unsure if anybody
9     else was in the house.
10 Q  Okay. I've asked you a couple of times to describe to me
11    what's going on with the house and you just said you were
12    unsure whether or not anybody was in the house -- anybody
13    else was in the house.
14 A  Right.
15 Q  Can you point to any fact or any circumstance that would
16    lead you to believe someone else was actually in the house?
17 A  There was another vehicle in the driveway, a Ford Explorer,
18    I believe, which belonged to Ms. Conklin. Other than that,
19    I didn't hear any noises from the house. Any noises that
20    would have been made would have been covered by the dogs.
21    It was daylight. I couldn't tell if there was any lights
22    going on and off.
23 Q  Did you know at that point that Ms. Conklin was over at 885
24    East Apple?
25 A  I don't recall.

Page 26

1  Q  Did you tell Detective Sergeant Straus that you were unsure
2     as to whether anyone else was in the home?
3  A  I didn't say that specifically. I told her what I recited
4     to you and the decision was made between the two of us that
5     we needed to go inside the house. We had an unlocked door.
6     We didn't have to force or damage the house.
7  Q  Did you have a warrant?
8  A  Not at that time.
9  Q  Who entered the house?
10 A  Detective Kutches and Trooper Trucks. I was still outside
11    with the male party.
12 Q  Did he then leave?
13 A  Yes, shortly thereafter.
14 Q  Did you then enter the house?
15 A  I did not, not until the warrant was signed.
16 Q  Did you enter before the warrant arrived but after you'd
17    been told it was signed?
18 A  I can't answer that.
19 Q  Because you don't remember or --
20 A  I -- I don't remember. Sorry.
21 Q  But you're confident that you did not enter until at least
22    after it was signed?
23 A  Yes.
24 Q  Why did you not enter with the other two officers?
25 A  Like I said, I was standing outside with the male subject.

Page 27

1     Someone had to keep an eye on him until he got out of there,
2     so. . . . I takes two guys to clear a house. We sent the
3     minimum amount of guys in.
4  Q  After he left, why did you not enter the house until the
5     warrant was signed or --
6  A  They had cleared the house from any people that would have
7     been inside. They found Derek Antol, Junior, inside the
8     house, brought him out to me. I spoke with him briefly,
9     called his mother. Actually, I think I left a message for
10    her mother -- his mother and she just arrived on scene. I
11    think Samantha -- she told me Samantha called her, at which
12    time with nobody in the house, there was no reason to be
13    inside. We weren't worried about destruction of evidence
14    any further.
15 Q  Did either Detective Kutches or Trooper Trucks tell you
16    anything about their interaction with Derek, Junior?
17 A  They told me -- they came outside. I asked, you know --
18    obviously with Derek, Junior, I asked where he was. They
19    said he was sleeping in a main-floor bedroom.
20 Q  Did you observe them -- those two walk in the building?
21 A  Yes.
22 Q  And they used the unlocked back door?
23 A  Correct.
24 Q  Did Detective Kutches or --
25 A  Trooper Trucks.

Page 28

1  Q  -- Trooper Trucks tell you anything else about their
2     interaction with Derek, Junior?
3  A  Not until a later date. Not on that date.
4  Q  What did they tell you?
5  A  I can't remember specifically when or how I was told, but I
6     learned that Derek was mad because it was alleged that
7     either Detective Kutches or Trooper Trucks went in and
8     pointed their gun at Derek, Junior. I know I spoke with
9     Detective Kutches on it, who advised me that Trooper Trucks
10    had his taser out and pointed the laser of the taser at
11    Derek, Junior, but there was no firearms pointed at him.
12 Q  Did you get the impression that Detective Kutches was
13    telling you this based upon his personal observation?
14 A  Yes.
15 Q  Okay. I mean it would be more likely that they would be
16    close together or near each other as they're clearing the
17    rooms, right?
18 A  Correct.
19 Q  Now, you said laser. I don't know if you misspoke or not.
20    Does -- as far as you know, do the tasers have a laser
21    pointer?
22 A  Yes.
23 Q  So you literally meant laser?
24 A  Yes.
25 Q  And you meant the pointing device that comes with the taser

7 (Pages 25 to 28)

Tri-County  Court Reporters
248-608-9250

CASEY BRINGEDAHL
4/30/2015

Page 29

1  device?
2  A  Correct.
3  Q  Okay. Did you ever talk to Trooper Trucks about that?
4  A  I haven't seen Trooper Trucks or talked to him since that
5     incident.
6  Q  Any other conversations that you've had with either of --
7     either of them about what happened when they had contact
8     with him?
9  A  No.
10 Q  Now, once the search warrant arrives, what do you do?
11 A  I was tasked with evidence. We went into the home through
12    the front door, which I believe was unlocked, and started to
13    execute the search warrant. I believe that's when Mr. Antol
14    and Ms. Conklin showed up, as well.
15 Q  So you think the front door was unlocked?
16 A  Yes. I'm not sure if Detective Kutches unlocked it when he
17    was inside or it was found to be unlocked.
18 Q  Oh, when you went through it, it was unlocked?
19 A  Correct.
20 Q  Oh, okay.
21 A  Yes.
22 Q  Did you -- okay, tell me, when you walked in, what do you
23    see? Describe the layout for me.
24 A  You walk in. There's stairs going up. If you stay on the
25    main floor, it takes you to the left. There's the kitchen

Page 30

1  area, dining area, and the living area, and I believe some
2  bedrooms down the hallway on the main floor. If you go
3  upstairs, on the left there's a small office area. On the
4  right, there's a bathroom and a master suite. And then I
5  don't recall specifically how to get downstairs, but the
6  basement was unfinished.
7  Q  Is it a split foyer?
8  A  I'm sorry?
9  Q  You said up or down. Is -- the foyer, is it split?
10 A  No. You go in, you can't go downstairs. There must have
11    been a separate door to go downstairs. So when you go in,
12    you can only go on the main floor or go up.
13 Q  So it's a two story over a basement?
14 A  Correct.
15 Q  Did you do any searching?
16 A  I was busy collecting evidence. My searching would have
17    been brief, just in the area where I collected the evidence.
18 Q  And when you do that, how do you do it? How does the
19    evidence end up in your possession?
20 A  It gets photographed in its original location. It's then
21    seized and sealed into an MSP evidence envelope. I'm very
22    particular about my evidence, so I always take it and I'll
23    stack it in one specific spot within the house. Generally,
24    we bring a big kit with us in a -- in a box and I always
25    stack all my stuff right next to the box.

Page 31

1  Q  So who was the photographer?
2  A  I was.
3  Q  So do you photograph it in place or after it's brought to
4     you?
5  A  No, nobody touches it. Once we've -- so, say, Prosecutor
6     Justian's there, he's searching through drawers and finds a
7     handgun, he leaves that drawer open, he comes over and
8     notifies me, I photograph it, I collect it, then he
9     continues with his search.
10 Q  So you photograph and collect?
11 A  Correct.
12 Q  So if any doors were broken down or if anything -- any
13    cabinets were broken or walls broken open or anything like
14    that, it wasn't your job that day?
15 A  No, sir.
16 Q  Okay. Did you see any evidence of damage done by the
17    police - broken doors, broken walls, broken drywall,
18    anything like that?
19 A  No, not that I can recall.
20 Q  Everything was pretty open?
21 A  Yeah.
22 Q  After July 9, 2014, have you had any direct contact with
23    Derek Antol?
24 A  I did.
25 Q  When was that?

Page 32

1  A  It would have been a day or two after his arrest on the
2     warrant. He was lodged at the Muskegon County Jail. It was
3     brought to my attention that when he was arrested, he had a
4     quantity of cash on him. Per Lieutenant Dunlop, she
5     requested I go down and seize the cash and with intent to
6     forfeit. Myself and Detective Trooper Marshall went to the
7     Muskegon County Jail, met with Derek briefly, served him in
8     the CIS-12 and left.
9  Q  Did you have to seize the actual cash from his property at
10    the jail?
11 A  I believe we seized cash through the jail. The jail wrote
12    us a check for the amount that he had in his possession at
13    the time of booking.
14 Q  So when they book him, they take the cash and deposit it?
15 A  Into an account.
16 Q  And then give you the check?
17 A  Correct.
18 Q  And is that the $1935?
19 A  That sounds right.
20 Q  And this was from -- I think it was a few days later, he was
21    driving or something and got pulled over or whatever, but he
22    gets arrested out on the street not on July 9th, correct?
23 A  Yeah. I recall it being a day or two after.
24 Q  Okay. When you had contact with Mr. Antol at that point,
25    did you have any conversation with him?

8 (Pages 29 to 32)

CASEY BRINGEDAHL
4/30/2015

Page 33

1  A  Sure.
2  Q  What'd he say?
3  A  I advised him that I would -- you know, it wasn't
4     necessarily my decision to seize the cash and it was nothing
5     personal against him, but that the bosses wanted me to seize
6     his cash. And actually at the end of the conversations, we
7     shook hands and that was it.
8  Q  At the time you seized that cash, did you know anything
9     about how he reported his income on his tax returns?
10 A  No.
11 Q  Had you ever -- because you were over at Green Creek, did
12    you ever go inside Deuces Wild?
13 A  I don't recall ever -- I don't think I've ever been inside
14    that store.
15 Q  Okay. At the time you seized this cash, did you know what
16    that store sold, what the merchandise was in there?
17 A  Sure.
18 Q  How did you know that?
19 A  It's pretty well known within the police department that we
20    know where the medical marijuana dispensaries are, we know
21    where the smoke shops are. It's common knowledge.
22 Q  Did you know that 885 East Apple was a smoke shop?
23 A  Yes.
24 Q  Did you know -- was it your understanding that things were
25    sold in there that were lawful?

Page 34

1  A  It was my understanding that there was illegal sales
2     occurring within the premises.
3  Q  That's under --
4  A  I'm -- I'm -- I'm sure there's legal sales going on there,
5     as well.
6  Q  Like the merchandise, did you --
7  A  Sure.
8  Q  -- did you know that at the time?
9  A  Sure.
10 Q  Did you know anything about Mr. Antol maybe having any other
11    sources of income?
12 A  No.
13 Q  Did you have any specific information that Mr. Antol had
14    unlawfully sold marijuana himself?
15 A  Not that I can recall.
16 Q  Assuming for a moment that this was not somebody else's
17    decision telling you what to seize, at the moment you seized
18    it, what evidence did you have to conclude even to a
19    probable-cause standard that the money was forfeitable?
20 A  Any evidence gathered as to Mr. Antol's income would have
21    been covered during any interviews that were conducted. It
22    was Detective Dent's case. It was between him and my
23    command whether they wanted the money seized covered under
24    forfeiture. And I personally did not have that information
25    at the time. I know that information was gathered. I had

Page 35

1     no reason to believe that either Detective Dent or
2     Lieutenant Dunlop wouldn't have done their due diligence
3     before telling me to seize it.
4  Q  Fair enough. But is it your answer to my question that you
5     personally had no information as to whether or not that
6     money was forfeitable personally?
7  A  I had information that I knew illegal sales were being
8     conducted at the store. I knew that Mr. Antol's main source
9     of income was from the store. That was the information I
10    had at the time during the seizure.
11 Q  Do you -- did you have any information that after July --
12    after July 9, 2014, in other words, between the time of the
13    raid and the time of his arrest, that any illegal sales of
14    marijuana had occurred?
15 A  No.
16 Q  After you were finished at Green Creek, did you go over to
17    Farr Road at all on July 9th?
18 A  No.
19 Q  Did you go back to Apple Avenue that evening?
20 A  No.
21 Q  At any other time other than July 9th, have you been
22    assigned to do surveillance on Mr. Antol?
23 A  I was assigned to do surveillance for the warrant pickup
24    when he was picked up on his warrant.
25 Q  That was after July 9th.

Page 36

1  A  Okay.
2  Q  Now I'm asking --
3  A  Previous -- previous to that?
4  Q  Let's --
5  A  I'm confused.
6  Q  Yeah, I'm going to get to it all, but when you just said
7     that, you meant the warrant after July 9th?
8  A  Yes.
9  Q  Okay. So let's focus on prior to July 9. Had you been
10    tasked with doing any surveillance on Mr. Antol prior to
11    July 9, 2014?
12 A  No, I haven't specifically. I was tasked with doing
13    surveillance during the successful and unsuccessful
14    undercover buys. However, I was never -- I was never asked
15    to specifically surveil Mr. Antol.
16 Q  If -- if Mr. Dents' reports, and maybe his affidavit, and I
17    think he said it in his deposition, but if there's
18    information to suggest that on July 8th, members of WEMET
19    were conducting surveillance on Mr. Antol or Ms. Conklin,
20    were you involved in that?
21 A  I do recall that now that you mention it. The day before we
22    did go out and sit and watch the Green Creek address, but I
23    never followed Derek from there, I never followed Samantha
24    from there, we just sat and watched the house.
25 Q  What did you see when you did that surveillance?

9 (Pages 33 to 36)

Tri-County   Court  Reporters
248-608-9250

CASEY BRINGEDAHL
4/30/2015

Page 37

1  A  I don't recall. I remember somebody arriving to the house,
2     but I don't remember who it was or what it was. I can't
3     recall specifically.
4  Q  I need to take you back to Green Creek for a moment on July
5     9. Of the information -- when -- when Trooper Trucks and
6     Detective Kutches went inside, when they came out, did they
7     tell you about anything they had observed in terms of
8     marijuana?
9  A  I don't recall.
10 Q  Okay. Do you recall any of the three of you relaying any of
11    that information to Detective Dent before a warrant arrived?
12 A  No, I don't recall.
13 Q  Okay. All right. Since July 9th and excluding the day of
14    his arrest, have you done any surveillance on Mr. Antol or
15    Ms. Conklin up until today?
16 A  No.
17    MR. JUSTIAN: I'm going to object and I'm going
18    to tell him not to answer if there's any on-going
19    surveillance.
20 BY MR. BOSTIC:
21 Q  Are you aware of a K9 officer being sent to inspect Derek,
22    Junior's, locker at school?
23 A  No.
24 Q  Are you aware of within the last week or so detectives going
25    to the school and interviewing other students in Derek,

Page 38

1     Junior's, class?
2  A  No.
3  Q  Prior to July 9. 2014, had you ever communicated with
4     Detective Sergeant Schmitz of the Tobacco Tax Team?
5  A  I'm not going to answer I haven't. Maybe in passing just
6     briefly hello, but I've never spoken about a case with him
7     or directly called him or directly e-mailed him.
8  Q  And can you say with confidence that you never had any such
9     conversation with him concerning Mr. Antol and Ms. Conklin?
10 A  Absolutely.
11 Q  What about Mr. Parolini from the Department of Treasury?
12 A  I don't even know who that is.
13    MR. JUSTIAN: You just missed him when he came
14    out.
15    THE WITNESS: Yeah.
16 BY MR. BOSTIC:
17 Q  Okay. What about since July 9, 2014; any communications
18    with either of them about this case?
19 A  No.
20 Q  Did you talk to Derek, Junior, at Green Creek?
21 A  Briefly.
22 Q  What did he have to say?
23 A  I just asked him where Derek -- and I don't recall if I
24    asked -- I know I asked him where Derek, Senior, was, I
25    asked him who else was in the house with him. He said

Page 39

1     nobody. I asked him if there was a parent or somebody I
2     could call to come pick him up. He told me his mom, so
3     that's how I got his mom's phone number and left them a
4     message. We just -- after that, we just had general
5     conversation about horses and hockey.
6  Q  How old do you think he was?
7  A  Ten.
8  Q  Has Detective Dent ever made any statements to you
9     concerning his seizure of equipment - phones, electronics,
10    things of that nature from 885 East Apple?
11 A  Not that I can recall.
12    MR. BOSTIC: I'm done.
13    MR. JUSTIAN: No questions.
14    (At 3:33 p.m., deposition concluded)
15    * * *

Page 40

I certify that this transcript, consisting of 40 pages, is a
complete, true, and correct record of the testimony of Casey
Bringedahl held in this case on April 30, 2015.
 I also certify that prior to taking this deposition, Casey
Bringedahl was duly sworn to tell the truth.

May 1, 2015

Denise L. Jamba, CER 0786
Certified Electronic Recorder

| Michigan Department of State Police ORIGINAL INCIDENT REPORT | ORIGINAL DATE Wed, Jul 09, 2014 | | INCIDENT NO. WMN-0000144-14 | |
|---|---|---|---|---|
| | TIME RECEIVED 2147 | | FILE CLASS 35001 | |
| | WORK UNIT MSP CID ADMIN LANSING | | COUNTY Muskegon | |
| COMPLAINANT PATROL | | | TELEPHONE NO. | |
| ADDRESS: STREET AND NO. 1622 S BEACON BOULEVARD | | CITY GRAND HAVEN | STATE MI | ZIP CODE 49417- |
| INCIDENT STATUS Open | | | | |

# SEARCH WARRANT-MARIJUANA

### SUMMARY:

WEMET Detectives executed a search warrant at 1769 N Green Creek Rd. At the conclusion of the warrant, 7 marijuana plants, large quantities of usable marijuana and $21,021.00 cash were seized. Michael Porter was lodged on an outstanding warrant at the Muskegon County Jail. Warrants will be sought at a later date for the residents, Samantha Conklin and Derek Antol.

### VENUE:

MUSKEGON COUNTY, LAKETON TWP
1769 N GREEN CREEK RD

### DATE & TIME:

WED, JUL 09, 2014 AT 1400

### INFORMATION:

I was asked by Det Dent to surveil the address of 1769 N Green Creek Rd. He advised that he was in the process of obtaining a search warrant for the residence. If anyone were found to be in the residence, it would need to be secured to prevent the destruction of evidence.

### SURVEILLANCE:

I began surveilling the residence at approximately 1350 hours. At approximately 1415 hours, I observed a white male in a purple shirt walk out from behind the residence to a pole barn in the backyard. I contacted Tpr. Trucks and requested that he make contact with the male subject later identified as Michael Tozer.

| PAGE 1 of 22 | INVESTIGATED BY DET C BRINGEDAHL #108 | REPORTED BY | REVIEWED BY |
|---|---|---|---|

P - 000147

| Michigan Department of State Police | ORIGINAL DATE | INCIDENT NO. |
|---|---|---|
| | Wed, Jul 09, 2014 | WMN-0000144-14 |
| ORIGINAL INCIDENT REPORT | TIME RECEIVED | FILE CLASS |
| | 2147 | 35001 |

**CONTACT: MICHAEL TOZER**

Tpr Trucks and I made contact with Tozer in the side yard of the residence. Tozer stated that he is an electrician running a 220 volt line out into the garage. He is a private contractor and has been at the residence since 11 am. Tozer states he has known Derek Antol for approximately 2 months. The two were introduced through a mutual friend. Tozer advised that Antol left the residence at approximately 1130 am to an unknown location. Tozer was allowed to stay at the residence and was given access to the basement through an unlocked door to complete his wiring. Tozer had done previous electrical work for Antol about 6 weeks ago. He is charging Antol $400 to run the electrical line. Tozer advised that he did observe a few small plants in the pole barn. Tozer is a Michigan Medical Marijuana Card holder. He consented to a search of his 2003 Nissan Murano which revealed no marijuana or other contraband. Tozer advised that he doesn't carry any medication while he is working. He advised that he wasn't sure if anyone was still in the house. After a LEIN check, Tozer was allowed to leave the residence.

**VEHICLE: TOZER**

2003 Nissan Murano
LIC: 0KZQ16
VIN: JN8AZ08W53W235986
Registered to Tozer

**RESIDENCE:**

At this time, the decision was made to secure the residence. Tpr Trucks and Det Kutches gained access through the rear basement door which was found to be unlocked. Numerous loud announcements were made. Det Kutches and Tpr Trucks located Derek Antol Jr sleeping in a main floor bedroom. He was brought outside. The rest of the home was cleared without anyone found. It should be noted that the rear main floor entry of the deck and the front door were also found to be unlocked. Once the home was secured, Detectives waited outside for the warrant to be signed.

**CONTACT: DEREK ANTOL JR**

I briefly spoke with Dererk Jr who advised that he wasn't sure where his dad or Samatha (Conklin) currently are. He provided me with a phone number for his mother Erica Hume. I called her and left her a message to call me. A short time later, Erica Hume and her fiancee Samuel Schoen arrived at the residence. Erica advised that she had received a phone call from Conklin requesting that she come pick up Derek Jr. After confirming her identity, she took custody of Derek Jr and left the residence.

| PAGE | INVESTIGATED BY | REPORTED BY | REVIEWED BY |
|---|---|---|---|
| 2 of 22 | DET C BRINGEDAHL #108 | C. Bringedahl | MP |

P - 000148