# UNITED STATES OF AMERICA

# IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

| | |
|---|---|
| Derek Antol, individually and as next friend of DSAII, a minor, and Devon S. Antol, and Tryston Antol,<br>      Plaintiffs, | File No: 1:17-cv-613 |
| v. | |
| Adam Dent, Kate Straus, Casey Bringedahl, Casey Trucks, Pete Kutches, and Western Michigan Enforcement Team, a public body organized under the laws of the State of Michigan,<br>      Defendants, | Hon. Janet T. Neff<br>U.S. District Court Judge |

_____/

## PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES

Attachment 7 – deposition of Defendant Straus

KATE STRAUS
5/10/2018

### Page 1

UNITED STATES OF AMERICA
IN THE WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

DEREK ANTOL, individually and as
Next Friend of DSA, a minor, DSAII,
a minor, and TRYSTON ANTOL,

Plaintiffs,   Case No. 1:17-cv-613

-v-
HON. JANET T. NEFF
ADAM DENT, KATE STRAUS, CASEY
BRINGEDAHL, CASEY TRUCKS, PETE
KUTCHES, and WESTERN MICHIGAN
ENFORCEMENT TEAM, a public body
organized under the laws of the
State of Michigan,

Defendants.
_____/

DEPOSITION OF KATE STRAUS

Taken by the Plaintiffs on the 10th day of May, 2018,

at the offices of Cummings, McClorey, Davis & Acho, 2851

Charlevoix Drive, Suite 327, Grand Rapids, Michigan, at

2:49 p.m.

APPEARANCES:

For the Plaintiffs:   MR. J. NICHOLAS BOSTIC (P40653)
                      909 N. Washington Avenue
                      Lansing, MI 48906
                      (517) 706-0132
For the Defendant     MR. ADAM P. SADOWSKI (P73864)
Casey Trucks:         MR. PATRICK MYERS (P81444)
                      525 W. Ottawa Street
                      P.O. Box 30736
                      Lansing, MI 48909
                      (517) 373-5434

### Page 2

For the Defendants   MR. CURT A. BENSON (P38891)
Straus, Bringedahl & MR. BRAD WANALUNAS (P     )
Kutches:             2851 Charlevoix Drive, Suite 327
                     Grand Rapids, MI 49546
                     (616) 975-7470

Recorded by:   Denise L. Jamba, CER 0786
               Certified Electronic Recorder

### Page 3

TABLE OF CONTENTS

                              PAGE

KATE STRAUS:

Direct Examination by Mr. Bostic    5

EXHIITS:                      IDENTIFIED

EX-1 - Notice of Seizure and Intention to Forfeit  15
EX-2 - Notice of Seizure and Intention to Forfeit  18
EX-3 - Notice of Seizure and Intention to Forfeit  19
EX-4 - Notice of Seizure and Intention to Forfeit  20
EX-5 - Consent Judgment for Order of Partial
       Forfeiture                21
EX-6 - Incident Property Report        26

### Page 4

1    Grand Rapids, Michigan
2    Thursday, May 10, 2018 - 2:49 p.m.
3           KATE STRAUS
4    HAVING BEEN CALLED BY THE PLAINTIFFS AND SWORN
5       MR. BOSTIC: State your name for the record,
6    please.
7       THE WITNESS: Kate Straus.
8       MR. BOSTIC: Ms. Straus, my name is Nick Bostic.
9    I am the attorney for the plaintiffs in the Western
10   District of Michigan case Derek Antol, et al, versus Adam
11   Dent, et al, 1:17-cv-613. Today is the time and date set
12   for your deposition, which will be used for all purposes
13   as allowed by the Federal Rules of Evidence and the
14   Federal Rules of Civil Procedure.
15      Counsel, any objections as to notice?
16      MR. BENSON: No, sir.
17      MR. SADOWSKI: None for me.
18      MR. BOSTIC: Appearances for the record, please.
19      MR. BENSON: My name is Curt Benson. I'm here
20   representing Kate Straus.
21      MR. WANALUNAS: Brad Wanalunas representing Kate
22   Straus.
23      MR. SADOWSKI: Adam Sadowski representing
24   Defendant Trucks, who isn't here, so I don't know his
25   appearances are here or not, but regardless....

Electronically signed by Denise Jamba (201-416-679-6803)    2736e1e6-4f6e-4ff4-9465-f97aa087c994

KATE STRAUS
5/10/2018

### Page 5

1  MR. BOSTIC: If you're in the room, we want to
2  know who you are.
3  MR. MYERS: Patrick Myers for Defendant Trucks.
4  DIRECT EXAMINATION
5  BY MR. BOSTIC:
6  Q  Ms. Straus, what is your occupation?
7  A  Currently I'm a regulation agent for the State of
8     Michigan, the Bureau of Medical Marijuana Regulation.
9  Q  And what do you do in that capacity?
10 A  I'm essentially an investigator for the new facility
11    licensing division that has just started. Any of the new
12    provisioning centers, growers, transporters, I go out and
13    investigate any complaints against them and do inspections
14    for their facility so they can obtain a license.
15 Q  Do you also investigate portions of the initial
16    application process?
17 A  I have not yet, but I'm sure that's coming.
18 Q  Have any facilities been licensed yet?
19 A  No.
20 Q  So there's nothing to inspect yet?
21 A  We have started inspections 'cause there is part of an
22    inspection before they obtain their license.
23 Q  Okay. Directing your attention to July 9, 2014, what was
24    your occupation then?
25 A  I was a detective sergeant with the City of Muskegon

### Page 6

1   Police Department and I was out at WEMET, the West
2   Michigan Enforcement Team for undercover narcotics.
3  Q  And how long had you been a police officer as of July of
4     2014?
5  A  Eight years.
6     MR. BENSON: It's like a math problem.
7     THE WITNESS: Exactly. Yeah.
8     MR. BENSON: We promised there'd be no math on
9     this exam.
10 BY MR. BOSTIC:
11 Q  And when did you leave Muskegon P.D.?
12 A  December of 2017.
13 Q  And how much -- so you had -- now we have more math
14    problems.
15 A  Eleven years.
16 Q  Thank you. So why did you leave?
17 A  This opportunity came up and better for my family.
18 Q  Were you vested in a pension at Muskegon?
19 A  I was.
20 Q  During your time with the Muskegon Police Department, were
21    you ever disciplined for anything involving false
22    statement or dishonesty?
23 A  No.
24 Q  Have you ever been -- in course -- in terms of your police
25    work, have you ever been named as a defendant in any other

### Page 7

1   civil litigation?
2  A  Yes.
3  Q  How many?
4  A  I guess technically two.
5  Q  You and Officer Bringedahl were once sued for excessive
6     force, correct?
7  A  Yes.
8  Q  What was the other one?
9  A  This first lawsuit here with Mr. Antol pends to the
10    criminal case.
11 Q  Okay. So the one I filed for Derek in 2014?
12 A  Yeah. Is this all considered the same?
13 Q  Your -- your answer is -- is correct.
14 A  Okay.
15 Q  I just wanted to make sure that --
16 A  Okay.
17 Q  Okay. So other than involving Mr. Antol, we only have the
18    one?
19 A  Correct.
20 Q  Okay. Prior to July 9, 2014, had you had any direct
21    contact with Mr. Antol?
22 A  No.
23 Q  What about Ms. Conklin?
24 A  No.
25 Q  During the time period of June of 2013 until July of 2014,

### Page 8

1   were you considered a supervisory -- employee is not the
2   right word, officer with WEMET?
3  A  Let's clarify your dates, please. June of '13 through
4     when?
5  Q  July of '14.
6  A  No. I was promoted -- oh, yes. I'm sorry. I was
7     promoted October, November-ish of 2013 and went out to
8     WEMET at that time.
9  Q  Okay. So you went to WEMET as a supervisor?
10 A  Yes. Yeah.
11 Q  Okay. Because it's my understanding you can -- you might
12    be a sergeant or a supervisor in your home department, but
13    when you go to WEMET, you may or may not be a supervisor.
14    But you were a supervisor --
15 A  Correct.
16 Q  -- at WEMET?
17 A  Correct, I was.
18 Q  Okay. As a supervisor, did you have any responsibility
19    for reviewing or overseeing Mr. Dent's investigation?
20 A  Yes.
21 Q  Of this -- of this case of Mr. Dent?
22 A  Yes, I did.
23 Q  Were you aware that he fabricated documents in June of
24    2013 concerning a medical marijuana application?
25 A  When you say fabricated, as far as to obtain his medical

2 (Pages 5 to 8)

KATE STRAUS
5/10/2018

Page 9

1  mari -- can you clarify, I guess?
2  Q  Well, fabrication is -- yeah, I -- I don't want to say
3     legitimately fabricated, that's not what I mean, but he
4     fabricated documents for use in an undercover role.
5  A  Okay. I see where you're heading. I came to the team in
6     November of 2013.
7  Q  Okay.
8  A  So prior to that, no, I was not part of it. However, I
9     was aware he had fake documentation that said that he had
10    a medical marijuana card.
11 Q  Or had applied for a card?
12 A  Correct. Yes.
13 Q  Okay. So in the fall of 2013, were you aware that one or
14    more WEMET officers attempted to purchase marijuana at 885
15    East Apple --
16 A  Yes, I was.
17 Q  -- and were turned down?
18 A  I don't recall how many times they were turned down and
19    how many times they successfully purchased. I know there
20    was a combination of both.
21 Q  Were you aware that on July 8th, Mr. Dent did some
22    surveillance at East Apple and North Green Creek -- or
23    North Green Creek?
24 A  Yes, I was.
25 Q  How were you aware of it?

Page 10

1  A  My job as the supervisor, every month I have to review the
2     open active cases, and so every month I grabbed the
3     undercover case and at some point the decision was made to
4     wrap up some of these older cases that were open, so I
5     knew him and Detective Bringedahl were going to conduct
6     some surveillance on that case.
7  Q  Did you ever see the surveillance notes from that
8     surveillance?
9  A  Not that I can recall.
10 Q  On July 9, 2014, how did you first become aware that
11    something was going to happen at 885 East Apple that day?
12 A  One of the detectives received a call from the Tobacco Tax
13    Team -- the Michigan State Police Tobacco Tax Team that
14    they were inside the facility and observed marijuana.
15 Q  Did they explain to you at all -- or not to you, but did
16    part of that explanation include how they entered the
17    portion of the building where the marijuana was located?
18 A  No, I never directly talked to the Tobacco Tax Team until
19    we were on scene, but I believe they were just doing
20    administrative search.
21 Q  Did any of them at any time ever explain to you how they
22    entered the south part of the building?
23 A  I believe Detective Sergeant Schmit, Carl, said that when
24    they were in, they just walked around the entire building
25    to see if there was any sort of tobacco products inside

Page 11

1     the building and they just walked into the southern half.
2  Q  Did you see the video footage from the DVR?
3  A  No, I never witnessed the DVR footage.
4  Q  Did it -- was it ever brought to your attention that they
5     threatened Ms. Conklin and cornered her near the door of
6     the south part of the building --
7  A  No.
8  Q  -- and threatened her if they didn't get in?
9  A  No, I was not privy to that information.
10 Q  You never heard that?
11 A  Not that day while we were on scene. I've heard it since
12    then.
13 Q  When did you first hear it?
14 A  I think just in the course of all the -- I'm not really
15    sure when I heard it. Sorry, I don't recall.
16 Q  Okay. Do you think it would have been more than a year
17    later?
18 A  Could be.
19 Q  Okay. Who was present when you arrived at 885 East Apple
20    on July 9th?
21 A  The Tobacco Tax Team that was there, and I don't recall
22    all of their names, and then Detective Marshall and myself
23    were there. And Sergeant Grant from MSP showed up, too.
24    I'm not sure if he was already there or showed up after
25    the fact.

Page 12

1  Q  And then what about non-law enforcement when you first
2     arrived; who was there?
3  A  Ms. Conklin, Derek Antol. I don't recall if there was
4     anybody else. People were coming and going -- well,
5     trying to come to purchase marijuana while we were there,
6     but we stopped all them from entering the building.
7  Q  Do you recall a person with the last name of Supernaw
8     being there? He'd been an employee.
9  A  There might have been an employee there. I don't -- I
10    don't recall right now. Sorry.
11 Q  So you think you -- your recollection is that Mr. Antol
12    arrived before you did?
13 A  If he didn't arrive -- I'm sorry, I truly don't recall.
14    He was either there like just there or showed up right as
15    we were showing up.
16 Q  Do you recall him using a video or a telephone to record
17    the officers?
18 A  Yes. He was very -- he was extremely upset when he was
19    there and he was videotaping.
20 Q  And do you recall him telling you and the other officers
21    to leave?
22 A  Yes.
23 Q  Now, when you arrived, did you have an awareness as to
24    whether or not a search warrant was being prepared?
25 A  Yes, I did. We were at our office when we received the

3 (Pages 9 to 12)

KATE STRAUS
5/10/2018

Page 13

1  phone call that Tobacco Tax was in the building, and
2  between us, we came up with a game plan that Detective
3  Dent, he had the most knowledge of the case, was going to
4  head to the prosecutor's office to get the search warrant.
5  Myself, Detective Marshall were headed to Apple, and one
6  of our officers was going to the Farr Road address, the
7  residence, and North Green Creek was another.
8  Q  So was it your belief at the time that because the
9     officer -- the other officers had observed marijuana on
10    the premises and a search warrant was being prepared, that
11    you didn't have to leave, that you could hold the
12    premises?
13 A  Yes, we were going to secure the resi -- or secure the
14    premise so no evidence would be destroyed.
15 Q  And then how long do you think you stayed at East Apple
16    Avenue?
17 A  It was a long time. It was a couple hours in total. But
18    Adam was just starting to get the search warrant, so I bet
19    you we waited at least an hour and a half to get the
20    search warrant. Mr. Antol did not want us on the property
21    and I had explained to him that we were securing it for
22    evidence, but I agreed with him that if he would calm
23    down, we would all just step outside, and that's what we
24    did.
25 Q  So everybody sat outside around vehicles or --

Page 14

1  A  Yeah, by the front door.
2  Q  -- I think there's a plant -- a planter or something by
3     the door there. So people were sitting down?
4  A  Yeah, there was a planter, but, yes, we were right outside
5     the front door.
6  Q  And when you left Apple Avenue, where did you go?
7  A  I don't recall if we went back to our office to drop off
8     evidence, but either way, I made it up to North Green
9     Creek.
10 Q  Did you, on July 9th, 2014, ever go to Farr Road?
11 A  I never went there.
12 Q  When you arrived -- well, what time do you think the
13    search warrant arrived at Apple Avenue?
14 A  I'd have to look at the police report. I don't recall the
15    time of day.
16 Q  Did Mr. Dent show up with all three search warrants?
17 A  Yes, because Apple was the closest location to the
18    courthouse, so he came there with the search warrants, and
19    I don't remem -- I think he stayed. I don't recall if
20    other people came and picked up search warrants or if he
21    dropped them off and then went to the other residence.
22 Q  What time do you think you went to Farr -- or Green Creek?
23 A  I'm sorry, I don't recall the exact time.
24 Q  Do you think --
25 A  This was an all-day event from start to finish, I remember

Page 15

1     that.
2  Q  Do you think it was still daylight?
3  A  Yes.
4  Q  All right. And how long were you at Green Creek?
5  A  A couple hours.
6  Q  Do you recall serving any forfeiture notices?
7  A  Yes. I served the forfeiture to both Ms. Conklin and Mr.
8     Antol.
9         (At 3:06 p.m., Exhibit No. 1 marked by court
10        reporter)
11 BY MR. BOSTIC:
12 Q  You have there Deposition Exhibit No. 1. Do you recognize
13    that?
14 A  Yes. This is the forfeiture form that I completed and
15    gave to Derek.
16 Q  Is that your signature in the lower left corner?
17 A  Yep.
18 Q  Do you recall there being a DVR in the building at East
19    Apple?
20 A  Yes, there was.
21 Q  Do you recall seizing it?
22 A  Yes.
23 Q  Do you recall there being some cameras connected to the
24    DVR?
25 A  I'm sure there was cameras. Otherwise, how would it

Page 16

1     record? I don't -- I don't remember if we seized the
2     cameras. I think we just seized the -- the box.
3  Q  Why was the DVR not listed on the forfeiture notice?
4  A  Because it was separate at the time. It was considered
5     evidence because it had the videos of any of the
6     undercover buys, people in and out of the facility. It
7     wasn't considered a forfeiture.
8  Q  Well, when the case is over then, what would you do with
9     such a device?
10 A  Destroy it.
11 Q  What authority do you have as a police officer to
12    destroy -- to destroy private property?
13 A  I don't. After the case is over and done with, I get
14    notification from the prosecutor's office on what I can do
15    with the personal property and illegal property.
16 Q  So is the DVR illegal?
17 A  No, but it's just considered evidence.
18 Q  But it's private property owned by a citizen, correct?
19 A  Correct. After the case is over and done with, I wait for
20    the prosecutor to let me know how to handle all the
21    evidence and I do what they tell me to do.
22 Q  Okay. So there's a piece of evidence that is not
23    contraband, it's seized, the case is over. Are you
24    claiming that there's any legal authority that allows you
25    as a police officer to destroy that private property?

4 (Pages 13 to 16)

KATE STRAUS
5/10/2018

Page 17

1  MR. BENSON: I'm going to object. She's already
2  answered the question. She does not have the authority,
3  she follows the direction of the prosecuting attorney.
4  MR. BOSTIC: Well, that's the prosecutor's
5  position. I want to know if the witness has any legal
6  authority.
7  MR. BENSON: And I think she's already answered
8  the question is my point.
9  MR. BOSTIC: Well, I need her answer clarified.
10 BY MR. BOSTIC:
11 Q  You -- you gave an answer, no, and then you explained
12    about the other thing. So were you just explaining the
13    no? That's where I'm being -- I'm lost.
14 A  Yes, I legally can destroy their property when I have
15    authorization to do so.
16 Q  Okay.
17 A  I'm sorry, I don't know how else to --
18    MR. BENSON: You're doing fine.
19 BY MR. BOSTIC:
20 Q  That helped.
21 A  Okay.
22 Q  But in terms of a statute, are you aware of any authority
23    that allows you to destroy private property?
24 A  I don't -- I don't know off the top of my head a statute
25    that's written out there. However, I'm sure there is

Page 18

1  something 'cause police departments continually destroy
2  evidence from -- from crime scenes.
3  Q  So your viewpoint is that you're authorized to do whatever
4    the prosecuting authority instructs you to do?
5  A  Yes.
6  Q  Did you physically take the DVR off the shelf?
7  A  Where? Can you clarify?
8  Q  At 885 East Apple.
9  A  No, I did not.
10 Q  Did you physically handle it or were you aware of its
11    actual seizure on that date?
12 A  Yes, I was.
13 Q  And you don't recall the cameras being put in the bag with
14    the DVR?
15 A  That I don't recall. I saw the DVR at the facility, but
16    the evidence custodian that day, which should have been
17    Adam Dent, he's the one that packages it, handles it,
18    takes it back to our place, logs it in.
19    (At 3:13 p.m., Exhibit No. 2 marked by court
20    reporter)
21 BY MR. BOSTIC:
22 Q  I'm showing you what's been marked as Deposition Exhibit
23    No. 2. Do you recognize this one?
24 A  Yes, I do.
25 Q  And we have the same property but for -- except for the

Page 19

1  gun, and essentially you just served Mr. Antol and Ms.
2  Conklin for all the other items, correct?
3  A  Correct. Yes.
4    (At 3:14 p.m., Exhibit No. 3 marked by court
5    reporter)
6  BY MR. BOSTIC:
7  Q  I'm showing you what's been marked as No. 3. What is --
8    do you recognize this one?
9  A  Yes. This is the forfeiture items that we removed from
10    the address on North Green Creek to Derek.
11 Q  Do you recall him telling you at the time that some of the
12    cash was actually the property of his son?
13 A  I don't -- I don't recall that, no.
14 Q  When you compiled this list that's in No. 3, did you
15    determine which room the separate amounts came from?
16 A  That information is probably on the search warrant return.
17 Q  I understand that, but my point is did you determine --
18    did you seek to determine ownership separately for the
19    various amounts inside the home?
20 A  I did not, no. Another officer who was doing the
21    interviews would have asked the questions about where the
22    money -- who -- where the money belonged to and who was
23    part of it. That's the reason why it's separate on this
24    form, is because that money came from different locations.
25 Q  Well, then why would the other potential owners not be

Page 20

1  served separately?
2  A  If they -- his son is a minor at the time, then Derek just
3    would have been served with it. If it was another adult
4    on scene claiming ownership, we would have served that
5    adult.
6  Q  Well, if the son is a minor and he claims ownership, then
7    how is it forfeitable?
8  A  I don't recall all the conversations about this money.
9    However, most of this money was found in Derek's room.
10    That's why Derek was served.
11 Q  Well, right, I mean the $17,800 obviously. But you don't
12    recall one of the other two amounts belonging to one of
13    the boys?
14 A  I do not.
15    (At 3:17 p.m., Exhibit No. 4 marked by court
16    reporter)
17 BY MR. BOSTIC:
18 Q  Looking at No. 4, I take it you served both of the adults
19    the same thing just because they both lived there?
20 A  Yes. In our -- yes.
21 Q  If you serve somebody that's a non-owner and doesn't want
22    it, all they do is just not file a claim, right?
23 A  Correct.
24    (At 3:18 p.m., Exhibit No. 5 marked by court
25    reporter)

5 (Pages 17 to 20)

Tri-County Court Reporters
248-608-9250

Electronically signed by Denise Jamba (201-416-679-6803)    2736e1e6-4f6e-4ff4-9465-f97aa087c994

KATE STRAUS
5/10/2018

### Page 21

1  BY MR. BOSTIC:
2  Q  Now, if you would, take a look at the first six pages of
3     Deposition Exhibit 4.
4  A  Four? I only have one page.
5  Q  Did I get behind? Five. Sorry.
6     MR. BOSTIC: So the record is clear, No. 5 is a
7     nine-page document of three court orders and three
8     certificates of service. No. 4 was a forfeiture notice
9     served on Samantha Conklin.
10    THE WITNESS: Okay.
11 BY MR. BOSTIC:
12 Q  Okay. What do those appear to be to you?
13 A  Court orders, judgments.
14 Q  Have you ever seen these before today?
15 A  I saw them yesterday when I met with my attorney.
16 Q  Had you ever seen them prior to yesterday?
17 A  Not that I recall.
18 Q  Were you involved in -- during 2015 in returning any
19    property to Mr. Antol or Ms. Conklin?
20 A  I'm aware of what happened. I was not part of it.
21 Q  How were you aware of the return of some of the property?
22 A  Our property room manager is the one that releases all the
23    property in our cases, so he would have dealt with Mr.
24    Antol and Ms. Conklin. I was on the phone with Prosecutor
25    Matt Roberts in regards to releasing the property.

### Page 22

1  Q  When were you on the phone with Mr. Roberts?
2  A  Around this time. I don't have an exact time and date
3     that I had that phone conversation.
4  Q  When you say around this time, are you talking about the
5     date of the order, --
6  A  Yes.
7  Q  -- June 29, 2015?
8  A  Yes.
9  Q  What did Mr. Roberts tell you?
10 A  He advised me that everything on the forfeiture forms
11    could go back to Samantha and Derek and then all of the
12    evidence could be destroyed.
13 Q  Are you aware that some property items that were not on
14    the forfeiture forms were returned to Mr. Antol and Ms.
15    Conklin?
16 A  I'm not aware of that.
17 Q  So it's your testimony that Mr. Roberts told you to return
18    only the items listed on the notices?
19 A  Yes. Prosecutor Roberts had said that anything that's on
20    the forfeiture forms goes back -- back to them, everything
21    else could be destroyed. But as far as other property in
22    detail, that conversation would have been with our
23    property room manager, not with me.
24 Q  You mean as far as the individual evidence items --
25 A  Um-hum.

### Page 23

1  Q  -- after -- okay.
2  A  My office is separate from -- at the time was separate
3     from where the property room is.
4  Q  So you would have passed the information along from Mr.
5     Roberts to the property room, but then if -- if the items
6     that were not listed on the forfeiture notices, if
7     something other than destruction happened to them, such
8     as, return, you would not have been involved?
9  A  Well, typically how it happened is the conversations
10    happened between Bill Evans, our property room manager,
11    and the prosecutor's office, and I was usually never privy
12    to them until after the fact. If I had any questions
13    during my -- my review of the reports, I called Mr.
14    Roberts or he called me and questioned whatever the issue
15    was.
16 Q  So you don't have any idea how or why -- well, why certain
17    items not listed on the forfeiture forms were returned?
18 A  Correct. That was not part of my duties.
19 Q  When you were trained to work on the drug teams, did
20    anybody ever train you that you could destroy private
21    property that wasn't contraband?
22 A  As far as official training in classes, no. However, my
23    lieutenant taught me how to, you know, when a case is over
24    and done with, e-mail the prosecutor's office, get the
25    approval to destroy, and then I never handled the

### Page 24

1     evidence, it was in a computer system marking things to
2     destroy, not to destroy, to donate, whatever the
3     disposition of the evidence was. So, yes, sometimes
4     personal property was in there. Whether it was -- it
5     depends what it was from the case.
6  Q  Are you aware that there's a statute that essentially says
7     that property seized pursuant to a search warrant is to be
8     disposed of at the direction of the court?
9  A  I'm not aware of that statute.
10 Q  So aside from forfeiture, if it's seized pursuant to a
11    warrant, you're not -- you're not aware of a statute that
12    talks about how that property is to be held?
13 A  I've never read a statute for that, no, I have not. I'm
14    not aware of that.
15 Q  Have you had any conversations at any time with Lieutenant
16    Fias about this particular DVR being destroyed?
17 A  Yes, I did.
18 Q  When?
19 A  Some time right after it was destroyed, he received a
20    phone call from Mr. Antol requesting it, requesting the
21    DVR system.
22 Q  Did he tell you what his response was to Mr. Antol?
23 A  What Lieutenant Fias's response is?
24 Q  Yes.
25 A  Yes. We did -- we looked it up and realized that it was

6 (Pages 21 to 24)

KATE STRAUS
5/10/2018

### Page 25

1. destroyed and he offered to buy Mr. Antol -- give Mr.
2. Antol the money to reimburse him for the DVR system.
3. Q  Did he indicate to you that he was having this
4.     conversation with Mr. Antol or he was having the
5.     conversation with me?
6. A  That I don't know. I assumed it was with Mr. Antol
7.     because he offered to purchase -- I was present when we
8.     looked it up on the computer by the serial number how much
9.     we could buy it for, and I don't recall the exact amount
10.    of money. I'm going to throw out there around 300 some
11.    dollars. And Mr. Antol came back he wanted a $2,000 one.
12.    And there was a little bit of negotiation back and forth
13.    on that.
14. Q  Did you ever have a conversation with Lieutenant Fias
15.    about returning some of the items pursuant to these orders
16.    but holding other items because they were considered to be
17.    evidence in case there was an appeal?
18. A  I don't recall. I know there was lots of conversations,
19.    but I can't recall them at this time.
20. Q  Is one of the reasons that you take instructions from the
21.    prosecutor's office is to deal with the possibility of an
22.    appeal period?
23. A  Yes.
24. Q  Did Lieutenant Fias ever mention to you any type of policy
25.    or anything of that nature within WEMET or the state

### Page 26

1. police that required the destruction of anything that had
2. images of undercover officers on it?
3. A  Can you rephrase that? As a policy?
4. Q  Yes.
5. A  No.
6. Q  Have you ever heard of such a thing?
7. A  No. I'm not -- I'm not privy to all of the state police
8.    official orders.
9. Q  But in -- in your time at WEMET, did you ever hear that
10.    discussed?
11. A  No.
12. Q  How certain are you that your conversations with Mr.
13.    Roberts were by telephone as opposed to e-mail?
14. A  Oh, certain.
15. Q  Okay. Did you ever have any e-mails with Mr. Roberts
16.    about this property that you know of?
17. A  Not that I recall. I mean it's possible, but not that I
18.    recall.
19. Q  What e-mail address at the time would you have been using?
20. A  Probably Straus, S-t-r-a-u-s, K1, the number 1,
21.    @Michigan.gov.
22.        (At 3:31 p.m., Exhibit No. 6 marked by court
23.        reporter)
24. BY MR. BOSTIC:
25. Q  I've handed you what has been marked as Deposition Exhibit

### Page 27

1.    6. Do you recognize this?
2. A  I've never seen it in this form, but it's the status of
3.    the evidence.
4. Q  And then if you look at the last page, Page 33 of 69, the
5.    way it's marked at the bottom, --
6. A  Um-hum.
7. Q  -- inside the box there -- well, just above the box
8.    there's an entry that says "authorize to destroy,
9.    authorized by Straus, Kathryn." Is that you?
10. A  Yes, it is.
11. Q  So what date did you authorize the destruction?
12. A  According to this, September 18th of 2015.
13. Q  Above that, it says "date of report, July 18, 2016."
14. A  Yes.
15. Q  What is that referring to?
16. A  I have no idea.
17. Q  Perhaps that's the date that this report was printed?
18.    Yeah, it's at the top of each page, so we'll just -- we'll
19.    just ignore that. Okay.
20. A  Okay.
21. Q  And do you agree that September 18th, 2015 is after the
22.    date of our court orders in Exhibit 5?
23. A  Yes.
24. Q  Were you present when the DVR was actually destroyed?
25. A  That I -- that I don't know. I could -- I could have

### Page 28

1. been, but I'm not sure.
2. Q  How --
3. A  I'd have to look --
4. Q  How are things like this physically destroyed?
5. A  The -- well, right here Chris McIntyre, who I don't know
6.    his role at the time, whether he was a captain,
7.    lieutenant, but he is not part of WEMET, so he shows up
8.    with our property room manager and Lieutenant Fias and
9.    they're in the evidence room checking off everything that
10.    needs to be destroyed. They either box it up or put it in
11.    bins and then the rest of us, if we show up to help for
12.    the day, load the items into vans, drive them to the
13.    incinerator, and then dump them in the incinerator. But
14.    we don't -- most things are in boxes, we don't look
15.    through them, or in bins.
16. Q  Just go by the bar code on the -- on the item?
17. A  Yeah. And I don't -- I'm not part of the scanning
18.    process. That's the property room manager and the
19.    lieutenant.
20. Q  But what you're saying is that -- there's a cell phone,
21.    but it's in a paper bag instead of a clear plastic bag and
22.    it's sealed?
23. A  Um-hum.
24. Q  They check the bar code, check the item number, they don't
25.    open it to make sure that's what it is; is that what

7 (Pages 25 to 28)

KATE STRAUS
5/10/2018

### Page 29

1  you're saying?
2  A  They might, but then --
3  Q  Oh, when you load it, you guys don't --
4  A  Correct.
5  Q  Okay.
6  A  We're like the last stop before it burns, so we just trust
7  that the supervisors have done it correctly and we dump it
8  in the incinerator.
9  Q  There were several packages of records, tax returns,
10  income records, receipts, things of that nature, taken
11  from Apple Avenue. Do you recall seeing those?
12  A  There was a lot of paperwork. I'm not sure exactly
13  whether there was mail also seized. I'm not sure exactly
14  what all was in there.
15  Q  You agree that none of those items were listed on the
16  forfeiture forms?
17  A  Yes.
18  Q  Do you agree that they were returned?
19  A  I don't know if they were returned to them or not.
20  Q  What about a digital scale; do you know whether that was
21  returned?
22  A  No. I don't have any direct knowledge that anything was
23  given back to them except the stuff that was on the
24  forfeiture forms.
25  Q  Other than the one conversation with Matt Roberts that

### Page 30

1  you've talked about, did you have any other conversations
2  with Mr. Roberts about this property, Antol's property?
3  A  Not that I can recall.
4  Q  Okay. Have you ever had any conversations with Mr.
5  Bringedahl about his activities at Green Creek?
6  A  Yes.
7  Q  What did he tell you?
8  A  Not word for word. However, I was at the search warrant
9  on Apple and he called me and advised that there was a
10  handyman at the residence -- well, we weren't sure if he
11  was a handyman. There was somebody coming in and out of
12  the residence freely coming and going, and he wasn't sure
13  what was going on, that he was going to go and secure the
14  residence, and I advised him yes. And then after that, I
15  was advised that there was a child present in the home.
16  One of the other phone calls -- there was a couple phone
17  calls back and forth checking our timing and status and
18  when we would be up to Green Creek.
19  Q  You were still at East Apple Avenue at the time?
20  A  Yes.
21  Q  Had the search warrants arrived yet?
22  A  No, because he secured the residence before the search
23  warrant was there.
24  Q  Did he tell you that he went inside prior to the search
25  warrant arriving?

### Page 31

1  A  Yes, to secure the residence.
2  Q  Did he tell you whether or not he pulled out his firearm?
3  A  His firearm?
4  Q  Yes.
5  A  No, he didn't mention if he pulled out his firearm.
6  Q  Did he indicate whether any of the other officers had
7  pulled out their firearms?
8  A  Not on the phone call the day of.
9  Q  And when was that discussed?
10  A  It was after the fact. And I believe it was a taser.
11  Q  Who said it was a taser?
12  A  It had to have been Detective Bringedahl.
13  Q  Well, he was in an undercover capacity, correct?
14  A  He was. He was an undercover detective, yes.
15  Q  And who else was with him when they entered?
16  A  Trooper Trucks.
17  Q  What about Mr. Kutches?
18  A  He -- I don't recall his involvement. He was up there
19  helping with surveillance, but I don't remember what he
20  did as far as helping secure the residence or not.
21  Q  Well, isn't he the one that saw the handyman going back
22  and forth between the garage and the barn?
23  A  I'm not sure who saw. My direct contact was with
24  Bringedahl because he was the senior detective on -- on
25  the scene.

### Page 32

1  Q  Would he have had a taser?
2  A  Bringedahl, no.
3  Q  So most likely the only one with a taser would have been a
4  uniformed officer, correct?
5  A  Yes. I don't -- Kutches might have had a taser, too.
6  Q  Was he assigned to WEMET at the time or was he in uniform?
7  A  I don't recall. This was '14. If he -- I think he would
8  have been new on our team.
9  Q  Okay. But you agree it would be very unusual for an
10  undercover WEMET officer to have a taser with them?
11  A  Yes. The only ones on our team that had tasers were the
12  trooper and our county officers. Nobody else had tasers.
13  Q  But they -- they carried those even in an undercover
14  capacity?
15  A  Well, we knew we were doing a search warrant, --
16  Q  Oh, I see. Okay.
17  A  -- so they should have had police markings on with their
18  raid vest and belts. So it would have been very prevalent
19  that they were police.
20  Q  And -- and then the taser could have been attached to the
21  belt or the vest?
22  A  Yes. It would have been on their hip.
23  Q  Okay.
24      MR. BOSTIC: I don't have any other questions.
25      MR. SADOWSKI: I don't have any questions.

8 (Pages 29 to 32)

KATE STRAUS
5/10/2018

Page 33

1  MR. BENSON: No, I have no questions.
2  (At 3:43 p.m., deposition concluded)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 34

CERTIFICATION

I certify that this transcript, consisting of pages, is a complete, true, and correct record of the testimony of Kate Straus taken in this case on May 10, 2018.

I also certify that prior to taking this deposition, Kate Straus was duly sworn to tell the truth.

I also certify that I am not a relative of, employee of, or an attorney for a party; nor am I financially interested in the action.

Dated: May 14, 2018

Denise L. Jamba, CER 0786
Notary Public, State of Michigan
Kent County
My commission expires: October 13, 2019

34