UNITED STATES OF AMERICA

IN THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

Derek Antol, individually and as next friend of     File No: 1:17-cv-613
DSAII, a minor, and Devon S. Antol, and Tryston Antol,
    Plaintiffs,

v.

Adam Dent, Kate Straus,                             Hon. Janet T. Neff
Casey Bringedahl, Casey Trucks,             U.S. District Court Judge
Pete Kutches, and Western Michigan
Enforcement Team, a public
body organized under the laws of the
State of Michigan,
    Defendants,
_____/

**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS DENT, STRAUS, BRINGEDAHL, AND KUTCHES**

Attachment 9 – deposition of Lieutenant Andy Fias

ANDREW FIAS
7/31/2018

## Page 1

UNITED STATES OF AMERICA
IN THE WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

Derek Antol, individually and as next
friend of DSA, a minor, DSAII, a minor,
and Tryston Antol,
             CASE NO: 1:17-cv-613
    Plaintiffs,

v

Adam Dent, Kate Strauss,
Casey Bringedahl, Casey Trucks,
Pete Kutches, and Western Michigan
Enforcement Team, a public body
organized under the laws of the
State of Michigan,
    Defendants.
_____/

The Deposition of Andrew Fias,

taken before me, Cassandra M. Rodriguez, CER 8186, on July 31,

2018, at 99 West Apple Avenue, Muskegon, Michigan 49440,

commencing at or about 2:07 p.m.

APPEARANCES:

BY: J. NICHOLAS BOSTIC, ESQUIRE
909 North Washington Avenue
Lansing, Michigan 48906
517-706-0132
Appearing on behalf of the Plaintiffs.

BY: ADAM SADOWSKI, ESQUIRE
ASSISTANT ATTORNEY GENERAL
MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
525 West Ottawa Street, P.O. Box 30736
Lansing, Michigan 48909
517-373-6434
Appearing on behalf of the Defendant Casey Trucks.

## Page 2

BY: CURT A. BENSON, ESQUIRE
2851 Charlevoix Drive SE, Suite 327
Grand Rapids, Michigan 49546
616-975-7470
Appearing on behalf of the Defendants Adam Dent,
Kate Strauss, Casey Bringedahl & Peter Kutches.

## Page 3

```
 1                    INDEX
 2   WITNESS            EXAMINED BY         PAGE
 3   Andrew Fias        Mr. Bostic           5
 4
 5                    * * * *
 6
 7              INDEX OF EXHIBITS
 8   EXHIBIT          DESCRIPTION           PAGE
 9   Exhibit Number 1   Orders               12
```

## Page 4

```
 1              July 31, 2018
 2              Muskegon, Michigan
 3              2:07 p.m.
 4
 5
 6              ** ** ** ** **
 7              ANDREW FIAS,
 8   was thereupon called as a witness herein and, after having
 9   been first duly sworn to tell the truth, the whole truth and
10   nothing but the truth, was examined and testified as follows:
11              ** ** ** ** **
12              MR. BOSTIC: Would you state your name for the
13   record, please?
14              THE WITNESS: Andrew Phillip Fias.
15              MR. BOSTIC: Today is the time and date set for
16   your deposition in Antol and others versus Dent and others,
17   Western District file number 1:17-CV-613. My name is Nick
18   Bostic and I represent the Plaintiffs. Counsel, appearances
19   for the record.
20              MR. SADOWSKI: Adam Sadowski on behalf of
21   Trooper Trucks and also Defendant the deponent.
22              MR. BENSON: Curt Benson, here on behalf of the
23   remaining Defendants.
24              MR. BOSTIC: Counsel, any objection as to
25   notice?
```

ANDREW FIAS
7/31/2018

## Page 5

1   MR. BENSON: No.
2   MR. SADOWSKI: No.
3   ** ** ** ** **
4   EXAMINATION
5   BY MR. BOSTIC:
6   Q   Mr. Fias?
7   A   Yes, sir.
8   Q   In the summer of 2013 where were you employed?
9   A   I've been employed with the Michigan State Police since 1994
10      and I was assigned to the West Michigan Enforcement Team then.
11  Q   At the time what were your duties in regard to the West
12      Michigan Enforcement Team?
13  A   You know what month in 2013? Are you talking about 1-11, so
14      June of 2013?
15  Q   Yes.
16  A   I would have been the team leader of the Muskegon Team, the
17      Muskegon County Team.
18  Q   And as team leader -- if we refer to that as WEMET are we on
19      the same page?
20  A   Yes, sir.
21  Q   As the team leader how many people did you oversee?
22  A   I think back in 2013 there was I believe seven, one of those
23      being a sergeant.
24  Q   Now, since then are you still in charge of WEMET?
25  A   I am. In December of 2013 I took over as the acting section

## Page 6

1   commander of the entire West Michigan Enforcement Team, all
2   three counties, Allegan, Muskegon, and Ottawa. So I think
3   when this thing kind of really took off I was probably the
4   section commander by that point and there was a new lieutenant
5   in place in Muskegon. And now I'm in charge of all the teams
6   within the sixth district, so I have WEMET, CEMET, MET, and
7   SSCENT. There are four teams that I oversee, 12 counties.
8   Q   Okay. But --
9   A   That just happened in February, so prior to that -- from
10      December of '13 to February of this year I was the section
11      commander of the West Michigan Enforcement Team, WEMET.
12  Q   And WEMET was comprised of three county teams?
13  A   Yes, sir. Two teams in Ottawa County, one in Muskegon, one in
14      Allegan.
15  Q   So four teams?
16  A   Yes, sir.
17  Q   So in July of 2014 how many people did you have under your
18      command?
19  A   It holds in between 24 to 26. I think we're at 26 now. We
20      might have been down to 24 then, but it's an average in that
21      area of certified officers. I have a couple civilian staff,
22      as well.
23  Q   So in June of 2014 how involved were you in the day-to-day
24      operations of the Muskegon County Team?
25  A   Not very involved at all, just obviously overseeing that team,

## Page 7

1   but I had a lieutenant and a sergeant that actually did the
2   day-to-day street operations with that crew.
3   Q   And who was the lieutenant of the Muskegon County Team in the
4   summer of 2014?
5   A   That was Detective Lieutenant Michele, with one "L," Dunlap,
6   D-u-n-l-a-p.
7   Q   And who was the sergeant?
8   A   Sergeant Kate Strauss. Kate Strauss was promoted right around
9       the time of December of '13 when I took over the section
10      commander role.
11  Q   And is Lieutenant Dunlap MSP or --
12  A   She is state police. She's now assigned to the Wayland Post
13      as the assistant post commander.
14  Q   And Kate Strauss was City of Muskegon?
15  A   She was a City of Muskegon sergeant, yes, sir.
16  Q   Now, I don't want you to disclose any specific locations, but
17      just geographically where did you operate out of?
18  A   I operated out of the Ottawa office.
19  Q   In 2014?
20  A   Yes, sir.
21  Q   Okay. And where did the -- again, I'm not asking for an
22      address, but where did the Muskegon Team operate out of?
23  A   They have an office up in Muskegon County. At that time it
24      was kind of on the west side of town. They've since moved.
25  Q   Okay. When they would seize property, they being the Muskegon

## Page 8

1   Team, where would it go?
2   A   It initially goes to their office, so the Muskegon Team would
3       take it to the Muskegon office, process it. And then
4       eventually all property ends up at the main office in Ottawa
5       County. There's a very large property room in that office.
6       Temporary property rooms in the other two offices, Allegan and
7       Muskegon.
8   Q   So how long would they typically keep property at the Muskegon
9       office?
10  A   You know, depending on what it is we don't like to keep it
11      there for too long. It could take up to a week to get that
12      report started, get property entered, tagged. Two weeks maybe
13      at the most, but I think the sergeant lieutenant makes a
14      weekly trip down to Fillmore with some property.
15  Q   So is it fair to say that the goal was to get it down to the
16      Ottawa office essentially as soon as all the processing was
17      done?
18  A   Yes, sir.
19  Q   And then it stayed there in Ottawa unless it was needed lab,
20      court, whatever?
21  A   Correct.
22  Q   So it would not be stored back at the Muskegon office?
23  A   It could have temporary storage for court, that sort of thing,
24      but being stored up there would be -- well, I take that back.
25      Larger items, some larger items, were kept -- we had a large

2 (Pages 5 to 8)

Tri-County Court Reporters
248-608-9250

ANDREW FIAS
7/31/2018

### Page 9

1  garage space in the old Muskegon office, so there would be
2  some property housed in that larger garage space. But it was
3  normally stuff that we didn't have room for at the main
4  property room.
5  Q  So once it's processed and it's turned over to the Ottawa
6     County office who has access to it?
7  A  At the Ottawa County office there are a very small number of
8     people that have access to the property room. Primarily, it's
9     Bill Evans, he's a civilian retired police officer that's the
10    property manager and forfeiture manager, myself, the Muskegon
11    lieutenant, whoever that is, might be Officer Dunlap, and then
12    sometime in that -- since I arrived in Ottawa as the section
13    commander we promoted another lieutenant for the Ottawa office
14    that ran Ottawa and Allegan and that person would have had
15    access to the property room. And then there was an MSP
16    sergeant at Ottawa that had access to that room. So one, two,
17    three, four, five. Five people out of the 26 had access to
18    the property room. And by access, I should kind of qualify
19    that, that's somebody with card key access codes to get
20    through the door. Now, if a detective came to me and said, "I
21    need property piece A," I mean, that detective walks into the
22    property room. They're not prohibited from walking in --
23 Q  Right.
24 A  -- and I can get that piece of property and hand it to them,
25    that sort of thing.

### Page 10

1  Q  But the door control is limited to those --
2  A  Five people.
3  Q  Right. When the search warrants were executed on Mr. Antol's
4     properties at West Apple, Farr Road, and Green Creek did you
5     have any personal knowledge that that was happening at the
6     time?
7  A  It's common practice for my supervisors to advise me of, hey,
8     we're going to be doing a search warrant today and here's
9     where we're doing it. I think if I remember correctly that
10    whole situation kind of snowballed with the Tobacco Tax Team
11    doing an inspection at the Apple address, which quickly
12    morphed into we're going to be doing some search warrants.
13 Q  Were you in the loop at all on some communications to Mr. Dent
14    that he needed to freshen up the work that he did in 2013?
15 A  I don't recall that, no, sir.
16 Q  Right. Because by -- as of December 2013 you had all the
17    teams?
18 A  Yes, sir.
19 Q  And, again, in the summer of 2014 I take it having one of your
20    lieutenants tell you, hey, we're going to be executing a
21    search warrant today probably got to be fairly common?
22 A  Yeah. A few times a week. I mean, almost daily with all the
23    teams, but up here it's a couple times a week.
24 Q  Right. Okay. So that was not really something that would
25    garner any attention?

### Page 11

1  A  No. That policy's in place on my part in case we have a
2     critical incident, so I can respond to the scene and not have
3     to bug them with where are you, what's going on. I can get
4     there without -- with minimal intervention as to, you know,
5     what they're doing at the time of that critical incident.
6     Fortunately, knock on wood, we've never had that happen.
7  Q  As the criminal charges that resulted from that search warrant
8     went through the Muskegon circuit courts did you have any
9     involvement in decision making?
10 A  I remember some communication on the forfeiture, we were
11    trying to settle, but not on the criminal side. I didn't have
12    any say in what the disposition of those cases were.
13 Q  Who did you communicate with?
14 A  On the forfeiture side I think it was Matt Roberts from the
15    prosecutor's office.
16 Q  When these search warrants were executed in the summer of 2014
17    had you had any communications with the Tobacco Tax Team?
18 A  No, sir.
19 Q  We've had testimony that there was no prearrangement between
20    the Muskegon detectives on WEMET, no coordination with the
21    Tobacco Tax Team. I have expressed my disbelief in that
22    concept. Do you have any knowledge one way or the other as to
23    whether there was anything set up in advance?
24 A  Yeah. I know what -- just from what my lieutenant and my
25    sergeant told me that that tobacco inspection was completely

### Page 12

1     on them. They had no coordination. It actually was
2     frustrating for the both of them and myself because as you're
3     well aware we had some things going on. We had undercover
4     stuff going on with the Apple address and that -- I don't know
5     if my lieutenant and my sergeant were ready for what happened
6     that day. We were still kind of in the midst of an
7     investigation.
8  Q  Were you aware that in late 2013 Mr. Dent went back in to try
9     to make another purchase and was turned away?
10 A  I would have to review reports. I'm not -- no, I don't have
11    common knowledge of that. I know there was some -- like a
12    couple different detectives that were in there in a UC,
13    undercover, capacity.
14 Q  And since this happened has any information come to your
15    attention to dispel the idea that this was not a coordinated
16    inspection?
17 A  Not at all. I mean, I truly believe both the lieutenant and
18    the sergeant -- that there was no coordination. I mean, that
19    was not -- I think there's a couple other examples of that in
20    some of the work we were doing with that team kind of doing
21    their thing and not talking to us here in Muskegon County.
22 Q  Well, the lieutenant and the sergeant have expressed their
23    knowledge to you. What about Mr. Dent?
24 A  No. I don't recall any conversations with Dent about that.
25         (Exhibit Number 1 was marked for identification

nically signed by Cassandra Rodr.    : (101-163-830-7594)                    f36e92d8-1b5c-40d8-9747-8294b533907a

ANDREW FIAS
7/31/2018

Page 13

1  at 2:22 p.m.)
2  Q  (Continuing by Mr. Bostic): Sir, I'm handing you what's been
3     marked as Deposition Exhibit Number 1.
4  A  Okay.
5  Q  These are three out of the four forfeiture case orders. Have
6     you ever seen these documents before?
7  A  I've probably seen them, but I don't know if I've actually
8     gone through them line by line. Bill Evans would have
9     received this from either the sergeant or the lieutenant and
10    then he would have authored a supplemental report breaking
11    this down. And that's probably what I paid more attention to;
12    Bill's supplemental report that he authored that would have
13    stated what we were keeping and what we were giving back.
14 Q  Do you know which supplemental report that is?
15 A  If you don't mind me looking here I'll --
16 Q  Yeah. Please do.
17 A  It's near the end of the -- of 1-11-13. Supplemental number
18    14 authored by William J. Evans, property manager. You can
19    see that on page 1 he talks about the items to be released to
20    Samantha Conklin, the items to be released to Derek Antol.
21    Then he talks about the actual release of those items, then
22    the money retained by WEMET, some external documents, and then
23    it has person information on page 2. It's actually a three-
24    page report. Page 3 is kind of just some charging stuff.
25 Q  Well, my supps stop at six, so that tells me a lot right

Page 14

1     there. How many total supps do you have?
2  A  It looks like 1-11 is closed on supp 16.
3  Q  So by June of 2015, which is the date on these agreements, you
4     now have four teams under your belt. It's fair to say you're
5     not involved in the hands on portion of getting --
6  A  Right. I'm -- yeah, I'm pretty hands off, letting lieutenants
7     and sergeants do their thing and Mr. Evans does a phenomenal
8     job with the property room.
9  Q  Do you recall there being any conversations with anyone about
10    holding some of the items in these orders, pending the appeal
11    process?
12 A  I only recall that just from my review of the report today
13    that there were some items that were retained in property
14    because of the appeal process. That's pretty commonplace with
15    the Muskegon County prosecutor. They actually like things
16    held for a year.
17 Q  Did the prosecutor's office ever give you any kind of an order
18    or agreement from Mr. Antol to not fully comply with the
19    court's orders?
20 A  I'm not aware of that, no, sir.
21 Q  And then after the appeal period what happens?
22 A  Once the appeal period or the prosecutor says we're all set
23    with this, you can make disposition of the property, then the
24    property is returned, destroyed, retained. There are several
25    things that could happen to it.

Page 15

1  Q  Then sometime later in 2015 you and I had a couple of phone
2     conversations about one particular piece of property, correct?
3  A  Yes, sir.
4  Q  And what was that?
5  A  It was the DVR camera system for the shop.
6  Q  And what was the nature of the conversation?
7  A  That piece of property was destroyed by WEMET and you and I
8     discussed -- I called you to tell you that we shouldn't have
9     destroyed that and I think we had some conversations about
10    replacing it.
11 Q  Do you recall that the disclosure about it being destroyed was
12    actually in the spring of 2016?
13 A  I don't recall the date. I'm sorry.
14 Q  And then did you investigate how and why it got destroyed?
15 A  I did, yes, sir.
16 Q  What did you learn?
17 A  Between Sergeant Strauss and Lieutenant Dunlap -- more
18    Sergeant Strauss because she was handling a lot of complaint
19    review at that time. She kind of erred in the fact that she
20    thought it was a forfeited piece of property and she
21    authorized it for destruction. A lot of those things, you
22    know, if we forfeit them we're allowed to make a couple
23    different dispositions on it. We could retain it, we could
24    sell it, we could destroy it. Between her and the property
25    manager, the discussions that they had and I was not a part of

Page 16

1     that, but it was marked for destruction. There were several
2     items of property in this complaint. I don't know the number
3     off the top of my head, but I do remember reviewing a supp
4     that showed a long list of items authorized for destruction
5     and destroyed. And at the end of the day it's an item of
6     value -- and State Police policy if it's not forfeited and it
7     has value we either have to return it or we have to send it to
8     Lansing to the state auction.
9  Q  So how and why were any individual decisions made on property
10    when these orders say that all property except the $12,000
11    that was forfeited gets returned?
12 A  I guess I don't understand your question.
13 Q  Well, if you have a sergeant that improperly -- like you said,
14    she made a mistake. Then, I mean, that's -- what did you do
15    about her mistake?
16 A  You know, I don't have a lot of recourse with my non-state
17    people. She was verbally counseled and, I mean, at the end of
18    the day it's an understandable mistake. We deal with on
19    average 7,000 pieces of property in that property room and
20    this is probably the second time in my tenure at WEMET since
21    '07 that this has happened.
22 Q  Well, most of those items of property, are they subject to
23    court orders?
24 A  No. Not always.
25 Q  Okay. So would you agree that it's relatively rare that you

4 (Pages 13 to 16)

ANDREW FIAS
7/31/2018

### Page 17

1  have a formal court order that mandates that property get
2  returned?
3  A  Well, on forfeiture cases we get court orders from time to
4  time, but the -- a mass amount of property like that, it's not
5  that common that we get a -- you know, anything not including
6  THC I think it was how it was read to be returned.
7  Q  Do you recall during one of our telephone conversations being
8  asked why you thought the DVR was destroyed?
9  A  Yeah. There were several conversations that -- and I remember
10 the conversation you and I had and I mentioned that there was
11 footage of undercover officers on the DVR system. But still
12 at the end of the day after that conversation between you and
13 I our department policy doesn't really allow for -- at the end
14 of the day it's still a piece of property with value and
15 there's really not a loophole without the prosecutor saying to
16 destroy that piece of property, that we could destroy it.
17 Q  So were you -- did you have some sort of policy in mind when
18 you said that to me?
19 A  No. I was aware that there were -- when I said that to you
20 I -- there is footage of undercover officers on that DVR
21 system. I mean, we had -- I would have to look back at
22 reports, but I had several undercover officers go in there and
23 buy marijuana with or without cards or paperwork, without
24 paperwork. I mean, that sort of thing.
25 Q  Let's clarify a couple things here.

### Page 18

1  A  Sure.
2  Q  The footage of Mr. Dent's purchases in 2013 was on the
3  recording made by Mr. Dent, correct?
4  A  Recording by Mr. -- those are -- that's actually -- are you
5  speaking of the equipment that we used?
6  Q  Yes.
7  A  No. I mean, there was -- I believe there was a DVR system in
8  place from the onset of this investigation.
9  Q  Right. But are you aware that the DVR storage didn't go back
10 that far?
11 A  I'm not aware of that, no.
12 Q  Okay. Now, there may have been an attempt to purchase in
13 April or May and I don't know if that was still on there or
14 not, but on the -- in 2014 a lot of your officers walked into
15 the building and so they were on -- they were on some of the
16 footage because they went in and I don't know exactly at what
17 point the DVR was shut off.
18 A  Right. And those would be officers that act in an undercover
19 capacity with Muskegon County, so there was an officer safety
20 component that you and I discussed. But that wasn't discussed
21 with the prosecutor to get authorization to destroy the
22 property, which is what we would need in that instance. I
23 would need Prosecutor Hilson or Tague, I forget which one was
24 prosecutor at the time, to actually say or author some
25 authorization saying, yeah, you can destroy that piece of

### Page 19

1  property. Without that, by department policy it's a piece of
2  property with value and it's not a narcotic or contraband and
3  I would have to return it to the owner or send it to Lansing
4  for auction.
5  Q  But when you said that to me were you just sort of thinking
6  out loud or was that actually the reason that Detective
7  Strauss destroyed it?
8  A  No. I think I offered that to you as one of the possible
9  reasons it got destroyed because I looked -- you know, like I
10 said, when I looked further I understood from them that
11 wasn't -- that might have been their mindset, but they did not
12 get the proper authorization. You've got to utilize that
13 mindset, I guess.
14 Q  Okay. And when I told you on the phone that during the
15 criminal case we had actually -- the defense attorneys had
16 been given copies of that footage were you aware of that?
17 A  I don't remember that, no, sir.
18 Q  Were you surprised to hear that?
19 A  I don't remember, like I said, so I don't remember if I was
20 surprised.
21 Q  Did you ever have any discussions with Detective Dent about
22 his behavior in July of 2014?
23 A  You know, probably not until after this thing started to come
24 to light. And I don't know that I addressed it one on one,
25 but we certainly had a conversation when this all came to

### Page 20

1  light about, you know, the Antols felt like they were
2  mistreated. And I think I just kind of did a blanket meeting
3  with the team to tell them to be nice to people. It goes a
4  long way when we're dealing -- doing what we do, if we're able
5  to be nice. I mean, sometimes just human nature doesn't allow
6  us to be nice depending on who we're dealing with, but when
7  we're allowed to be nice it goes a long way getting that case
8  down the road for us. So there were conversations, but I
9  don't know if I ever had a direct conversation with him. I've
10 had conversations with him about his demeanor on other things.
11 Q  Mr. Antol made a complaint about him from his behavior in a
12 traffic stop in 2011. Do you recall that?
13 A  I'm not aware of that, no. He wouldn't have worked with me if
14 he was a traffic stop -- if he was in a uniform capacity.
15 Q  He was on WEMET, but he had -- he had officer at the time
16 Bringedahl make the traffic stop, but Detective Dent was on
17 WEMET.
18 A  And he made a complaint against Dent?
19 Q  Antol submitted a complaint about Dent's behavior.
20 A  I don't --
21 Q  Primarily, demeanor.
22 A  I don't recall that, but those complaints if they're in
23 written form will go to the department that they belong to and
24 at that time it would have been -- Sergeant Waltz (ph) would
25 have been his sergeant and I kind of let them sergeant from

5 (Pages 17 to 20)

ANDREW FIAS
7/31/2018

Page 21

1   Muskegon handle their people for the most part.
2   Q  Right. I mean, they're assigned to the team, but you don't
3      have any disciplinary authority over the locals; is that
4      correct?
5   A  I don't. As a state police lieutenant state police run team,
6      I mean, I'm still very aware that they are representatives of
7      the state police. But at the end of the day if they violate a
8      state police policy or even their own department policy the
9      only recourse I would have is to kick them back to the uniform
10     division off of WEMET, which I've done in the past with other
11     people. But for the most part that sergeant from City of
12     Muskegon handles all disciplinary stuff that happens.
13  Q  And was -- the sergeant that -- Steve Waltz?
14  A  Yes, sir.
15  Q  Was he on WEMET at the time?
16  A  He was the sergeant in 2011. He was the sergeant prior to
17     Sergeant Strauss.
18  Q  Okay. So did you see -- well, let me back up. Are you aware
19     that Detective Dent seized some cell phones from Mr. Antol and
20     his son in July of 2014?
21  A  Just from what I read in the reports today. It refreshed my
22     memory that he did take a cell phone that had left the house
23     or something with a child or teenaged son and then they had to
24     get it returned or something like that is the way I read the
25     report.

Page 22

1   Q  Well, that was another complaint that was made against
2      Detective Dent, but that's not here or there for today's
3      purposes. One of those phones had footage of -- they were all
4      outside. They called me on the phone and I said, "Everybody's
5      got to leave. The officers have to leave the store." The
6      officer said, "Fine. Then everybody leaves the store." So I
7      told my client -- I said, "That's true. You're ordering them
8      to leave. The search warrant is on the way. Everybody goes
9      outside," and that's what happened. So Mr. Antol used the
10     phone and panned across all of the officers. So, essentially,
11     every single officer that was there ended up on that phone and
12     some of those officers were making comments. Did you ever see
13     that footage?
14  A  I never saw that footage.
15  Q  Were you aware that it was Mr. Antol's position that the DVR
16     footage included misconduct on the part of the tax team
17     members?
18  A  I was not.
19  Q  Nobody has ever told you about them cornering Samantha Conklin
20     in the building to get her to let them in the back of the
21     building?
22  A  No, sir.
23  Q  Nobody told you that one of the tax team members waved his
24     handcuffs in front of her to get consent?
25  A  No, sir.

Page 23

1   Q  You didn't know that was on there?
2   A  No, sir.
3   Q  From July 2014 until present what is your official email
4      address?
5   A  It's my last name and first initial. Fiasa, f-i-a-s-a, at
6      Michigan.gov.
7   Q  And has that been consistent since July of '14?
8   A  That's been consistent since the start of email with the state
9      police.
10  Q  And that predates July of 2014?
11  A  Yes, sir.
12  Q  All right. Do you have any specific recollection of your
13     exchanges with Mr. Roberts concerning this property?
14  A  No, sir. I don't think I had conversations with him regarding
15     the property. I think there was one or two emails that may
16     have talked about our position on the forfeiture. That's
17     about it.
18  Q  I think you were cc'd on a few of these emails, but I'm not
19     going to -- I just wanted to confirm your email address and
20     I'll leave it at that. I don't think -- I don't think you
21     even responded. In 2017 I filed a complaint with the
22     professional standards section of the MSP concerning the DVR
23     and some other conduct.
24  A  Yes, sir.
25  Q  So would professional standards even begin to address

Page 24

1      Detective Strauss' conduct?
2   A  No, sir.
3   Q  So they wouldn't even make an investigation and say she
4      violated our policy, but we're done?
5   A  No, sir.
6   Q  It's just pass it on?
7   A  Correct. That's the way I understand it from Lieutenant
8      Powell's handling. I remember a conversation with her during
9      that professional standards investigation and several of her
10     questions were, "Who does Strauss work for? Who does Dent
11     work for?" So that's where those things went.
12         MR. BOSTIC: I don't have any other questions.
13         MR. BENSON: I have no questions.
14         MR. SADOWSKI: Either do I.
15         (The deposition concluded at 2:42 p.m.)

6 (Pages 21 to 24)

Tri-County Court Reporters
248-608-9250

ronically signed by Cassandra Rodrig    101-163-830-7594)                                f36e92d8-1b5c-40d8-9747-8294b533907a

ANDREW FIAS
7/31/2018

Page 25

1  STATE OF MICHIGAN    )
2                      ) ss:
3  COUNTY OF KENT       )
4
5
6      I hereby certify that the foregoing attached pages
7  are a full and complete transcript of the proceedings held
8  on the date and at the place hereinbefore set forth. I
9  reported electronically the proceedings held in the matter
10 hereinbefore set forth, and the testimony so reported was
11 subsequently transcribed under my direction and supervision,
12 and the foregoing is a full, true and accurate transcript of
13 my original electronic recording.
14
15     _____
16     Cassandra M. Rodriguez, CER-8186
17
18
19
20
21
22 Notary Public
23 Kent County, Michigan
24 My Commission Expires:
25 May 6, 2023

7 (Page 25)

Electronically signed by Cassandra Rodri  (101-163-830-7594)    f36e92d8-1b5c-40d8-9747-8294b533907a